UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| PATSY K. COPE, individually, and ALEX ISBELL, as dependent administrator of, and on behalf of, the ESTATE OF DERREK QUINTON GENE MONROE and his heirs-at-law, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| COLEMAN COUNTY, TEXAS; LESLIE W. COGDILL; MARY JO BRIXEY; and JESSIE W. LAWS, | § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **This case arises from a tragic and unnecessary pre-trial prisoner suicide resulting from flagrant violation of constitutional rights. The Defendant jailer did absolutely nothing to intervene while Derrek Monroe hung himself in a jail cell and died. The jailer apparently did so because of Coleman County's policy – a jailer cannot assist a prisoner committing suicide until help arrives. The jailer's and County's deliberate indifference and objective unreasonableness resulted in Derrek Monroe's death.**



Table of Contents

I.    Introductory Allegations .................................................................................. 4

      A.    Parties.................................................................................................. 4

      B.    Jurisdiction.......................................................................................... 6

      C.    Venue ................................................................................................... 7

II.   Factual Allegations ......................................................................................... 7

      A.    Introduction ........................................................................................ 7

      B.    Derrek Monroe.................................................................................... 7

      C.    Derrek's Arrest and Initial Incarceration ........................................... 8

      D.    Jail Intake and Magistrate Notification.............................................. 8

      E.    Derrek's First Coleman County Jail Suicide Attempt ...................... 14

      F.    Derrek's Second (and Unfortunately Successful) Coleman County Jail Suicide
            Attempt ............................................................................................. 16

      G.    Typed Statements of Administrator Brixey and Jailer Laws ............... 22

      H.    Autopsy Report ................................................................................ 24

      I.    Coleman County Post-Death Reporting............................................ 25

      J.    Factual Allegations: Suicides in Jails .............................................. 26

      K.    TCOLE Records............................................................................... 29

      L.    *Monell* Liability ................................................................................ 32

            1.    The County's Policy, Practice, and Custom Regarding Lengthy Phone Cords
                  in Jail Cells Was a Moving Force Behind and Caused Derrek's Death ......... 32

            2.    The County's Policy Regarding Not Assisting Inmates Committing Suicide
                  was a Moving Force Behind and Caused Derrek's Death ............................. 36

            3.    The County's Policy, Practice, and/or Custom Regarding the Minimum
                  Number of Jailers Present was a Moving Force Behind and Caused Derrek's
                  Death .................................................................................................... 39

            4.    The County's Policies, Practices, and Customs Regarding Training its
                  Employees was a Moving Force Behind and Caused Derrek's Death .......... 39

            5.    The County Ratified the Natural Person Defendants' Actions...................... 40

III.  Causes of Action ........................................................................................... 40

      A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective
            Reasonableness Pursuant to Kingsley v. Hendrickson ......................... 40

      B.    Cause of Action Against Leslie W. Cogdill, Mary Jo Brixey, and Jessie W. Laws
            Under 42 U.S.C. § 1983 for Violation of Derrek Monroe's 14th Amendment Due
            Process Rights to Reasonable Medical Care, to be Protected, and Not to Be
            Punished as a Pretrial Detainee (Episodic Act or Omission)\................................ 43

C.    Cause of Action Against Coleman County Under 42 U.S.C. § 1983 for Violation of Derrek Monroe's 14th Amendment Due Process Rights as a Pretrial Detainee to Reasonable Medical Care, to be Protected from Himself, and Not to be Punished ................................................................................................ 47

D.    Causes of Action Against Coleman County for Violation of Americans with Disabilities Act and Rehabilitation Act ................................................ 50

IV.  Concluding Allegations ............................................................................... 51

    A.    Conditions Precedent ........................................................................ 51

    B.    Use of Documents at Trial or Pretrial Proceeding ............................. 52

    C.    Jury Demand .................................................................................... 52

    D.    Prayer .............................................................................................. 52

TO THE HONORABLE UNITED STATES DISTRICT COURT:

The Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Patsy K. Cope ("Ms. Cope") is a natural person who resides and did reside and was domiciled in Texas at all relevant times. Ms. Cope was Derrek Quinton Gene Monroe's legal and biological mother. Derrek Quinton Gene Monroe is referred to herein at times as "Mr. Monroe," "Derrek Monroe," and/or "Derrek."

2.      Plaintiff Alex Isbell ("Mr. Isbell"), as the Dependent Administrator of the Estate of Derrek Quinton Gene Monroe, acts in that capacity and files this lawsuit asserting claims in that capacity and on behalf of the estate (including all of the heirs-at-law including but not limited to Ms. Cope and Mr. Monroe's minor children, B.M.B and D.M.M.). Letters of dependent administration were issued to Mr. Isbell on or about April 9, 2018, in Cause Number PR06293, in the County Court of Coleman County, Texas, in a case styled *In the Estate of Derrek Quinton Gene Monroe, Deceased.*

3.      Defendant Coleman County, Texas ("Coleman County") is a Texas county. Coleman County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Billy Bledsoe, at 100 W. Live Oak Street, Suite 102, Coleman, Texas 76834, or wherever Honorable Judge Bledsoe may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). Coleman County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers and is liable for

such actions and/or failure to act the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act). Coleman County's policies, practices, and/or customs were the moving force behind constitutional violations, and resulting damages and death, referenced and asserted in this pleading.

4.      Defendant Leslie W. Cogdill ("Mr. Cogdill," "Sheriff Cogdill," or "Les Cogdill") is a natural person who resides, is domiciled, and may be served with process at 2308 Clow Street, Apartment B12, Coleman, Texas 76834. Sheriff Cogdill may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Sheriff Cogdill at Sheriff Cogdill's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Sheriff Cogdill is being sued in his individual capacity, and he acted at all relevant times under color of state law. Sheriff Cogdill was employed by Coleman County at all such times and acted or failed to act in the course and scope of his duties. Sheriff Cogdill was the sheriff of Coleman County at the time Derrek committed suicide, and he was a chief policymaker for the County regarding policies relevant to claims in this case.

5.      Defendant Mary Jo Brixey ("Ms. Brixey," "Administrator Brixey," or "Jail Administrator Brixey") is a natural person who resides, is domiciled, and may be served with process at 3101 North Highway 84, Coleman, Texas 76834. Ms. Brixey may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Brixey at Ms. Brixey's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Brixey is being sued in her individual capacity, and she acted at all relevant times under color of state law. Ms. Brixey was employed by Coleman County at all such times and acted or failed to act in the course

and scope of her duties, and she was, in the alternative, a chief policymaker for the County regarding policies relevant to claims in this case.

6.       Defendant Jessie W. Laws ("Mr. Laws" or "Jailer Laws") is a natural person who resides, is domiciled, and may be served with process at 115 Hollywood Street, Coleman, Texas 76834.  Mr. Laws may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Laws at Mr. Laws' dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Laws is being sued in his individual capacity and acted at all relevant times under color of state law.  Mr. Laws was employed by Coleman County at all such times and acted or failed to act in the course and scope of his duties.

### B.       Jurisdiction

7.       The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and federal statutes including but not necessarily limited to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.  The Plaintiffs do not, by including the following sentence, assert, stipulate, or allege any state law claims.  If any state law claims are alleged or construed to be alleged in this pleading, the court has supplemental jurisdiction over any such claims pursuant to 28 U.S.C. § 1367(a).  This is true because they are so related to the claims within the court's original jurisdiction that they and the claims within the court's original jurisdiction arise from a common nucleus of operative fact and form part of the same case or controversy under Article III of the United States Constitution.

8.     The court has personal jurisdiction over Coleman County because it is a Texas county. The court has personal jurisdiction over the natural person Defendants because they reside and are domiciled in, and are citizens of, Texas.

### C.     Venue

9.     Venue is proper in the San Angelo Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division and district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

## II.     Factual Allegations

### A.     Introduction

10.     The Plaintiffs provide in the factual allegations sections below the general substance of certain factual allegations. The Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, the Plaintiffs intend that those sections provide the Defendants sufficient fair notice of the general nature and substance of the Plaintiffs' allegations, and further demonstrate that the Plaintiffs' claim(s) have facial plausibility. Whenever the Plaintiffs plead factual allegations "upon information and belief," the Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

### B.     Derrek Monroe

11.     Derrek was born in 1989 in the City of Coleman, Coleman County, Texas, to Patsy Cope and the late Larry Don Monroe. Derrek was raised in Coleman and went to Coleman High School. Derrek was a mechanic by trade, and he was a member of North Coleman Baptist Church.

Derrek suffered an untimely and unnecessary death at 28 years of age. He was survived by his mother, two children, four brothers, and others.

### C. Derrek's Arrest and Initial Incarceration

12. Derrek was arrested on Friday, September 29, 2017 at approximately 11:10 a.m. in the City of Coleman, Coleman County, Texas. He was ultimately transported to the Coleman County Jail by Coleman County Sheriff's Deputy Ryan Tucker for booking and incarceration. Either Deputy Tucker or Officer Murphy completed an arrest record for Derrek. The record referenced Pat Cope, Derrek's mother, as his emergency contact.

### D. Jail Intake and Magistrate Notification

13. Coleman County employee Liz Lancaster completed an intake form when Derrek was initially incarcerated in the jail, and she signed it at 1:22 p.m. on September 29, 2017. The form is entitled "Screening Form for Suicide and Medical/Mental/Developmental Impairments." Information about Derrek obtained by Ms. Lancaster should have resulted in loud "alarm bells" going off in her head and that of other Coleman County employees. It was clear information that would lead even a layperson to the conclusion that there was a substantial likelihood, and a virtual certainty, that Derrek would attempt to kill himself if he were put into a situation into which he was able to do so. A portion of that form is shown below.

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| **IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | ✓ | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | ✓ | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | ✓ | | "wished I had a way to do it" |
| 1c. Have you ever attempted suicide? If so, when and how? | ✓ | | 2 wks ago, bunch of pills |
| 1d. Are you feeling hopeless or have nothing to look forward to? | ✓ | | "A little" |
| **IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGSITRATE. Notify Mental Health when warranted** | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | ✓ | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | ✓ | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | ✓ | | "Because I was already going to prison" |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | ✓ | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | | ✓ | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | ✓ | | "All of the above" |
| 8. Have you ever received services for emotional or mental health problems? | ✓ | | MHMR (Coleman |
| 9. Have you been in a hospital for emotional/mental health in the last year? | ✓ | | River Crest X 4yrs Ago |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | ✓ | | Some sort of Schizophrenia" |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | ✓ | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | ✓ | | Lost About 10lbs. |
| **IF YES to 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | ✓ | | "Crying" |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things which are not there)? | | ✓ | |
| 15. Is inmate incoherent, disoriented or showing signs of mental illness? | | ✓ | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | ✓ | |

Additional Comments (Note CCQ Match here): CCQ - No Match Found!

| Magistrate Notification Date and Time: 9/29/17 2:35 Electronic of Written (Circle) 2:7pm | Mental Health Notification Date and Time: 9/29/17 2:3pm | Medical Notification Date and Time: |
|---|---|---|

Supervisor Signature, Date and Time: ___ Lancaster    9/29/17 @ 1:22pm

14.     One of the questions was "Are you thinking of killing or injuring yourself today? If so, how?" The "Yes" box was checked, and Derrek was quoted as saying, "Wished I had a way to do it." This put Ms. Lancaster and the County on notice that, if Derrek were provided a way to kill himself while in the County's custody, he would likely do so.

15.     The next question asked, "Have you ever attempted suicide? If so, when and how?" Once again, the "Yes" box was checked. They handwritten comment indicated that Derrek told Ms. Lancaster that he had done so just two weeks prior by taking a "bunch of pills."

16.     Another question on the form read, "Are you feeling hopeless or have nothing to look forward to?"  Once again, the "Yes" box was checked.  The handwritten comment read, "A little."

17.     Another question asked, "Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things?"  The "Yes" box was checked, and the handwritten comment read, "Because I was already going to prison."  Taken in context, it appears that Derrek was indicating to Ms. Lancaster that he was depressed or had little interest in doing anything because he believed that he was going to prison.  This, combined with the other statements regarding suicide and the ability to commit suicide, indicated that Derrek could not be confined in a simple jail cell but instead should be taken to a mental hospital pursuant to State law.  State law allows police officers to do so in circumstances like those with which Ms. Lancaster and Coleman County were presented.

18.     Another question read, "Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest?"  Once again, the "Yes" box was checked.  The handwritten comment read, "All of the above."

19.     Another question read, "Have you ever received services for emotional or mental health problems?"  Once again, the "Yes" box was checked.  The handwritten comment read, "MHMR Coleman."  This signaled to Ms. Lancaster and the Defendants that Derrek had apparently received significant mental health treatment through the government.  Derrek was also asked, "Have you been in a hospital for emotional/mental health in the last year?"  The "Yes" box was checked and Derrek apparently indicated, pursuant to the handwritten comment, "River Crest 4 yrs ago."  The form also indicated that Derrek believed that he was diagnosed with "some sort of schizophrenia."

20.    Another question on the form read, "Have you lost/gained a lot of weight in the last few weeks without trying (at least 5 lbs.)?"  The handwritten note indicated that Derrek had lost approximately ten pounds.  This signaled that Derrek had a significant physical or emotional problem.  Finally, another question on the form read, "Does inmate show signs of depression (sadness, irritability, emotional flatness)?"  Once again, the "Yes" box was checked.  Ms. Lancaster wrote, "Crying."

21.    It is difficult to imagine a more extensive set of facts listed in a prisoner intake form that would put a jail and its employees on notice that a person should not be incarcerated but instead immediately taken to and admitted in an appropriate mental health facility.  Upon information and belief, all natural person Defendants reviewed the intake information form before Derrek committed suicide.

22.    Ms. Lancaster, presumably partially as a result of information recorded in the intake form above, completed an Inmate Mental Condition Report to Magistrate.

Coleman _____ County Jail

### Inmate Mental Condition Report to Magistrate

NAME Monroe, Derrek Gene OFFENSE Man/Del CS Pg 1 > 4g < 200g "1=1"   Tempes/Fab Phys. Evid w/Intent to Impair "3"

ARRESTING AGENCY: DPS

BOOKING OFFICER Liz Lancaster BOOKING TIME ____ AM DATE 9/29/17

The above inmates may have mental health issues based on:

☐ Observation of law enforcement officer at time of arrest

☐ CCQ return show possible match

☒ Self admission by inmate at booking

☐ Subject is violent and appears to be a danger to themselves or others

☐ Medical evaluation by Emergency Room or other Medical Professional

☐ Previous arrest/medical records of the jail

☐ Observation of Jail Staff

☐ No Indication/No Notification Made

Details: Inmate admitted to thinking about killing himself. Inmate admitted to attempting suicide X 2 wks ago via taking a bunch of pills. Inmate to feeling hopeless. Inmate admits to feeling down prior to arrest because he knows he is going to prison. Has received MHMR services per inmate but no CCQ match found

As required by law, this notification is made to the magistrate in reference to an observation or report of possible mental illness by the above listed means. It is required within 72 hours after receiving credible information of reasonable cause to believe that a defendant committed to the Sheriff's custody: 1) Has mental illness 2) is a person with mental retardation or 3) the observations of the defendant's behavior immediately before, during and after the defendants arrest and the results of any previous assessment of the defendant for mental illness. (Art. 16.22 (a)

MAGISTRATE SIGNATURE: _____

MAGISTRATE NOTIFIED AT 3:20, ON 9-29-1 BY C____

OFFICER SENDING NOTIFICATION: Liz Lancaster, Jailer (Fax-Email-Direct)

23.    Jailer Lancaster indicated that Derrek "may have mental health issues based on self-admission by Derrek at his booking. She also wrote to the judge:

Inmate admitted to thinking about killing himself. Inmate admitted to attempting suicide X 2 weeks ago via taking a bunch of pills. Inmate [sic] to feeling hopeless. Inmate admits to feeling down prior to arrest because he knows he is going to prison. Has received MHMR services per inmate but no CCQ match found.

The form indicates that the Magistrate was apparently notified at 3:20 p.m. on September 29, 2017.

24.     Upon information and belief, before the Magistrate was notified, at approximately 2:25 p.m., Jailer Lancaster contacted the MHMR crisis hotline and was told that MHMR would send someone to the jail.  Further, at approximately 2:30 p.m. on September 29, 2017, Jail Administrator Brixey instructed Jailer Lancaster to put Derrek on a thirty-minute suicide watch. However, such a suicide watch is completely ineffective.  Anything other than continuous monitoring, and the ability to immediately intervene in the event a prisoner attempts suicide, is ineffective.  Nevertheless, this instruction showed Ms. Brixey's control over the jail and how Derrek would be monitored while he was involuntarily incarcerated.

25.     Mr. Laws received a phone call at approximately 2:37 p.m. on September 29, 2017 in which he was told that someone would be at the jail within an hour to evaluate Derrek.  Upon information and belief, at 2:39 p.m. on September 29, 2017, someone, using the Coleman County Jail e-mail address of colemancountyjail@webb-access.net, e-mailed to Jonathan W. Harvey with Center for Life Resources, at e-mail address jonathan.harvey@cflr.us, a copy of Derrek's completed Screening Form for Suicide and Medical/Mental/Development Impairments. Thus, Mr. Laws was fully aware that Derrek had psychological problems sufficient to require one or more MHMR employees to appear at the scene.

26.     One or more MHMR personnel arrived at approximately 3:15 p.m. to seek Derrek, as recorded in a log by Jailer Lancaster.  However, at approximately 3:19 p.m., Derrek collapsed at the bottom of the stairs.  Someone called "911" for emergency personnel.  Moreover, Jailer Lancaster notified Sheriff Cogdill of the event at approximately 3:22 p.m.  Derrek was then taken to the Coleman County Medical Center at approximately 3:30 p.m. due to him having a seizure when he collapsed.

E.      Derrek's First Coleman County Jail Suicide Attempt

27.      Derrek attempted to commit suicide during his incarceration at the Coleman County Jail at least once before the following suicide attempt which resulted in his death.   Most information in this section of this pleading was obtained from Coleman County records and is asserted upon information and belief.

28.      On September 29, 2017, at approximately 3:45 p.m., Derrek was seen at the Coleman County Medical Center. He was ultimately admitted at approximate 5:00 p.m.  Derrek was discharged from the Coleman County Medical Center the following day, September 30, 2017, and he arrived at the jail, escorted by Deputy Tucker, at approximately 1:26 p.m.  Thereafter, which should have been a surprise to no one – **only about 17 minutes after returning to the Coleman County Jail – at approximately 1:43 p.m. – Derrek attempted to commit suicide by hanging.** However, he fell and was unsuccessful.  This happened while Mr. Laws was the jailer with charge over Derrek.  Therefore, Mr. Laws did not have to speculate from that point about whether and how Derrek might kill himself.  Mr. Laws knew that Derrek would kill himself by hanging/strangulation.

29.      Approximately thirty minutes later, Sheriff Cogdill spoke with Derrek.  Therefore, Sheriff Cogdill was clearly aware that Derrek had self-harm tendencies and attempted to kill himself.  It was likely at or near this time that Sheriff Cogdill, upon information and belief, asked Jailer Lancaster to e-mail to him the completed Screening Form for Suicidal and Medical/Mental/Developmental Impairments.  Upon information and belief, Sheriff Cogdill read that form or a copy of it at or near 2:13 p.m. on September 30, 2017 or, in the alternative, showed deliberate indifference and/or objective unreasonableness by choosing not to read that form until after Derrek had died.  If Sheriff Cogdill did not read it at that time, upon information and belief, he knew that it existed and that he could have read it.

30.     Ms. Lancaster e-mailed Sheriff Cogdill at 2:42 p.m. on September 29, 2017 and wrote:

Sheriff Cogdill,

Upon booking in Monroe, Derrek Gene on 9/27/17 into the Coleman County Jail, he admitted to several things. See attached for suicide screening.

Thanks,
Liz Lancaster, Jailer.

Ms. Lancaster attached to the e-mail the completed Screening Form for Suicidal and Medical/Mental/Developmental Impairments described and depicted above. Coleman County produced a copy of Ms. Lancaster's e-mail, with a response from Sheriff Cogdill dated Sunday, October 1, 2017 at 5:27 p.m., in which Sheriff Cogdill wrote, "Received and read intake screening on Derrek Monroe." However, upon information and belief, Sheriff Cogdill had received plenty of information regarding Derrek's suicidal and self-harm tendencies and mental health issues well enough before Derrek committed suicide, and he could have intervened and saved Derrek's life. Upon information and belief, Sheriff Cogdill failed to do so and was deliberately indifferent to Derrek's serious mental and healthcare needs.

31.     Someone, between roughly 2:13 p.m. and 2:38 p.m. on September 30, 2017, called the MHMR hotline regarding Derrek. However, Derrek was not removed from the jail despite having attempted to commit suicide. Derrek even had a seizure at approximately 3:11 p.m., and he still was not removed from the jail. One or more MHMR personnel began travelling to the jail at approximately 3:36 p.m., and Derrek spent some time on the first level of the jail with one or more MHMR personnel at approximately 5:00 p.m. However, despite Derrek's clear suicide attempt, Mr. Laws and/or Sheriff Cogdill did not seek emergency admission for Derrek to an

appropriate mental health facility. Instead, they allowed him to remain in his cell, with a lengthy phone cord which he could use as a ligature to commit suicide.

F.    Derrek's Second (and Unfortunately Successful) Coleman County Jail Suicide Attempt

32.    Jailer Lancaster was on duty at the Coleman County Jail beginning, upon information and belief, at approximately 11:00 p.m. on Saturday, September 30, 2017. Upon information and belief, her shift ended eight hours later – at approximately 7:00 a.m. on Sunday, October 1, 2017. Upon information and belief, Jailer Laws then replaced Jailer Lancaster. Further, upon information and belief, Jailer Lancaster was the only jailer working at the jail during her shift, and Mr. Laws was the only jailer working at the jail when he began his shift at approximately 7:00 a.m. on October 1, 2017. Further, upon information and belief, Sheriff Cogdill and Ms. Brixey made the decision not to staff the jail with more than one jailer, and/or they refused to staff the jail with more than one jailer, after they learned about Derrek's significant physical, emotional, and psychological issues, including self-harm and suicidal tendencies. This decision or refusal was deliberate indifference and/or objectively unreasonable.

33.    Coleman County produced a video recording which, according to its time stamp, began at 8:21 a.m., and 13 seconds, on October 1, 2017. Times provided in this section of this pleading are in the following format: "hour:minute:second." Thus, the designation "08:21:13" indicates 8:21 a.m. and 13 seconds. The video recording is from a perspective roughly perpendicular to the front of the cell in which Derrek was incarcerated, as depicted below.



All events during the time period described in this section of this pleading are not listed.  Instead, the primary material events are generally described.

34.   At 8:22:20, Jessie Laws has what is apparently an innocuous discussion with Derrek.  At 8:25:28, Derrek appears to do something with the telephone on the wall in his cell. Derrek then goes to the cell door and sits on an apparent mat/bedding on the floor.  Then, after not too long, Derrek stands, walks to the back of his cell, and then walks to the cell door and looks out.

35.   At 8:27:42, Derrek returns to the area of the phone in his cell and appears to pick up the phone receiver and do something with it.  At 8:29:56, Mr. Laws reappears in the video frame.  Mr. Laws grabs the cell door bars and appears to speak to Derrek.  At 8:30:10, Mr. Laws walks off-screen to the left.

36.   At 8:30:30, Mr. Laws returns to the video frame with the cell door key.  He opens the cell door and puts the cell door key into the right pocket of his pants.  At 8:30:40, Derrek walks

out of the cell and to the right through a door to the shower area. Mr. Laws follows Derrek. Thus, at this point, Derrek is out of his cell, with only apparently Mr. Laws present. Mr. Laws shows no fear of Derrek and does not seem at all concerned that Derrek is out of his cell.

37.     At 8:31:55, Mr. Laws returns from the shower area and grabs what appear to be blue surgical gloves. He then returns to the shower area. The door to the shower area remains open the entire time.

38.     Several minutes later, at 8:35:16, Derrek returns to the video frame from the shower area and walks into his cell. Mr. Laws closes and locks the cell door, and he once again puts the cell door key into the right pocket of his pants. He leaves on one blue surgical glove and remains in the area just outside the cell – apparently speaking with Derrek.

39.     Less than one minute after Derrek returns to his cell, at 8:36:05, Mr. Laws appears to shut off water to Derrek's cell by turning the valve at or near the ceiling. Derrek appears to simultaneously get very angry, and he throws a toilet plunger toward the front of the cell. He then picks up the plunger and beats it several times on the plate obscuring the toilet from view. Derrek walks around his cell looking distraught and angry.

40.     At 8:36:34, Jessie Laws reappears from the shower area, to which he briefly went while Derrek was upset. Derrek appears to say or yell something to Mr. Laws, and Mr. Laws turns and acknowledges Derrek. Mr. Laws walks to the cell door and looks at something that Derrek points to on Derrek's head or face.

41.     Seconds later, at 8:36:43, Mr. Laws is mopping the area outside of the cell while Derrek stands, looking very upset, and grabs the phone receiver from the wall. At 8:36:51, Mr. Laws looks into the cell and watches Derrek grab the phone receiver from the wall. Derrek slams the phone receiver against the wall several times and throws it in apparent anger, while Mr. Laws watches. Mr. Laws then walks into the shower area. He returns shortly thereafter with a mop

bucket and continues to mop while Derrek returns to sitting on a mat on his cell floor.  Shortly thereafter, Derrek stands up, and walks toward the rear of his cell, while Mr. Laws watches.

**42.      At 8:37:45, which was only approximately 2 minutes, 30 seconds after Derrek had been returned to his cell, Derrek removes the phone receiver from the wall and wraps it around his neck, while Mr. Laws continues mopping.**  At approximately 8:38:09, after Derrek completes wrapping the cord around his neck and places weight onto the taut phone cord, Mr. Laws begins removing the glove from his left hand and turns toward the camera.  Upon information and belief, Mr. Laws makes a telephone call to Jail Administrator Brixey.

43.      Derrek is attempting to commit suicide using ligature strangulation, or hanging. Both terms are used interchangeably in this pleading.   Ligature strangulation is a type of strangulation that occurs usually through use of a cord-like object, such as a telephone cord, rope, wire, shoelace, or drawstring.  Ligature strangulation does not require suspension of a person's physical body.  Upon information and belief, all Defendants knew this before Derrek committed suicide.  The word "hanging" is typically used when a person's body is suspended above the floor. Strangulation is a form of asphyxia which is caused from constriction of a person's neck by ligature without body suspension.  The cause of death can be due to asphyxia, cerebral anoxia, or venous congestion, combined asphyxia and venous congestion, vagal inhibition, and, in rare cases, fracture-dislocation of cervical vertebrae.

44.      At some point between approximately 8:38:35 and 8:39:06, Derrek appears to stop moving.  Mr. Laws does nothing.  Mr. Law is deliberately indifferent to Derrek and acts in an objectively unreasonable manner.

45.      At 8:40:34, Mr. Laws reappears in the video frame.  He slowly walks to the cell door and puts his hands on it.  He then slowly walks off-screen again, with the cell door key in his

pants pocket. He could open the cell door at any time and save Derrek's life, but he decides not to do so.

46.     At 8:41:59, Mr. Laws walks calmly toward the cell door, holds it, and looks in. Mr. Laws then walks off-screen at approximately 8:42:33. At 8:42:49, a prisoner in an adjoining cell to the left can be seen standing and/or moving.

47.     At 8:43:06, Mr. Laws reappears in the video frame. He appears to show no significant concern for Derrek but instead appears to be simply standing or sitting and waiting in the lower left-hand corner of the screen. At 8:43:33, Mr. Laws returns to the cell door and looks into the cell. He looks at his watch, at 8:43:39, while he continues standing outside of the cell door. Mr. Laws knows that it has been approximately over five minutes since Derrek completed wrapping the telephone cord around his neck and placed weight on it. Still, Mr. Laws chooses not to use the key in his pocket to save Derrek's life. Nevertheless, upon information and belief, Derrek was already brain dead, had a heart attack, and/or was not breathing by this point.

48.     At 8:44:45, Mr. Laws turns away from the cell door and walks around the area in front of the cell, apparently waiting. Mr. Laws returns to the cell door again and looks inside at 8:45:06.

49.     At 8:45:21, Mr. Laws appears to put on blue surgical gloves and approach the cell door, looking into the cell again. Even so, he never attempts to enter the cell, at any time, even though he has the key in his right pants pocket. At 8:45:55, Mr. Laws walks outside of the camera view again and appears to be waiting in an area off the left bottom portion of the screen.

50.     At 8:46:43, Mr. Laws reappears in the camera view, initially with his right hand in his right pocket. He walks up to the cell door, grabs the door with both hands, and looks in. He then walks away again, waiting for someone. He paces back and forth and looks at his watch again.

51.     **At 8:47:40, which was approximately 10 minutes after Derrek began wrapping the phone cord around his neck, Jail Administrator Brixey appears, and Mr. Laws finally opens the cell door using the key that was in his pocket the whole time.** Mr. Laws and Jail Administrator Brixey walk into the cell and appear to remove Derrek from the phone cord. Unfortunately, it is far too late for Derrek. Upon information and belief, Derrek had a heart attack, was no longer breathing, and/or was in substance "brain dead." The delay in intervening in Derrek's attempted suicide caused, proximately caused, and was a producing cause of his death and all injuries leading up to and causing his death.

52.     At 8:47:59, Jail Administrator Brixey quickly leaves the cell and goes off-screen while Mr. Laws remains in the cell. At 8:48:44, Jail Administrator Brixey returns to the cell. Shortly thereafter, it appears that she and Mr. Laws are doing something with Derrek which does not appear to be chest compressions.

53.     At 8:50:32, Jail Administrator Brixey stands and moves quickly out of the cell. It appears that Mr. Laws is standing and not performing chest compressions on Derrek.

54.     At 8:52:12, Jail Administrator Brixey reappears in the video screen and walks into the cell. She immediately walks out again, while it appears that Mr. Laws is not doing chest compressions.

55.     At 8:54:08, a female apparent paramedic arrives and walks into the cell. She is shortly thereafter followed by an apparent male paramedic. After she and Mr. Laws remove Derrek from the cell and place him on the floor outside the cell, the female paramedic, at 8:54:56, appears to begin vigorous chest compressions. **Chest compressions did not begin until nearly 17 minutes after Derrek successfully wrapped the phone cord around his neck and placed weight onto the taut cord.** The paramedics appeared to do the best they could at the scene, but it

was too late for Derrek. Derrek ultimately died in the hospital the following day as a result of the hanging.

56.     Medical records indicate that Derrek arrived at the Coleman County Medical Center, via EMS, and was treated for attempted suicide. His general appearance was listed as "unresponsive mode." Medical records also indicate that he arrived at the hospital, via EMS, for an attempted suicide. Derrek had suffered a number of things, including respiratory failure. Records document that Derrek had attempted suicide by hanging with a phone cord. Derrek was ultimately transferred to Hendrick Medical Center.

57.     Hendrick Medical Center records indicate that Derrek was unconscious and unresponsive. Those records mistakenly indicate that he had attempted suicide in his jail cell with "a rope." Hendrick records also indicate that Derrek had suffered respiratory arrest and cardiac arrest as a result of his suicide attempt by hanging. A physician expressed concern about Derrek having an anoxic brain injury after having hypoxia for more than five minutes. This clearly occurred as a result of the Defendants' actions and inaction referenced in this pleading. Derrek was diagnosed with an anoxic brain injury, and a CT scan showed diffuse cerebral edema with loss of gray-white matter junction, compatible with an anoxic brain injury and likely brain death. The records indicate that Derrek had an anoxic brain injury "due to suicide attempt." Derrek ultimately died in the hospital on October 2, 2017.

### G.     Typed Statements of Administrator Brixey and Jailer Laws

58.     Jailer Laws allegedly signed a typed statement on October 21, 2017 at 1:30 p.m., and Jail Administrator Brixey allegedly signed a typed written statement on October 6, 2017 at 1:30 p.m. Jailer Laws explained that Derrek had asked to shower, and Mr. Laws called Jail Administrator Brixey on the phone for permission (which she presumably gave). Mr. Laws

brought a clean smock for Derrek.  When Derrek finished showering, Derrek said that he wanted some clothes.  Jailer Laws, knowing that Derrek was likely to commit suicide, said that he could not give Derrek clothes.  Instead, he indicated that he can only provide the smock.  When Derrek asked why he could not have clothes, Jailer Laws said that he "told him that we didn't want him to hurt himself and Sheriff Cogdill and MHMR were worried about him."  This once again demonstrated that Sheriff Cogdill was fully aware of Derrek likely killing himself if provided the opportunity.  Even so, neither Sheriff Cogdill, nor Jail Administrator Brixey, had provided enough personnel to watch Derrek and assure that he did not hang himself using the telephone cord.  Further, neither Sheriff Cogdill nor Jail Administrator Brixey assured that Derrek was not put into a cell without a lengthy phone cord and/or that the phone cord was shortened so that Derrek would be unable to hang himself.  They failed to take such actions in deliberate indifference, and acting in an objectively unreasonable manner, even though they knew Derrek attempted to kill himself just the day before.

59.     Jailer Laws wrote that Derrek became increasingly angry after Jailer Laws put him back into the cell.  Derrek then said he would act "stupid" if Jailer Laws did not provide him some clothes.  Derrek began to overflow the toilet, which resulted in Jailer Laws shutting off the water to the cell.  Jailer Laws then wrote that Derrek wrapped the phone cord around his neck.  Jailer Laws then called Sheriff Cogdill, a deputy, and Jail Administrator Brixey.  Jailer Laws wrote, "As per training, I did not enter the cell without backup."  Even if Coleman County policy prohibited it, Jailer Laws should have entered the cell and saved Derrek's life.  The failure to do so was deliberate indifference and objectively unreasonable.  Jailer Laws wrote, "As soon and [sic] Admin Brixey, I entered the cell, and unwrapped the phone from around his neck.  He fell limp to the floor and I checked for a pulse."

60.     Jail Administrator Brixey wrote in her statement in part that she had received a call from Mr. Laws at 8:27 a.m. asking about showering Derrek.  Administrator Brixey told Jailer Laws, upon information and belief, knowing he was the only one watching Derrek, to allow him to exit the cell and shower.  Administrator Brixey also wrote that, at 8:41 a.m., she received another call from Jailer Laws advising her that Derrek was hanging himself with the phone cord. Administrator Brixey said that she headed to the jail and arrived upstairs at 8:48 a.m. Administrator Brixey confirmed in her written statement that, when Jailer Laws removed the phone cord from Derrek, he went limp to the floor.  Administrator Brixey shortly thereafter contacted Sheriff Cogdill by cell telephone, and Sheriff Cogdill told Administrator Brixey that he was almost to the jail.

61.     Jail Administrator Brixey had allowed Mr. Laws to open the cell and allow Derrek to take a shower, without any back-up assistance.  However, Jail Administrator Brixey did not instruct and would not allow Jailer Laws to open the cell door to save Derrek's life.  This is blatant deliberate indifference of Jail Administrator Brixey toward Derrek's life and mental health needs, and it is clearly objectively unreasonable.

H.     Autopsy Report

62.     Doctor Nizam Peerwani, Chief Medical Examiner for the Tarrant County Medical Examiner's Office, performed an autopsy of Derrek.  The autopsy report reads that Derrek was "discovered" suspended in the Coleman County Jail on October 1, 2017.   Upon information and belief, this indicates an early attempt to cover up that Derrek was not "discovered" after hanging himself, but was instead watched for the several minutes passing from the point in time he hung himself until the point in time he died.

63.     Moreover, the report shows that Derrek was not a large man.  He was 5'- 4½" tall and weighed only 161½ pounds.  Therefore, there is no reason that Mr. Laws could not have intervened and saved Derrek's life before someone arrived to help.  It was clear that Mr. Laws did not fear Derrek, because he had let him out of his cell to shower before Derrek returned to the cell and hung himself.  Mr. Laws should have intervened, but in his deliberate indifference, and acting objectively unreasonably, he chose not to do so.  The autopsy report read that the cause of death was hanging, and the manner of death was suicide.

I.     Coleman County Post-Death Reporting

64.     Coleman County, in the custodial death report form it filed with the Attorney General of Texas, described the event as follows:

> ON SUNDAY OCTOBER 1, 2017 AT APPROIMATELY [SIC] 8:38 AM, COLEMAN COUNTY JAILER WAS IN THE CELL AREA NEAR CELL 3 (SINGLE CELL) WHEN AN INMATE BECAME VIOLENT IN CELL 3 AND STARTED HITTING THE PHONE AGAINST THE TABLE IN CELL 3.  THE INMATE THEN WRAPPED THE PHONE CORD AROUND HIS NECK AND HUNG HIMSELF.  AT THE TIME OF THE INCIDENT THERE WAS ONLY ONE JAILER IN THE JAIL.  THE JAILER CONTACTED THE SHERIFF, JAIL ADMINISTRATOR, AND ON DUTY DEPUTY.   WHEN THE JAIL ADMINISTRATOR ARRIVED AT THE JAIL THE ON DUTY JAILER ENTERED CELL 3 AND BEGAN LIFE SAVING TREATMENT.
>
> THE INMATE WAS TRANSPORTED TO COLEMAN COUNTY MEDICAL CENTER EMERGENCY ROOM BY HEART OF TEXAS EMS.  THE INMATE WAS LATER TRANSFERRED TO HENDRICK MEDICAL CENTER IN ABILENE, TEXAS, TAYLOR COUNTY.
>
> ON MONDAY OCTOBER [sic] AT 8:49 PM THE INMATE WAS PRONOUNCED DEAD AT HENDRICK MEDICAL CENTER.

(*Emphasis in original*).

65.     The report to the Attorney General also indicated that Derrek entered the jail facility at 1:05 p.m. on September 29, 2017 for an alcohol/drug offense.  It also read that Derrek

exhibited mental health problems and made suicidal statements during the incident and/or at entry to the jail.

66.     Coleman County, in the inmate death reporting form it filed with the Texas Commission on Jail Standards, indicated that Derrek had been booked in at 1:05 p.m. on September 29, 2017 and died at 8:49 p.m. on October 2, 2017.  It listed Mr. Laws as the last officer with contact with Derrek, and it also indicated that Derrek was on suicide watch at the time he committed suicide.   The report listed the following regarding Derrek: "EPILEPSY OR SEIZURES, DRUG ADDICTION, AND ATTEMPTED SUICIDE.  SEIZURES ALL THE TIME BUT NOT DIAGNOSED BY A DOC . . . ."

(*emphasis in original*).

The report indicated that the investigating officer was Sheriff Les W. Cogdill.

### J.     Factual Allegations: Suicides in Jails

67.     Jail suicides, as the Defendants knew before incarcerating Derrek, are a huge problem in the United States. One-thousand fifty-three (1,053) people died in local jails in 2014, three-hundred seventy-two (372) of which died as a result of suicide.  The Defendants also knew when incarcerating Derrek that most jail suicides occur by hanging/strangulation, with prisoners using objects available to them as ligatures.   Prisoners commonly use bed linens, clothing (including drawstrings), telephone cords, and trash bags.

68.     The Texas Commission on Jail Standards ("TCJS") specifies use of a screening form for suicide and medical/mental/developmental impairments.  The screening form was revised before Derrek was incarcerated to achieve, as one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line jail personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake

screening "is the first step and is crucial to determine which inmates require more specialized mental health assessment." Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."

69.     The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders. The TCJS requires that an intake screening form be completed for all prisoners immediately upon admission into a jail facility. Further, staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the inmate's incarceration. A jail must maintain any such additional screening forms in a prisoner's file.

70.     Suicides were not a novel occurrence and/or unknown issue to the Defendants. They were well-aware of the risk, and in Derrek's case the certainty, of suicide. They were deliberately indifferent to this certainty, and Derrek died as a result. The natural person Defendants acted in an objectively unreasonable manner, and Coleman County's policies, practices, and/or customs were the moving force behind Derrek's death.

71.     Over twenty-five years ago, in November 1991, the Texas Commission on Jail Standards published the Guide for Development of Suicide Prevention Plans. Even that long ago, when society and medical professionals as a whole knew much less than they have learned over the last few years, the Commission recommended continuous observation for high risk, acutely suicidal inmates who had attempted suicide. Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 25 years ago (in 1992, unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies

was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother

of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on

notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth

Circuit (Texas, Louisiana, and Mississippi), regarding pre-trial detainees in need of mental health

care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care.  **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**
>
> **What we learn from the experiences of Henderson County is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice;** that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation.
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Coleman County was put on notice long ago that anything short of continuous monitoring of

suicidal inmates was insufficient and violated the United States Constitution.  The law was clearly

established with exacting specificity, and the Defendants were charged with knowledge of it.

Thus, the City's ambiguous thirty-minute policy does not pass constitutional muster and was a moving force behind Derrek's death.

###### K.    TCOLE Records

72.    The Texas Commission on Law Enforcement ("TCOLE") keeps records regarding each Texas law enforcement officer's service history, licensing, academy education, and post-academy courses completed.   TCOLE records further demonstrate in this case the deliberate indifference and objective unreasonableness of the natural person Defendants.

73.    The TCOLE record for Jail Administrator Brixey indicates that she had a jailer license from November 2000 through March 2008, and then regained that license in July 2008 and kept it through the date that Derrek committed suicide.   Upon information and belief, Jail Administrator Brixey worked for Coleman County during the entirety of these time periods. Therefore, Jail Administrator Brixey was well aware, due to requirements to obtain that license and her many years of experience with that license, of the risks involved in incarcerating Derrek, with his suicidal tendencies, in an inappropriate cell, and without sufficient supervision.   She, Sheriff Cogdill, and Jailer Laws knew that only one jailer being present with a suicidal inmate such as Derrek was ineffective, especially with a telephone cord much longer than recommended by the Texas Commission on Jail Standards.

74.    Further, just a few months before Derrek's suicide – on April 25, 2017 – Jail Administrator Brixey completed a suicide prevention course through the Texas Association of Counties.   Upon information and belief, things she learned in that course would have shown to her that her failures related to Derrek's death would be violations of an objective reasonableness standard and/or would constitute deliberate indifference towards Derrek's serious mental health needs.   Jail Administrator Brixey understood that, if Coleman County policy would prohibit a

single jailer from entering a cell while an inmate was attempting to commit suicide, then Jail Administrator Brixey would need to assure that there were at least two jailers present with such a suicidal inmate. She also knew that such an inmate should not be housed in a cell with a telephone cord the length of the cord in Derrek's cell. This information was not new to Jail Administrator Brixey, because she had taken the Suicide Detection and Prevention in Jails course, through OSS Academy, on July 25, 2015. That was an 8-hour course and, upon information and belief, covered issues which the Plaintiffs have alleged in this pleading caused Derrek's death (including but not limited to appropriate prisoner supervision and not having something in a prisoner's cell that the prisoner could use as a ligature).

75.     TCOLE records for Sheriff Cogdill indicate that he obtained his jailer license in May 2011 and retained it through the date of Derrek's death. Moreover, Sheriff Cogdill had been a licensed peace officer since April 1996, and he retained that licensure through December 2016 (until just before Sheriff Cogdill became sheriff of Coleman County). Sheriff Cogdill received his Basic Instructor Proficiency certificate on June 5, 2007, and his Master Peace Officer certificate on March 31, 2011. Just a few months before Derrek's death, in March 2017, Sheriff Cogdill completed a 31-hour course, entitled Jail Administration, through Bill Blackwood LEMI of Texas. Upon information and belief, Sheriff Cogdill would have learned plenty of information in that course which would had lead him to believe that his action and inaction related to Derrek's death would have been objectively unreasonable and constitute deliberate indifference. Sheriff Cogdill knew that a prisoner such as Derrek should not be housed in a cell that contained something that could be used as a ligature, such as the lengthy telephone cord. Sheriff Cogdill also knew that, if he would continue to allow the County policy to be that a single jailer could not help an inmate committing suicide, he should have staffed the jail with at least two jailers when Derrek was in his cell.

76.     As with Jail Administrator Brixey, Sheriff Cogdill had completed suicide-specific training.  Sheriff Cogdill completed, on February 8, 2013, an 8-hour course entitled "Suicide Detection and Prevention in Jails (Intermediate)."  He had also completed a Basic County Jail Course, comprised of 96 hours, in May 2011.  Sheriff Cogdill's TCOLE record indicates that he received a total of 1,889 course hours in law enforcement training.  Sheriff Cogdill was a very experienced, and very educated, law enforcement officer during the entire time Derrek was incarcerated in the Coleman County Jail.  Sheriff Cogdill was sufficiently informed and educated regarding the high risk of Derrek committing suicide, and he failed to properly staff the jail and/or modify the phone cord as needed.  This constituted deliberate indifference and acting in an objectively unreasonable manner.

77.     TCOLE records indicate that Jailer Laws received his jailer's license in January 2008.  Upon information and belief, Jailer Laws worked as a jailer for Coleman County from that point in time through the date of Derrek's death.  Thus, he had many years of jailer experience prior to Derrek's death.  Jailer Laws knew, as a result, not to take the actions taken by him in this case and, even if instructed by County policy not to intervene in the attempted suicide of an inmate, to do so anyway.  It appears that Jailer Laws took the same suicide prevention course as did Jail Administrator Brixey in April 2017.  Thus, he, like Jail Administrator Brixey, had fresh knowledge regarding what to do and what not to do regarding suicidal inmates such as Derrek.  Upon information and belief, they discussed issues with the jail as a result of that education.  Further, upon information and belief, they failed to make any meanful changes in the jail and thus caused and/or proximately caused Derrek's death.  Despite all the education and experience mentioned in this section of the pleading, neither Jail Administrator Brixey nor Sheriff Cogdill, as policymakers and/or chief policymakers for the County regarding issues in this pleading, made any changes in county jail policies which were necessary to prevent Derrek's death.  They consciously ignored

their education, experience, and training, as well as the Texas Commission on Jail Standards memorandum (referenced below) regarding telephone cords, and the impending certain suicide attempt by Derrek.

L.     *Monell* Liability

      1.     The County's Policy, Practice, and Custom Regarding Lengthy Phone Cords in Jail Cells Was a Moving Force Behind and Caused Derrek's Death

78.     Coleman County did not care enough about pre-trial detainees, held involuntarily at its approximately 127-year-old crumbling jail, to comply with Texas Commission on Jail Standards ("TCJS") relevant technical assistance memoranda.  Only two years prior to Derrek committing suicide, by hanging himself through use of a telephone cord in his cell, the TCJS sent to all sheriffs and jail administrators in Texas – including those in and working for Coleman County – the following technical assistance memorandum regarding the length of telephone cords in jail cells.

# TEXAS COMMISSION ON JAIL STANDARDS

EXECUTIVE DIRECTOR
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
Info@tcjs.state.tx.us

## TECHNICAL ASSISTANCE MEMORANDUM

To:        **All Sheriffs and Jail Administrators**
From:      **Brandon Wood, Executive Director**
Date:      **July 9, 2015**
Reference: **Length of Phone Cords in Holding and Detoxification Cells**

Since September of 2014, four (4) suicide hanging deaths involving the use of telephone cords have occurred in Texas jails. These incidents have demonstrated that changes must be made if a jail chooses to place a telephone within a cell. A number of solutions have been suggested, including shortening cords or replacing standard telephones with a cord-free or hands-free type phones. A cord-free or hands-free type inmate phone that has a recessed, cordless handle is available, functioning similarly to a speaker-phone, but with the privacy of a telephone.

In each case, the telephone was located within the holding/detoxification cell, allowing the prisoners unhindered access at any time. Because of these incidents, two of the jails shortened their receiver cords to a total length of 12-16 inches. The telephones were otherwise unaltered, and are still in the same locations. The third jail replaced all phones in the holding, detoxification and separation cells with a cordless, hands-free phone. The fourth jail is planning to replace their phones in holding and detox with a hands-free telephone. These four incidents highlight the need to provide telephones that, if placed within holding cells or other jail cells, do not provide a possible means of suicide.

While there is no minimum jail standard that mandates the length of the telephone cords in Texas county jails, it is the recommendation of this agency that **ALL** phone cords be no more than twelve (12) inches in length. While we cannot prevent every suicide that occurs, it is incumbent upon this agency to share these events with our stakeholders in order to try and prevent future suicide attempts to preserve lives.

**Note:  In a Texas jail in 2002, a female inmate successfully committed suicide by hanging herself with a phone cord that measured 15 and ¾ inches in length. The photo evidence of this hanging can be viewed by clicking on the following link: http://www.hawaii.edu/hivandaids/Suicidal_Hangings_in_Jail_Using_Telephone_Cords.pdf

Stanley D. Egger, Abilene, Vice Chair          Sheriff Dennis D. Wilson, Groesbeck          Dr. Michael M. Seale, M.D., Houston
Irene A. Armendariz, Austin                    Sheriff Gary Painter, Midland                Larry S. May, Sweetwater
Jerry W. Lowry, New Caney                                                                   Allan D. Cain, Carthage

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview"
To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas

**79.      The memorandum informed Coleman County that, in less than a one-year period prior to the July 9, 2015 Technical Assistance Memorandum, there had been 4 suicide hanging deaths in Texas involving the use of telephone cords in jails.  The TCJS flatly wrote, "These incidents have demonstrated that changes must be made if a jail chooses to place a**

**telephone within a cell."**   The memorandum suggested shortening cords or replacing standard phones with a cord-free or hands-free type phone.   As was the case in Derrek's cell, and each of the four suicides mentioned in the memorandum, "the telephone was located within the . . . cell, allowing the prisoner[s] unhindered access at any time."   The memorandum also noted that, because of the four suicides, two of the referenced jails shortened the phone cords to a total length of 12 to 16 inches.   Upon information and belief, the phone cord which Derrek used to commit suicide, depicted below, was at least thirty-six (36) inches in length.



80.     The memorandum continued, "These four incidents highlight the need to provide telephones that, if placed within . . . jail cells, do not provide a possible means of suicide." The concluding paragraph which, upon information and belief, was read by then – Coleman County Sheriff Wade Turner and the Coleman County jail administrator a little more than two years before Derrek's death, was a haunting prediction regarding what would occur at the Coleman County Jail if Coleman County did not shorten or remove telephone cords in its cells:

> While there is no minimum jail standard that mandates the length of the telephone cords in Texas county jails, it is the recommendation of this agency that **ALL** phone cords be no more than twelve (12) inches in length. While we cannot prevent every suicide that occurs, it is incumbent upon this agency to share these events with our stakeholders in order to try and prevent future suicide attempts to preserve lives.

(*emphasis in original*).

The final section of the memorandum warned Coleman County that a Texas female inmate had even successful committed suicide by hanging herself with a telephone cord that was only 15 ¾ inches long.

81.     Upon information and belief, after reading the Technical Assistance Memorandum, the jail administrator and Sheriff Turner did absolutely nothing to modify the length of the telephone cord of the cell in which Derrek committed suicide. Sheriff Turner had been in office since 1998 and failed to make even this modest, inexpensive modification to the jail cell. Sheriff Turner and/or the jail administrator simply did not care, acted with deliberate indifference, and/or acted in an objectively unreasonable manner. Shortening the telephone cord would have been a relatively inexpensive way to have prevented Derrek's death. Instead, the County's policy and practice in choosing not to modify the telephone cords after knowing that people could commit suicide using them, but instead leaving them at a length of, upon information and belief, over 36 inches, caused, proximately caused, was the producing cause, and was a moving force behind Derrek's death. Sheriff Turner was the chief policymaker for Coleman County regarding its jail

operations at the time and, upon information and belief, the jail administrator also had authority to shorten the telephone cords. In the alternative, at all times relevant to this pleading, the Coleman County Commissioner's Court was the chief policymaker for relevant decisions.

### 2.    The County's Policy Regarding Not Assisting Inmates Committing Suicide was a Moving Force Behind and Caused Derrek's Death

82.    Coleman County had in place, during the time period when Derrek was involuntarily incarcerated in its jail, certain polices, practices, and/or customs related to inmates with mental health issues and/or self-harm tendencies. Unfortunately, one or more such policies, practices, and/or customs were the moving force behind constitutional violations and which caused, and/or proximately caused, Derrek's death.

83.    One Coleman County policy was that all pre-trial prisoners would be screened at the time they were booked into the jail, using the intake form referenced above (and which was used with Derrek). That policy reads in part, "Any known or declared previous attempts of suicide will place the inmate at *High Risk*. (*emphasis in original*). Further, "Any inmate responding inappropriately on the intake screening form or who has attempted suicide will be reported immediately to the Sheriff for additional evaluation, hospitalization, or other appropriate action." Thus, upon information and belief, as soon as Jailer Carpenter completed the intake for Derrek, due to numerous issues on that form referenced above, Sheriff Cogdill was contacted and informed of the information on the form and that Derrek would be designated as *High Risk*. Clearly, an inmate being at a *High Risk* designation means that the inmate was, using the County's criteria, significantly likely to commit suicide and/or otherwise harm himself.

84.    The policy also required that *High Risk* inmates receive continuous, or at least periodic five-minute, observation(s). Thus, this was no policy at all. Five-minute observations and continuous observation are mutually exclusive. A jailer had to speak with the prisoner at each

such check, check the inmate and cell closely, and document any appropriate observations. However, as any thinking person would recognize, simple observations without necessary intervention would be pointless. The point of observing people who are incarcerated against their will is to enable one to actually do something if there is a problem. Nevertheless, contrary to common sense and objective reasonableness, and instead paying homage to deliberate indifference, Coleman County had in place at the time of Derrek's suicide the following "INTERVENTION" policy:

> If a Suicide attempt is in progress, the correctional officer or jailer will notify the nearest officer on duty or on call and call the Emergency Medical Service. The correctional officer will enter the cell and attempt appropriate life saving techniques ***after back-up personnel have arrived***.

(*emphasis added*).

85.    Thus, if a person is attempting to commit suicide in a jail cell, and it takes back-up personnel 5 minutes, or 10 minutes, or even 100 minutes to arrive, Coleman County policy would not allow the correctional officer on duty to take any action toward saving the inmate's life. The officer would simply have to watch as an inmate kills himself. The officer could be left staring at a dead body if it takes a lengthy period of time for help to arrive. The policy even contemplates that the correctional officer may be the only officer in the building, by addressing a situation in which the correctional officer would notify the officer "on call." Common sense dictates that the policy showed deliberate indifference for Coleman County prisoners. Death by hanging/strangulation can occur in less than five minutes, and brain damage occurs within a very few minutes due to lack of oxygen to the brain. Moreover, all Defendants knew before Derrek's incarceration that hanging/strangulation was the most common method of suicide in Texas jails.

86.    That policy, procedure, and/or custom was wholly ineffective and showed deliberate indifference to inmates with known serious medical needs, such as Derrek. Further, it

was an objectively unreasonable policy, procedure, and/or custom. That policy, procedure, and/or custom allowed a correctional officer, watching an inmate kill himself or herself, to take no action whatsoever but instead simply to wait. It reminds one of a recent commercial for LifeLock. LifeLock is a credit monitoring company that also purports to resolve and/or avoid credit issues. In the commercial, an apparent dentist and assistant are shown examining a man in a dental chair. The following conversation ensues:

| | |
|---|---|
| Apparent dentist: | David, you have one of the worst cavities I have ever seen. Okay. Have a good day. |
| Patient: | Aren't you going to fix it? |
| Apparent dentist: | Oh, I'm not a dentist, I'm a dental monitor . . . tell you when you have a bad cavity. |
| Apparent dental assistant: | It's bad. Lunch? |
| Apparent dentist: | Oh, yes. |
| Patient: | Where are you going? |

https://www.youtube.com/watch?v=CGDzxPsdi7w

87.     The "patient" was shocked that the purported dentist and dental assistant knew that he had a bad cavity and would do nothing about it. The purported dentist and dental assistant merely noted that the supposed patient had a serious problem.

88.     The commercial is humorous and makes the point that LifeLock goes beyond simply monitoring credit. Unfortunately, with regard to "monitoring" Derrek, there is no humor in its application. It did little good to "monitor" Derrek, by watching him as he killed himself. Derrek did not need monitoring – he needed help. If there had been immediate help when Derrek wrapped the telephone cord around his neck, he would have lived. Thus, the deliberate indifference of natural people mentioned herein to Derrek's known serious mental and health

issues, in addition to and combined with Coleman County's policy, practice, and/or custom allowing "monitoring" without intervention, were moving forces behind and resulted in and caused Derrek's unnecessary death.

### 3.  The County's Policy, Practice, and/or Custom Regarding the Minimum Number of Jailers Present was a Moving Force Behind and Caused Derrek's Death

89.     Further, upon information and belief, Coleman County's policy, practice, and custom regarding the minimum number of jailers present with a suicidal inmate showed deliberate indifference.  Coleman County did not require more than one jailer to be present with a suicidal inmate, even though Coleman County's policy was that the single jailer could not assist with an inmate attempting to commit suicide.  This policy was confirmed and ratified by Sheriff Cogdill and Jail Administrator Brixey.  This policy was a proximate cause of, producing cause of, and a moving force behind Derrek's death and violation of his constitutional rights.

### 4.  The County's Policies, Practices, and Customs Regarding Training its Employees was a Moving Force Behind and Caused Derrek's Death

90.     The County's policies, practices, and/or customs regarding training its employees for suicide attempts by inmates was a moving force behind, and proximately caused, Derrek's death and the Plaintiffs' damages.  The County trained its jailers not to intervene in the attempted suicide of an inmate until help arrived.  However, such training resulted in actions of jailers which were ineffective to stop serious injury and death to Coleman County inmates.  Specifically, with regard to Derrek, this training was a cause of Jailer Laws not intervening in Derrek's attempted suicide.  Jailer Laws wrote in his statement that he had not entered the cell until back-up arrived, as he was trained.  Derrek suffered brain injury and death as a result of this training.

### 5.    The County Ratified the Natural Person Defendants' Actions

91.    Upon information and belief, neither the County, Sheriff Cogdill, nor Jail Administrator Brixey took any action to reprimand Jessie Laws or any other person related to Derrek's death. In fact, the County and such persons fully approved of the manner in which Derrek was handled by the County and its employees – from beginning to end. Thus, the County and its employees ratified the conduct of all persons mentioned in this pleading and thus confirmed the unconstitutional County policies, practices, and/or customs. The fact that the natural person Defendants acted together alone demonstrates County policy, practice, and custom. In other words, the natural person Defendants were the County, as they acted and failed to act with regard to Derrek. Thus, their joint action demonstrated County policy, practice, and custom.

## III.    Causes of Action

### A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to Kingsley v. Hendrickson

92.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470. The Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in excessive force cases, and that the officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

93.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-

73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an objective reasonability basis. There is no reason to treat pretrial detainees' other rights arising under the 14th Amendment's due process clause – such as the right to receive reasonable medical care, the right to be protected from harm, and the right not to be punished – differently.

94. It appears that this standard is now the law of the land. In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id.* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the

95. The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the

---

majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately.

same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

96.     Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

**B.     Cause of Action Against Leslie W. Cogdill, Mary Jo Brixey, and Jessie W. Laws Under 42 U.S.C. § 1983 for Violation of Derrek Monroe's 14th Amendment Due Process Rights to Reasonable Medical Care, to be Protected, and Not to Be Punished as a Pretrial Detainee (Episodic Act or Omission)\**

97.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Leslie W. Cogdill, Mary Jo Brixey, and Jessie W. Laws are liable to the Plaintiffs (including Ms. Cope and all other heirs at law, including Derrek's minor children B.M.B. and D.M.M.), pursuant to 42 U.S.C. § 1983, for violating Derrek's rights to reasonable medical care, to be protected from himself and others, and not to be punished as a pretrial detainee, such rights guaranteed by the 14th Amendment to the United States Constitution.  Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  Pre-trial detainees are also entitled to protection from themselves and others, and not to be punished at all since they have not been convicted of any crime resulting in their incarceration.

98.     Leslie W. Cogdill, Mary Jo Brixey, and Jessie W. Laws acted and failed to act under color of state law at all times referenced in this pleading. Leslie W. Cogdill, Mary Jo Brixey, and Jessie W. Laws wholly or substantially ignored Derrek's suicidal and self-harm tendencies and his obvious serious medical and mental health needs, and they were deliberately indifferent to those needs. They chose to allow Derrek to harm himself, and thus failed to protect him, and further punished Derrek by, among potentially other things, allowing him to harm himself. These Defendants were not just aware, but very much aware, of Derrek's serious psychological and medical issues and tendencies to harm himself. They gained this knowledge as described in the Factual Allegations section above. Thus, these Defendants had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk. They were aware of the excessive risk to Derrek's health or safety and were aware of facts from which an inference could be drawn of serious harm (and they in fact drew that inference). In fact, based on what occurred, it was more than an inference to these officers. It was blatantly apparent to these Defendants that, unless they protected Derrek and provided him needed medical and/or psychological care, he would kill himself.

99.     These Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Derrek, as a pretrial detainee, had a clearly established right to receive reasonable medical care, to be protected from himself and others, and not to be punished. These rights included the right to be continuously and appropriately monitored and, moreover, the right to have Defendants immediately intervene in the event Derrek attempted to harm himself. These rights also included the right to have removed from Derrek's cell known items which are commonly used by suicidal inmates to kill themselves, such as the lengthy telephone cord.

100.     In the alternative, these Defendants' deliberate indifference, conscious disregard,

state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of the constitutional violations set forth in this section of this pleading.  The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470-71.  Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, all flow from the 14th Amendment's due process clause.  *Id.*  Since such constitutional protections flow from the same clause, the analysis of what it takes to prove such constitutional violations should be identical.

101.    The natural person Defendants are not entitled to qualified immunity.  Their denial of reasonable medical and mental health care, their refusal to promptly intervene in Derrek's suicide attempt, their decision not to appropriately staff the jail, their total disregard for Derrek's health and safety, and/or their total disregard for Derrek's suicidal tendencies and propensity to hurt himself caused, proximately caused, and were a producing cause of Derrek's death and other damages suffered by Derrek, Ms. Cope, and Derrek's heirs-at-law (asserted by Alex Isbell as Dependent Administrator of the Estate of Derrek Quinton Gene Monroe).

102.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law, including Ms. Cope and minor children of Derrek, B.M.B. and D.M.M., and the Estate of Derrek Quinton Gene Monroe, seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting caselaw.  Therefore, Derrek's estate and/or his heirs at law suffered the

following damages, for which they seek recovery from these natural person Defendants:

- Derrek's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- Derrek's medical expenses;

- Derrek's funeral expenses;  and

- exemplary/punitive damages.

103.     These heirs-at-law (including Ms. Cope and minor children of Mr. Monroe, B.M.B. and D.M.M.) also, individually, seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations.  Ms. Cope seeks those damages due to the wrongful death of her biological and legal son, and minors B.M.B and D.M.M. seek those damages due to the wrongful death of their biological and legal father.  The damages suffered by the heirs-at-law were caused and/or proximately caused by the natural person Defendants.  If Derrek had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.  Therefore, the Defendants' actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Ms. Cope, and minor children B.M.B. and D.M.M., for which they all individually seek compensation:

- loss of services that Ms. Cope would have received from her son, Derrek;

- expenses for Ms. Cope for Derrek's funeral;

- past mental anguish and emotional distress suffered by them resulting from and caused by the death of Derrek;

- future mental anguish and emotional distress suffered by them resulting from and caused by the death of Derrek;

- loss of companionship and society that they would have received from Derrek; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed

violation of Derrek's constitutional rights. These Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Derrek's rights and safety. Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988. These Defendants should be jointly and severally liable for any judgment because, among potentially other reasons, they caused indivisible damages and jointly acted in depriving Derrek of his constitutional rights.

> C.      Cause of Action Against Coleman County Under 42 U.S.C. § 1983 for Violation of Derrek Monroe's 14th Amendment Due Process Rights as a Pretrial Detainee to Reasonable Medical Care, to be Protected from Himself, and Not to be Punished

104.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Coleman County is liable to the Plaintiffs (including Ms. Cope and all other heirs at law, including minor children B.M.B. and D.M.M.), pursuant to 42 U.S.C. § 1983, for violating Derrek's rights to reasonable medical care, to be protected from himself and others, and not to be punished as a pre-trial detainee, such rights guaranteed by the Fourteenth Amendment to the United States Constitution. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers. Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for an official policy or practice Section 1983 claim is objective. Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).

105.    Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  They are also entitled to be protected from themselves and others and not to be punished (since they have not been convicted of any crime resulting in their incarceration).  Coleman County acted or failed to act under color of state law at all relevant times.  Coleman County's policies, practices, and/or custom were the moving force behind and caused Derrek's death and the Plaintiffs' resulting damages.  Sheriff Turner – and later Sheriff Leslie W. Cogdill – were policymakers for the County at all relevant times, and they were the chief policymakers at all such times for the Sheriff's Department (and the County jail at which Derrek was incarcerated).  In the alternative, Jail Administrator Brixey or the Coleman County Commissioner's Court was the County's chief policymaker at all relevant times.   The County was deliberately indifferent regarding its prisoners with serious medical and mental health issues, and self-harm and suicidal tendencies, as evidenced by allegations set forth in the Factual Allegations section above, and it acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced in that section, as well as the failure to adopt appropriate policies, were the moving forces behind violation of Derrek's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.  The County's relevant policies, practices, and/or customs were also objectively unreasonable as applied to Derrek and those similarly situated.

106.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law, including Ms. Cope and minor children of Derrek, B.M.B. and D.M.M., and the Estate of Derrek Quinton Gene Monroe, seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute

(Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting caselaw. Therefore, Derrek's estate and/or his heirs at law suffered the following damages, for which they seek recovery from the County:

- Derrek's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- Derrek's medical expenses; and

- Derrek's funeral expenses.

107.    These heirs-at-law (including Ms. Cope and minor children of Mr. Monroe, B.M.B. and D.M.M.) also, individually, seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations. Ms. Cope seeks those damages due to the wrongful death of her biological and legal son, and minors B.M.B and D.M.M. seek those damages due to the wrongful death of their biological and legal father. The damages suffered by the heirs-at-law were caused and/or proximately caused by the County. If Derrek had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law. Therefore, the County's actions, policies, practices and/or customs caused, were the proximate cause of, were the producing cause of, and were moving forces behind the following damages suffered by Ms. Cope, and minor children B.M.B. and D.M.M., for which they all individually seek compensation:

- loss of services that Ms. Cope would have received from her son, Derrek;

- expenses for Ms. Cope for Derrek's funeral;

- past mental anguish and emotional distress suffered by them resulting from and caused by the death of Derrek;

- future mental anguish and emotional distress suffered by them resulting from and caused by the death of Derrek; and

- loss of companionship and society that they would have received from Derrek.

Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988. All Defendants should be jointly and severally liable for any judgment because, among potentially other reasons, they caused indivisible damages and jointly acted in depriving Derrek of his constitutional rights.

### D.   Causes of Action Against Coleman County for Violation of Americans with Disabilities Act and Rehabilitation Act

108.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Coleman County is liable to the Plaintiffs (and Derrek's heirs-at-law) pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act. Upon information and belief, Coleman County has been and is a recipient of federal funds. Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose. Further, Title II of the ADA applies to Coleman County and has the same mandate as the Rehabilitation Act. Claims under both the Rehabilitation Act and ADA are analyzed similarly.

109.   The Coleman County jail is a "facility" for purposes of both the rehabilitation and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes. Derrek was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of his major life activities. Derrek was therefore disabled. Derrek was also discriminated against by reason of his disability.

110.    A majority of circuits have held, for purposes of Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate indifference.  The Fifth Circuit has declined to follow the majority view.  Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

111.    Coleman County's failure and refusal to accommodate Derrek's mental disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Derrek's death and the Plaintiffs' damages.

112.    Coleman County's violations of the Rehabilitation Act and the ADA included its failure to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Derrek's mental disabilities.  These failures and refusals, which were intentional, proximately caused Derrek's death and the Plaintiffs' (and Derrek's heirs-at-laws') damages.  Because Derrek's death resulted from Coleman County's intentional discrimination against him, the Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.  The Plaintiffs (and Derrek's heirs at law) seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of the Plaintiffs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and the ADA, and the Plaintiffs also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

IV.    Concluding Allegations

A.    Conditions Precedent

113.    All conditions precedent to assertion of the Plaintiffs' claims have occurred.

**B.      Use of Documents at Trial or Pretrial Proceeding**

114.     The Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by the Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

**C.      Jury Demand**

115.     The Plaintiffs demand a jury trial on all issues which may be tried to a jury.

**D.      Prayer**

116.     For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs (and Derrek's heirs at law) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally applicable, for:

a)     actual damages of and for Patsy K. Cope individually including but not necessarily limited to the following:

- loss of services that she would have received from her son, Derrek;

- expenses for Derrek's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of Derrek;

- future mental anguish and emotional distress resulting from and caused by the death of Derrek; and

- loss of companionship and society that she would have received from Derrek;

b)     actual damages of and for B.M.B. and D.M.M., the minor children and heirs at law of Derrek:

- past mental anguish and emotional distress resulting from and caused by the death of Derrek;

- future mental anguish and emotional distress resulting from and caused by the death of Derrek; and

- loss of companionship and society that she would have received from Derrek;

c)   actual damages of and for the Estate of Derrek Monroe through its Dependent Administrator Alex Isbell (ultimately the heirs-at-law of Derrek) including but not necessarily limited to the following:

- Derrek's conscious pain and suffering; and

- funeral expenses;

d)   exemplary/punitive damages for all Plaintiffs (including all heirs at law) from the natural person Defendants;

e)   reasonable and necessary attorneys' fees for all Plaintiffs (including all heirs at law) through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

f)   court costs and all other recoverable costs;

g)   prejudgment and postjudgment interest at the highest allowable rates;  and

h)   all other relief, legal and equitable, general and special, to which the Plaintiffs (including all heirs at law) are entitled.

Respectfully submitted,

Law Offices of Dean Malone, P.C.


By: /s/ T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:        (214) 670-9904

Attorneys for the Plaintiffs