# TAB A

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

PATSY K. COPE,            *
individually, and ALEX   *
ISBELL, as dependent     *
administrator of, and    *
on behalf of, the        *
ESTATE OF DERREK         *
QUINTON GENE MONROE      *
and his heirs-at-law,    *
                         *
    Plaintiffs,          *
                         *
VS.                      * CIVIL ACTION NO.
                         * 6:18-cv-00015-C
COLEMAN COUNTY, TEXAS;   *
LESLIE W. COGDILL;       *
MARY JO BRIXEY; and      *
JESSIE W. LAWS,          *
                         *
    Defendants.          *

**********************************************
ORAL AND VIDEOTAPED DEPOSITION OF
BRANDON N. GATES
OCTOBER 11, 2018
**********************************************

    ANSWERS AND VIDEOTAPED DEPOSITION OF
BRANDON N. GATES, a witness produced on behalf of the
Plaintiff, taken in the above-styled and numbered
cause on the 11th day of October, 2018, before Cara B.
McLeod, Certified Court Reporter No. 7775, in and for
the State of Texas, taken at the Hampton Inn
Brownwood, 1103 Riverside Drive, City of Brownwood,
County of Brown, State of Texas, in accordance with
the Federal Rules of Civil Procedure and any
Stipulations hereinafter set forth.

    It is further agreed that Rule 30(b)(5)
is waived by agreement of the parties.

Page 2

A P P E A R A N C E S

    MR. T. DEAN MALONE
    Law Offices of Dean Malone
    900 Jackson Street
    Suite 730
    Dallas, Texas  75202
    (214) 670-9989
    dean@deanmalone.com

    COUNSEL FOR THE PLAINTIFFS

    MR. JON MARK HOGG
    Jackson Walker, LLP
    135 West Twohig Avenue
    Suite C
    San Angelo, Texas  76903
    (325) 481-2560
    jmhogg@jw.com

    COUNSEL FOR THE DEFENDANTS

ALSO PRESENT:  Mr. Gary Gilmore, Videographer
               Mr. Leslie Cogdill
               Ms. Mary Jo Brixey

Page 3

1                 W I T N E S S   I N D E X
2
3    BRANDON N. GATES:                    PAGE
4    EXAMINATION
5      BY MR. MALONE                    4
6    EXAMINATION
7      BY MR. HOGG                     42
8    FURTHER EXAMINATION
9      BY MR. MALONE                   48
10   FURTHER EXAMINATION
11     BY MR. HOGG                     50
12   Reporter's Certification           53
13           REQUESTED DOCUMENTS/INFORMATION
14              NONE
15           CERTIFIED QUESTIONS
16              NONE
17
18           E X H I B I T   I N D E X
19   PLAINTIFFS'                       PAGE
20   No. 1 --  Enlarged color photographs
             [90-109]                   10
21
22
23
24
25

Page 4

P R O C E E D I N G S

1
2          (On the record at 10:02 a.m.)
3          THE VIDEOGRAPHER:  We are now going on
4    the video record.  Today is October 11th, 2018.  Time
5    is 10:02 a.m.  Our deponent is Brandon Neil Gates.    10:02:42
6          If counsel will please identify
7    themselves for the record, the deponent may be sworn
8    in.
9          MR. MALONE:  Yes, sir.  Dean Malone here
10   on behalf of Patsy Cope and Alex Isbell, plaintiffs.   10:02:58
11         MR. HOGG:  Jon Mark Hogg here for all
12   defendants.
13         MR. MALONE:  And Mr. Hogg, do you want
14   to waive the reading required by the federal rules?
15         MR. HOGG:  Yes.                     10:03:09
16         MR. MALONE:  Thank you.
17         BRANDON N. GATES,
18   having been first duly sworn, testified under oath as
19   follows:
20              EXAMINATION
21   BY MR. MALONE:
22      Q   Good morning, sir.  How are you?
23      A   Good.  You?
24      Q   Doing -- doing pretty well.
25         MR. HOGG:  I'm sorry, Dean.  Do you want   10:03:21

Page 5

1    him to have the microphone on?
2              MR. MALONE: Oh, yeah.
3              If you would, put that microphone on
4    your lapel, as I also forgot to do.
5              (Witness complies.)            10:03:27
6              THE WITNESS: That work?
7              MR. MALONE: Say a couple things, if you
8    wouldn't mind, and we can see if the videographer can
9    hear you all right.
10             THE WITNESS: Y'all ready to do this?    10:03:42
11             THE VIDEOGRAPHER: Oh, we got him.
12             MR. MALONE: Okay. Good.
13             THE VIDEOGRAPHER: Yeah.
14             MR. MALONE: All right. Let's -- let's
15   start over here.                   10:03:45
16             THE WITNESS: All right.
17        Q   (By Mr. Malone) Good morning, sir. My name
18   is Dean Malone, and I represent, in this lawsuit, the
19   plaintiffs, in other words, the people that brought
20   the lawsuit --                   10:03:55
21        A   Uh-huh.
22        Q   -- and that's Patsy Cope and Alex Isbell --
23   regarding the death of Derrek Monroe.
24             You understand who I am and who I
25   represent?                   10:04:05

Page 6

1         A   Yes, sir.
2         Q   Thank you, sir.
3              Would you please give us your full name?
4         A   Brandon Neil Gates.
5         Q   And would you also give us your address?    10:04:10
6    
7    
8         Q   Okay.
9    
10        Q   Do you have a cell telephone number?    10:04:20
11        A   Yes, sir.
12        Q   Could we have that, please?
13        A   (325) 220-0045.
14        Q   And not the day of the month but could you
15   give us the month and the year that you were born?    10:04:29
16        A   June of '76.
17        Q   Okay. Thank you, sir.
18             You're here in Brownwood, Texas today,
19   right?
20        A   Yes, sir.                   10:04:41
21        Q   And we say some things on this for purposes
22   of the jury in case they see this video later. So
23   that's why some questions might sound strange to you.
24   All right?
25             And we're -- we're actually in a    10:04:50

Page 7

1    conference room at a Hampton Inn on October 11 of
2    2018, right?
3         A   Yes, sir.
4         Q   And it's a little after 10 o'clock in the
5    morning.                   10:04:59
6         A   Yes, sir.
7         Q   And we're in this conference room. And
8    there's a court reporter to your left, and there's an
9    attorney representing the County, to your
10   understanding, kind of across the table from me,    10:05:08
11   right?
12        A   Yes, sir.
13        Q   And there are a couple of other folks in the
14   room other than the videographer. Do you recognize
15   who those two people are?            10:05:15
16        A   Yes, sir.
17        Q   Who do you recognize them to be?
18        A   Sheriff Les Cogdill and a jail
19   administrator -- I forgot her name.
20        Q   Mary Jo Brixey ring --            10:05:25
21        A   Mary --
22        Q   -- a bell?
23        A   -- Jo.
24        Q   Okay.
25             THE WITNESS: I'm sorry, Mary Jo.    10:05:27

Page 8

1         Q   (By Mr. Malone) And have you ever had to
2    give -- give a deposition like this before?
3         A   No, sir.
4         Q   One of the most important things, to keep the
5    court reporter happy with you and me, is not to talk    10:05:36
6    on top of each other.
7         A   Yes, sir.
8         Q   So my questions are not always the best.
9    I'll admit. So if you can try to figure out when I'm
10   done before you answer, I'll try to figure out when    10:05:47
11   your answer is complete before I ask the next
12   question. All right?
13        A   Yes, sir.
14        Q   And also, if I ask you a question that
15   doesn't make sense to you or you don't understand it    10:05:53
16   or it was just a bad question, if you'll let me know
17   at the time, I'll try to rephrase it for you. All
18   right?
19        A   Yes, sir.
20        Q   We're here today because of the death of    10:06:03
21   Derrek Monroe in the Coleman County Jail.
22             Are you familiar with that happening,
23   that --
24        A   Yes, sir.
25        Q   -- occurrence?                   10:06:17

Page 9

```
 1            Were you in the Coleman County Jail at
 2   the time?
 3       A   Yes, sir.
 4       Q   Now, the records that we've got indicate that
 5   Mr. Monroe had died as a result of him wrapping a       10:06:24
 6   phone cord around his neck on October 1 of 2017.  Just
 7   timewise, does that sound about right to you?
 8       A   Yes, sir.
 9       Q   Do you recall, in that time period, the day
10   you would have been initially incarcerated in that      10:06:42
11   jail and the time you left?
12       A   I don't -- don't know exactly the dates, but
13   it was end of September, I believe, and left out --
14   I'm not sure -- middle October, something like that.
15   I's -- I was locked up 36, 37 days.                     10:07:07
16       Q   Okay.  And obviously, we're talking 2017?
17       A   Yes, sir.
18       Q   Before you were locked up in the Coleman
19   County Jail, did you know Derrek Monroe?
20       A   No, sir.                                        10:07:22
21       Q   Did you get to know him at all while you were
22   locked up there?
23       A   No, sir.
24       Q   Were you and he ever in the same cell?
25       A   Yes, sir.                                       10:07:28
```

Page 10

```
 1       Q   Do you remember about how long y'all were in
 2   the same cell together?
 3       A   Maybe -- maybe a couple hours.
 4       Q   Do you remember why y'all would have been in
 5   the same cell together?                                 10:07:43
 6       A   I guess it was the only cell open and they
 7   stuck him in there with us.
 8       Q   Okay.  Do you remember which cell number that
 9   was?
10       A   I believe Cell 2.                               10:07:52
11       Q   I've been told --
12           In fact, what I'll do is I'm going to
13   mark an exhibit here.
14           MR. MALONE:  If I could get a sticker,
15   please.                                                 10:08:08
16       A   It was right next to the one-man cell.
17       Q   (By Mr. Malone)  Right next to the one-man
18   cell?
19       A   Yes, sir.
20       Q   Okay.                                           10:08:18
21           (Deposition Exhibit Number 1
22           was marked.)
23       Q   (By Mr. Malone)  I'm handing you what I've
24   marked as Exhibit 1.  That's a collection of
25   photographs.  And you'll notice they're numbered in     10:08:24
```

Page 11

```
 1   the lower right-hand corner.  It's kind of hard to
 2   read some of them because it's on the actual photo.
 3       A   Yes, sir.
 4       Q   Starts with Page 90 and ends on 109.
 5           If you look at -- at Page 90 in               10:08:37
 6   Exhibit 1, the left of the two cell doors there, in
 7   your understanding, is that Cell Number 2 --
 8       A   Yes, sir.
 9       Q   -- in the Coleman County Jail?
10       A   Yes, sir.                                       10:08:48
11       Q   Does Page 90 in Exhibit 1 accurately depict
12   what that area of the Coleman County Jail looked like
13   when you were incarcerated there back in --
14       A   Yes, sir.
15       Q   And let me finish for the court reporter, if    10:08:59
16   you don't mind.
17       A   Okay.  I'm sorry.
18       Q   -- back in 2017?
19       A   Yes, sir.
20       Q   Okay.  The cell door we see open on Page 90     10:09:01
21   of Exhibit 1, in your understanding, is that the
22   single-man cell?
23       A   That's the one that Mr. Monroe committed
24       Q   That's the one that Mr. Monroe committed
25   suicide in?                                             10:09:17
```

Page 12

```
 1       A   Yes, sir.
 2       Q   Is that Cell Number 3, in your understanding?
 3       A   To best of my knowledge, yes, sir.
 4       Q   Okay.  How many times have you been
 5   incarcerated in the Coleman County Jail?                10:09:25
 6       A   Once.
 7       Q   Do you remember what day of the week it was
 8   when you actually were arrested and taken there?
 9       A   No, sir.
10       Q   Okay.  Now, you and I actually spoke some       10:09:38
11   time ago briefly, right?
12       A   Yes, sir.
13       Q   And you -- you gave me some information and
14   we tried to get back together later, due to your work
15   schedule -- and for whatever reason, it just never      10:09:55
16   happened, right?
17       A   Yes, sir.
18       Q   And you told me a little bit about what you
19   knew about what occurred before the day that Derrek
20   committed suicide, right?                               10:10:04
21       A   Yes, sir.
22       Q   Let's go back to the first time that you
23   remember seeing Derrek Monroe in the Coleman County
24   Jail.  Where were you, and where was he?
25       A   I was in Cell 2, and they brought him into      10:10:14
```

Page 13

1    Cell 2.
2        Q   Do you remember how he was dressed?
3        A   In civilian clothes.
4        Q   And what about yourself?  What were you
5    dressed in?                              10:10:26
6        A   I was dressed in county clothes, I guess.  I
7    don't know what you call them.
8        Q   All right.  What color were they?  You
9    remember?
10       A   Mine?                           10:10:35
11       Q   Yes, sir.
12       A   Orange and white, I believe.
13       Q   Do you know why Mr. Monroe had street clothes
14   on?
15       A   Because he'd just got locked up.    10:10:42
16       Q   Do you know if that was before his intake
17   when he was in your cell?
18       A   I don't know.  I don't know, sir.
19       Q   Okay.  So he ends up in your cell.  And if I
20   remember your testimony earlier, you said for about    10:10:52
21   two hours is the total time you and he were in a cell
22   together, right?
23       A   Yes, sir.
24       Q   So he ends up in Cell Number 2, in your
25   recollection.  What happens next?         10:11:03

Page 14

1        A   I took it he -- and that's what everybody was
2    saying -- he ate a bunch of drugs before he got in
3    there.  And he face-planted face first on the -- on
4    the concrete and got up.  He wrapped a blanket around
5    his neck then, leaned up against the wall under the    10:11:29
6    phone.  And then we're all keeping an eye on him
7    because we're not knowing what he's going to do next,
8    if he's going to get on us or whatever, so...
9            He jumped up above the toilet -- latrine
10   and hung his blanket, which was wrapped around his    10:11:44
11   neck, around the top of a piece of angle iron up there
12   and -- and bailed off of it.  Of course, the knot gave
13   way.
14           THE WITNESS:  And then y'all shortly
15   come in after that -- the jailers did.       10:11:57
16           MR. MALONE:  Okay.  Objection,
17   nonresponsive.
18       Q   (By Mr. Malone)  The reason I say that is I
19   have to have a clean record sometimes because I
20   anticipate what some of the judge's rulings might be    10:12:06
21   if we object later.  So I'm going to have to ask you
22   the same question but in small bites.  All right?
23       A   Yes, sir.
24       Q   And -- and -- and I'll kind of tell you why I
25   objected.  It was because you said something about    10:12:17

Page 15

1    some people said something about drugs.  So I'm -- I'm
2    just going to ask you about what happened in this next
3    question.  All right?
4        A   Got you.
5        Q   So -- so here's my question.  After Derrek    10:12:25
6    Monroe ended up in Cell 2 with you when you describe,
7    what's the next thing that happened?
8        A   He -- he sat on the floor and then he tried
9    to get up and he face-planted on the concrete.  And
10   then --                                  10:12:43
11       Q   What do you mean by that?
12       A   He -- he didn't catch hisself.  He just stood
13   up and fell face-forward (indicating).  And then
14   shortly after that, he got -- I guess -- he sat up
15   against the wall, wrapped a blanket around him, and    10:12:58
16   looked like he was trying to choke hisself out then.
17           And then he got up and got above the
18   latrine and wrapped around the angle iron above the
19   latrine and -- which was wrapped around his neck as
20   well -- and jumped off it, and the knot gave way.    10:13:16
21       Q   Okay.
22       A   And --
23       Q   I'm sorry.
24       A   -- I guess it kind of knocked him out.  And
25   that's when the jailers come in and they took him to a    10:13:22

Page 16

1    hospital, I believe, suicide watch.
2        Q   Okay.  When you said that he tried to choke
3    himself out, this is before he wrapped --
4        A   Yeah, he tried -- well, he did -- he wrapped
5    around his legs and wrapped around his neck and was    10:13:37
6    trying to choke hisself out.
7        Q   Did it look like to you that he was really
8    attempting to do that?
9        A   Yeah.
10       Q   And what do you mean by choke himself out?    10:13:45
11       A   Just wrapped -- he about to -- he was trying
12   to choke hisself.
13       Q   Okay.  And then you said that didn't work,
14   apparently.
15       A   No.                             10:13:58
16       Q   And then he tied the knot on -- the -- the
17   sheet onto what?
18       A   A piece of angle iron above the toilet and
19   jumped off the toilet.
20       Q   Did it look to you like he was attempting to    10:14:09
21   hang himself?
22       A   Oh, yeah.
23       Q   Legitimately?
24       A   Yes, sir.
25       Q   What made you think that?          10:14:16

Page 17

```
 1      A   Because he tied it around his neck and then
 2   tied it around the top of the angle iron and
 3   bomb-dived off of it.
 4      Q   Okay.  And then when he did that, what --
 5   what happened to his body and/or the sheet?       10:14:25
 6      A   It kind of -- the -- the knot gave way as
 7   soon as he jumped.  And then he, I guess, blacked out.
 8   I don't know.  And they -- jailers come in and took
 9   him out.
10      Q   Why do you think he blacked out?  What made   10:14:39
11   you think he blacked out?
12      A   I don't know.  I guess he popped his neck
13   pretty good.  I mean, he had to have.
14      Q   Okay.  At that point, did any of y'all do
15   anything to try to help him, anybody else in the cell?  10:14:52
16      A   No, we were still trying to figure out what
17   he was doing, actually.
18      Q   And how many other people were in the cell at
19   that time before the jailers showed up?
20      A   There were me and two others before he come   10:15:02
21   in.
22      Q   Remember who they were?
23      A   Sambo Croft, Quentin something or another --
24   I don't know Quentin's last name -- and -- I don't
25   even know if it was Quentin.  I know it's Sambo and    10:15:24
```

Page 18

```
 1   some guy from Fort Worth.  I can't remember -- Paul
 2   something or another.  I don't know Paul's last name.
 3      Q   Sambo, Quentin, and Paul?
 4      A   I don't know if Quentin was in there at the
 5   time.  Sambo was in there, and Paul was in there.     10:15:37
 6   Paul's in Fort Worth.  Sambo's from Coleman, Sambo
 7   Croft.  And possibly Quentin.
 8      Q   All right.  What made you think that Derrek
 9   had blacked out after he jumped with that sheet around
10   his neck?                                              10:15:55
11      A   Because he was -- he was laying on the floor
12   not responsive.
13      Q   Not moving at all?
14      A   Huh-uh.
15      Q   Is that a "no" for our court --                10:16:05
16      A   No.
17      Q   -- reporter?
18      A   Yeah.
19      Q   Okay.  And then I think you testified that
20   the jailers showed up next?                           10:16:09
21      A   Yes, sir.
22      Q   Who -- who was it?  Do you remember?
23      A   I don't remember.
24      Q   Do you know a Jessie Laws?
25      A   Yes, sir.                                      10:16:16
```

Page 19

```
 1      Q   Do you recall if he had shown up after the
 2   event you just described?
 3      A   I'm not -- I'm not sure, sir.
 4      Q   Okay.  What about the sheriff?  Do you recall
 5   if he had shown up at that time?                      10:16:26
 6      A   I want to say sheriff was there, yes.  I'm
 7   pretty sure.
 8      Q   Do you recall if the jail administrator
 9   showed up?
10      A   I do not recall.                               10:16:36
11      Q   Okay.  I think we did this at the beginning
12   of the deposition, but I forget if we did it before.
13          So you understand that -- that Leslie
14   Cogdill is the sheriff, right?
15      A   Yes, sir.                                      10:16:49
16      Q   And Mary Jo Brixey is the jail administrator.
17      A   Yes, sir.
18      Q   And that at the time you were in the Coleman
19   County Jail that Jessie Laws was the jailer -- a
20   jailer.                                               10:17:00
21      A   Yes, sir.
22      Q   Okay.  Other than those three people, did you
23   interact --
24          MR. MALONE:  Strike that.
25      Q   (By Mr. Malone)  Okay.  What makes you think   10:17:07
```

Page 20

```
 1   that the sheriff was there after that event you just
 2   described?
 3      A   Some reason I -- I just thought he was there,
 4   I believe.  I don't know.
 5      Q   Okay.                                          10:17:18
 6      A   It was during the daytime.
 7      Q   You remember?  Morning?  Afternoon?
 8      A   I don't remember.  It was daytime.
 9      Q   Okay.  When they showed up, what happened
10   next?                                                  10:17:30
11      A   They pulled him out and took him to where, I
12   believe, was the hospital.
13      Q   Why do you think they did that?
14      A   Because he tried to commit suicide.
15      Q   Did you hear anybody say that he tried to     10:17:41
16   commit suicide?
17      A   I mean, just other than us.
18      Q   Okay.  And did y'all say that to the jailers?
19      A   Yes, sir.
20      Q   What did you say?                              10:17:53
21      A   Said he tried to hang hisself.
22      Q   And do you remember anybody responding --
23      A   No.
24      Q   -- to that?
25      A   Huh-uh.                                        10:18:02
```

Page 21

1    Q   Do you remember anything that the sheriff
2   said at about that time regarding Derrek or to Derrek?
3    A   No, sir.
4    Q   I -- I think you had mentioned to me, on the
5   phone call, that at one point Sheriff Cogdill said to    10:18:15
6   Derrek, Don't -- Don't you die on me, you SOB,
7   something like that?
8    A   Yes, sir.  That -- that was later, I believe.
9    Q   Okay.  When was that?
10    A   When he actually hung hisself in the    10:18:29
11   three-man.
12    Q   Okay.  So on the day of the event you
13   described, is there anything else that you can recall
14   you or anybody else in the cell telling the jailers
15   that showed up after he tried to kill himself?    10:18:43
16    A   No, sir.
17    Q   Did any of the jailers say anything that
18   indicated to you they understood he tried to kill
19   himself on that day?
20    A   No, sir.    10:18:54
21    Q   Is there anything else you can remember about
22   anybody else saying anything that day that you haven't
23   told us already?
24    A   No, sir.
25    Q   Okay.  When was the next time that you talked    10:19:00

Page 22

1   to anybody about Derrek Monroe while you were still
2   incarcerated there?
3    A   What are you talking -- I guess we talked
4   about him amongst ourselves in the cell.
5    Q   Okay.  Did y'all talk to any other jailers or    10:19:24
6   the sheriff or the administrator before he tried to
7   hang himself that second time --
8    A   No, sir.
9    Q   -- using the phone cord?
10    A   No, sir.    10:19:33
11    Q   Okay.  So between the time of the event you
12   just described with the sheet and the time where he,
13   unfortunately, succeeded with the phone cord, other
14   than people in your cell, you don't remember talking
15   to anybody else about Derrek; am I right?    10:19:45
16    A   Yes, sir.  And it was a blanket, I believe,
17   sir.
18    Q   Oh, a blanket?
19    A   Yes, sir.
20    Q   How many blankets were in that cell at that    10:19:50
21   time?
22    A   Four, I take it.
23    Q   Just normal blankets?
24    A   Yes, sir.
25    Q   Okay.    10:19:59

Page 23

1    A   Well, the ones they issue you.
2    Q   Did y'all have sheets also?
3    A   Had a mattress cover, I believe, or the sock
4   you put over the mattress.
5    Q   Can you describe for the jury the blankets?    10:20:11
6   Were they thin?  Were they thick?
7    A   Like, cotton woven -- I don't -- something
8   like that, I believe.  Yeah.
9    Q   Okay.  We -- we've taken some other
10   depositions in this case, and what you've described    10:20:27
11   occurred, there's been testimony that that was a sheet
12   that he used.  You're saying it was not a sheet?
13    A   I'm -- I'm not sure.  I -- I took it it was a
14   blanket.  I don't know.
15    Q   All right.  But you don't remember any sheets    10:20:43
16   in y'all's cells.  You do remember four blankets,
17   though.
18    A   Yes, sir.
19    Q   Okay.  Anything else about what we've talked
20   about so far that I may have misspoke on?    10:20:51
21    A   No, sir.
22    Q   All right.  So after that event you
23   described, it's your understanding they took Derrek to
24   the hospital, right?
25    A   Yes, sir.    10:20:58

Page 24

1    Q   And from that point in time until the next
2   day when it was your understanding that Derrek wrapped
3   the phone cord around his neck, were you ever removed
4   from Cell Number 2?
5    A   Yes, sir.    10:21:12
6    Q   For what?
7    A   They moved all of us once they pulled him --
8   pulled Derrek out and was trying to revise [sic] him,
9   I guess.
10    Q   Where did -- where did they put y'all?    10:21:24
11    A   In the Number 1 Cell, female cell.  There was
12   no females in it at the time.
13    Q   Okay.  And once they took Derrek, in your
14   understanding, to the hospital, did they put y'all
15   back into Cell 2?    10:21:33
16    A   Yes, sir.
17    Q   And you don't have any recollection, other
18   than possibly the sheriff, of anybody else that was
19   there at that time.
20    A   Sheriff and Jessie was there and two EMTs.    10:21:40
21   That's --
22    Q   Okay.
23    A   -- all I remember.
24    Q   So that first time that you've described the
25   sheriff and Jessie were there at the point in time    10:21:50

Page 25

1   when the EMTs showed up.
2       A   Yes, sir.
3       Q   Jessie Laws, right?
4       A   Yes, sir.
5       Q   Okay.  All right.  Let's go to -- was it the     10:22:01
6   next day, in your recollection, that Derrek wrapped
7   that phone cord around his neck?
8       A   The next day of --
9       Q   Yeah, after the event you described, was it
10  the next day or a couple days later?          10:22:19
11      A   No EMTs showed up that day.  I'm talking
12  about the --
13          I'm confused now.
14      Q   Okay.  Well, let's -- let's be sure we're
15  clear because my --                 10:22:26
16      A   All right.
17      Q   -- questions -- so when you testified a
18  minute ago the sheriff and Jessie were there with the
19  EMTs, are you talking the --
20      A   I'm talking about when he actually hung     10:22:33
21  hisself.
22      Q   Okay.
23      A   Yes, sir.
24      Q   You're not talking about the -- what we call
25  the blanket attempt.                 10:22:38

Page 26

1       A   No, sir.  No, no.
2       Q   Okay.  Just want to be sure that -- that your
3   testimony's clear on that.
4           So that -- the time when Derrek actually
5   succeeded with the -- the phone cord --          10:22:47
6       A   Yes, sir.
7       Q   -- do you remember how many days after the
8   first suicide attempt that you've described to us that
9   it was?
10      A   It was as soon as he got back from the       10:22:55
11  hospital, which I thought was one day.
12      Q   Okay.  And at that time, you're still in
13  Cell 2?
14      A   Yes, sir.
15      Q   And Derrek's in Cell 1 -- or Cell -- Cell 3.   10:23:05
16  I'm sorry.
17      A   Yes, sir.
18      Q   What is it that causes you to understand
19  something's going wrong regarding Derrek in Cell
20  Number 3?                        10:23:17
21      A   He was in there making all kinds of racket,
22  and it was -- it was early morning.  And I can
23  remember all of us yelling at him to shut the hell up
24  not knowing, you know, what he was doing.  We just
25  thought he was in there tearing up shit.  And that's   10:23:35

Page 27

1   when Jessie went running around.  And then I believe
2   Les showed up.  And then -- yeah.  Then they pulled
3   him out.
4           And I can remember Sambo saying, Come
5   here and look at how blue he is.  And I told him I     10:23:58
6   didn't want to see that because I got vivid dreams.  I
7   didn't want to see it.
8           That's when we knew he'd pretty much
9   hung hisself.
10      Q   When you say "all kinds of racket," what do   10:24:11
11  you mean?  Was he saying stuff?
12      A   No.  When he hung his- -- he went to, I
13  guess, kicking out his last breath of air, I guess.
14  He was in there kicking around, banging around, making
15  all kinds of racket.                 10:24:29
16      Q   After he hung himself?
17      A   Yes, sir.
18      Q   How do you know that's -- that's when that
19  happened?
20      A   I just took it -- I mean, sound like he was   10:24:35
21  in there banging around on that table in there, that
22  table in the three-man right below the -- I don't know
23  for a fact because I couldn't see it, but that's what
24  it sounded like.
25      Q   Okay.  Now, the jury in this case I think   10:24:49

Page 28

1   will have to decide a lot -- or certain issues on a
2   more-likely-than-not standard.
3       A   Uh-huh.
4       Q   You know, over 50 percent, in other words.
5       A   Uh-huh.                  10:25:01
6       Q   So you -- you've told us your opinion, that
7   the racket that you described that Derrek was making
8   was as a result of him kicking around after he'd
9   wrapped the phone cord around his neck, right?
10      A   Yes, sir.                  10:25:11
11      Q   But you've also told us you couldn't see him,
12  right?
13      A   Yes, sir.
14      Q   So what is it -- well, let me ask you
15  straight up.  In -- do you have the opinion that more   10:25:16
16  likely than not that's what was causing the racket you
17  heard?
18      A   Yes, sir.
19          MR. HOGG:  Objection, form --
20      Q   (By Mr. Malone)  And what is --       10:25:24
21          MR. HOGG:  -- calls for speculation.
22          I'm sorry.
23      Q   (By Mr. Malone)  What is it that causes you
24  to have that opinion?
25      A   Just there ain't nothing you can bang around   10:25:28

Plaintiffs' Appendix 8

Page 29

1   on there other than that.  I mean -- I mean, he's got
2   his rack and stuff, but -- speculation on my part, I
3   take it.  I don't know.
4       Q   Okay.  You describe nothing to bang around on
5   other than that.                        10:25:46
6       A   Uh-huh.
7       Q   What are you talking about?
8       A   Other than that table.  Where -- there's a
9   sheet metal table and a little chair underneath it.
10      Q   So if you look again --          10:25:56
11      A   But he does have a metal rack, that being
12  said, and a metal toilet and a metal sink, so --
13      Q   Okay.
14      A   -- yeah.
15      Q   So we want to be fair, obviously --  10:26:04
16      A   Yeah, fair enough.
17      Q   -- in this case.
18          So do you know more like- -- on a
19  more-likely-than-not standard, you don't know for
20  sure?                                   10:26:11
21      A   I don't know for sure.
22      Q   Okay.  Fair enough.
23          So at -- at the time that he ultimately
24  succeeded with that phone cord, what's the first thing
25  that you heard Jessie say to anybody -- Jessie Laws?  10:26:24

Page 30

1       A   I can't recall.  He -- like I said, it was
2   early, and there was a lot of commotion going on.
3   We's still on our rack when all that was going on.
4       Q   Still asleep?
5       A   Off and on, yes, sir.            10:26:41
6       Q   Do you remember whether you saw Jessie call
7   anybody on the phone?
8       A   I's still in my rack.  My rack -- I was --
9   going in the cell, I'd be the bottom one on the right.
10  Only way you can see the phone is if you get up and    10:26:58
11  walk to the -- to the bars -- to the door.
12      Q   All right.  So looking at -- again, at that
13  Page 90 of Exhibit 1, which is the first page of the
14  exhibit, that left of the two cell doors, if we're
15  looking at that cell, just as we see it in this photo,  10:27:16
16  your rack, or where you were sleeping, would be bottom
17  right.
18      A   Bottom right all the way at the back.
19      Q   I got you.
20      A   So I got to walk 8 foot to the door to see    10:27:26
21  out.
22          You can't see nothing where I'm laying,
23  I mean, other than straight out, which would be the
24  staircase and the window on the right.
25      Q   So if you would look, please, at Page 107 in  10:27:47

Page 31

1   Exhibit 1.  It's a photo of a phone and a metal table,
2   looks like, beneath it.
3       A   107.  (Witness complies.)
4           Yes, sir.  What about it?
5       Q   All right.  The cell that you were in, Cell   10:28:03
6   Number 2, did it have a phone and a table just like we
7   see here?
8       A   No, sir.
9       Q   What was different about the one in your
10  cell -- the phone in your cell?             10:28:11
11      A   Phone would be on the opposite wall.  The
12  table not mounted to the wall in our cell.  And it's a
13  table about four times that size with four chairs.
14      Q   The length of the phone cord we see on
15  Page 107 of Exhibit 1, can you tell us whether that's   10:28:32
16  similar or different from the phone cord in Cell
17  Number 2?
18      A   Yeah, that -- that's about the same.  You
19  could pretty much get on the phone and sit at the
20  table next to it.                         10:28:43
21      Q   So what we see on -- on Page 107 as far as
22  the phone cord length is pretty much the same as the
23  phone cord length in Cell Number 2 in Coleman County
24  when you were there.
25      A   Yes, sir.                         10:28:56

Page 32

1       Q   Okay.  So after you heard the racket you
2   described on the day that Derrek had committed
3   suicide, who's the first person you recall showing up
4   in that area outside your cell?
5       A   Again, I laid in my rack the whole time.     10:29:11
6       Q   Oh, you did?
7       A   Yes, sir.
8       Q   Okay.  So I think you told us that -- was it
9   Sambo Croft that said, Hey, why don't you come look at
10  him, and you --                           10:29:24
11      A   Yes, sir.
12      Q   -- said, I don't want to.
13      A   Yes, sir.  I was still -- I was in the rack
14  the whole time that -- until they told us to get up
15  and get out, move -- move cells.            10:29:28
16          I didn't look at him then when I walked
17  out.
18      Q   Was he still on the floor as far as you knew?
19      A   Yes, sir.
20      Q   Could you see him kind of out -- in your      10:29:39
21  peripheral vision?
22      A   I could see him -- yeah, I -- I looked --
23  glanced over, but I didn't want to look at his face,
24  which they hadn't covered up anyway, still were
25  working on him.  It was two EMTs and him.    10:29:49

Page 33

1   Q   And when you testified earlier that they
2   moved you and the other guys out of Cell Number 2 into
3   Cell Number 1, were you talking about at this time
4   that you just told about?
5   A   Yes, sir.                          10:30:03
6   Q   Not the day before --
7   A   No, sir.
8   Q   -- when he tried to kill himself with the --
9   A   No, sir.
10  Q   -- blanket.  Okay.                 10:30:07
11  A   No, they just -- they pretty much got him and
12  pulled Jail him out and we stayed in the cell.
13  Q   So when the EMTs are working on him, is that
14  the time when they move y'all to Cell Number 1?
15  A   They moved -- yeah.  Yes, sir.     10:30:18
16  Q   And then at some point, they removed Derrek
17  from -- obviously, from the floor, right, from that --
18  that floor of the jail.
19  A   They -- they closed the door.
20      There's a door that divides 1 and 2     10:30:31
21  Cells because it's a female side, and they closed the
22  door.
23  Q   So you couldn't see out anymore?
24  A   No, sir.
25  Q   And about how long was it after that that    10:30:40

Page 34

1   they moved y'all back to Cell Number 2?
2   A   Seemed like 30 minutes or so.
3   Q   Okay.  And when was it that you heard the
4   sheriff say what -- well, tell us what you heard the
5   sheriff say.                          10:30:55
6   A   As I recall, sheriff come up there and him
7   and -- I couldn't understand what they was saying, but
8   when they finally got the cell open, he was saying,
9   Don't die on me, pretty much.
10  Q   Okay.                             10:31:11
11  A   They -- they were arguing back and forth,
12  back and forth.  And you could tell they's -- they's
13  trying to get him -- do what they could.
14  Q   Trying to keep him alive?
15  A   Yes, sir.                         10:31:21
16  Q   Who was arguing?  Who was arguing back and
17  forth?
18  A   Well, I say arguing.  They were -- they were
19  talking back and forth.  They wasn't arguing.
20  Q   Okay.  And are you talking about the sheriff   10:31:29
21  with somebody else?
22  A   Yes, sir.
23  Q   Like a jailer or the administrator?
24  A   One of the two.  I mean, like -- again, I was
25  laying down in my rack.               10:31:37

Page 35

1   Q   Did you hear anything else that they said
2   when they were talking back and forth?
3   A   No, no.  They was -- they was scrambling
4   around.
5   Q   After all that happened, other than just guys   10:31:57
6   in your cell, did you talk to anybody else about
7   Derrek committing suicide there at the jail during the
8   time you were still in the jail?
9      MR. MALONE:  That's a bad question.
10  Strike it.                            10:32:12
11  Q   (By Mr. Malone)  Before you left the Coleman
12  County Jail when -- in other words, when your
13  incarceration ended, did you talk to any jailers or
14  the jail administrator or the sheriff about Derrek
15  committing suicide?                   10:32:22
16  A   I tried talking to Jessie about it.  He -- he
17  wouldn't talk about it, said he couldn't.
18  Q   Okay.  What did -- what did you say to him?
19  A   I just asked what took place, you know, what
20  happened, because I was a trustee.    10:32:34
21  Q   What's a trustee?
22  A   You'd help out with lunch, supper, and
23  cleanup.  Just -- just help out what you can --
24  Q   Okay.
25  A   -- under their supervisor.         10:32:48

Page 36

1   Q   And why did you feel like Jessie should have
2   spoken to you as a trustee?
3      MR. HOGG:  Objection,
4   mischaracterization of the testimony.
5      You can answer.                   10:32:59
6   A   I don't know.  I could tell, I mean, it had
7   to be tough on him.
8   Q   (By Mr. Malone)  Okay.  So were you just
9   talking -- trying to talk to Jessie more to help him
10  work through what happened, or were you just trying to   10:33:11
11  figure out what happened?
12  A   Probably just trying to figure out what
13  happened.
14  Q   Okay.
15  A   Somewhat a little bit on both, I guess,   10:33:20
16  because I got along with all of them up there.
17  They're -- seem like good people, and I could tell it
18  was bothering him.
19  Q   Okay.  Other than Jessie, did you talk with
20  the sheriff or jail administrator or any other    10:33:31
21  jailers about --
22  A   No, sir.
23  Q   -- Derrek committing --
24  A   No, sir.
25  Q   -- suicide?  Okay.                10:33:37

Page 37

```
 1          So while you were still incarcerated
 2   there in Coleman County, have you told us everything
 3   that you can remember that anybody said, whether it's
 4   you or somebody you heard, regarding Derrek Monroe
 5   committing suicide or attempting to commit suicide?      10:33:55
 6     A   Have I told you everything?
 7     Q   Yes, sir.
 8     A   Yes, sir.
 9     Q   Is there anything else you can remember about
10   either of those two events -- the -- the first one --    10:34:05
11          MR. MALONE:  Well, strike that.  Let's
12   start over.
13     Q   (By Mr. Malone)  Is there anything else you
14   can remember about the first time Derrek attempted to
15   commit suicide using the blanket that you haven't        10:34:13
16   already told us about?
17     A   No, sir.
18     Q   And then what about the second time where he,
19   unfortunately, was successful with a phone cord?  Is
20   there anything else about that event that you can        10:34:24
21   recall that you haven't already told us about?
22     A   He sat there and, I believe, Jessie was
23   sitting at the table -- again, I didn't get up and
24   look, but you could hear him saying, I'm going to --
25   I'm going to kill myself.  I'm going to kill myself.     10:34:43
```

Page 38

```
 1   Please help me, seemed like for an hour or more.
 2     Q   Who was saying that?
 3     A   Derrek Monroe.
 4     Q   Before he actually, apparently, did it?
 5     A   Yes, sir.                                          10:34:53
 6          And Jessie's sitting there telling him,
 7   No, you're not.  You're going to be all right.
 8          You know, he was trying to talk him
 9   down, I guess.
10     I never did get up and, you know, lay           10:35:06
11   eyes, but they was the only two awake at that time, I
12   believe.  It was early morning.  I can't remember if
13   it was before breakfast or not.
14     Q   So you said you heard Derrek saying, for more
15   than an hour, I'm going to kill myself.  I'm going to    10:35:27
16   kill myself.  Please help me?
17     A   Yes, sir.
18     Q   Did you see Jessie Laws take any action in
19   response to that?
20     A   No, I didn't get up out of my rack, but I         10:35:37
21   heard him talking to him, tried to tell him it's going
22   to be all right, that he didn't need to do that.
23     Q   Did you have any concerns when you heard
24   Derrek saying that for a long time?
25     A   No.                                               10:35:53
```

Page 39

```
 1     Q   Why not?
 2     A   No, because -- and this is just hearsay what
 3   Sambo and -- Sambo was telling me, that he -- he was
 4   always a suicide risk, or something like that, always
 5   threatening outside the jail and inside the jail he      10:36:08
 6   was going to kill hisself every time something got
 7   tough.
 8          That's just what one man told me.  You
 9   know what I mean?
10     Q   Sure.                                        10:36:18
11     A   Of course I didn't know the guy.
12          MR. MALONE:  Objection, nonresponsive.
13          I'm not being offensive when I object.
14   I just have to do --
15          THE WITNESS:  Yes, sir.                      10:36:22
16          MR. MALONE:  -- these things for the
17   record.
18     Q   (By Mr. Malone)  Now, did you know -- and --
19   and I'm -- apologize if I asked this.  Did you know --
20   I think you said you did not know Derrek before this,    10:36:30
21   right, before being in jail --
22     A   No, I --
23     Q   -- with him?
24     A   -- didn't.  No.
25     Q   What about Sheriff Cogdill?  Did you know him  10:36:35
```

Page 40

```
 1   before you were incarcerated there?
 2     A   No, sir.
 3     Q   And the administrator, Ms. Brixey, Mary Jo
 4   Brixey, did you know her beforehand?
 5     A   No, sir.                                          10:36:46
 6     Q   Jessie Laws?
 7     A   No, sir.
 8     Q   Did you grow up or did you ever live in
 9   Coleman or Coleman County?
10     A   No, sir.  I'm from Oklahoma.  I've been here     10:36:53
11   about two years by the time I got incarcerated.
12     Q   You must like Texas.  You're still here.
13     A   I won't make any --
14     Q   Leave that alone.
15     A   -- Oklahoma jokes.                               10:37:07
16          So any of the people involved in this
17   case -- Patsy Cope, Alex Isbell -- we've already
18   talked about the sheriff, the jail administrator, the
19   jailer -- anybody else at the jail -- did you know
20   anybody that you understand to be connected with this   10:37:21
21   case before you were incarcerated in the Coleman
22   County Jail?
23     A   No, sir.
24     Q   And then, what about after Derrek died?  Have
25   you become friends with or good acquaintances with      10:37:33
```

Page 41

1    anybody you understand to be connected with this case?
2         A.   No, sir.
3         Q.   Other than during this deposition and our
4    brief phone call, is there anybody else you've talked
5    with about what happened that day and --        10:37:49
6         A.   No.
7         Q.   -- other than people at the jail while you're
8    still there?
9         A.   No, sir.
10        Q.   Has anybody else approached you to try to        10:37:57
11   find out what you knew about what happened?
12        A.   No, sir.
13        Q.   And initially, you had contacted our office,
14   right?
15        A.   Yes, sir.                                10:38:07
16        Q.   Okay.
17        A.   You posted something on Facebook -- or
18   somebody had.
19        Q.   And you saw it and then contacted us and just
20   said, Hey, I've got some information.                10:38:15
21        A.   Yes, sir.
22        Q.   And is it true that we spoke -- I never asked
23   you to --
24             (Unidentified person entered
25             the deposition proceedings.)            10:38:20

Page 42

1             UNIDENTIFIED SPEAKER:  (Inaudible.)
2             MR. MALONE:  Let me start over.
3         Q.   (By Mr. Malone)  Is it true that when we
4    spoke I never asked you to provide any specific
5    testimony?                                        10:38:30
6         A.   No, sir.
7         Q.   I never asked you to say anything specific?
8         A.   No, sir.
9         Q.   And have you told the God's honest truth
10   during your testimony here today?                 10:38:35
11        A.   Yes, sir.
12        Q.   Is there anything else about what happened
13   that you can recall, as you've been sitting here a few
14   more minutes, that you haven't already told us about?
15        A.   No, sir.                                10:38:44
16        Q.   All right, sir.  I very much appreciate your
17   time.  I'm going to pass you as a witness, and this
18   other attorney might have some questions for you.
19        A.   Okay.
20             EXAMINATION                             10:38:55
21   BY MR. HOGG:
22        Q.   Good morning, Mr. Gates.  And as -- as I
23   introduced earlier in the deposition, I'm -- my name
24   is Jon Mark Hogg, and I represent the County and the
25   defendants in this case.                          10:39:08

Page 43

1             Now, do you recall, as far as
2    contacting, being contacted by an attorney in my
3    office by the name of Amanda Crouch?
4         A.   Oh, yes, sir.
5         Q.   Okay.  So you did speak to someone else?    10:39:20
6         A.   Yes, sir, I did.  I apologize on that one.
7         Q.   Okay.  All right.  And do you recall what
8    you -- what she asked about?
9         A.   This -- asked what I -- pretty much what I
10   knew had happened.                                10:39:33
11        Q.   And that's pretty much what you've testified
12   here to today.
13        A.   Yes, sir.
14        Q.   Okay.  And -- and she never asked you to say
15   anything or to change your --                     10:39:41
16        A.   No, sir.
17        Q.   -- testimony?  All right.
18        A.   No, sir.
19             I apologize on that one.  I did forget
20   about --                                          10:39:47
21        Q.   Okay.
22        A.   -- that.
23        Q.   All right.  I just want to make -- make sure
24   that was clear --
25        A.   Yes, sir.                               10:39:50

Page 44

1         Q.   -- because we all --
2         A.   Yes, sir.
3         Q.   -- we all tend to forget things from time to
4    time.
5         A.   Yes, sir.                               10:39:53
6         Q.   Now, what were you incarcerated for?
7         A.   Prohibited weapons, two illegal shotguns,
8    which I only got charged with one.  That's what I got
9    locked up for.
10        Q.   Okay.  And have you ever been convicted of a    10:40:07
11   felony?
12        A.   I am now.
13        Q.   Okay.  Was that the weapons charge?
14        A.   Yes, sir.
15        Q.   Okay.  Prior to your time in the --      10:40:20
16        A.   No, sir, never been incarcerated, never been
17   charged.
18        Q.   And have you been convicted of a felony since
19   that time?
20        A.   No, sir.                                10:40:31
21        Q.   Okay.  Have you been arrested since the last
22   time you were in the Coleman County Jail?
23        A.   Excuse me?
24        Q.   Have you been arrested since --
25        A.   No, sir.                                10:40:39

Page 45

```
1       Q   -- then?  Okay.
2           And I'd just like to go back and just
3   make sure a couple of things are clear.  First, I'd
4   like to ask you about the incident when he first --
5   when Mr. Monroe first comes into the cell and you have    10:40:55
6   the two incidents where -- that you described earlier
7   where he tried to choke himself.  Okay?
8       A   (No verbal response.)
9       Q   Now, you testified that he was in there for
10  approximately two hours?  Do you know how -- is that     10:41:08
11  a -- is that a fair estimate, or was he -- or do you
12  know?
13      A   That's a ballpark figure.
14      Q   Okay.  Because I'm just trying to determine
15  how -- how the time frame was on these incidents.        10:41:23
16          So he --
17      A   I --
18      Q   -- came in --
19      A   I'd get -- I'd have to get up again to see
20  the clock.  You know what I'm saying?  I was laying in    10:41:29
21  my rack the whole time he's in there.  I'm keeping my
22  eye on him because --
23      Q   Okay.
24      A   -- he's...
25      Q   Because you don't know what he's going to do.    10:41:36
```

Page 46

```
1       A   No, he's acting -- yeah --
2       Q   Now --
3       A   -- little radical, I guess.
4       Q   -- was it almost immediately after he came
5   into the cell that he began to try this first choking    10:41:45
6   incident with the -- wrapped around his neck and his
7   leg, or did --
8       A   I don't recall.
9       Q   -- or did some time go by?
10      A   I'd say 30 minutes or more, seemed like.  I     10:41:57
11  don't -- that's been a year ago.  You know what --
12      Q   Okay.
13      A   -- I mean?
14      Q   Yeah, I understand.  And that's why I just
15  want to -- just want to make sure if the two hours       10:42:07
16  is -- if that's a -- a real two hours or if it all
17  just happened -- this all happened within a half hour
18  of each other --
19      A   It could have --
20      Q   -- you know.                                     10:42:14
21      A   It could have happened.  I mean...
22      Q   Did the two incidents with him wrap- --
23  trying to choke himself with it wrapped around his leg
24  and also the attempt to hang himself by jumping off
25  the toilet, did those happen right after each other?     10:42:26
```

Page 47

```
1       A   Yes, sir.  I'd say that -- that was within
2   five or ten minutes --
3       Q   Okay.
4       A   -- of each other.
5       Q   But as you sit here today, you don't have any   10:42:33
6   idea what amount of time went by.
7       A   No, sir, I don't.
8       Q   Okay.  Could have been 10 minutes?  30
9   minutes?  Could have been an hour?
10      A   Yes, sir.                                        10:42:46
11      Q   Okay.  And the same thing with the time that
12  you're laying in the rack and you described it as
13  Jessie hollering and screaming about killing himself
14  for about an hour?  Do you know if it was really an
15  hour?                                                    10:43:02
16      A   I don't know, again, sir --
17      Q   You --
18      A   -- because I --
19      Q   You didn't have --
20      A   -- I can't --                                    10:43:06
21      Q   -- a watch --
22      A   -- see the clock.  Yes.
23      Q   You didn't have a watch on --
24      A   Yes, sir.
25      Q   -- I assume.  All right.                         10:43:08
```

Page 48

```
1       A   All we got's time in there, and I don't know
2   what time it was.
3       Q   And you were -- I think you said you were
4   laying in your rack the whole time --
5       A   Yes, sir.                                        10:43:15
6       Q   -- and trying to go back to sleep, I assume.
7       A   Yes, sir.
8       Q   Okay.  And it -- the way you perceived it, it
9   seemed like it took a long time.  Is that fair to say?
10      A   Yes, sir.                                        10:43:29
11      Q   But you don't have any idea how long it
12  actually took.
13      A   No, sir.
14      Q   All right.  And -- and just to clear up to
15  make sure -- I think it's pretty clear on your           10:43:37
16  testimony, but you did not see or witness anything
17  about the incident or the interaction between Jessie
18  Laws and Derrek Monroe on the morning that --
19      A   No, sir.
20      Q   -- he killed himself?  Okay.                     10:43:49
21          That's all the questions I have.  Thank
22  you.
23          FURTHER EXAMINATION
24  BY MR. MALONE:
25      Q   Just real brief, maybe out of curiosity more    10:43:58
```

Page 49

```
 1   than anything.  You have a felony conviction because
 2   you had an illegal shotgun?
 3      A   Yes, sir.
 4      Q   Can you describe what kind of shotgun gets
 5   you a felony conviction like that?                10:44:09
 6      A   It was a shotgun my grandpa gave me that he
 7   had for years.  Illegal length.  It was too short.  I
 8   think 18 3/4 -- 16 3/4 the legal length, and mine was
 9   a couple inches too short.
10      Q   And that's -- that alone got you a felony    10:44:28
11   conviction.
12      A   Yes, sir.
13      Q   Possessing it?
14      A   Having it in my apartment.
15      Q   And there was no use of -- use of it -- no   10:44:37
16   violent use of it, anything like that.
17      A   No, sir.
18      Q   Mere possession.
19      A   Well, yeah, I had -- I had it in my -- when
20   they got it out of my apartment, I wasn't there.  When  10:44:48
21   they found it in my apartment, I wasn't there.  So you
22   know, me possessing it in my apartment, not having it
23   in my actual possession.
24      Q   All right.  And which law enforcement agency
25   actually arrested you for that?                   10:45:00
```

Page 50

```
 1      A   Coleman County Sheriff's Department.
 2      Q   Okay.  Do you know who the officer was, the
 3   deputy?
 4      A   Deputy Barkemeyer, I believe, if I'm saying
 5   that right.                                       10:45:12
 6      Q   Okay.  And do you know how they ended up at
 7   your apartment, how they found out about that?
 8      A   Santa Anna PD's the one that went in my
 9   apartment.  They went in there to arrest Diana Wells
10   because she had a warrant, and she let them in my   10:45:25
11   apartment.
12      Q   Got you.
13          All right, sir.  I appreciate your time
14   again.  I'm going to pass you as a witness.
15      A   Yes, sir.                                  10:45:32
16          FURTHER EXAMINATION
17   BY MR. HOGG:
18      Q   I'm sorry.  There's always a couple more
19   questions.
20      A   Yes, sir.                                  10:45:36
21      Q   You did not -- since you did not get out of
22   your rack the morning of the incident where Mr. Monroe
23   killed himself, you didn't see who arrived first to
24   assist Mr. Laws?
25      A   No, sir.                                   10:45:49
```

Page 51

```
 1      Q   Okay.
 2      A   No, sir.
 3      Q   You don't know whether it was the sheriff or
 4   Mary Joe Brixey?
 5      A   Yes, sir.  That's true.                    10:45:53
 6      Q   Or the EMT.
 7      A   Yes, sir.
 8      Q   Okay.  So when you're talking about Les
 9   Cogdill being there, you don't know if he arrived
10   first or if someone else arrived first.           10:46:02
11      A   This is true, sir.
12      Q   Okay.  And do you recall?  Were you already
13   in the -- the female cell, in Cell 1, with the door
14   closed when you -- you claim you heard Mr. Cogdill
15   say, Don't die on me?                             10:46:16
16      A   I believe I's still in my cell.
17      Q   In the -- in your cell in the rack?
18      A   Yes, sir.
19      Q   Okay.  Okay.  But you don't know how long he
20   had been there or whether anyone else had --       10:46:26
21      A   No, sir.
22      Q   -- been there?
23      A   I don't -- I don't know how long anybody had
24   been there.
25      Q   And I'm not trying to be rude.  I just want  10:46:31
```

Page 52

```
 1   to make sure we get the clean record since we were
 2   talking over each other.
 3          You don't know -- since you were laying
 4   in your bed, you still -- you do not know who arrived
 5   first, whether it was Mr. Cogdill or Mary Joe       10:46:47
 6   Brixey --
 7      A   Yes --
 8      Q   -- correct?
 9      A   -- sir.
10      Q   All right.  Or it could have been EMTs.  You  10:46:53
11   don't know.
12      A   Yes, sir.
13      Q   All right.
14          MR. HOGG:  No further questions.
15          MR. MALONE:  And I have no further          10:46:58
16   questions either.
17          THE VIDEOGRAPHER:  This concludes the
18   deposition of Brandon Nei-- Neil Gates.
19          The time is 10:46 a.m., and we're off
20   the record.                                       10:47:07
21          (End of proceedings at 10:46 a.m.)
22          - - - - -
23
24
25
```

Page 53

1   STATE OF TEXAS   )
2   COUNTY OF TAYLOR  )
3
4          I, Cara B. McLeod, Certified Court
5   Reporter No. 7775, duly qualified in and for the State
6   of Texas, do hereby certify that, pursuant to the
7   stipulations hereinbefore set forth, there came before
8   me, BRANDON N. GATES, who was by me duly sworn to
9   testify the truth, the whole truth and nothing but the
10  truth of their knowledge concerning the matters in
11  controversy in this case; and that they were thereupon
12  carefully examined upon their oath and their
13  examination reduced to typewriting by me or under my
14  supervision; that the deposition is a true record of
15  the testimony given by the witness.
16         I further certify that I am neither
17  attorney nor counsel for, nor related to or employed
18  by any of the parties to the action in which this
19  deposition is taken, and further that I am not a
20  relative or employee of any attorney or counsel
21  employed by the parties hereto or financially
22  interested in the action.
23         That the amount of time used by each
24  party at the deposition is as follows:
25

Page 54

1          1.  MR. T. DEAN MALONE
                TIME:  0:37
2
              2.  MR. JON MARK HOGG
3                TIME:  0:06
4          I have hereunto set my hand this _____
5   day of _____, 20_____.
6
7
8
9
          _____
10        Cara B. McLeod, Texas CSR No. 7775
          CSR Exp:  12/31/19  Firm Reg No. 4923
11        Accuracy Plus Reporting, LLC
          104 Pine Street
12        Suite 708
          Abilene, Texas  79601
13        (325) 677-3355
          info@accuracyplusreporting.com
14
15
16
17
18
19
20
21
22
23
24
25

Plaintiffs' Appendix 15

# TAB B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
## San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as     :
Dependent Administrator of, and on Behalf of, the   :
Estate of Derrek Quinton Gene Monroe       :
vs.                                           :     CIVIL ACTION NO. 6:18-CV-00015-C
                                             :
Coleman County, Texas; Leslie W. Cogdill;      :
Mary Jo Brixey; and Jessie W. Laws         :

### NOTICE

TO: ALL PARTIES BY AND THROUGH THEIR ATTORNEY(S) OF RECORD AS PROVIDED IN THE ATTACHED SERVICE LIST.

PLEASE TAKE NOTICE THAT ON THE <u>21st</u> DAY OF     <u>September</u> , <u>2018</u>, AT THE HOUR OF 10:00 A.M., THE PRODUCTION OF DOCUMENTS AND/OR TANGIBLE THINGS BY THE CUSTODIAN OF RECORDS FOR:

**Classen Buck Seminars, Inc. (Any & All Records)**
**P.O. Box 154340**
**Waco, TX 76715**

will be conducted before a Notary Public, or other officer authorized to administer oaths employed by Records Deposition Service of Texas, Inc., 2201 Main St., Ste. 1250, Dallas, TX 75201, at the deponent's address, pursuant to provisions of Federal Rules of Civil Procedure. A subpoena duces tecum will be issued to require the witness to produce records, books, papers, documents, and tangible things pertaining to: see attached Exhibit "A."

This notice is given on behalf of the Plaintiff, at the instance and authorization of (his)(her)(its) counsel of record T. Dean Malone, Esq., whose address is 900 Jackson St., Ste. 730, Dallas, TX 75202 and whose phone number is 214-670-9989. Counsel does not propose to interrogate the Deponent, the proceeding being solely for the purpose of authenticating and copying the records, books, and documents in the possession or control of the Deponent. You, of course, are welcome to appear if you so desire. If you have any objection to the copying of the records and documents please call (214) 760-7600.

If the Deponent designated in this Notice is an organization such as a corporation, partnership, association or government entity, deponent-organization shall designate one or more officers, agents or other persons who can testify on behalf of the Deponent with respect to all of the matters thereto.

Order No. **15690**

THERE WILL BE NO INTERROGATION OF THE DEPONENT BY THE UNDERSIGNED COUNSEL.

STATE OF TEXAS   )
COUNTY OF DALLAS )

Law Offices of Dean Malone
T. Dean Malone, Esq.
900 Jackson St., Ste. 730
Dallas, TX 75202

NOTICED BY:  T. Dean Malone, Esq.
24003265

Stacy Ochoa

## CERTIFICATE OF SERVICE

BEFORE ME, the undersigned authority, on this day personally appeared Stacy Ochoa being first duly sworn, on oath states that a copy of the above Notice was personally served this _____09/10/2018_____ on the above-named attorneys to whom this Notice is addressed, at the address set out in such Notice, the same being the last known address of such attorney, (by depositing a copy thereof, postage paid, in a wrapper addressed to such attorneys at such address) or (by facsimile) or (by personal delivery of such Notice to the addressee above set forth).

SUBSCRIBED AND SWORN before me this _____09/10/2018_____.

HOWARD R. FALLON
Notary Public of Texas
My Commission Expires 07/02/22

HOWARD RICHARD FALLON
Notary Public
STATE OF TEXAS
ID#9477936
My Comm. Exp. July 2, 2022

Order No. 15690

IN THE UNITED STATES DISTRICT COURT
FOR THE Northern DISTRICT OF TEXAS
San Angelo DIVISION

| | | |
|---|---|---|
| Patsy K. Cope, Individually, and Alex Isbell, as | : | |
| Dependent Administrator of, and on Behalf of, the | : | |
| Estate of Derrek Quinton Gene Monroe | : | |
| vs. | : | CIVIL ACTION NO. **6:18-CV-00015-C** |
| | : | |
| Coleman County, Texas; Leslie W. Cogdill; | : | |
| Mary Jo Brixey; and Jessie W. Laws | : | |

## LIST OF ATTORNEYS:

Jon M. Hogg, Esq.
Jackson Walker, LLP
135 W. Twohig Ave., Ste. C
San Angelo, TX  76903
325-481-2550   Fax: 325-481-2552

Order No. **15690**

Plaintiffs' Appendix 19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
## San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as   :
Dependent Administrator of, and on Behalf of, the   :
Estate of Derrek Quinton Gene Monroe   :
vs.   :   CIVIL ACTION NO.  6:18-CV-00015-C
  :
Coleman County, Texas; Leslie W. Cogdill;   :
Mary Jo Brixey; and Jessie W. Laws   :

## EXHIBIT A

### I. DEFINITIONS

The term "records, books, papers and documents" as used herein shall include any printed, typewritten or handwritten matter or reproduction thereof whatever character, including without limitation, correspondence, memoranda, agreements, letters, hand or typewritten notes, tape recordings, computer runs and any codes necessary to comprehend such runs, checks, check stubs, bank statements, and writings of every kind and character, whether originals or reproductions.

### II. DOCUMENTS TO BE PRODUCED

Copies of the following for Course No. 3501, entitled "Suicide Detection and Prevention in Jails (Inter)," taken by Leslie W. Cogdill on February 8, 2013 through Classen Buck Seminars, Inc.; syllabus, books, all course materials, audio and video recordings, and all display slides (including projector slides and PowerPoint slides), and documents and tests completed by Leslie W. Cogdill.

Order No. 15690.002

# IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
### San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as             :
Dependent Administrator of, and on Behalf of, the           :
Estate of Derrek Quinton Gene Monroe                        :
vs.                                                         :       CIVIL ACTION NO. **6:18-CV-00015-C**
                                                            :
Coleman County, Texas; Leslie W. Cogdill;                   :
Mary Jo Brixey; and Jessie W. Laws                          :

**AFFIDAVIT**

STATE OF _____

COUNTY OF _____

     BEFORE    ME,    the    undersigned    authority,    personally    appeared (Custodian) _____ who being by me duly sworn, deposed as follows: ___(Please print your name)___

    1. I, the undersigned, am over twenty-one (21) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

    2. I am the Custodian of Records for **Classen Buck Seminars, Inc.** and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.

    3. Attached hereto are _____ pages of records concerning **Leslie W. Cogdill**. These are the original records or exact duplicates of the original records.

    4. It is the regular practice of **Classen Buck Seminars, Inc.** to make this type of record at or near the time of each act, event, condition, opinion or diagnosis set forth in the record.

    5. It is the regular practice of **Classen Buck Seminars, Inc.** for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.

    6. It is the regular practice of **Classen Buck Seminars, Inc.** to keep this type of record in the course of regularly conducted business activity.

    7. It is the regular practice of the business activity to make the records.

Further Affiant sayeth not.


_____
SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the _____ day of _____, _____.


_____
NOTARY PUBLIC
In and for the State of _____
My Commission Expires:_____

Order No. **15690.002**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

San Angelo Division

Patsy K. Cope, Individually, and Alex Isbell, as
dependent administrator of, and on behalf of,
the Estate of Derrek Quinton Gene Monroe and
his heirs-at-law,

*Plaintiff*

v.

Coleman County, Texas; Leslie W. Cogdill;
Mary Jo Brixey; and Jessie W. Laws,

*Defendant*

Civil Action No. **6:18-cv-00015-C**

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   **Classen Buck Seminars, Inc.**
**P.O. Box 154340, Waco, Texas 76715; (254) 379-6153**

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **Copies of the following for Course No. 3501, entitled "Suicide Detection and Prevention in Jails (Inter),"
taken by Leslie W. Cogdill on February 8, 2013 through Classen Buck Seminars, Inc.: syllabus, books,
all course materials, audio and video recordings, and all display slides (including projector slides and
PowerPoint slides), and documents and tests completed by Leslie W. Cogdill.**

| Place:   Records Deposition Service of Texas, Inc.<br>1701 N. Collins Blvd., Ste. 334, Richardson, TX 75080 L<br>Phone: (214)760-7600; Fax: (214)760-0222 | Date and Time:<br>**September 21, 2018 at 3:00 p.m.** |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 8/31/2018

*CLERK OF COURT*

OR

_____               _____
*Signature of Clerk or Deputy Clerk*                                *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  **Patsy K. Cope
and Alex Isbell** _____ , who issues or requests this subpoena, are:
**T. Dean Malone, Law Offices of Dean Malone, P.C., 900 Jackson St., Suite 730, Dallas, Texas 75202
dean@deanmalone.com / (214) 670-9989**

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. **6:18-cv-00015-C**

### PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or

  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Plaintiffs' Appendix 24

IN THE UNITED STATES DISTRICT COURT
FOR THE Northern DISTRICT OF TEXAS
San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as                      :
Dependent Administrator of, and on Behalf of, the                    :
Estate of Derrek Quinton Gene Monroe                                 :
vs.                                                                  :          CIVIL ACTION NO.  6:18-CV-00015-C
                                                                     :
Coleman County, Texas; Leslie W. Cogdill;                            :
Mary Jo Brixey; and Jessie W. Laws                                   :

## EXHIBIT A

### I. DEFINITIONS

The term "records, books, papers and documents" as used herein shall include any printed, typewritten or handwritten matter or reproduction thereof whatever character, including without limitation, correspondence, memoranda, agreements, letters, hand or typewritten notes, tape recordings, computer runs and any codes necessary to comprehend such runs, checks, check stubs, bank statements, and writings of every kind and character, whether originals or reproductions.

### II. DOCUMENTS TO BE PRODUCED

Copies of the following for Course No. 3501, entitled "Suicide Detection and Prevention in Jails (Inter)," taken by Leslie W. Cogdill on February 8, 2013 through Classen Buck Seminars, Inc.; syllabus, books, all course materials, audio and video recordings, and all display slides (including projector slides and PowerPoint slides), and documents and tests completed by Leslie W. Cogdill.

Order No. 15690.002

| Suicide Detection and Prevention in Jails (3501) UPDATED 09/10 |
|---|

# Forward

## PREFACE

The purpose of this course is to give individuals involved in the correctional setting a thorough understanding and knowledge of offenders and inmates with mental impairments, suicidal behavior and methods for detection and prevention of suicide. Suicide prevention should begin at the time an offender is arrested and continue through the time the individual is incarcerated in a correctional facility. Experience and research has shown that almost all jail suicides can be prevented if a comprehensive program is in place that includes staff training, intake screening, communication between staff, appropriate and safe housing, frequent observation, prompt intervention, and human interaction between staff and inmates.

We wish to thank the Texas Commission of Law Enforcement Officers Standards and Education for their contribution to this course. Special thanks also to Ms. Karen Hall of the Open Records Office, Texas Department of Criminal Justice, Huntsville, TX for providing statistical information on current suicide rates in Texas prisons and jails.

Additional information for this course was also taken from:

- *Jail Suicide/Mental Health Update*, Fall 2001, Vol 10, No. 4
- Gale Encyclopedia of Medicine
- American Correctional Association Standards
- *2001 TDCJ Statistical Information* (www.tdcj.state.tx.us)
- *Texas Commission on Jail Standards* (www.tcjs.state.tx.us)
- *Suicide Across the Life Span* by Judith M. Stillion and Eugene McDowell
- *Techniques in Crisis Intervention: A Training Manual from the Suicide Prevention Center, Inc.*
- Prison Suicide: An Overview and Guide to Prevention (available from National Institute for Corrections or www.nicic.gov)
- *The Court's Role In Shaping Prison Suicide Policy*, by William C. Collins, Esq.

### Suicide Detection and Prevention in Jails: Including Mental Impairments

The purpose of this course is to give individuals involved in the correctional setting a thorough understanding and knowledge of offenders and inmates with mental impairments, suicidal behavior and methods for detection and prevention of suicide. Suicide prevention should begin at the time an offender is arrested and continue through the time the individual is incarcerated in a correctional facility. Experience and research has shown that almost all jail suicides can be prevented if a comprehensive program is in place that includes staff training, intake screening, communication between staff, appropriate and safe housing, frequent observation, prompt intervention, and humane interaction between staff and inmates.

# Lesson 01 - Introduction and Myths about Suicide

## 1.1 Introduction

**Learning objective:** The student will be able to explain the extent of the offender suicide problem nationally and in Texas jails and lockups.

### *National Statistics*

Suicide data is collected by the Bureau of Justice Statistics (BJS) as part of the requirements for the Death in Custody Reporting Act of 2000. These statistics reveal the following:

- Suicide is the third leading cause of death in U.S. Jails, behind natural causes and AIDS.
- Jail suicide rates have declined steadily from 129 per 100,000 inmates in 1983 to 47 per 100,000 in 2002.
- The suicide rate in the Nations 50 largest jail jurisdiction is half that of all other jails.
- During 2002 the Nations smallest jails had a suicide rate 5 times that of the largest jails.
- Death rates are higher among men in 9 of the 10 leading causes of death.
- Males and White inmates had the highest rate of suicide in jails, and are 6 times more likely to commit suicide than Black inmates and 3 times more likely than Hispanic inmates.
- Violent offenders committed suicide at nearly triple the rate of nonviolent offenders in jail.
- Nearly half of jail suicides occurred in the first week of custody.

### *State Prison Statistics*

- State prison suicide rates, which have historically been lower than the rate in jails, dropped from 34 per 100,000 in 1980 to 14 per 100,000 in 2002.
- Drug offenders had the lowest suicide rates of all State prisoners.
- 7% of State prison suicides took place during the first month of custody.
- During 2002, the latest year for which such data are available, suicide accounted for 168 state prisoner deaths.

### *Local Jail Statistics*

- There are over 3,300 local jails operated by county and municipal jurisdictions.
- In 2002, the suicide rate in local jails (47 per 100,000 inmates) was over 3 times the rate in State prisons (14 per 100,000 inmates).
- Almost half of jail suicides occurred during the inmate's first week of custody.
- During 2002, the latest year for which such data is available, suicide accounted for 314 jail inmate deaths.

Plaintiffs' Appendix 27

*State of Texas Prison Death Statistics*

- The number of prisoner deaths in Texas from 2005 to 2009 is 1609.
- The number of prisoner deaths in Texas, resulting from suicide from 2005 to 2009 is 325.
- From 2005 to 2009, natural causes/illness was the number one cause of death in Texas, at 778.
- The number of prisoner deaths in Texas in 2009 was 294.
- The number of prisoner deaths in Texas resulting from suicide in 2009 was 56.
- In 2009, natural causes/illness was the number one cause of death in Texas, at 143.

**1.2 Learning Objective:** Student will be able to identify the four factors in a pro-active stance to neutralize litigation.

Most experts agree that liability can be neutralized by "proactive" policies and procedures, coupled with adherence to state and national standards. One such policy would be to implement a four step prevention program with accompanying written policies and procedures that include:

- **Properly trained staff** - this includes training staff not only on suicide prevention but on mental health conditions
- **Intake or admissions screening** - implementing programs that assess an offenders mental condition when he is admitted to a
- **Classification -** after screening, inmates should be classified according to their risk and appropriate supervision provided to ensure their well-being.
- **Increased monitoring** - increase monitoring of all incarcerated offenders for suicidal tendencies appearing after admittance.

It is very important to remember that any program implemented must correspond to state and national jail standards. These standards can be found in Minimum Jail Standards and Guide for the Development of Mental Disabilities Suicide Prevention Plans which are produced by the Texas Commission on Jail Standards.

**1.3 Learning objective:** The student will be able to give at least two reasons why law enforcement officers working the streets need training in the signs and symptoms of suicide.

There are four main reasons why law enforcement officers working the streets need training in the signs and symptoms that an offender is considering suicide:

- Law enforcement is a professional service with the primary goals of protecting lives and protecting rights.
- An arresting officer is the first person in an official capacity to observe offenders and have a chance to see suicide signs and symptoms, thus enabling them to refer the offender to available crisis intervention or mental health services.
- Arresting officers can alert jail staff to offenders exhibiting suicidal symptoms.
- Although many officers prevent jail suicides, some are named in lawsuits for failing in "duty of care" and for deliberate indifference.

**1.4 Myths and Facts Concerning Suicide**

**Learning objective:** The student will be able to list at least five myths and accompanying facts about suicide.

There are numerous myths regarding suicide. Listed below are some of the common myths and the real facts regarding those myths.

Plaintiffs' Appendix 28

- **Myth:** People who make suicidal statements or threaten suicide don't commit suicide.
  **Fact:** Most people who commit suicide have made direct or indirect statements indicating their suicidal intentions.

- **Myth:** Suicide happens suddenly and without warning.
  **Fact:** Most suicidal acts represent a carefully thought out strategy for coping with various personal problems.

- **Myth:** People who attempt suicide have gotten it out of their systems and won't attempt it again.
  **Fact:** Any individual with a history of one or more prior suicide attempts is at much greater risk than those who have never made an attempt.

- **Myth:** Suicidal people are intent on dying.
  **Fact:** Most suicidal people have mixed feelings about killing themselves. They are ambivalent about living, not intent on dying. Most suicidal people want to be saved.

- **Myth:** Asking about and probing the inmate about suicidal thoughts or actions will cause him to kill himself.
  **Fact:** You cannot make someone suicidal when you show your interest in their welfare by discussing the possibility of suicide.

- **Myth:** All suicidal individuals are mentally ill.
  **Fact:** Although the suicidal person is extremely unhappy, they are not necessarily mentally ill.

- **Myth:** The rate of suicide is lower in a jail setting.
  **Fact:** Jail suicides occur several times more often than in the general population.

- **Myth:** Inmates who are really suicidal can be easily distinguished from those who hurt themselves but are just being manipulative.
  **Fact:** Manipulative goals as a motive for self-injury are not useful in distinguishing more lethal attempts from less lethal attempts.

- **Myth:** You can't stop someone who is really intent on committing suicide.
  **Fact:** Most suicides can be prevented.

*Remember, recognizing the symptoms and signs of suicide and appropriately responding to those signs is the best prevention there is for suicide.*

| Suicide Detection and Prevention in Jails (3501) UPDATED 09/10 |
|---|

# Lesson 02 - Profiling Suicide Victims

## 2.1 Suicide Victim Profile

**Learning objective:** The student will be able to list at least five characteristics in a "typical profile" of inmates who commit suicide.

- In 2009, there were 56 individuals who committed suicide in the State of Texas while either detained or incarcerated.
- 98% of the suicide victims were male and 2% were females.
- 16% of suicide victims were African American, 23% were hispanic, 60% were Anglo and 2% were other.
- 1% of suicide victims were under age 18, 29% were between the ages of 18-29, 29% were between the ages of 30-39, 25% were between the ages of 40-49, 11% were between the ages of 50-60, and 5% were over the age of 60.
- 75% of suicide was a result of asphyxia by hanging, 14% resulted from gunshot wounds, 4% resulted from a drug overdose and 7% were suicide by other means.
- 14% of suicides occurred with the first 24 hours of incarceration.
- 11% occurred within the first three hours.
- 50% of suicides were in county-run facilities; 50% occurred in urban jails.
- 64% were detained on violent charges and 36% on non-violent charges.
- 9% of suicide victims were under the influence of alcohol and/or drugs at incarceration.
- 34% of suicide victims had more than one charge.
- 80% of suicide victims were screened for potentially suicidal behavior at booking; with 7% demonstrating mental behavior symptoms.
- 30% of suicides occurred during six-hour period between midnight and 6 A.M.
- 33% of the suicide victims were in isolation.

## 2.2 The Purpose of Profiling

**Learning objective:** The student will be able to explain the correct purpose of a suicide victim profile.

Suicide victim profiles are an important supportive instrument and assessment aid in preventing jailhouse suicides. The intent of the above statistics and profile was to give jail personnel information so they can be sensitive to the characteristics most often appearing in jail suicide victims. The purpose of it is meant to supplement the warning signs and behaviors that are observed at arrest, during transport, booking/intake, and confinement.

**Remember:**

- Profiles are important but not end-alls.
- The signs and symptoms picked up at arrest are very important in detecting and preventing suicide
- Behavior at booking is also very significant
- A profile when used in conjunction with staff awareness training and intake screening can be a valuable tool in jail suicide prevention.

## 2.3 Benefits and Problems of Victim Profiles

**Learning objective:** The student will be able to describe the benefits and problems of locally/regionally developed suicide victim profiles.

Local and regional suicide profiles are encouraged. They may be a more accurate tool for your facility than the national profile. But remember there are benefits and problems to these profiles. They include:

- **Benefits**: usually more accurate than a national profile
- **Problems**: inmates who come from different regions than your local one may be more likely to conform to the national profile.

Additionally, when developing regional profiles, remember:

- Be cautious about quick-fixes and current fads
- Television monitors aren't always effective it only takes a minute or two for an inmate to commit suicide and if the monitors are not constantly monitored they don't serve the purpose.
- Tearaway blankets and gowns are useful to prevent hangings, but they can be used to suffocate oneself.

Plaintiffs' Appendix 31

**Suicide Detection and Prevention in Jails (3501) UPDATED 09/10**

# Lesson 02 - Profiling Suicide Victims

## 2.1 Suicide Victim Profile

**Learning objective:** The student will be able to list at least five characteristics in a "typical profile" of inmates who commit suicide.

- In 2009, there were 56 individuals who committed suicide in the State of Texas while either detained or incarcerated.
- 98% of the suicide victims were male and 2% were females.
- 16% of suicide victims were African American, 23% were hispanic, 60% were Anglo and 2% were other.
- 1% of suicide victims were under age 18, 29% were between the ages of 18-29, 29% were between the ages of 30-39, 25% were between the ages of 40-49, 11% were between ages of 50-60, and 5% were over the age of 60.
- 75% of suicide was a result of asphyxia by hanging, 14% resulted from gunshot wounds, 4% resulted from a drug overdose and 7% were suicide by other means.
- 14% of suicides occurred with the first 24 hours of incarceration.
- 11% occurred within the first three hours.
- 50% of suicides were in county-run facilities; 50% occurred in urban jails.
- 64% were detained on violent charges and 36% on non-violent charges.
- 9% of suicide victims were under the influence of alcohol and/or drugs at incarceration.
- 34% of suicide victims had more than one charge.
- 80% of suicide victims were screened for potentially suicidal behavior at booking; with 7% demonstrating mental behavior symptoms.
- 30% of suicides occurred during six-hour period between midnight and 6 A.M.
- 33% of the suicide victims were in isolation.

## 2.2 The Purpose of Profiling

**Learning objective:** The student will be able to explain the correct purpose of a suicide victim profile.

Suicide victim profiles are an important supportive instrument and assessment aid in preventing jailhouse suicides. The intent of the above statistics and profile was to give jail personnel information so they can be sensitive to the characteristics most often appearing in jail suicide victims. The purpose of it is meant to supplement the warning signs and behaviors that are observed at arrest, during transport, booking/intake, and confinement.

**Remember:**

Plaintiffs' Appendix 32

- Profiles are important but not end-alls.
- The signs and symptoms picked up at arrest are very important in detecting and preventing suicide
- Behavior at booking is also very significant
- A profile when used in conjunction with staff awareness training and intake screening can be a valuable tool in jail suicide prevention.

## 2.3 Benefits and Problems of Victim Profiles

**Learning objective:** The student will be able to describe the benefits and problems of locally/regionally developed suicide victim profiles.

Local and regional suicide profiles are encouraged. They may be a more accurate tool for your facility than the national profile. But remember there are benefits and problems to these profiles. They include:

- **Benefits**: usually more accurate than a national profile
- **Problems**: inmates who come from different regions than your local one may be more likely to conform to the national profile.

Additionally, when developing regional profiles, remember:

- Be cautious about quick-fixes and current fads
- Television monitors aren't always effective it only takes a minute or two for an inmate to commit suicide and if the monitors are not constantly monitored they don't serve the purpose.
- Tearaway blankets and gowns are useful to prevent hangings, but they can be used to suffocate oneself.

Plaintiffs' Appendix 33

# Lesson 03 - Inmate Suicide

### 3.1 Important Factors in Inmate Suicide

**Learning objective:** The student will be able to describe at least four factors in the jail environment that have an impact on suicide.

*Environmental factors that have an effect on inmate suicide:*

- **Authoritarian environment** - many inmates are not use to the restrictiveness and regimentation of being incarcerated. This often leads to depression.
- **No apparent control over future** - many inmates feel they have no control over what happens to them. They are also fearful of and uncertain about the legal process.
- **Isolation from family, friends, and community** - limited and/or no visitation by family and friends results in a feeling of isolation by the inmate
- **The shame of incarceration** - inmates can't handle the embarrassment of being incarcerated and feel suicide will solve the problem
- **Dehumanizing aspects of incarceration** - inmates often view the searches, lack of privacy, and restrictiveness of incarceration as dehumanizing
- **Fears** - inmates, especially new ones, have a preconceived notion of what being in prison is like from TV and movies that stereotype institutions. They are often afraid they are going to be stabbed, raped, or otherwise assaulted.
- **Officer insensitivity** - often officers are insensitive to the feelings and beliefs of inmates when it comes to arrest and incarceration. Inmates are often seen as a victim of their environment with no hope of changing. **Note:** the longer a jail officers career, the more likely he is to have de-sensitized himself to the inmates and his surroundings; often jail personnel are also victims of the jail environment.
- **Trauma of arrest often inversely proportionate to offense** - 75% of suicide victims charged with non-violent crime. The trauma of the arrest, booking, intaking, etc. often overly traumatizes these inmates.
- **Pillars of the Community** - individuals who have been high profile in their communities and are now jailed often feel embarrassment, shame, and self-loathing. These individuals are considered very high suicide risks. Example: the priest who was accused of sexual abuse and committed suicide by hanging himself.
- **Insufficient knowledge** - textbook knowledge about jailhouse operations does not always give corrections officers sufficient knowledge or understanding about the emotional environment of the jail.
- **Training** - on-the-job training and crossing training by mental health professionals is needed so corrections officers can have a better understanding of suicide and suicide prevention

### 3.2 Pre-disposing factors

Plaintiffs' Appendix 34

**Learning objective:** The student will be able to identify at least four pre-disposing factors in jail suicides.

*Commonly found factors related to suicide:*

- **Recent loss of stabilizing resources**
  - Loss of a wife or loved one or, in the case of a youthful offender, a peer
  - Loss of a job or expulsion from school
  - Loss of home or farm,
  - Loss of finances.
- **Recent, excessive drinking and/or drug use**
- **Severe guilt or shame over the event**
- **Same sex rape or threat of same sex rape**
- **Current mental illness**
- **Poor health or terminal illness**
- **Emotional breaking point -** often, inmates are at the end of their rope and that is why they committed the offense. Being incarcerated compounds these feelings and they reach their breaking point.

## 3.2 Periods of High Risk for Inmate Suicide

**Learning objective:** The student will be able to list at least six periods of high risk for suicides occurring in jails.

There are nine different periods of time that inmates are considered at the highest risk to commit suicide. These periods are:

- First 24 hours of confinement
- Intoxication/withdrawal
- Waiting for trial
- Immediately after sentencing
- Impending release
- Holidays
- Darkness
- Decreased staff supervision
- Bad news of any kind - whether legal or personal.

## 3.3 Signs and Symptoms of Potential Suicide

**Learning objective:** The student will be able to list at least ten signs and symptoms of potential suicides.

The key times that corrections officers and law enforcement officers should be observing inmates for signs and symptoms of suicide are at the time of **arrest**, during **transportation**, and during **booking**. There are numerous warning signs and symptoms that an inmate might be suicidal. These include:

**Situational**

- Recent loss or separation from a loved one
- Long or life sentence
- Receiving a parole "hit".
- Receiving time in administrative segregation
- Chronic or terminal illness
- Family history of suicide
- History or previous suicide attempts
- Psychiatric diagnosis ("Special needs" inmate)
- Absence of a support network (no letters or visits)
- Suicide of a friend, fellow inmate, or family member

**Cognitive/Emotional**

- Belief that one is a failure
- Feeling hopeless and helpless
- Extreme guilt about offense

**Behavioral**

- Giving away personal possessions
- Change in previous patterns of behavior
- Isolating one's self
- Hoarding medications
- Crying or other indications of depression

**Use of Verbal Expressions such as:**

- "I can't go on"
- "I've nothing to live for"
- "Nobody cares what happens to me"
- "My life is over"

000111

**Additional signs and symptoms to look for include:**

- Current depression or paranoia
- Expresses or evidences strong guilt and/or shame over offenses
- Talks about or threatens suicide
- Under influence of alcohol or drugs
- Previous suicide attempts and/or history of mental illness
- Severe agitation and or aggressiveness
- Projects hopelessness/helplessness, no sense of future
- Expresses unusual or great concern over what will happen to him/her
- Noticeable behavior changes
- May act very calm once decision is made to kill self
- Speaks unrealistically about getting out of jail
- Has increasing difficulty relating to others
- Does not effectively deal with present; preoccupied with the past
- Begins packing belongings
- Starts giving away possessions
- May try to hurt self : "attention getting" gestures (burning self with cigarette, mild cuts on arms/wrists, etc.)
- Paranoid delusions or hallucinations

## 3.4 Depression

**Learning objective:** The student will be able to identify at least eight signs and symptoms of depression.

The single best indicator of suicide is depression. A national study by the American Foundation for Suicide Prevention found that the best suicide prevention technique is getting an individual treatment for depression. It found that individuals who were being pharmaceutically treated for depression were much less likely to commit suicide. With this in mind, it is important for corrections officers to be cognizant of the signs and symptoms of depression. Following is a list of the major signs and symptoms of depression.

- Feelings of inability to go on - hopelessness or helplessness
- Extreme sadness and/or crying
- Withdrawal or silence
- Loss of or increase in appetite and/or weight
- Pessimistic attitudes about the future
- Insomnia or awakening early; excessive sleeping
- Mood/behavior variations
- Tenseness
- Lethargy - slowing of movements or non-reactive
- Loss of self esteem

- Loss of interest in people, appearance, or activities
- Excessive self blaming
- Strong feelings of guilt
- Difficulty concentrating or thinking

## 3.6 Agitation

**Learning objective:** The student will be able to outline at least three symptoms of agitation.

Agitation often precedes a suicide or suicide attempt. Often, inmates use the suicide as a means of relieving the tension and pressure they are feeling. It is important that you be aware of the following signs that an inmate is becoming agitated:

- High level of tension
- Extreme anxiety
- Strong emotions such as guilt, rage, or the wish for revenge.

## 3.7 Situational Factors Factors That Influence Suicide Decisions

**Learning objective:** The student will be able to name four situational factors which can have an impact on jail suicides.

Situational factors which can have an impact on jail suicides include:

- First-time arrestee or insignificant arrest
- Young offender (anyone under 18, whether or not in adult court)
- Persons with high status in the community
- Prior suicide by close family member or loved one
- Previously imprisoned, facing new, serious charges and long prison term
- Recent jail suicide or attempted suicide by other inmates - "copycat"
- Harsh, condemning, rejecting attitudes of officers
- Prior experience with pain/suffering of alcohol/drug withdrawal

## 3.8 Stress Factors Factors That Influence Suicide Decisions

**Learning objective:** The student will be able to identify at least four current or recent stress factors which can influence jail suicides.

Everyone has a breaking point. Often, life stress situations compound on each other, giving the inmate a feeling of hopelessness and no way out. When these situations occur, officers need to be on the lookout for signs of suicide. These situations include:

- Loss (or threat of loss) of a loved one
- Recent job loss or failure.
- Recent, pending, threatened divorce, separation, or break up
- Rejection by peers - especially true for young offenders
- Serious business or financial loses
- Discovery of major health problems
- Victim of same-sex rape or seriously threatened with same-sex rape.
- Committed heinous crime or one of passion or a revolting sex crime

**Suicide Detection and Prevention in Jails (3501) UPDATED 09/10**

# Lesson 04 - Medical and Mental Health Considerations

It has been reported that jails who have implemented awareness training of suicide symptoms for corrections officers, coupled with the implementation of sound practices in the institution, have led to a decrease in suicides. Officers who receive proper training in suicide detection and prevention can effectively assess the majority of potentially suicidal inmates at booking, while many others are detected by corrections officers supervising inmates in the general population. Many jails report reductions in suicides following awareness training of officers in suicide symptoms and implementation of sound practices.

This lesson will cover information that officers need to properly assess mental health conditions and suicidal risks among inmates.

### 4.1 Medical and Mental Health Conditions

**Learning objective:** The student will be able to cite at least six conditions for which medical and mental health clearance should be requested prior to admitting an arrestee to the jail.

Various medical conditions require medical clearance before an arrestee is booked into jail. Appropriate medical attention prevents suicides and reduces inmate anxiety. High risk candidates for suicide include pregnant women in labor, pregnant women with other serious medical problems, and inmates who claim they need certain types of medication but who do not have medication with them. **Remember:** inmates with unattended medical problems are greater suicide risks.

Listed below are 9 medical conditions that, if exhibited by inmates, should always receive a medical clearance before booking. Although this is not a jail standard requirement, common practice dictates that these problems be addressed. If these problems are addressed prior to booking they can alleviate some of the reasons inmates may attempt suicide:

- Prisoners who are unconsciousness or semi-consciousness
- Prisoners with any significant external bleeding
- Prisoners with any obvious fractures (broken bones)
- Prisoners with any signs of head injury
- Prisoners who may have neck or spinal injuries
- Prisoners with any other sort of severe injury
- Prisoners who cannot walk under their own power
- Prisoners displaying signs and symptoms of possible internal bleeding
- Prisoners with sever abdominal pain
- Prisoners displaying signs of significant drug or alcohol abuse, e.g. a blood level of .275 and more if detained must be observed more closely.

High risk candidates for suicide include:

- Pregnant women in labor
- Pregnant women with other, serious problems
- Prisoners who claim they need certain types of medication but who do not have medication with them

Appropriate medical attention

- Prevents suicides. *Inmates with unattended medical problems are greater suicide risks*
- Reduces anxieties

## 4.2 Risks of Intoxicated inmates

**Learning objective:** Students will be able to list at least three reasons why the confinement of intoxicated persons in jails may be risky.

**Three reasons confinement of intoxicated persons include:**

1. Inmates choke on their own vomit
2. Aspiration pneumonia, caused by inhaling vomit, has a 1/3 mortality rate
3. Injuries to intoxicated inmates and victimization of intoxicated inmates are constant issues.

## 4.2 Intake Screening

**Learning objective:** The student will be able to outline three aspects of intake screening.

Intake screening is the most important aspect of health care with an inmate population. Most mental health conditions and suicidal risks can be detected during the intake screening process. There are three major aspects of intake screening. These are:

- **Observations in an Intake Screening**
  - Observe signs and symptoms of mental illness or suicide by arresting/transporting personnel and booking/intake personnel are important. Catching these signs during intake can go a long way towards preventing suicide later on.
  - Use of appropriate forms and/or questionnaires can aide by providing a variety of medical, mental health, and suicide prevention questions for the intake screener to ask.
  - Provide disposition and referral guidelines and documentation of observations crucial for effective follow-up services and lawsuit protection.
- **Intake screening is done immediately upon arrival at jail, otherwise deaths and lawsuits can occur and communicable diseases can spread.**
- **Intake screening should be conducted by**

o **trained booking or corrections officers, or**

o **nurses or paramedical personnel**

## 4.4 Texas Commission on Jail Standards Guidelines for intake screening

**Learning objective:** The student will be able to state the Texas Commission on Jail Standards Guidelines for intake screening.

*A jail's primary responsibility is to safely and securely detain all individuals remanded to their custody*

- Equitable treatment of all inmates is required without regard to race, religion, national origin, sex, age, or disability

- Mental Disability/Suicide Intake Screening form is required on all inmates
  - o identifies medical, mental health, or other special needs
  - o jail staff should be familiar with the questions asked and what to expect from inmate responses.

## 4.5 Benefits of Intake Screening

**Learning objective:** The student will be able to list at least four benefits of intake screening.

*Benefits of Intake Screening include:*

- Potentially suicidal persons are identified
- Traumas, possible illnesses, and infectious diseases are detected
- Possible drug and alcohol abuse and withdrawal assessed
- Early evaluation and treatment of chronic and acute mental illnesses are discovered and treatment facilitated
- Medication use determined and the need to obtain replacement medication quickly assessed.
- Legal liability protection - can accurately show what needed to be done, what information the patient provided, and what signs and symptoms were exhibited at check-in.

## 4.6 Conditions to Look For

**Learning objective:** The student will be able to describe at least four conditions that screeners can observe about the arrestee at booking.

*Conditions Which Screeners Can Observe About Arrestee at Booking*

- Behavior, speech actions, attitudes, and mind set

Plaintiffs' Appendix 42

- Scars from previous suicide attempts. Examples would include rope scars on neck, cutting scars on wrist.
- Traumas or bruises, color and condition of skin
- Visible signs of drug or alcohol use/withdrawal (tracks on arms, sweating, shaking, etc.)

## 4.7 Determining Mental Retardation

**Learning objective:** Student will be able to describe six factors to determine if a person might have mental retardation and require a review by mental health authorities.

### *Factors to Determine Mental Retardation*

- Physical appearance of the individual
  - o inappropriate clothing for the season
  - o noticeable physical disabilities
  - o awkward or poor motor skills
  - o slow reaction time
- Communication problems
  - o ability or inability to communicate at the level of others in his/her approximate age group
  - o speech impairment
  - o mimics responses to questions rather than try to answer them properly
- Attention span and motor difficulties
  - o difficulty staying on the subject you are trying to discuss
  - o easily distracted
  - o does not maintain normal eye contact, may "wander"
- Social behaviors and interactions
  - o appears to try to have excessive desire to please others
  - o someone else speaks for him in certain situations or transactions
  - o acts younger than his/her age
  - o easily led or persuaded by others(this often comes out in preliminary questioning)

  - o Displays an inappropriate "social distance" during conversations; is detached from the conversation and not engaging in a communication exchange
  - o Appears to use hostility or anger to compensate for his intellectual deficits
- Task performance deficiencies
  - o trouble reading or writing
  - o unable to identify oneself
  - o not able to tell time
  - o problems making or counting change
  - o cannot easily use the telephone

- o cannot give directions to his/her home and has trouble understanding simple directions or instructions.
- Educational background
  - o attended special education classes in school
  - o did not finish high school (at this point you might want to inquire as to the reason they did not finish - was it a legal issue or a grade issue, or what.)
- Work history
  - o lack of any substantial long term employment - job hops often
  - o has or is participating in a sheltered work place such as Goodwill Industries or supported employment
- Residential background
  - o has or is living in a group home, state school or other supervised living situation
- Criminal history
  - o appears person took part in crime with others to gain acceptance
  - o with younger people at time of arrest
  - o was a follower in the crime

## 4.8 Problems associated with using the factors to determine mental retardation

**Learning objective:** The student will be able to identify problems associated with using the above factors to determine if a person has mental retardation.

As with any process, there are drawbacks to using these factors. Although the factors listed serve as guidelines, it is important to remember there is no single "right" answer. Any number of factors may indicate a need for professional assessment. These problems can be easily corrected by not taking shortcuts (ask all the questions), expand on questions you don't feel like you got a satisfactory answer to, and refer as soon as possible if you suspect mental illness or mental retardation. Remember:

- The factors are only guidelines
- There is no single "right" answer
- Any number of factors may indicate a need for professionals in the mental health and retardation field
- DO NOT take shortcuts, ask all questions
- Expand on those questions to gain further insight
- Refer as soon as possible if you suspect mental retardation. This advice is also good for those with mental illness problems, as described in the next objective.

## 4.9 Key issues involving persons with mental illness

Learning objective: The student will be able to identify key issues involving persons with mental illness.

*Key issues involving persons with mental illness*

Plaintiffs' Appendix 44

When dealing with possible mental illnesses, intake personnel must rely on their own perceptions to decide whether or not referral or other actions are appropriate. Many mental illnesses are caused by diseases of the brain or chemical imbalances and can be controlled with psychotropic medications

There are three categories of psychotropic medications. The categories are:

- **Anti psychotic drugs** - medicines used to treat psychosis and other mental and emotional conditions. *It is important to remember that anti psychotic drugs don't cure mental illness, but rather they reduce the symptoms to allow the individual to seek counseling and live a more normal life.*
- **Antidepressants** - medicines used to relieve mental depression. These medications, which work to correct chemical imbalances in the brain, reduce the symptoms of depression (extreme sadness, hopelessness, loss of appetite, fatigue, change in sleep patterns, difficult concentrating, and lack of energy). Also used to treat other disorders such as bulimia, cocaine withdrawal, panic disorder, obsessive-compulsive disorders, and certain types of chronic pain.
- **Mood Stabilizers -** medicines used to correct mood disorders that result in severe or prolonged mood states that disrupt daily functioning. General mood disorders include major depressive disorders (discussed above), bipolar disorder (also discussed above), and dysthymia (recurrent or lengthy depression that may last a lifetime - not as severe as major depressive disorder). Mood disorders appear to be genetic and are associated with chemical imbalances in the brain. Major life stressors (such as being arrested) will often trigger mood disorders in individuals prone to them.

The side effects of these medications can be uncomfortable and often irreversible. The side effects can also cause inmates to refuse to take the medication and thus have a relapse of their condition. Physical symptoms due to the side effects of psychotropic medications include:

- Fixed muscle spasms
- Twisted neck with protruding tongue and eyes that are rolled back
- Restlessness, constant movement of legs even when sitting down
- Tremors of limbs
- Dizziness, flushed face

## 4.10 Psychotic Episodes

**Learning objective:** The student will be able to identify procedures for handling a psychotic episode.

Major life stressors, such as being arrested or being sentenced to a long prison term, can trigger a psychotic episode in arrestees. Anyone can help a disturbed individual during a crisis situation. The role of the officer is to help the inmate through the episode in a safe manner. This involves being cognizant of safety during a crisis situation, including what to evaluate before entering a disturbance and how to approach a potentially psychotic inmate.

*Safety during a crisis situation*

- Maintain a position of safety - stand at least arms length away from the inmate and seek cover if the inmate has a weapon

- Request appropriate back-up from other officers.
- Develop in your mind your initial intervention plan - what you are going to say and do
- Wait for assistance to arrive and advise them of the situation and your proposed course of action
- Confine and isolate the situation
- Delay rapid actions - time is on your side here and can assist in deescalating the situation.
- Remain calm during the whole episode - if you remain calm there a high likelihood you will be able to calm the inmate down.

### Entering the disturbance

- Be aware of your environment - does the inmate have a weapon; are there other persons in the area?
- Note entrances and exits to the area in case you need an escape route
- Survey any damage to the area to assess the degree of violence the inmate is exhibiting
- Determine if everyone involved in the episode are in the area and where they are positioned.

### Approaching the inmate

- Take time to look over the situation
- Even if you know the inmate, introduce yourself. This creates an impression of non-hostile authority.
- Use the inmates name repeatedly. This will make the conversation more personal and make the inmate more comfortable with you.
- State the reason for your presence.
- Take charge - isolate the individual who is having the problem, clear the area, establish that you are the authority.
- Separate persons who are in conflict
- Move dangerous objects out of the reach of or view of the subject
- Remove people or objects that seem to be upsetting the subject
- If certain individuals or objects have a calming effect on the subject, use them (is there another inmate that the inmate is close to, does the inmate have a favorite book that he likes?)
- Do not violate the subjects personal space - keep at least an arms length between you and the inmate
- Avoid crowding or rushing the subject - time is on your side here - take your time in talking to the inmate
- Avoid one-on-one physical confrontations
- Divert subject from anxiety by asking routine information (when is your birthday, what is your middle name, where are you from)
- Maintain control at all times
- Use good communication skills (ask open ended questions to find out what the problem is, maintain eye contact, square off looking at the individual).
- Encourage the inmate to talk to you about the problem
- Don't lie to the inmate about what you can or can't do

### 4.11 Intake Screening

**Learning Objective:** The student will be able to name at least four elements of a successful intake-screening interview.

During arrest, transportation, booking and supervision of inmates, all officers should continually assess an inmates/offenders suicide risk and report any potential suicidal behaviors to a supervisor or medical authorities. There are several observations that booking officers should make to assess potentially suicidal behavior.

**Observations by booking officers that will aid in suicide risk assessment:**

- **Look for the following signs and symptoms**:
    - Behavior, speech, actions, attitudes, or state of mind (remember previous lessons) displayed by the inmate that may be a signal that the inmate is at risk
    - Scars, especially cut marks on the wrist or rope burn marks around the neck, that might indicate a previous suicide attempt
    - Traumas or bruises that would indicate some type of assault. Color and condition of skin that might indicate some type of disease.
    - Visible signs of drug or alcohol use and withdrawal
- **Determine if medication is being used by the inmate**. Remember, if an inmate is taking certain prescription antidepressants or mood alternators and abruptly discontinues their use, this could lead to suicidal tendencies.
- **Most intake processes involve some type of questionnaire designed to assess an offenders potential suicide risk and state of mind**. Effective interviewing will yield over 90% honest answers and gives the inmate the impression that someone cares about them. By following some of the below techniques, booking officers can get effective results from the questions:
    - Explain the rationale for the process. This reduces paranoia and the feeling the offender may get that he is being "picked on".
    - Ask questions in a common-sense manner and in as private a setting as possible.
    - Speak in a normal, quiet, matter of fact tone. Don't be judgmental no matter what answers the offender gives.
    - Use language the inmate can understand.
    - Do not be pushy, abrupt, or sarcastic. Allow the inmate to explain his answer without cutting him off.
    - If the inmate does not understand the question, slowly and clearly repeat the question. You might also consider rephrasing the question in simpler language or giving the offender an example of what you are asking.
    - Ask clarifying questions. Try rephrasing what the offender said to be sure you understood. For example, you might say "So you are saying that . . ."
    - Use follow up questions to glean additional information from the offender. This can be particularly effective if the offender is having problems understanding the questions or is being vague with their answers.

**4.12 Observational Factors and Suicide Screening Questions**

**Learning Objective:** The student will be able to list at least eight observational factors and interview questions pertaining to suicide screening.

Most intake processes in jails include a form listing specific questions to ask offenders when they are being booked into jails. Think back to the form used in your facility. It should include specific question designed to determine whether an offender is a suicide risk. These questions include:

- **Have you ever received MHMR (Mental Health/Mental Retardation) services or any other mental health services?**
  If the answer is yes, ask the following follow-up questions:

- o What services did you receive? Did you receive medication, counseling or were you hospitalized?
- o When did you receive these services?
- o Where did you receive these services?
- o Are you currently taking medication or are you currently under a psychiatrist or psychologists care?

- **Do you know where you are?**
  You should use the following criteria to evaluate the offenders response:

  - o Must answer very specifically. Naming the city and state is not enough. An example of an appropriate answer would be: "Yes, I am being booked in the county jail in Merkel, TX."
  - o Ask what type of place it is. They should say it is a jail.

- **What season is this?**
  You should use the following criteria to evaluate the offenders response:

  - o Does the person name the actual season, such as winter, spring, summer, or fall?
  - o Does the person name something else to indicate they are aware of their surroundings? This might include the offender telling you it is baseball season or football season or the NBA Playoff season.

- **What is the difference between a lawyer and an attorney?**
  You should use the following criteria to evaluate the offenders response:

  - o Response should indicate they are the same
  - o If they answer they are the same, ask them to explain to you what an attorney/lawyer is.

- **Sometimes people tell me they hear voices or noises that other people don't seem to hear. What about you?**
  You should use the following criteria to evaluate the offenders response:

  - o If the offenders answers no, I don't hear voices or noises you have received an appropriate response.
  - o If the offender answers yes, I do sometimes hear voices or noises, ask for an explanation.

These general questions are to assess the offenders state of mind during the intake process. Specific questions that can be asked regarding potentially suicidal behavior include:

- **Have you ever attempted suicide or had thoughts about killing yourself?**
  If the individual answers "yes", you should ask:

  - o When?
  - o Why?
  - o How?

- **Are you thinking about killing yourself today?**
  If the individual answers "yes", you should ask:

  - o Why?
  - o How are you going to do that?

Plaintiffs' Appendix 48

○ Where are you planning on doing it?

- **Have you ever been so down and depressed that you couldn't do anything for more than a week. If yes, do you feel that way now?**
  A yes answer could be a sign of depression, which is one of the predictors of suicidal behavior.

- **When not on drugs or drinking, have you ever gone for days without sleep or had a long period in your life when you felt very energetic or excited?**
  An answer of "yes" to this question could indicate manic/depressive disorder, which is one of the predictors of suicidal behavior.

- **Have you experienced a recent loss or death of a family member or friend or are you worried about major problems other than your legal situation?**
  One of the main predictors of suicidal behavior is a recent loss or major problem such as divorce or separation from spouse and children.

You should also observe whether the individual appears to be "flat" - that is non-responsive to questions and his/her surroundings or displaying a la of expression to anything that is going on.

In addition to specific questions booking officers can ask the offender to determine an offenders suicide potential, there are also a number of observational questions the booking officer can ask himself to determine whether an offender is a potential suicide risk. Answers of "yes" to these questions could be a signal the offender is unstable and in need of mental health referral. These questions include:

- **Does the individual act or talk in a strange manner?**
  You should use the following criteria to evaluate the offenders response:

  ○ Does the inmate appear to not be able to focus his attention on what is happening?
  ○ Does the inmate hear things that no one else hears?
  ○ Does the inmate talk to him/herself?
  ○ Does the inmate continually look around as if seeing something that isn't there?
  ○ Does the inmate have unusual motor movements such as ticking, jumping, involuntary movements, etc?

- **Does the individual seem unusually confused or preoccupied?**
  You should use the following criteria to evaluate the offenders response:

  ○ Does the inmate appear puzzled and his surroundings or what is going on?
  ○ Does the inmate not seem to understand the conversation?
  ○ Is the inmates attention deeply fixed on something other than questions being asked?

- **Does the individual talk very rapidly or seem to be in an unusually good mood?**
  You should use the following criteria to evaluate the offenders response:

  ○ Does the inmate appear giddy or euphoric (could be a sign he is in a manic phase)?
  ○ Does the inmate speak in sentences that run on top of each other?

- **Does the individual claim to be someone else such as a famous or fictional person?**
  This could be a sign the person is delusional and mentally ill.

- **Does the individuals vocabulary appear to be limited?**
  This should be evaluated in the person's native language. If it appears the vocabulary is limited, this could be a sign of mental retardation and should be reported.

- **Does the individual have trouble coming up with words to express him/herself?**
  This could also be a sign of mental retardation and should be reported.

## 4.13 Factors and principles in assessing suicidal behavior

**Learning Objective:** The student will be able to identify at least four factors and principles in assessing suicidal behavior.

There are several principles and factors involved in assessing suicidal behavior. Being cognizant of these factors can greatly increase the chance that booking officers will successfully identify suicidal behavior in offenders during intake. These factors include:

- Searching an offenders records to determine if they have prior suicide attempts
- Taking all suicide threats seriously. After all, manipulation by threatening suicide is the first real threat.
- Gauge the intensity of the offenders stress and depression. Pay particular attention to inmates that were identified in previous lessons as "high risk".
- Determine an offenders impulsiveness. In general, the younger the inmate, the more impulsive they are. This can be especially true of very young inmates accused of horrific crimes.
- Ask direct questions and explore the situation as far as possible. Glean as much information as you can from the offender to judge their state of mind.
- If an inmate threatens suicide, ask them what their plan is for committing suicide. In general, the more detailed the plan, the greater the likelihood they will attempt suicide. A non-specific plan such as "I will figure out a way" tends to be a lower-risk threat than "I am going to take my bed sheet and hang myself in my cell", which tends to be a higher-risk threat.
- If the inmate has access to implement the plan, determine if the means are available. For example "I am going to take my bed sheet and hang myself in my cell" means they have access and means to carry out the plan. Alternatively, "I am going to go to Tennessee and shoot myself on my mothers grave", would be assessed as a lower risk because the inmate is going to be incarcerated and not have (hopefully) access to a gun.
- Assess resources available to prevent the act and refer the inmate to those appropriate resources. This should ALWAYS be done in high risk cases.

Suicide Detection and Prevention in Jails (3501) UPDATED 09/10

# Lesson 05 - Interacting with Potentially Suicidal Inmates

This section will cover basic skills an officer needs when he/she encounters suicidal inmates. Students will be given a background on the basic role of the officer in suicide prevention and will be given practical guidelines on how to handle situations that arise involving suicidal inmates.

## 5.1 The most important factor in Suicide Prevention

**Learning objective:** The student will be able to list the most important factor in suicide prevention.

The most important factor in preventing suicide in jails is a well-trained officer. Officer training involves three facets that will give the corrections officer the needed skills to effectively intercede on behalf of a suicidal inmate. These three facets are:

- Awareness training to detect signs and symptoms of suicidal behavior
- Procedures to thoroughly document suicidal behavior and the outcomes of the intervention
- How to refer inmates for counseling or medical services.

## 5.2 Basic Role of Corrections Officer in Suicide Prevention

**Learning objective:** The student will be able to define the basic role of the officer in suicide prevention.

**Basic role of the officer in suicide prevention:**

- Be aware of the symptoms (discussed in previous lessons) ordinarily displayed by inmates prior to a suicide attempt
- Be tuned in to both obvious and subtle signs that every inmate sends out prior to a suicide attempt
- Have daily contact with inmates. By noticing sudden behavioral changes, you may be able to head off a suicide attempt.
- Be empathetic, not judgmental. State law requires a "Duty of care"
- Don't give up on an inmate. By continually being a positive role model the officer may be able to save the inmates life.
- If you are accepting of inmates and not judgmental you will save lives versus being "hard" and rejecting, which can encourage suicidal tendencies.
- If only one person cares, and shows they care, you may be able to prevent a suicide.
- The busy, uncaring officer may be "the last straw" and push the inmate over the edge to a suicide attempt.

**5.3 Good Discipline and Mental Health Principles in the Jail Setting**

**Learning objective:** The student will be able to name at least ten principles of good discipline and mental health principles in jails which can have an impact on suicide prevention.

The best suicide prevention is humane interaction between correctional officers and inmates. By following the golden rule, "do unto others as you would have others do unto you", officers can greatly affect the levels of suicidal behavior in their facilities.

By practicing principles of good discipline and mental health that will be discussed in this lesson, officers will see positive outcomes including:

- Good inmate management and discipline
- Positive atmosphere and climate in the facility
- Special incident involving inmates will be minimized
- Mentally ill and suicidal inmates will be more effectively managed

Principles for good discipline and mental health:

- BE FAIR - Number one among all officer traits
- Don't show favoritism among inmates - Showing favoritism is NOT FAIR
- Keep promises - broken promises represent lies to inmates. In other words, don't make promises if you are not SURE you can keep them
- Use authority and power constructively - officers who have self respect have no wish for Power.
- If you make a mistake "admit it" - This is one of the hardest things for officers to do, yet it elevates you more to the human status with inmates and you earn respect in their eyes.
- Do not put down or be condescending to inmates - self confident, self respecting officers don't put others down.
- Do not wash "dirty linen" in public - No open criticism of fellow staff members or established policies and procedures; this leads to poor team morale and is devastating to cooperative working environments.
- Answers questions as fully as possible and give a rationale for the answer whenever possible. A reasonable answer promotes communication and respect for others.
- If you need an inmate to do something, ask them first and then, if they don't comply, order them. Remember, you catch more flies with honey than vinegar.
- Be consistent and use sound reasoning when making decisions
- Talk with inmates and get them to talk to you. This is a key factor in suicide prevention and, although it requires officer involvement, it also shows respect for the inmate.
- Be someone an inmate can look up to - positive role models are more likely to deter suicides.
- Be a team player - this type of consistency between staff will set an example for inmates and create a stable, comfortable environment in the facility
- Be self-confident (don't confuse this with being arrogant). Having self respect produces self confidence - lack of self respect produces arrogance.
- Demonstrate sincerity and honesty with inmates, these traits are the foundation for other positive traits
- Give credit when credit is due - by emphasizing the positive you will inspire inmates to do better and produce positive results.

- Accept constructive criticism and use it to better you job performance and your personal traits. Employees grow by accepting criticism and dealing with the issues brought up. Do not become defensive.
- Keep an open mind about inmates and situations - don't stereotype them, if you do, learning will stop for you and for them.
- Don't not use threats as a way to get inmates to cooperate - you will lose respect and once lost, it is very hard to earn back.
- Leave personal problems at home - inmates have enough of their own problems without feeling like they are taking on yours; likewise don't let your personal problems affect your attitude at work.
- Don't yell or swear - that does not set you up as a positive role model and encourages the same type of language from inmates
- Do more than what is expected of you. Giving an extra 2% can yield a 100% difference in outcomes.
- Be patient - patience reflects self confidence and respect for others.
- Don't give up easily on an inmate - if you give up, their last hope in life may fade
- Don't preach - set a positive example and you will accomplish much, much more
- Show that you care - a caring officer who shows it can save lives.

*Officers who follow principles of good discipline will be more effective agents of change in inmates' lives.*

Managing Mentally Ill Inmates, Some of whom may be suicidal

- Try to calm the individual and relieve anxiety by being calm, confident, firm, fair, and reasonable yourself. Explain how you see the problem, what is being done, what the outcome will be. Tell the inmate that the crisis is just temporary - things can be worked out - as generally happens.
- Encourage the inmate to speak freely, express their feelings and to relate to you. Avoid arguing and help the inmate structure the experience so that it is not so chaotic, and it does not appear unusual.

## 5.4 Interacting with Suicidal Inmates

It is important when dealing with any mentally ill or suicidal person that you remain calm, confident, firm, fair and reasonable. This will help calm the individual and relieve their anxiety. You should explain to the inmate how you see the problem, what is being done about the problem, and what the likely outcome will be. Assure the inmate the crisis is temporary and can be worked out. Officers should also encourage inmates to speak freely and express their feelings. You should avoid arguing with the inmate and help the inmate structure the experience so that it does not appear out of control or unusual.

**Learning objective:** The student will be able to list the steps in approaching a suicidal person.

During contact with a suicidal inmate, there are several important factors to remember when approaching them. These factors are:

- REMAIN CALM - A calm demeanor on your part can help deescalate a volatile situation.
- Remember - the subject may attempt to have others kill them.
- Make a plan and follow it. Rushing to the rescue only escalates the situation and increases the risk to everyone.
- In an unstable situation the person may become homicidal so STAY ALERT.
- Ask the inmate what their intent is - "Are you thinking about killing yourself?"

- Check out the situation. You should ask:
  - How are you planning to kill yourself? (remember, a non-specific plan has a better chance of a favorable outcome than a very specific plan)
  - When are you planning to kill yourself?
  - Ask the person to remove the means - if the person has a knife or gun, ask them to put it down.
  - Ask if they are taking the action for their personal safety; if so, taking the means away could trigger a suicide

## 5.5 Communication Techniques with Suicidal Individuals

**Learning objective:** The student will be able to identify appropriate communication techniques with someone who is suicidal.

Every well meaning officer needs guidance on what to say and how to say it when dealing with suicidal inmates. Often, officers engage in communication skills that actually act as barriers to effective communication.

**What to say to a suicidal inmate:**

- Show compassion for the individual. Saying something like "I can see that you are very upset/hurting right now", shows empathy to the inmate and can help calm a volatile situation.
- Redirect the persons thoughts to feelings and away from the actions. This can be accomplished by saying something like, "What are you feeling?" or "What are you thinking about?"
- Offers alternatives. Ask, "What else do you think you could do right now to make yourself feel better or resolve this situation?"
- Let the person talk without showing condemnation or shock.
- Convey to the person that suicidal thoughts are normal part of severe depression. This will allow the person to feel less guilty or isolated.
- Help the person to identify pain, whether physical or emotional. Ask them if they are hurting and where they are hurting at.

**Barriers to effective communication between corrections officers and inmates:**

- The officer should not offer his/her own solutions or give advice.
- The officer should not become angry, judgmental, or threatening. Threats will only escalate the situation and could lead the inmate to go ahead with the suicide.
- The officer should not make jokes or act sarcastic about the situation. Ridiculing inmates for attempting suicide is the worst possible thing you can do.
- The officer should not make promises he cannot keep
- The officer should *NEVER* challenge the inmate to follow through with the suicide threat.
- The officer should never ignore the suicidal risk or threat.

## 5.6 Critical Factors in dealing with manipulative inmates

Plaintiffs' Appendix 54

**Learning objective:** The student will be able to list two critical factors in dealing with manipulative inmates.

Sometimes, inmates threaten suicide in order to manipulate staff into giving in. Recommended guidelines for dealing with manipulative inmates include:

- Utilize preventive steps, including increased supervision.
- Avoid isolation as a response to manipulative behavior
- Document the behavior without making a determination that it was manipulative behavior
- Refer the inmate to mental health/medical personnel for assessment, even if you think he is being manipulative. They are the ones best qualified to make that judgment and you wouldn't want to be the one who made that call and then something catastrophic happened.
- Avoid using the term "manipulation" in written documentation. This will unduly label the inmate and his next real attempt might not be taken seriously.

## 5.7 Low risk versus high risk suicidal inmates

**Learning objective:** The student will be able to explain the difference between low and high-risk suicidal inmates.

### Characteristics of inmates at a low risk for suicide:

- Individual not actively suicidal, but has expressed suicidal thoughts and/or has a prior history of self-destructive behavior.
  - *They should be placed under close watch and physically observed by staff at staggered intervals not to exceed 15 minutes.*

### Characteristics of inmates at a high risk for suicide:

- Individual is actively suicidal by either threatening and/or engaging in the act of suicide or other self-destructive behavior, and/or has had a recent suicide attempt
  - *They should be placed under constant watch and physically observed by staff on a continuous, uninterrupted basis - remember it only takes a second for a situation to get out of control.*

## 5.8 Supervising both low and high risk suicidal inmates

**Learning objective:** The student will be able to explain the recommended system for supervising both low and high-risk suicidal inmates.

- All suicidal inmates should be housed in suicide-resistant, protrusion-free cells located in high traffic/visibility areas.
- Belts, ties, shoelaces, suspenders, or anything that an inmate can use to hang themselves should be removed. Only in extreme cases should clothing be removed, and, in that case a paper gown should be issued.
- In most cases, constant watch status should not require clothing removal or restraint application
- The national correctional standard for audio monitoring and/or closed circuit TV should not be utilized as a replacement for staff observation.

- The removal of clothing and applying of restraints should only be used as a last resort during periods when the inmate is physically engaging in self-destructive behavior.

| Suicide Detection and Prevention in Jails (3501) UPDATED 09/10 |
| --- |

# Lesson 06 - First Aid

Because suicide attempts by inmates in jail facilities is a very real scenario, it is important that officers are trained in First Aid and CPR. Jail Standards recommend that all staff who come in contact with inmates should be trained in standard First Aid and CPR.

**IMPORTANT: If you discover an inmate attempting suicide, you should respond immediately, secure the scene, initiate First Aid, and alert other staff to call for emergency help. NEVER presume that an inmate is dead, always initiate and continue life saving measures until relieved by medical personnel.**

By recognizing the previously discussed signs and symptoms of suicidal inmates, and being proficient in your standard First Aid training, officers can help reduce the number of suicides committed by incarcerated inmates.

## 6.1 Proper Handling of a Hanging Inmate

**Learning objective:** The student will be able to describe at least three immediate steps in the proper handling of an inmate who is found hanging.

Hanging may affect any or all neck structures. These structures include the *airway*, the *spinal cord* and *blood vessels*. When an inmate is found hanging you should immediately do the following:

1. IMMEDIATELY cut the victim down (one person holds up the body while others cut noose with readily available tool) - deaths occur because of no cutting tool
2. Have someone call an ambulance or medical personnel immediately
3. Give basic First Aid until medical help arrives - ***NEVER*** discontinue life saving First Aid. That is a decision that needs to be made by qualified medical professionals.

## 6.2 First Aid for Hanging Victims

**Learning objective:** The student will be able to outline at least four aspects of First Aid for a hanging victim.

Not only is it important to immediately administer First Aid to hanging victims, it is also important to remember that the follow-up treatment for an individual who does not complete the suicide is important. Below are four aspects of First Aid treatment that officers should adhere to when dealing with suicidal inmates.

Once the inmate has been cut down, immediately begin Rescue Breathing and CPR:

1. Slowly roll victim onto their back (roll towards you)
2. Open airway by head tilt-chin or modified jaw thrust

3. Check for breathing

4. If no pulse, begin CPR

**<u>REMEMBER: only a physician or other qualified professional designated by state law can pronounce individual dead. Until such time, start and continue First Aid and CPR.</u>**

- Suicide attempt is a serious matter, whether you feel the inmate is using it as a manipulative tactic or whether it is a serious attempt. Regardless of how you feel about the inmate's crime or suicide attempt, you should keep your personal feelings to yourself. Do not belittle the inmate or make sarcastic remarks. These remarks will only worsen the inmate's emotional state.

- **Suicidal inmates should always receive psychological help - offer that help as soon as practical after the suicide attempt once the inmate is physically able.**
- There should be a thorough review of all suicide attempts/completions to ensure that such a tragedy does not occur again.
- This should be done in the form of an administrative review of the facts and circumstances surrounding the incident and recommendations on how to keep the incident from happening again.

Plaintiffs' Appendix 58

Suicide Detection and Prevention in Jails (3501) UPDATED 09/10

# Lesson 07 - Jail Suicide Prevention Plans

**Functional Area**: During this block of instruction, the student will learn the importance and components of a Jail Suicide Prevention Plan.

## 7.1 Mental Disabilities/Suicide Prevention Plan

**Learning Objective**: The student will be able to list at least five components of the Mental Disabilities/Suicide Prevention Plan required by the Texas Commission on Jail Standards.

- Training
  - Staff training in Procedures, supervision, documentation and handling inmates who are mentally disabled or suicidal
  - Supplemental training for staff members responsible for intake
  - Staff training in assessment and classification of inmates during the intake screening process
- Identification/Screening:
  - Procedures to identify inmates who are mentally disabled or suicidal
  - Procedures for referrals to Department of State health Services, Department of Aging and Disability Services, or other available mental health officials
- Staff Communication between staff members
  - Required to develop procedures for communication between staff members of information relating to inmates who are mentally disabled and/or potentially suicidal.
- Housing
  - Procedures for the assignment of inmates who are classified as mentally disabled and/or potentially suicidal to appropriate housing. *Remember, inmates should always be housed in the least restrictive environment possible to avoid additional mental anguish and trauma.*
- Supervision
  - Provisions for adequate supervision of inmates who are mentally disabled and/or potentially suicidal and procedures for documenting supervision.
  - Minimum standards call for face to face observation at least every 30 minutes or more frequently with potentially suicide/disruptive inmates
  - Additionally, two way voice communication between inmates and officers will be in place at all times.
  - Closed circuit TVs may be used to **supplement**, not in lieu of, personal observation
- Intervention
  - Establish procedures for staff intervention prior to the occurrence of suicide
  - Establish procedures for staff intervention during a suicide or attempted suicide (remember your first aid lesson in the previous lesson)
  - Establish procedures for staff intervention in the event of a deterioration in the inmates mental condition

- Reporting
  - Establish procedures for reporting completed suicides to appropriate outside authorities
  - Establish procedures for reporting completed suicides to family members
- Follow-up/Review
  - establish procedures for follow-up review of policies and procedures by sheriff/operator and mental health/medical officials in the case of an attempted or completed suicide

## 7.2 Procedures for Sharing Client Information

**Learning Objective:** The student will be able to discuss general procedures for sharing client information with other agencies in accordance with provision of Texas Health and Safety Code, Section 614.017 and 611.004.

Under 611.004 a professional may disclose confidential information only:

- To governmental agency if the disclosure is required or authorized by law;
- To medical or law enforcement personnel if the professional determines that there is a probability of imminent physical injury by the patient to the patient or others or there is a probability of immediate mental or emotional injury to the patient;
- To designated persons or personnel of a correctional facility in which a person is detained if the disclosure is for the sole purpose of providing treatment and health care to the person in custody

Persons covered under 614.017:

- Convicted felons with mental illness or mental retardation
- An individual with mental illness or mental retardation placed on community supervision after a grant of deferred adjudication

Agencies that may share information under 614.017

- Department of State Health Services (assumed Community Mental Health Services from TDMHMR)
- Municipal or County Health Departments
- Hospital Districts
- Texas Juvenile Probation Commission
- Texas Youth Commission
- Department of Assistive and Rehabilitative Services
- Commission on Jail Standards
- Texas Department of Criminal Justice
- Correctional Managed health Care Committee
- Community supervision and corrections departments
- Local Juvenile probation departments
- Local jails regulated by Texas Commission on Jail Standards
- Department of Assistive and Rehabilitative Services
- Health and Human Services Commission

Memorandum of Understanding between Parties required

Authorized Agencies Can:

- Receive information relating to a special needs offender regardless of whether other state law makes that information confidential, if the agency receives the information for the purpose of providing continuity of care to the offender
- Disclose information relating to a special needs offender including information about the offenders identity, needs, treatment, social, criminal, and vocational history, and medical and mental health history, if the agency discloses the information for the purpose of providing continuity of care to the offender

Restrictions:

- Continuity of care information can be shared without consent of the offender for the purpose of providing continuity of care for the following offenders
  - Offenders with mental impairments.
  - Elderly offenders
  - Physically disabled, terminally ill, or significantly ill offenders.
- Disclosure of continuity of care information without a consent form should be on a need to know basis within the agencies entitled to share the information

Program Assistance: contact

- Texas Department of State Health Services
- Texas Department of Aging and Disability Services
- Texas Correctional Office on Offenders with Medical or Mental Impairments

## 7.3. Administrative Review

**Learning Objective**: The student will be able to list three areas to be included in an Administrative Review.

Administrative review should be separate and apart from other investigations. The review should include:

- A critical review of the circumstances surrounding the incident
- A critical review of jail procedures relevant to the incident
- A synopsis of all relevant training received by staff
- Pertinent medical and mental health services/reports involving the victim
- Recommendations, if any, for change in policy, training, physical plant, medical/mental health services and operational procedures

## 7.4 Components of a Psychological Autopsy

**Learning Objective:** The student will be able to name at least two components of a psychological autopsy.

Psychological Autopsy and Follow-up Support for Jail Staff:

- Evaluation of facts and circumstances
- Goal: to prevent suicides in the future
- All staff concerned with suicide is involved to discuss signs/symptoms which were overlooked
- Staff should be encouraged to discuss feelings
- Recognizing feelings and discussion may ward off after-effects
- Professional counseling services for severe guilt cases
- Suicides can occur without staff negligence, although it is common for staff to blame selves for "not having done better"

Recommend data collection guide:

- Identifying data for the deceased (demographic)
- Details of the death (method, date, time, location, how discovered and by whom)
- Deceaseds history
- Social history (including legal)
- Psychiatric history (history of prior attempts)
- Relevant medical history
- Personality style
- Role of alcohol/drugs
- Death trends in family
- Recent life changes
- Clues to suicide prior to death
- Behavioral changes
- Affective changes
- Direct/indirect suicidal communications
- Reaction of staff to death
- Recommendations for enhancing screening, referral and treatment

Some type of support should be available for staff. Jail Administration, possibly with mental health staff involvement, should:

- Discuss with concerned staff their feelings stemming from the death
- Recognition of staffs feelings and giving them a chance to express
- Themselves may be all that is necessary to ward off any long term negative after-affects

Professional counseling services may be required by some staff and inmates

Suicide Detection and Prevention in Jails (3501) UPDATED 09/10

# Lesson 08 - Jail Design

**Functional Area**: During this block of instruction, the student will learn how a jail design can impact suicide prevention.

**8.1 Direct versus Remote Supervision Jails**

**Learning Objective**: The student will be able to outline the differences between direct and remote supervision jails and their impact on suicide prevention.

- Poor jail design and layout influence suicide and affect monitoring and supervision
- Officers must be stationed in or immediately adjacent to housing areas
- Officer must respond within four minutes to emergencies (American Correctional Association Standard)
- Cells laid out on linear basis down long hallways much more difficult to monitor
- With an officer inside the cells in a pod or module, there is better interaction and communications with behavior changes picked up quicker and suicide prevention more likely
- Direct supervision jail concept clearly supports not only better suicide prevention but alleviates many other jail problems
- Proper jail design is good insurance for alleviating liability, especially with all too often inadequate jail staffing and overcrowding

**8.2 Aspects of Jail Architecture**

**Learning Objective**: The student will be able to identify aspects of jail architecture which help make a facility-resistant or protrusion-free.

- Eliminate Bars and air grilles
- Eliminate Clothes hooks and towel racks
- Eliminate Beds, and shelves
- Eliminate Sprinklers
- Eliminate Door hinges
- Eliminate Handles and knobs
- Eliminate Water faucet lip projection, toilet paper holders and soap trays
- Avoid isolation
- Consider special management units, cells (for potentially suicidal and mentally ill inmates), administrative segregation, and holding cells
- Review of Texas Commission on Jail Standards Rules regarding jail architecture

Plaintiffs' Appendix 63

**Suicide Detection and Prevention in Jails (3501) UPDATED 09/10**

# Lesson 09 - Controversial Issues in Suicide Prevention

**Functional Area**: During this block of instruction, the student will learn the various controversial issues impacting suicide prevention in jail setting.

## 9.1 Controversial issues

**Learning Objective**: The student will be able to list at least five controversial issues concern approaches to suicide prevention.

1. Contracts Not to Commit Suicide
2. Stripping Potential Suicides Naked
3. Using closed circuit television
4. Rating Scales
5. Suicide Profiles
6. Policy of not allowing single officers in cells
7. Protecting the Crime Scene
8. No vital signs equal death
9. Don't talk with inmates
10. Using citizen volunteers for suicide watch
11. Using inmate watchers

## 9.2 Pros and Cons

**Learning Objective:** The student will be able to explain the pros and cons of at least five controversial issues.

1. Contracts Not to Commit Suicide, with Promise that Treatment Will Be Provided
   - Contractors report good success with concept
   - Danger is, not all promises for service delivery are kept, or inmate misinterprets intent of contract; namely, when treatment ends, so does commitment
   - An acutely suicidal inmate does not respond to verbal or written agreements

2. Stripping Potential Suicides Naked
   - Practice is degrading and can worsen depression

- More suitable measures recommended are:
    - Constant or close supervision by staff and/or volunteers
    - Suicide-Resistant cell
    - Place with two or more selected and trained inmates who can alert staff to any crises, yet have no control over suicidal inmate. (CAUTION: using inmates in this capacity could increase the liability risks to a jail)
- Courts have not looked favorably on stripping as a suicide prevention tool: U.S. District Court in Oregon prohibited stripping and ordered two-minute check

3. Using closed circuit television (CCTV) As Major Monitoring Instrument
    - CCTV should only be used as a supplement to human monitoring
    - Various inmates commit suicide "on camera"
    - "Camera hypnosis" claimed by officers. This has lead to a recommendation to limit watch time to one hour then relieved
    - CCTV often broken down or fuzzy
    - Dispatching and other distractions impair use
    - 24-hour monitoring of suicidal inmate on CCTV not violation of privacy rights (with policy)
    - Lack of CCTV cited in lawsuits as liability factor

4. Rating Scales
    - Various suicide experts disagree with use of rating scale on lethality because "no one can be that exact or skillful"
    - "All threats must be taken seriously" disavows ratings
    - Do you rate the ninth "wolf cry" the same as the first

5. Suicide Profiles: The "Typical" Suicide -- Does It Exist?
    - Profiles meant to sensitize jail personnel to common characteristics
    - Caution is necessary in use of paper profiles
    - What happens at arrest, transportation, and booking is most important
    - Local/Regional jail suicide profiles more appropriate
        - Awareness training in signs/symptoms encourages use of profile factors in suicide assessment
        - No typical suicide. Each case is a unique combination of factor

6. Policy "never enter a cell without backup"
    - Flexible policy advocated
    - Officer must be allowed to make judgment decisions
    - Proper training supports this

7. Some jails have one dispatcher-jailer on duty, deaths occur due to "never enter" policy

8. Workable approaches include:
    - Assess: "are they really hanging?"
    - Push warning button and lock down inmate population
    - Use one or two selected inmates to assist. (CAUTION: using inmates in this capacity could increase the liability risks to a jail)

9. Life-Safety and duty of care demand "cut down" action and CPR (with proper protective equipment) within four minutes from start of hanging

10. When no vital signs exist, do not presume death has occurred; a doctor or other designated professional are the ones that make this decision
   - Jails found liable for not starting CPR when no vital signs
   - "Dead" people are alive today due to CPR

11. Protecting the scene of the crime
   - Some jails found liable when officers stand by and let inmate hang -- to protect scene
   - Preserving life clearly over rides "protecting scene"

12. "Don't talk with inmates" policy: Prohibits good communications with inmates - a key factor in suicide prevention

13. Using citizen volunteers and inmates for suicide watch:
   - Trained volunteers lauded by some jail officials
   - One-fourth of county jails use volunteers at some level
   - Neighborhood crime watch group can provide suicide watchers
   - Excuses for not using:
     - They are hard to recruit
     - You can't always count on them
     - "We're afraid of the liability issue"
   - Above excuses disappear when staff support volunteers
   - Respected citizen groups key recruitment vehicle
   - Lawsuits don't result from using volunteers and can be included in insurance coverage

14. Inmate watchers
   - Properly selected/trained inmates serving as suicide watchers in many jails all over the country
   - Inmates assist staff: Have no control over suicidal inmates
   - Watchers stationed in front, across, or next to cell
   - Dormitory setting safe environment for suicidal inmate

15. Don't place in isolation except under special circumstances

Suicide Detection and Prevention in Jails (3501) UPDATED 09/10

# Lesson 10 - Jail Suicide Litigation

**Functional Area:** During this block of instruction, the student will learn aspects of Jail suicide litigations and case laws.

### 10.1 Title 42, Section 1983

**Learning Objective:** The student will be able to define a Title 42, Section 1983 violation.

The courts, both state and federal, are requiring higher standards to operate a constitutional jail. Litigation plays a significant role in improving jail conditions and jail suicide prevention.

History:

- Little usage until the mid-portion of the 20th Century, Title 42 of the United States Code, Section 1983 became the legal vehicle by which persons could sue government officials for violations of constitutional rights.
- A Section 1983 action, is simply the way you get to court to raise a question of a constitutional violation

Section 1983 reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or causes to be subject, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Title 42, United States Code, Section 1983:

- Protection to citizen regarding deprivation of rights, privileges and immunities guaranteed by the Constitution
- Liability for persons who violate these guaranteed rights
- Rights most commonly identified are:
  - Freedom from false arrest and/or imprisonment, cruel and unusual punishment, and excessive use of force
  - Due process

  o  Equal protection

## 10.2 Negligence

**Learning Objective**:  The student will be able to define negligence.

- A. Defined:
  - 1. Neglect is failing to care for or attend to sufficiently or properly, or ignore or disregard.
  - 2. In simplicity, a reasonable probability that what you do or don't do will cause harm to the inmate.
- B. Courts have ruled that mere negligence is an insufficient claim under Section 1983 and have required a showing of gross negligence or deliberate indifference
- C. Negligence or "simple negligence" is required in many state courts for liability in death by suicide

## 10.3 Deliberate Indifference

**Learning Objective:**  The student will be able to define deliberate indifference.

- A. Courts are ruling that the deliberate indifference standard is met only if there is a strong likelihood, rather than a mere possibility, that failure to provide care would result in harm to the prisoner
- B. Federal courts require "gross negligence" or "deliberate indifference" for liability
  - 1. A strong probability that what you do or don't do will cause harm
  - 2. Actions which are "shocking to the conscience"
  - 3. Where there is a pattern of negligence or simple negligence
- C. Prior suicides and failure to meet state and national standards are used by plaintiffs to show a pattern of misconduct
- D. Gross negligence and deliberate indifference are also based on formal policy or custom and practice
- E. Plaintiffs must show existence of a policy or custom and practice in proving failure to correct unconstitutional conditions, e.g.:
  - 1. No screening for possible suicidal behavior
  - 2. Grossly inadequate monitoring of suicidal inmate
  - 3. No training of officers in signs/symptoms of suicide
- F. Plaintiffs must also prove that the suicide was a reasonably foreseeable consequence of the inaction or action of personnel involved
- G. Jail suicide litigation centers mainly around:
  - 1. Insufficient staff
  - 2. Inadequate training and supervision
  - 3. Deficient jail conditions
  - 4. Lack of policies and procedures for screening and monitoring potentially suicidal inmates
  - 5. Overcrowding
- H. Suicide prevention programs only as good as the staff members who support them. "One suicide demands measures to prevent the next one" - Suicide attempts demand measures to prevent first actual suicide

Plaintiffs' Appendix 68

Suicide Detection and Prevention in Jails (3501) UPDATED 09/10

# Lesson 11 - Summary (read before taking test 10)

If recognized standards and practices are followed, it has been demonstrated from experience that almost all jail suicides can be prevented. There are two key factors in jail suicide prevention:

- capable, properly trained correctional, mental health, and medical staff
- capable, proactive administration and effective supervisors

Additionally, a well though out plan is also extremely important in preventing suicides. The Texas Commission on Jail Standards plan identifies the following key areas to be used in developing a suicide prevention plan:

- staff training
- identification/screening procedures
- staff communication
- housing
- supervision
- intervention
- reporting
- follow-up/review of incidents

The main formula for success in preventing jail suicides is:

- following recognized standards and practices
- effecting human interaction by good officers with awareness training
- practicing the Golden Rule

## Case Law Involving Detention and Corrections

The following cases are offered as references on current trends in case law involving detentions and corrections.

- Anderson v. City of Atlanta, 778 F. 2nd 678 (11th Cir. 1985)
- Falkenstein v. City of Bismark, 268 N.W. 2nd 787 (N.D. 1987)
- Garcia v. Board of County Commissioners of the County of El Paso (U.S.D.C., District of Colorado, Civil Action No. 83-2-222)
- Kanayurak v. North Slope Borough, 677 p. 29 893 (AK. 1984)

Plaintiffs' Appendix 69

- Miga v. City of Holyoke, 497 N.E. 2nd 1 (Mass. 1986)
- Moomey v. City of Holland, 490 F. Supp. 188 (W.D. Mich. 1980)
- Owens v. Haas, 601 F.2nd 1242 (2nd Cir. 1979), cert. Denied, 444 U.S. 980 91979)
- Pantoja v. City of Conzales, 335 (N.D. Ca. 1982)
- Patridge v. Two Unknown Police Officers, 751 F.2d 1182 (5th Cir. 1986)
- Roberts v. Stokely, 388 So.2nd 1267 (2nd Dist. Fla. Ct. of Ap. 1980)
- Soto v. City of Sacramento, 567 F. Supp. 662 (E.D. Cal. 1983)
- Strandell v. Jackson County, 648 F. Supp. 126 (S.D. Ill 1986)

## Resources and References

AELE Monthly Law Journal. Jail & Prisoner Law Section. "Civil Liability for Prisoner Suicide". February 2007.

American Association of Suicidology Jail Suicide Task Force. "Jail/Custody Suicide: A Compendium of Suicide Prevention Standards and Resources".

American Foundation for Suicide Prevention - www.afsp.org

American Jail Association - www.aja.org

Center for Disease and Control Prevention - www.cdc.gov/nchs/fastats/suicide.htm

CorrectionsOne News. "Jail cited for Failures to make suicide check every 15 minutes". 28 April 2009.

CorrectionsOne News. "NCCHC: Suicide prevention moves to a new level". 17 November 2009

National Center on Institutions and Alternatives. "Juvenile Suicide in Confinement: A National Survey". February 2004

National Center on Institutions and Alternatives & National Institute of Corrections: Jail Suicide/Mental Health Update. Volume 16 Number 4. Spring 2008.

National Center on Institutions and Alternatives & National Institute of Corrections: Jail Suicide/Mental Health Update. Volume 17 Number 2. Fall 2008.

National Institue of Correction - www.nicic.org

OCALA.com. "Inmate suicide an ongoing problem despite series of reforms". 19 March 2009.

Oklahoma Department of Corrections. "Suicide Prevention". 1 January 2007.

SAMHSA's National Mental Health Information Center - www.samhsa.gov

Texas Commission on Jail Standards - www.tcjs.state.tx.us

Texas Office of the Attorney General Custodial Death Information - www.oag.state.tx.us

Training Institute for Suicide Assessment and Clinical Interviewing - www.suicideassessment.com

U.S. Department of Justice - Office of Justice Programs.  "Suicide and Homicide in State Prisons and Local Jails".  August 2005

World Health Organization: Department of Mental Health and Suicide Abuse. "Preventing Suicide in Jails and Prisons".   2007.

World Health Organization: Department of Mental Health and Mental and Behavioral Disorder. "Preventing Suicide: A Resource for Prison Officers".   2000.

# TAB C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
## San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as     :
Dependent Administrator of, and on Behalf of, the     :
Estate of Derrek Quinton Gene Monroe     :
vs.     :     CIVIL ACTION NO. **6:18-CV-00015-C**
    :
Coleman County, Texas; Leslie W. Cogdill;     :
Mary Jo Brixey; and Jessie W. Laws     :

## EXHIBIT A

### I. DEFINITIONS

The term "records, books, papers and documents" as used herein shall include any printed, typewritten or handwritten matter or reproduction thereof whatever character, including without limitation, correspondence, memoranda, agreements, letters, hand or typewritten notes, tape recordings, computer runs and any codes necessary to comprehend such runs, checks, check stubs, bank statements, and writings of every kind and character, whether originals or reproductions.

### II. DOCUMENTS TO BE PRODUCED

Copies of the following for Course No. 3514, entitled "Jail Administration," taken by Leslie W. Cogdill on March 24, 2017 through Bill Blackwood LEMI of Texas; syllabus, books, all course materials, audio and video recordings, and all display slides (including projector slides and PowerPoint slides), and documents and tests completed by Leslie W. Cogdill.

Order No. **15690.001**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
### San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as
Dependent Administrator of, and on Behalf of, the
Estate of Derrek Quinton Gene Monroe
vs.

CIVIL ACTION NO. 6:18-CV-00015-C

Coleman County, Texas; Leslie W. Cogdill;
Mary Jo Brixey; and Jessie W. Laws

**AFFIDAVIT**

STATE OF **Texas**

COUNTY OF **Walker**

BEFORE ME, the undersigned authority, personally appeared
(Custodian) **Sharese Hurst** who being by me duly sworn, deposed as
follows:    (Please print your name)

1. I, the undersigned, am over twenty-one (21) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

2. I am the Custodian of Records for **Bill Blackwood LEMI of Texas** and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.

3. Attached hereto are **/39** pages of records concerning **Leslie W. Cogdill**. These are the original records or exact duplicates of the original records.

4. It is the regular practice of **Bill Blackwood LEMI of Texas** to make this type of record at or near the time of each act, event, condition, opinion or diagnosis set forth in the record.

5. It is the regular practice of **Bill Blackwood LEMI of Texas** for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.

6. It is the regular practice of **Bill Blackwood LEMI of Texas** to keep this type of record in the course of regularly conducted business activity.

7. It is the regular practice of the business activity to make the records.

Further Affiant sayeth not.

_____
SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the **20th** day of
**September** , **2018** .

HOLLIE A. MITCHELL
MY COMMISSION EXPIRES
APRIL 19, 2022
NOTARY ID: 12508851-8

_____
NOTARY PUBLIC
In and for the State of **Texas**
My Commission Expires: **April 19, 2022**

Order No. 15690.001

**ROSTER ID: 10298381**
**Jail Administration**

| Course Date | Hours | Course ID | Course Description |
|---|---|---|---|
| 3/24/2017 | 31 | 3514 | Jail Administration Management and Operations NES |

| P_ID | Name | Department |
|---|---|---|
| 10906 | DANIEL J BUENO | JIM WELLS CO. CONST. PCT. 1 |
| 18811 | DONALD W JACKSON | TEXAS PARKS & WILDLIFE DEPT. |
| 30258 | John L Dagen | MCCULLOCH CO. SHERIFF'S OFFICE |
| 31686 | CARL L SQUYRES | RUNNELS CO. SHERIFF'S OFFICE |
| 37439 | BRYAN W BEAVERS | KAUFMAN CO. SHERIFF'S OFFICE |
| 41604 | KIRK A COKER | HUTCHINSON CO. SHERIFF'S OFFICE |
| 42137 | Zena A Stephens | JEFFERSON CO. SHERIFF'S OFFICE |
| 50128 | KENNETH M EGGLESTON | LIPSCOMB CO. SHERIFF'S OFFICE |
| 54344 | SALLY I HERNANDEZ | TRAVIS CO. SHERIFF'S OFFICE |
| 58066 | THOMAS E WATT | GRAYSON CO. SHERIFF'S OFFICE |
| 69361 | RAND M HENDERSON | MONTGOMERY CO. SHERIFF'S OFFICE |
| 79807 | RICHARD M SCAMAN | FALLS CO. SHERIFF'S OFFICE |
| 83261 | JAMES D MITCHELL | WINKLER CO. SHERIFF'S OFFICE |
| 86016 | VANCE W HILL | BROWN CO. SHERIFF'S OFFICE |
| 87701 | MARSHALL W THOMAS | MONTAGUE CO. SHERIFF'S OFFICE |
| 90705 | LEMUEL B WARDEN | OLDHAM CO. SHERIFF'S OFFICE |
| 93395 | NORRIS L AKIN | WISE CO. SHERIFF'S OFFICE |
| 95428 | THOMAS P SPURLOCK | JACK CO. SHERIFF'S OFFICE |
| 95915 | JESUS G RAMOS | LAMPASAS CO. SHERIFF'S OFFICE |
| 101700 | ABRAHAM M VEGA | LYNN CO. SHERIFF'S OFFICE |
| 102159 | WILLIAM G PRICE | WILBARGER CO. SHERIFF'S OFFICE |
| 107485 | BRETT E MCGUIRE | PALO PINTO CO. FIRE MARSHAL'S OFFICE |
| 111819 | ANDREW R AGUILAR | CRANE CO. SHERIFF'S OFFICE |
| 112257 | LESLIE W COGDILL | COLEMAN CO. SHERIFF'S OFFICE |
| 146221 | MATTHEW J ATKINSON | GONZALES CO. SHERIFF'S OFFICE |
| 155761 | CHARLES R STEWART | ANDREWS CO. SHERIFF'S OFFICE |
| 156946 | THOMAS A CASTLOO | WOOD CO. SHERIFF'S OFFICE |
| 216154 | MATTHEW L COATES | ERATH CO. SHERIFF'S OFFICE |

| 229560 | SCOTT A WILLIAMS | CORYELL CO. SHERIFF'S OFFICE |
| 233915 | CARL R BOWEN | DEWITT CO. SHERIFF'S OFFICE |
| 270435 | FLETA A BARNETT | ARMSTRONG CO. SHERIFF'S OFFICE |
| 282245 | JUSTIN R CARAWAY | HAMILTON CO. SHERIFF'S OFFICE |
| 330056 | JAMES R SCIFRES | HOCKLEY CO. SHERIFF'S OFFICE |
| 373182 | SHANNON SRUBAR | WHARTON CO. SHERIFF'S OFFICE |
| 432867 | THEODORE M ALLEN | SHERMAN CO. SHERIFF'S OFFICE |

Plaintiffs' Appendix 76

# TEXAS COMMISSION ON LAW ENFORCEMENT

## SIGN IN SHEET

003

| Page #<br>1 | Provider #<br>513011 | Course #<br>3514 | Course<br>Hours<br>31 | Beginning Date<br>3/20/2017 | Ending Date<br>3/24/2017 | | | # of Students<br>35 | |
|---|---|---|---|---|---|---|---|---|---|

| Course Title: Jail Administration Management &<br>Operations for Newly Elected Sheriff's | | | | Instructor(s):<br>Various | Name of Academy/Department:<br>Bill Blackwood LEMIT / Sam Houston State University | | | | | |

| PID | Last Name | First Name | Signature | Sun.<br>P.M. | Mon<br>A.M. | Mon<br>P.M. | Tue.<br>A.M. | Tue.<br>P.M. | Wed.<br>A.M. | Wed.<br>P.M. | Thu.<br>A.M. | Thu.<br>P.M. | Fri.<br>A.M. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 111819 | Aguilar | Andrew | | X | X | | | | | | | | |
| 93395 | Akin | Lane | | X | X | LA | LA | LA | LA | LA | LA | LA | LA |
| 432867 | Allen | Ted | | X | X | | | | | | | | |
| 146221 | Atkinson | Matthew | | X | X | | | | | | | | |
| 270435 | Barnett | Fleta | | X | X | | | | | | | | |
| 37439 | Beavers | Bryan | | X | X | | | | | | | | |
| 233915 | Bowen | Carl | | X | X | | | | | | | | |
| 10906 | Bueno | Daniel | | X | X | | | | | | | | |
| 282245 | Caraway | Justin | | X | X | | | | | | | | |
| 156946 | Castloo | Thomas | | X | X | | | | | | | | |
| 216154 | Coates | Matt | | X | X | | | | | | | | |
| 112257 | Codgill | Les | | X | X | | | | | | | | |
| 41604 | Coker | Kirk | | X | X | | | | | | | | |
| 30258 | Dagen | John | | X | X | | | | | | | | |
| 50128 | Eggleston | Kenneth | | X | X | KE | KE | KE | KE | KE | KE | | KE |
| 69361 | Henderson | Rand | | X | X | | | | | | | | |
| 54344 | Hernandez | Sally | | X | X | | | | | | | | |
| 86016 | Hill | Vance | | X | X | | | | | | | | |
| 18811 | Jackson | Don | | X | X | | | | | | | | |
| 107485 | McGuire | Brett | | X | X | | | | | | | | |
| 83261 | Mitchell | Darin | | X | X | | | | | | | | |
| 102159 | Price | Bill | | X | X | | | | | | | | |
| 95915 | Ramos | Jess | | X | X | | | | | | | | |
| 79807 | Scaman | Ricky | | X | X | | | | | | | | |
| 330056 | Scifres | Ray | | X | X | | | | | | | | |

Plaintiffs' Appendix 77

| Page #<br>2 | Provider #<br>513011 | Course #<br>3514 | Course<br>Hours<br>31 | Beginning Date<br>3/20/2017 | | Ending Date<br>3/24/2017 | | | | | | | | # of Students<br>35 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Course Title:<br>Jail Administration Management & Operations for Newly Elected Sheriff's | | | | Instructor(s):<br>Various | | Name of Academy/Department:<br>Bill Blackwood LEMIT / Sam Houston State University | | | | | | | | | |
| PID<br>95428 | Last Name | First Name | | Signature | Sun.<br>P.M. | Mon<br>A.M. | Mon<br>P.M. | Tue.<br>A.M. | Tue.<br>P.M. | Wed.<br>A.M. | Wed.<br>P.M. | Thu.<br>A.M. | Thu.<br>P.M. | Fri.<br>A.M. | |
| 95248 | Spurlock | Thomas | | Thomas P. Spurlock | X | X | TS | TS | TS | TS | TS | TS | TS | TS | |
| 31666 | Squyres | Carl | | | X | X | CS | CS | CS | CS | CS | CS | CS | CS | |
| 373182 | Srubar | Shannon | | Shannon Sr | X | X | SS | SS | SS | SS | SS | SS | SS | SS | |
| 42137 | Stephens | Zena | | Stephen | X | X | | | | | | | | | |
| 105761 | Stewart | Rusty | | | X | X | | | | | | | | | |
| 87701 | Thomas | Marshall | | | X | X | | | | | | | | | |
| 101700 | Vega | Abraham | | AVega | X | X | AV | AV | AV | AV | AV | AV | AV | AV | |
| 90705 | Warden | Brent | | | X | X | | | | | | | | | |
| 58066 | Watt | Tom | | | X | X | TW | TW | TW | TW | TW | TW | TW | TW | |
| 229560 | Williams | Scott | | Scott Williams | X | X | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

004

✳ 155761

**Correctional Management Institute of Texas**
**Jail Administration: Management & Operations**
**For Newly Elected Sheriffs**
**Huntsville, Texas**
**March 20-24, 2017**
**Participant List**

**Andrew Aguilar**
Crane County Sheriff
201 W. 6th. St./PO Box 1175
Crane, TX 79731
Phone: 432-558-3571
Cell:
Email: aaguilar@co.crane.tx.us

Lane Akin
Wise County Sheriff
200 Rook Ramsey
Decatur, TX 76234
Phone: 940-627-5971
Cell:
Email: lane.akin@sheriff.co.wise.tx.us

**Ted Allen**
Sherman County Sheriff
PO Box 526
Stratford, TX 79084
Phone: 806-366-5551
Cell:
Email: ted.allen@co.sherman.tx.us

Matthew Atkinson
Gonzales County Sheriff
PO Box 1757
Gonzales, TX 78629
Phone: 830-672-6524
Cell: 830-263-1865
Email: matkinson@co.gonzales.tx.us

**Fleta Barnett**
Armstrong County Sheriff
PO Box 531
Claude, TX 79019
Phone: 226-3151
Cell:
Email: bfjmlitt@aol.com

Bryan Beavers
Kaufman County Sheriff
PO Box 849
Kaufman, TX 75142

Phone: 972-932-9701
Cell:
Email: beavers@l

**Carl Bowen**
DeWitt County Sheriff
208 E. Liveoak
Cuero, TX 77954
Phone: 361-275-5734
Cell:
Email: chiefdeputy@co.dewitt.tx.us

**Justin Caraway**
Hamilton County Sheriff
1108 s. Rice Street
Hamilton, TX 76531
Phone: 254-386-8126
Cell:
Email: hamiltonsheriff@hamiltoncountytx.org

**Matt Coates**
Erath County Sheriff
1043 Glen Rose Road
Stephenville, TX 76401
Phone: 254-965-3338
Cell:
Email: sheriff@co.erath.tx.us

**Kirk Coker**
Hutchinson County Sheriff
PO Box 1426
Borger, TX 79008
Phone: 806-274-6343
Cell:
Email: hcsheriff@hutchinsoncnty.com

**Kenneth Eggleston**
Lipscomb County Sheriff
PO Box 120
Lipscomb, TX 79056

005

Plaintiffs' Appendix 79

**Correctional Management Institute of Texas**
**Jail Administration: Management & Operations**
**For Newly Elected Sheriffs**
**Huntsville, Texas**
**March 20-24, 2017**
**Participant List**

Phone: 806-862-2611
Cell:
Email: keggleston@lipscombso.com

**Sally Hernandez**
Travis County Sheriff
5555 Airport Blvd
Austin, TX 78751
Phone: 512-854-9788
Cell:
Email: sally.hernandez@traviscountytx.gov

**Don Jackson**
Blanco County Sheriff
400 Hwy. 281
Johnson City, TX 78636
Phone: 830-868-7104
Cell:
Email: djackson@co.blanco.tx.us

**Brett McGuire**
Palo Pinto County Sheriff
PO Box 279
Palo Pinto, TX 76484
Phone: 659-2085
Cell:
Email: brett.mcguire@co.palo-pinto.tx.us

**Darin Mitchell**
Winkler County Sheriff
1300 Bellaire St.
Kermit, TX 79745
Phone: 432-586-3461
Cell:
Email: darin.mitchell@co.winkler.tx.us

**Bill Price**
Wilbarger County Sheriff
PO Box 1556
Vernon, TX 76385
Phone: 940-996-6208
Cell:

Emai: bprice@co.wilbarger.tx.us

**Jess Ramos**
Lampasas County Sheriff
PO Box 465
Lampasas, TX 76550
Phone: 512-566-8255
Cell:
Email: jess.ramos@co.lampasas.tx.us

**Ray Scifres**
Hockley County Sheriff
1310 Avenue H
Levelland, TX 79336
Phone: 806-894-3126
Cell:
Email: rscifres@hockleycounty.org

**Carl Squyres**
Runnels County Sheriff's Office
612 Strong Ave
Ballinger, TX 76821
Phone: 325-365-2121
Cell:
Email: runnels128@icloud.com

**Zena Stephens**
Jefferson County Sheriff
1001 Pearle St. Ste 103
Beaumont, TX 77701
Phone: 409-835-8411
Cell:
Email:

**Marshall Thomas**
Montague County Sheriff
PO Box 127
Montague, TX 76251
Phone: 940-894-2491
Cell:
Email: mthomas@montaguesheriff.com

006

**Correctional Management Institute of Texas**
**Jail Administration: Management & Operations**
**For Newly Elected Sheriffs**
**Huntsville, Texas**
**March 20-24, 2017**
**Participant List**

**Brent Warden**
Oldham County Sheriff
PO Box 452
Vega, TX  79092
Phone:  806-267-2162
Cell:
Email:  vegaso@amaonline.com

**Scott Williams**
Coryell County Sheriff
510 E Leon St
Gatesville, TX  76528
Phone:  254-865-7201
Cell:
Email:  swilliams@sheriff.co.coryell.tx

Plaintiffs' Appendix 81

[LEGACY LEADERSHIP]

# Legacy Leadership
## Dr. Randy Garner
### Professor, Behavioral Sciences
### Sam Houston State University

Leadership is not about theories...

Thinking *Forward*
When should you think about the legacy you will leave?
Is it ever too early to think about what people will think, say, or do, after your tenure as a leader has ended?

### Legacy Leadership
### *How will you be remembered?*
Questions for Thought...
Who left an indelible impression on you at work or in your personal life?
What makes a person unforgettable?
Whose shoes would you walk in today if you could?

### *Clarifying Your Legacy*
It will be revealed in how your colleagues, employees, and others think and behave as a result of the time they spent working with you
In clarifying what you would like for others to take away as a result of having worked with or for you; you gain a better understanding of yourself in your leadership role

### *Understanding Legacy*
The usual thought is passive; it is "Something to be remembered for."
Better to consider it "something that changed the way others think and behave."

### *Legacy Leadership Formula*
The sum total of the difference you make in peoples lives, directly and indirectly; formally and informally.
The way you behave in your day-to-day life *defines* your legacy

### *It's Not About the Résumé*
Building a Leadership Legacy differs from building a résumé
A résumé may include pages of experience and accomplishments
But none of that reflects the person's suitability to serve as a leader
Education and experience does not ensure leadership capability

### *Legacy leadership is about Service*
Where do you see yourself on the organizational chart?
A Farmer's Legacy

### *Legacy Leadership is About Sacrifice*
Leadership is hard work; nearly every act of leadership requires suffering
Often a choice between personal success and the welfare of others
Leaders must be willing to pay the price
By sacrificing, you demonstrate you are <u>not</u> in it for yourself

1

Plaintiffs' Appendix 82

[**LEGACY LEADERSHIP**]

### *Legacy Leadership is About Teaching*
The very best leaders are the very best teachers
The very best teachers are the very best learners
They know that by investing in developing others, they are developing themselves

### *Legacy Leadership is recognizing YOU are the Most Important Leader in Your Organization*
Leaders who have the most influence on us are those who are closest to us.
They are the most likely to influence our performance—either positively or negatively.

### *Legacy Leadership is About Liking and Respect*
"I don't care if people don't like me. I just want them to respect me."
This is NOT a binary choice
Legacy leaders desire to be liked *and* respected

### *Legacy Leadership is Built on Trust*
Trust is the social glue that binds human relationships.

### *Legacy Leadership is about taking 100% Responsibility*
There is only ONE PERSON responsible for the quality of your life – You.
Give up your excuses, victim stories, the reason why you "can't" and why you "haven't," and ALL your blaming outside circumstances
If you Don't Like Your Outcomes; Change Your Responses

### *Legacy Leaders Realize the Importance of Keeping Their Word*
It used to be that one's word was one's bond
People thought carefully about whether they could deliver on their promises before agreeing to anything; it was important
Today, keeping one's agreement seems to be a hit or miss affair; people casually give their word and casually break it.

### *Legacy Leadership is Built from the Inside Out*
A lasting legacy is built on a firm bed of principle and purpose.
Leadership development is first and foremost self-development.
It is an inner quest to discover who you are; to find the awareness needed to lead.

### *Legacy Leaders Focus on Action, Not Complaining*
Legacy leaders have a bias toward action
Action that will achieve their desired outcomes
Complaining and blaming are not future focused

### *Legacy Leadership is Recognizing it is Not Just the Leader's Vision*
Leaders have assumed that it's their vision that matters; and if so, *they* have to create it.
The very best leaders understand that their key task is *inspiring* a *shared* vision, not selling their own.

### *Legacy Leaders are Clear and Specific in Setting Goals*
Many of us set goals; however, legacy leaders set goals that are specific and are able to be measured by anyone else.
Vague goals produce vague results

2

Plaintiffs' Appendix 83

[LEGACY LEADERSHIP]

### *Legacy Leadership is having the Courage to be Humble*
The words **human** and **humble** share a common origin
Legacy leaders do not get 'hung up" about being "in charge."

### *Leadership Legacy involves Encouragement*
Appreciation of others is a hallmark of legacy leadership
Do not just assume that others know that you appreciate their efforts—tell them.
No one likes to be an assumption

#### Become a Master Gardener
A mater gardener pays attention to the plants and trees---they learn the best way to nourish each one
There is no one-size-fits-all plan of care
Soil, light, moisture, temperature, climate, must all be tailored to each plant's specific needs.
Would you treat a Rose like an Oak?

### *Summary: The Importance of Legacy Leadership*

References:

Notes:

3

Plaintiffs' Appendix 84



## Jail Administration: Management & Operations

Texas Commission on Jail Standards

## Philosophy

We will work cooperatively, patiently, and fairly with public officials and private citizens; we will be sensitive to community needs and ideals while carrying out our regulatory responsibilities. We recognize a shared commitment to utilize criminal justice resources toward common goals.

## Mission

To ensure safe, secure, and suitable jail facilities for correctional personnel, inmates and the community through proper rules and procedures. In addition, to provide leadership in resolving inmate population issues efficiently and economically.

Plaintiffs' Appendix 85









_____
_____
_____
_____
_____
_____
_____
_____

# FYI...

The Commission on Jail Standards performs all of its functions* within an operating budget of $ 959,452 per year.

*Including the collection of Juvenile Justice and appropriate receipts

_____
_____
_____
_____
_____
_____
_____

According to the
National Institution of Corrections
there are approximately

**3,500** jails in the United States.
Interesting Fact:

**TEXAS** has **7%** of the 3,500.
(244 entities that are inspected
with a total of **95,309** beds)

_____
_____
_____
_____
_____
_____
_____
_____







Plaintiffs' Appendix 88



Courts transitioned from "hands off" attitude to humane treatment of inmates.



Section 1983



64th LEGISLATURE HOUSE BILL 272 (TCJS created)



Chapter 511 of the Government Code – Texas Commission on Jail Standards Role and Responsibilities

Chapter 351 of the Local Government Code – Duties of the Sheriff in terms of operating the county jail.



**Each county jail must comply with the minimum standards and the rules and procedures of the Commission on Jail Standards.**

Standards are derived from:

• New legislative action

• Case law

• Feedback from the field

• A demonstrated need for change

Plaintiffs' Appendix 90

## FYI…

**31 states have <u>mandatory</u> jail inspection programs**

**8 states have <u>voluntary</u> jail inspection programs.**



The Inspection Process

### Internal Inspections

During intervals of at least four months and at least two times each year, **the sheriff/operator shall inspect each facility** for which he/she is responsible **inquiring into the security, control, conditions, and state of compliance with the rules of the commission.**

(TITLE 37 PUBLIC SAFETY AND CORRECTIONS, PART 9 TEXAS COMMISSION ON JAIL STANDARDS, CHAPTER 297 COMPLIANCE AND ENFORCEMENT, RULE §297.1 Regular Local Inspections)

## Commission Inspections

Not less than once each fiscal year, the commission staff shall perform at least one, unannounced inspection for each facility under commission jurisdiction and shall inquire into security, control, conditions, and compliance with the established minimum standards.

The commission staff shall at any time have access to all parts of each facility; the books, records, data, documents, and accounts pertaining to each facility and to the inmates confined therein; and shall have the right and authority to interview any of the officials of the facility or inmates therein.

The sheriff/operator shall assist staff by all means at their disposal to enable them to perform the functions, powers, and duties of their office.

(TITLE 37  PUBLIC SAFETY AND CORRECTIONS, PART 9  TEXAS COMMISSION ON JAIL STANDARDS,  CHAPTER 297  COMPLIANCE AND ENFORCEMENT, RULE §297.2  Regular Commission Inspections)





6    019



## OFFICIAL NOTICE OF NON-COMPLIANCE



## WHAT HAPPENS AFTER COUNTY OFFICIALS RECEIVE THE OFFICIAL NOTICE OF NON-COMPLIANCE??

1. Initiate the appropriate corrective actions shall within the timeframe prescribed by the notice of non-compliance (not to exceed 30 days).
2. In writing, notify the Commission of the county's initiation or completion of corrective action(s) within 30 days of receipt of the notice of non-compliance.
3. Complete the corrective action(s) within the timeframe prescribed by the notice of non-compliance (not to exceed one year).
4. Once the facility is ready for a re-inspection, TCJS must receive written verification of such and the county must specifically request a re-inspection. TCJS inspector(s) will not conduct a re-inspection until we have such letter

### What's Next??

If the responsible party fails to initiate corrective action to the notice of non compliance the Commission may issue a remedial order.

**What is a Remedial Order??**

An administrative order that may declare that the facility in question or any portion thereof be closed, that further confinement of inmates or classifications of inmates in the non-complying facility or any portion thereof be prohibited, that all or any number of inmates then confined be transferred to and maintained in another designated facility, or any combination of such remedies. Also, a remedial order may be issued to terminate a contract with a facility housing non-Texas sentenced inmates and force responsible officials to initiate action terminating the contract and transfer affected inmates.

*The remedial order shall be in writing and shall identify each standard with which the jail has failed to comply.

*The remedial order shall take effect fifteen days after it is received by the sheriff or county judge unless the order is appealed, in which case it is stayed until the appeals hearing.

Plaintiffs' Appendix 94

**Remedial Orders**

The remedial order shall be in writing and shall identify each standard with which the jail has failed to comply.

The remedial order shall take effect fifteen days after it is received by the sheriff or county judge unless the order is appealed, in which case it is stayed until the appeals hearing.

FYI...

Non-compliant jail inspection reports are posted on the TCJS website.

www.tcjs.state.tx.us

Plaintiffs' Appendix 95



_____

_____

_____

_____

_____

_____

_____

_____

_____



_____

_____

_____

_____

_____

_____

_____

_____

_____

# FYI...

**AUGUST 15, 2002:**

**THE DAY THE COMMISSION VOTED TO SHUT DOWN THE CALHOUN COUNTY JAIL.**

**NOVEMBER 16, 2006:**

**THE DAY THE HOWARD COUNTY JAIL WAS ORDERED SHUT DOWN**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Plaintiffs' Appendix 96

# FYI...

**AUGUST 5, 2015:**

**THE DAY THE COMMISSION VOTED TO SHUT DOWN THE FRIO COUNTY JAIL.**

**FEBRUARY 4, 2016:**

**THE DAY THE COMMISSION VOTED TO SHUT DOWN THE MAVERICK COUNTY JAIL.**

---

# What are.....

the five (5) main areas in which jails are most often found to be in non-compliance?

---

# # 1 is.....

....not completing the Mental Health/Suicide Prevention Screening Form either immediately upon intake or in its entirety....

## Mental Disabilities/Suicide Prevention

*The entire form must be completed immediately upon entrance to the facility. Be sure to ask all questions and note responses and observations. All areas must be complete. It is imperative to note the time and date of the screening. If a response noted on the form is not applicable, note N/A on form.*

---

# # 2 is.....

....not completing the visual face-to-face observation of all inmates by jailers at least once every hour or at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined....

---

# # 3 is.....

....jailers are not participating in quarterly fire drills/air pack training as required by minimum jail standards...

Plaintiffs' Appendix 98

# # 4 is.....

Chapter 263.55-Inspections, Maintenance, Testing. All life safety equipment shall be inspected, maintained, and tested by persons qualified to do so (whether under vendor contract, by state or private agency or otherwise) in order that such equipment shall be safe, secure, and fully operative at all times,.... Long story short, ensure your fire panel has been inspected and properly tagged. The panel must reset to normal mode and the panel can not show to be in "Trouble" mode.....

# # 5 is.....

Licensing

Chapter 275.2 Personnel employed or appointed as jailers or guards of county jails shall be licensed as per the requirements of the Texas Commission on Law Enforcement under the provisions of the Texas Administrative Code, Title 37. Personnel employed or appointed as jailers or guards at facilities operated under vendor contract with a county or city shall be subject to the same qualifications, training, and testing procedures as county jailers.

# HEALTH SERVICES

**Mental Disabilities/Suicide Prevention**

Continuity of Care Query
(CCQ)

**Where is this record maintained?**

This is to be maintained in the inmate's medical file

Plaintiffs' Appendix 99

## CODE OF CRIMINAL PROCEDURE §16.22

Art. 16.22. EARLY IDENTIFICATION OF DEFENDANT SUSPECTED OF HAVING MENTAL ILLNESS OR MENTAL RETARDATION. (a) (1). **Not later than 72 hours after receiving credible information that may establish reasonable cause to believe that a defendant committed to the sheriff's custody has a mental illness or is a person with mental retardation**, including observation of the defendant's behavior immediately before, during, and after the defendant's arrest and the results of any previous assessment of the defendant, **the sheriff shall provide written or electronic notice of the information to the magistrate.** On a determination that there is reasonable cause to believe that the defendant has a mental illness or is a person with mental retardation, the magistrate, except as provided by Subdivision (2), shall order the local mental health or mental retardation authority or another qualified mental health or mental retardation expert to:

### Texas Commission on Jail Standards

Executive Director Brandon Wood (512) 771-5283
Assistant Director Shannon Herklotz (512) 769-4326
Inspector Fred St. Amant (512) 653-5392
Inspector Jackie Semmler (512) 653-4346
Inspector Phillip Bosquez (512) 769-6976
or (830) 570-9784
Inspector Shane Sowell (432) 813-0990
Research Specialist Diana Spiller (512) 463-2690

Main Office Number (512) 463-5505
Office Fax Number (512) 463-3185

**TCJS has gone global.... Facebook and Twitter are now in our arsenal....**



**Facebook: Texas Commission on Jail Standards**
**Twitter:    @TxCommJailStand**



## Emerging Trends in Law Enforcement and Jail Liability

Deborah Overton Bonner
Stan Lewiecki
Claims Attorneys
Texas Association of Counties
January 17, 2017

---

## Who are we and what do we do?

- Debbie Bonner, TAC Claims Attorney
- Stan Lewiecki, TAC Claims Attorney
- TAC Risk Management Pool provides counties with a stable, sustainable resource of protection against a variety of risks and liabilities. The Pool provides counties with the following coverages:

| | |
|---|---|
| Law Enforcement | Public Officials |
| Property | General Liability |
| Auto Liability | Automobile Physical Damage |
| Workers Compensation | |

TAC provides LE coverage to 187 of 254 counties in Texas

---

## What is Law Enforcement and Jail Liability?

- Civil Liability for violations of (mostly) federal civil rights in the context of law enforcement activities
- Criminal Liability is also possible, but rare
  - Assault (Physical and/or Sexual)
  - Homicide
- Claims are rare under Texas Bill of Rights, usually a "pro se" claimant
- Civil Liability from violation of Bill of Rights to U.S. Constitution
- Remedies for Civil Liability
- 1st, 4th, 8th and 14th Amendments most common

## Bill of Rights – U.S. Constitution

- Main way to establish civil liability against law enforcement
- Introduced by James Madison in 1789 to help ratify U.S. Constitution
- Concern was United States would have too much power
- Law Enforcement liability arises from
  - 1st Amendment
  - 4th Amendment
  - 8th Amendment (and the 14th Amendment, too!)

## 1st Amendment – ratified 1789

- "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
- Original reason for First Amendment
- Originally only applied to the United States Congress
- First applied to states (including counties) in 1925

## Trends in First Amendment Jail Claims

- Speech / Press
  - Access to Legal Materials / Law Library
  - Access to Mail
- Religion
  - Lack of Accommodation
  - Lack of Religiously Adequate Meals
  - Lack of access to religious materials

028

Plaintiffs' Appendix 102

2

## 4th Amendment - 1789

- The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
- Original reason for Fourth Amendment
- Originally only applied to the United States government
- First applied to state (including counties) in 1961

## Trends in 4th Amendment Jail Claims

- Excessive Force – use only as much force as a reasonable jailer under the same or similar circumstances would find necessary
  - Use of Tasers
  - Use of bodily force
  - Body Cams – helpful or not?
  - Cell phone cams and social media
  - Restraints
  - Death as a result of excited delirium
- Strip Searches

## Trends in 4th Amendment LE Claims

- Excessive Force – use only as much force which a reasonable officer under the same or similar circumstances would find necessary
  - Incident to arrest
    - TASER claims
  - Application of physical restraints and handcuffs
  - Shootings of suspects
- Searches of premises and property
- Are auto accidents 4th Amendment Claims?

## Sex in the Jail

- Common event
- Affects Coverage
- County liability is rare

## 8th Amendment – 1791

- Excessive bail shall not be required, nor excessive fines imposed, **nor cruel and unusual punishments inflicted**
- Original reason for 8th Amendment – English origin
- Originally only applied to the United States government
- First applied to states (including counties) in 1962
- Punishments never allowed: drawing and quartering, public dissection, burning alive, and disembowelment

## The 14th Amendment "wrinkle"

- 14th Amendment applies to cruel and unusual claims by pre-trial detainees
- 8th Amendment applies to cruel and unusual claims by convicted persons
- Same types of claims – arise from same environment
- Some difference in legal standards

Plaintiffs' Appendix 104

## Trends in 8th/14th Amendment Jail Liability

- 8th Amendment claims rarely occur outside the Jail, but possible
- Jail Suicides
  - Trending down in 2016 over the previous 5 years
  - Highest severity LE claims
  - Not always problematic
- Jail Deaths – non suicide
  - Medically compromised upon intake to jail
  - Sometimes people just die

## Jail Deaths

- Violation of the 8th Amendment right to be free of cruel and unusual punishment
- Generally, two contexts:
  - Failure to provide medical care
    - Not negligence
    - Disregarding a substantial risk of serious harm or death
  - Suicide
    - 140 jail suicides in Texas since 9/1/09 – but trending down for 2016
    - Hanging 84% of the time
    - 60% of hangings are with linens
- Hot topic in litigation and the news
- Sticky Issues – observation, logs, videos, training, audits
- Federal courts are watching these claims more closely, good or bad



## Questions?

### Thank you!

| Debbie Bonner | DebbieB@county.org | 972.567.9075 |
| Stan Lewiecki | StanL@county.org | 512.743.4426 |

## Intake Drug and Alcohol Questionnaire

Inmate Name: _____     Date: _____   SO#: _____

**1.   Do you take any of the following drugs?**

**A.     Benzodiazepines:**                                    How Often/Amount?

| | | | |
|---|---|---|---|
| Alprazolam (Xanax®) | Yes | No | _____ |
| Triazolam (Halcion®) | Yes | No | _____ |
| Lorazepam (Ativan®) | Yes | No | _____ |
| Temazapam (Restoril®) | Yes | No | _____ |
| Flurazapam (Dalmane®) | Yes | No | _____ |
| Estazolam (ProSom®) | Yes | No | _____ |
| Midazolam (Versed®) | Yes | No | _____ |
| Diazepam (Valium®) | Yes | No | _____ |
| Chlordiazepoxide (Librium®) | Yes | No | _____ |
| Clonazepam (Klonopin®) | Yes | No | _____ |

**B.     Opiates:**

| | | | |
|---|---|---|---|
| Opium | Yes | No | _____ |
| Codeine | Yes | No | _____ |
| Morphine | Yes | No | _____ |
| Tramadol (Ultram) | Yes | No | _____ |
| Methadone | Yes | No | _____ |
| Buprenorphine (Subutex®) | Yes | No | _____ |
| Propoxyphene (Darvocet®) | Yes | No | _____ |
| Pethidine (Demorol®) | Yes | No | _____ |
| Hydrocodone (Lortab®/Vicodin®/) | Yes | No | _____ |
| Oxycodone (Percocet®/Oxycontin®) | Yes | No | _____ |
| Hydromorphone (Dilaudid®) | Yes | No | _____ |
| Oxymorphone (Opana®) | Yes | No | _____ |
| Fentanyl | Yes | No | _____ |
| Heroin | Yes | No | _____ |

**C.     Barbiturates/Depressants**   Yes   No

**2.   Questions relating to Alcohol/Drug Consumption:**

A.  Do you drink on a daily basis?               Yes   No
B.  Do you take recreational drugs daily?     Yes   No     What? _____
C.  Are you addicted to any drug or alcohol? Yes   No     What? _____

**3.**   Are you presently suffering from withdrawals?  Yes   No

**4.**   Do you a expect to have withdrawal symptoms?  Yes   No

**5.**   Are you in current need of medical attention?  Yes   No

I/M Signature: _____   Receiving Off: _____

## If "YES" to any of the above, have arresting officer obtain medical clearance prior to admission

Plaintiffs' Appendix 106

**FOR MEDICAL STAFF ONLY**

_____ I/M is ok to be received into jail.
_____ I/M is to be put on "Medical Watch" every _____ minutes.

I/M Was examined by: _____     Time: _____

## Intoxication and Withdrawal Deaths

Robert Davis
Flowers Davis PLLC Tyler
2016

---

## I. Definitions

**Homicide:** Any death that is not natural or suicide where the actions of another party is involved.

**Detoxification:** the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug on which the person is physiologically dependent, of one that is cross-tolerant to it, or of one that medical research has demonstrated to be effective.

---

## II. Examples

**Death in Dallas County Jail Spurs Lawsuit on Lack of Health Training**



Craig Morris battled alcoholism his entire life. Morris was said to have died from pneumonia 18 hours after being booked into the Dallas County Jail

"*Craig Morris spent his last moments lying motionless on a cold cement floor until his labored breathing slowed and then stopped.*"

"SYMPTOMS OF A TROUBLED JAIL SYSTEM."

### Undergoing Heroin Withdrawal, Kitsap County Jail Inmate Died from Heart Condition



A Kitsap County Jail inmate who died in December after being found in a cell undergoing heroin withdrawal and with low blood pressure died from a heart condition brought on by chronic drug use.

The nurse said "[Boshears] was a little dehydrated but wasn't in any medical distress aside from her withdrawing from heroin."

### Inmate's Death at Snohomish County Jail is Ninth Since 2010

Lindsay M. Kronberger died from probable heart problems, dehydration and opiate withdrawal, according to the Snohomish County Medical Examiner's Office.

Court records show the woman had admitted heroin use to police as recently as Jan. 3.

She was being kept in the jail's medical unit when she was found unresponsive at 1 a.m. Jan. 13.



### Woman's Death is One of Many in Troubled Gregg County Jail

Cowling died from a probable seizure due to withdrawal from methadone and alprazolam

She was reportedly "slumped over her bed, clutching a bottle of Diet Dr Pepper, after a day of wailing and seizures."

"Amy [Cowling] needed her medication to stay alive, and I knew that, I knew that," she said. "That's why I was begging them to help her repeatedly."



### Decatur County Jail Inmate's Death Blamed on Alcohol Withdrawal



A Greensburg man who died after being incarcerated at Decatur County Jail succumbed to complications from alcohol withdrawal, the coroner has ruled.

Thirty-eight-year-old Shane Satterfield of Greensburg died in March after officials say he stopped breathing at the Decatur County Jail, where he was serving a 14-day sentence for drunken driving.

### Inmate Found Dead in Bucks County Prison

Officials say an inmate who was found dead at the Bucks County Correctional Facility died from cardiac arrest related to heroin withdrawal.

The coroner says Yamell had cardiomyopathy, also known as an enlarged heart.

Reportedly, "she had a history of drug abuse, heart disease and high blood pressure."



### Lawsuit Claims Lake County Jail Let Heroin-sick Woman Die

A prisoner died in the Lake County Jail because she was not given proper medical care for her heroin withdrawal.

"She told them on more than one occasion that she thought she was dying, and that she was having a heart attack," attorney Robert Blaies said in the suit.

"She was ignored by the observation officer and was told that she was just a (expletive) junky (sic) going through withdrawal and that there was nothing wrong with her," Blaies stated.



### Joe Arpaio: Maricopa County to Pay $1.1M to Settle Suit

The family of a woman who died following a drug withdrawal at a Maricopa County jail in Phoenix will receive $1.1 million to settle a lawsuit brought against Sheriff Joe Arpaio.



Health-care workers had started Johnson on the Clinical Opiate Withdrawal Scale, a "pen-and-paper instrument" that rates common symptoms of opiate withdrawal, according to the National Institute of Health.

### County Jail Sued Over Utah Inmate's Heroin Withdrawal Death

Utah Medical Examiner ruled the woman's death was the result of severe dehydration from vomiting while in heroin withdrawal



As Goggin underwent a mandatory health exam upon her latest arrival at jail, she told a nurse she's been using two grams of heroin a day

The 25-year-old's addiction to heroin and cocaine had been the reason for her arrest

### Valley Street Jail "Torture"

After an autopsy, the state medical examiner's office concluded his death was accidental, the result of "severe dehydration and acute renal failure due to protracted vomiting caused by heroin withdrawal."



Kevin McEvoy, 24, died in the Valley Street jail in Manchester, New Hampshire from dehydration after being denied medical treatment

Forced by jail staff in 2008 to try to kick a heroin addiction cold turkey, the former Hudson man received no medical attention, lost 24 pounds in four days and in essence vomited himself to death.

### New York State: Genesee Jail Ignored Dead Inmate's Needs



Nikko Gambino died in July 2011 after apparent substance withdrawals at the Genesee County Jail.

In the days before his death, Gambino, 42 and a former heroin and pain pill addict from Wyoming County, suffered from such severe hallucinations that he imagined he was being killed by spiders, and once shouted for an "angel," was afraid to leave the jail because he would be "sucked into the sand," and was speaking into an imaginary cellular telephone, the report states.

### Transcripts Detail Jail Inmate's Pleas for Help Before She Died



Eusemia Rodriguez's body was already ravaged from drug-and-alcohol abuse when she was booked into the Santa Fe County jail last year on charges of assaulting her boyfriend. Less than 24 hours later, the mother of three was dead.

An autopsy report listed the cause of Eusemia Rodriguez's death as chronic alcoholism

### Dying Inmate Accused Of Faking Seizures and Health Problems



The coroner's report said the cause of Jaquez's death was "dehydration." They also noted nausea, vomiting, and diarrhea connected to her heroin withdrawal.

"She was a human being and she was sick and calling out for help. She didn't have to die from a heroin withdrawal. She didn't have to die from this. She should have been hospitalized." –Mother of the victim

A video shows Jaquez pushing distress button while guards walked away

**Inmate Dies in Vista
Detention Facility After
Suffering Drug Overdose**



Investigators were later able to determine his
death was a result of asphyxiation from an
acute asthma attack. One of the main
contributors to his asthma attack was reported
to be heroin withdrawal, as well as a small
amount of methamphetamine.

**Sussex Inmate's Death
Ruled a Homicide, Prison
Staff Under Investigation**

"A 48-year-old Wilmington man incarcerated at
Sussex Correctional Institution in Georgetown
died of multiple blunt force injuries sustained
while struggling with prison staff."



According to a report, while in DOC custody it
was determined that Shoup suffered from
symptoms consistent with substance
withdrawal.

**Inmate in Jail's Medical
Unit Dies**

Preston suffered from alcoholism. It is said
that Preston died due to alcohol withdrawal.

As Preston became agitated and aggressive, two
deputies strapped him face-down to a bed for 25
minutes. He began vomiting and suffered a seizure.
Soon after, he quit breathing and his heart stopped.

"The 46-year-old man, who suffered a seizure,
became agitated and was strapped face down to
a bed."



### Report Faults Company in Death of Broome County Jail Inmate



Rios died of "cardiac arrhythmia produced by cardiomyopathy" — an abnormal heart rhythm stemming from a deterioration of the heart muscle — "from illicit drug use."

Among the commission's findings is that the doctor who was at the jail for more than eight hours on July 20, 2011, was never made aware of Rios' condition. In a statement later to the Commission of Correction, the doctor said he "never touched the chart."

### Berkeley Jail Sued After Inmate Deaths

An inmate reportedly died from upper gastrointestinal bleeding from a tear in his esophageal varices, according to the complaint.

The inmate, Woods, had a history of bipolar depressive disorder, Hepatitis C, cirrhosis of the liver, esophageal varices (dilated veins) and gastrointestinal bleeds, according to the complaint. He was on Ondansetron for nausea and vomiting, Zolpidem for sleep, Nexium for reducing stomach acid, Atenolol for high blood pressure, and Seroquel and Prozac for depression.



### Madison County Inmate Dies After Suffering Heroin Withdrawals



Brandon Clint Hacker, 35, was also suffering from peptic ulcer disease and a "perforational duodenal ulcer," said Madison County Coroner Jimmy Cornelison.

Hacker told the jail's nurse he was feeling ill and believed he was suffering from heroin withdrawal.

**County Jail Inmate Dies**



Christy Ann Sanders, a 27-year-old San Lorenzo Valley woman, died while in jail during August. An autopsy determined her cause of death was bilateral pulmonary atelectasis with anoxia, or collapse of the lung, due to intravenous heroin abuse. Sanders was serving a 60-day sentence for a probation violation at the time.

## III. Discussion

Significant percentages of inmates admitted to correctional institutions have a history of alcohol and/or other drug abuse. The withdrawal may be mild, moderate, or severe. Alcohol withdrawal is the abstinence syndrome with the highest mortality rate, although withdrawal from opiates and depressant drugs (e.g., benzodiazepines) may be, on occasion, life-threatening.

The treatment for most non-life-threatening withdrawal is amelioration of symptoms, which can be managed in the convalescent or outpatient setting. Abstinence syndromes in certain groups (including those who are psychotic, geriatric, epileptic, pregnant, adolescent, or otherwise medically ill) may require different protocols. For example, current medical thinking is that pregnant patients should not be withdrawn from a methadone maintenance program.

## III. Discussion

As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times.

Training for correctional officers includes recognizing the signs and symptoms of intoxication and withdrawal. Intoxication and withdrawal also increase the potential for suicide, a factor that is to be incorporated into the staff training on suicide prevention.

## IV. Benzodiazepine Withdrawal

A. **Xanax – The Most Abused Benzo**

Second only to hydrocodone, Xanax is the most abused drug in the United States. Physicians prescribe it like candy, and it is cheap to buy on the streets. Often use in combination with an opiate (such as hydrocodone or methadone) and Soma (a muscle relaxer), it forms what the users call the "California Cocktail." It is also often used in huge quantities and combined with alcohol. While it is seldom toxic in and of itself, in combination with other drugs, it is killer. Withdrawal from Xanax can also be a killer, and that is our focus, because often the drug addicts in our society withdrawal in our jails.

## IV. Benzodiazepine Withdrawal

B. **Withdrawal Defined**

Benzodiazepine withdrawal is the cluster of symptoms that emerge when a person who has taken benzodiazepines has developed a physical dependence and undergoes dosage reduction or discontinuation. It is characterized by often severe sleep disturbance, irritability, increased tension and anxiety, panic attacks, hand tremor, sweating, difficulty in concentration, confusion and cognitive difficulty, memory problems, dry retching and nausea, weight loss, palpitations, headache, muscular pain and stiffness, a host of perceptual changes, hallucinations, seizures, psychosis, and suicide.

## IV. Benzodiazepine Withdrawal

C. **Percentage of Users Who Experience Withdrawal**

Not every user long-term user will experience symptoms upon discontinuation, but the proportion of those who will has been variably estimated to be between 15% and 44%.

## IV. Benzodiazepine Withdrawal

D. Should Not Be Prescribed for Long-term Use
- Long-term use, defined as daily use for at least three months, is not desirable because of the associated increased risk of dependence, dose escalation, loss of efficacy, increased risk of accidents and falls, particularly for the elderly, as well as cognitive, neurological, and intellectual impairments.
- Chronic exposure to benzodiazepines causes neural adaptations that counteract the drug's effects, leading to tolerance and dependence. In severe cases, the withdrawal reaction may exacerbate or resemble serious psychiatric and medical conditions, such as mania, schizophrenia, and, especially at high doses, seizure disorders.

## IV. Benzodiazepine Withdrawal

E. Treatment of Benzo Withdrawal
According to the British National Formulary, it is better to withdraw too slowly rather than too quickly from benzodiazepines. The rate of dosage reduction is best carried out so as to minimize the symptoms' intensity and severity. Anecdotally, a slow rate of reduction may reduce the risk of developing a severe protracted syndrome. Long half-life benzodiazepines like diazepam (Valium) or chlordiazepoxide (Librium) are preferred to minimize rebound effects, and are available in low potency dose forms.

## IV. Benzodiazepine Withdrawal

F. Duration
- After the last dose has been taken, the acute phase of the withdrawal generally lasts for about two months.

## IV. Benzodiazepine Withdrawal

G.  Pro-Active Management
- Attached as Exhibit 1 is a form questionnaire that my office has drafted to give jail staff a heads up during the booking process for people who may be at risk for life-threatening withdrawals.

## V. Pre-Trial Detainees Legal Analysis

A.  Episodic Act or Condition of Confinement
- The first issue to determine in a case brought by a pre-trial detainee is whether the case presents an episodic act or a condition of confinement.
   "A 'condition of confinement' case is a '[c]onstitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement.'" Scott v. Moore, 114 F.3d 51, 53-54 (5th Cir. 1997).

## V. Pre-Trial Detainees Legal Analysis

B.  Methadone – Conditions Case –
   Opinions from Other Circuits:
   Two circuit courts of appeal have directly addressed the issue of whether methadone is even required in an institutional setting and whether or not pre-trial detainees have a right to continued methadone treatment after arrest. Both Circuits concluded that pre-trial detainees had no right to methadone treatment.

## V. Pre-Trial Detainees Legal Analysis

C. **Episodic Act**

- In contrast, where the complained of harm is a particular act or omission of one or more officials, the action is characterized properly as an "episodic act or omission" case and it not amenable to review under the *Wilson* test. *See Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996). In an "episodic act or omission" case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.

- To prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with subjective deliberate indifference.
  *Scott v. Moore*, 114 F.3d 51, 53-54 (5th Cir. 1997).

## Attached: Exhibit 1, Form Questionaire

# "LAW ENFORCEMENT LIABILITY ISSUES"

## 2017

Robert S. Davis
FLOWERS DAVIS, P.L.L.C.
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
903/534-8063
903/534-1650 Facsimile

## TABLE OF CONTENTS

I.    Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Absolute Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    C.    Stay Of Discovery Or Disclosure Pending Ruling On Immunity Issue. . . . . 2

II.   Supervisory Liability -- When Is a Supervisor Liable. . . . . . . . . . . . . . . . . . . . 2

III.  Specific Constitutional Violations Arrestee's/Inmates Frequently Assert . . . . . . . 4

    A.    Medical Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.    Pretrial Detainees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.    Convicted Felons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          3.    HIV-positive Detainees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Excessive Use Of Force Claims                                        9

          1.    Arrestees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          2.    Convicted Felons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          3.    Pre-trial Detainees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          4.    Bystander Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          5.    Verbal Threats Do Not Arise To A Constitutional Violation. . . . . . 11

    C.    Denial Of Access To The Courts And Access To Legal Materials. . . . . . 12

          1.    Inmates Are Entitled To An Adequate Law Library Or Adequate
                Assistance But There Is Room For Alternatives Other Than A Law
                Library. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          2.    Actual Injury Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          3.    Right to Law Library Access Or Legal Assistance Not Unlimited
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Plaintiffs' Appendix 121

4.   Inmates' Access Limited To Claims That Attack Their Sentences, Directly Or Collaterally, And Challenge The Conditions Of Their Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5.   Some Additional Assistance May Be Required For The Illiterate Or Non-English Speaking Inmate. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6.   Prisoner Who Waives Appointed Counsel And Other Arbitrary Denial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7.   Prisoners In Administrative Segregation. . . . . . . . . . . . . . . . . . . . 14

8.   No Constitutional Right To File Frivolous Lawsuits. . . . . . . . . . . . 14

9.   Inmates Are Allowed to Assist Each Other On Legal Matters. . . . 14

10.   Inmates Must Receive Paper, Pens, Notaries And Stamps. . . . . . 14

11.   States Must Pay For Lawyers For Indigent Defendant. . . . . . . . . . 15

12.   Appointment of Counsel in Civil Rights Case. . . . . . . . . . . . . . . . 15

D.   Food. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

E.   Visitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1.   General Visitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2.   Conjugal Visits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.   Contact Visits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

F.   Grievances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

G.   Jail Conditions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1.   Convicted Felons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2.   Pre-trial Detainees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H.   Recreation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.   Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Plaintiffs' Appendix 122

|   |   | 1. | Deprivation of Property. | 21 |
|   |   | 2. | Jail Disciplinary Proceedings. | 22 |
|   |   | 3. | Violation of State's or County's Own Rules. | 22 |
|   |   | 4. | Failure To Follow State Laws Or Procedures Does Not Give Rise To A 1983 Claim. | 23 |
|   | J. | Jail Suicide. | | 23 |
|   | K. | Freedom Of Religion. | | 24 |
|   |   | 1. | General Rule. | 24 |
|   |   | 2. | Designation of Affilitation. | 24 |
|   |   | 3. | Grooming Policy. | 24 |
|   | L. | First Amendment - Publications and Mail. | | 25 |
|   |   | 1. | Censorship of Mail. | 26 |
|   | M. | Cause Of Action For State Created Danger. | | 26 |
|   | N. | Claims for Sex in Jail. | | 26 |
|   | O. | Female Guards Supervising Male Inmates. | | 27 |
|   | P. | Retaliation. | | 28 |
|   | Q. | Trustee Status, Lack of Education/Work Opportunities. | | 28 |
|   | R. | Arbitrary Punishments Of A Complete Cellblock. | | 28 |
|   | S. | Radio and Television Access. | | 29 |
|   | T. | Telephone Access. | | 29 |
| IV. | | There Is No State Law Counterpart to 42 U.S.C. § 1983. | | 29 |
| V. | | The Prison Litigation Reform Act. | | 29 |

# I.
# IMMUNITY

As with any claim asserted against a government employee or official, the first line of defense is the affirmative defense of immunity from suit, either absolute or qualified. Consequently, a good understanding of both of these types of immunity is very important to the practitioner.

The modern doctrine of immunity, either qualified or absolute, is the result of explicit judicial balancing of adverse interests which are implicated in suits brought by private persons allegedly injured by the acts of public officials. *See Butz v. Economou*, 98 S. Ct. 2909, 2912 (1978). On one hand, there is the private desire to obtain redress from governmentally imposed injuries; as well as, the public interest in both punishment and deterrence of official wrongdoing. *Id.* On the other hand, there is the public aim of shielding officials from liability so that they do not become overly cautious in the performance of their duties. *See Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2736-38 (1982); *Butz*, 98 S. Ct. at 2909-12; see also *The Supreme Court*, 1981 Term, 96 Harv. L. Rev. 4, 229 (1982); Schuck, *Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages*, 1980 Sup. Ct. Rev. 281, 281-85 (1980).

## A.    Absolute Immunity

As courts have weighed the conflicting values inherent to the immunity concept, the courts have acknowledged that the scales do not always tip evenly. *Butz*, 98 S. Ct. at 2909-12. For those officials whose governmental functions are especially sensitive or whose constitutional status requires complete protection from suit, the Supreme Court has recognized an absolute immunity defense. *Eastland v. United States Servicemen's Fund*, 95 S. Ct. 1813, 1821 (1975)(legislators have absolute immunity for acts in their legislative capacity); *Stamp v. Sparkman*, 98 S. Ct. 1099, 1108 (1978)(judges have absolute immunity for acts in their judicial capacity); *Imbler v. Pachtman*, 96 S. Ct. 984, 994-95 (1976)(prosecutors have absolute immunity for acts in initiating and pursuing a prosecution); *Butz*, 98 S. Ct. at 2912. (other executive officers have absolute immunity for performing prosecutorial or adjudicative functions); *Nixon v. Fitzgerald*, 102 S. Ct. 2690, 2704 (1982)(The President of the Unites States is protected by absolute immunity).

As a general rule, the doctrine of absolute immunity will only come into play in jail suits when the Plaintiff attempts to assert a cause of action against individual county commissioners or individual city councilman for the performance of their legislative functions. When this does occur, the individual commissioners and councilman (including the mayor and the county judge) are entitled to an absolute immunity from suit for the performance of their legislative functions.

## B.    Qualified Immunity

Officials whose functions do not require complete insulation from liability are not protected by the doctrine of absolute immunity. *Butz*, 98 S. Ct. at 2909-12. Instead, these

050

Plaintiffs' Appendix 124

individuals have been accorded a qualified immunity. *Id.* (qualified immunity recognized for certain Executive Branch officials); *Scheuer v. Rhodes*, 94 S. Ct. 1683, 1692-93 (1974)(qualified immunity recognized for governors and their aides); *Pierson v. Ray*, 87 S. Ct. 1213, 1218-19 (1967)(qualified immunity recognized for police officers).

Prior to 1982, the court utilized a two-prong, subjective/objective test for qualified immunity. *See Wood v. Strickland*, 95 S. Ct. 992, 1000-01 (1975). Under this test, public officials had the burden of proving their good faith. *See id.* Many courts, under this test, considered the subjective element to be a question of fact, and this approach was criticized in *Harlow*, 102 S. Ct. 2727, 2737-38 (1982). The court reasoned that this approach was not workable because, in part, substantial costs were being accumulated to litigate the subjective good faith of governmental officials. *Id.* These costs included the risk of trial, distraction of officials from their governmental duties, inhibition of discretionary actions, and deterrence of able people from entering public service. *Id.* at 2737.

As a result of the hardships under the subjective/objective test, the Supreme Court eliminated the subjective element of the qualified immunity test. *Id.* at 2738. The Court concluded that utilizing the new standard would allow many claims to be resolved by summary proceeding. *Id.* at 2738-39.

As a general rule, under the doctrine of qualified immunity, government officials are shielded from liability as long as their actions can reasonably be thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 107 S. Ct. 3034, 3038 (1987). In other words, government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Harlow*, 102 S. Ct. at 2738. For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable person would understand that what he was doing would violate that right. *Melear v. Spears*, 862 F.2d 1177, 1183 (5th Cir. 1989).

## C.    Stay Of Discovery Or Disclosure Pending Ruling On Immunity Issue

A district court should freeze pre-trial discovery until the district court can determine whether a substantial basis for the defense of qualified immunity exists. *Elliot v. Perez*, 751 F.2d 1472, 1478 (5th Cir. 1985). Officials should be free not only from ultimate liability, but also from discovery and other pre-trial concerns, if they are entitled to qualified immunity. *Id.* This rule was fashioned due to the fact that qualified immunity is an immunity from suit, and extends beyond just a defense of liability. *Id.* A defendant who raises a meritorious issue of qualified immunity is entitled to dismissal before the commencement of discovery, and courts have the obligation to carefully scrutinize a plaintiff's claim prior to subjecting a public official to the unnecessary burdens that a civil trial of this nature can bestow. *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986).

## II.
## SUPERVISORY LIABILITY -- WHEN IS A SUPERVISOR LIABLE

For a supervisor to be held liable under section 1983, the supervisor must either be personally involved in the acts causing the deprivation of an individual's constitutional rights, or there must be some other causal connection between an act of the supervisor and the constitutional violation sought to be addressed. *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983); *C-1 by P-1 v. City of Horn Lake*, 775 F. Supp. 940 (N.D. Miss. 1990). To state a claim against a supervisory official, in his individual capacity, a plaintiff must plead and prove that the supervisory official was personally responsible for the plaintiff's alleged constitutional deprivation or was responsible for the plaintiff's alleged constitutional deprivation in accordance with case law governing the liability of supervisory officials for constitutional violations committed by their subordinates. *Doe*, 733 F. Supp. at 252 (E.D. Tex. 1990) (citing *Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987)). Consequently, a supervisory official, in his individual capacity, may only be subject to suit a if plaintiff can plead and prove: 1) the official's affirmative participation in acts causing the constitutional deprivation, or 2) the official implemented an unconstitutional policy that caused plaintiff's injury. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992); see *Thompkins,* 828 F.2d at 304; *Doe,* 733 F. Supp. at 258. Under Section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability. *Thompkins*, 828 F.2d at 303; *Doe,* 733 F. Supp. at 258. Without personal involvement on the part of the supervisor, the plaintiff is required to establish that the supervisor failed to supervise the employees adequately, the failure was grossly negligent and the failure to supervise caused the constitutional violation. *Bigford*, 834 F.2d at 1220; *Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir. 1986).

Additionally, the supervisory official may also be entitled to qualified immunity from suit. The supervisory official will not be subject to suit if the objective circumstances warranted a belief that the alleged unconstitutional conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Doe*, 733 F. Supp. at 258 (quoting *Harlow* 102 S. Ct. at 2738).

To state a claim against a supervisory official, a plaintiff must plead and prove that the supervisory official was personally responsible for the plaintiff's alleged constitutional deprivation or was responsible for the plaintiff's alleged constitutional deprivation in accordance with case law governing the liability of supervisory officials for constitutional violations committed by their subordinates. *Doe*, 733 F. Supp. at 252 (citing *Thompkins*, 828 F.2d 298).

A supervisory official, in his individual capacity, may only be subject to suit if a plaintiff can plead and prove: 1) the official's affirmative participation in acts causing the constitutional deprivation, or 2) the official implemented an unconstitutional policy that caused plaintiff's injury. *Mouille*, 977 F.2d at 929; *see Thompkins*, 828 F.2d at 304; *Doe,* 733 F. Supp. at 258. Under Section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability. *Thompkins*, 828 F.2d at 303; *Doe*, 733 F. Supp. at 258. Without personal involvement on the part of the supervisor, the plaintiff

Plaintiffs' Appendix 126

is required to establish that the supervisor failed to supervise the employee adequately, the failure was grossly negligent and the failure to supervise actually caused the constitutional violation. *Bigford*, 834 F.2d at 1220; *Hinshaw*, 785 F.2d at 1263.

Moreover, in addition to the stringent requirements set forth above, a supervisory official is also entitled to qualified immunity from suit. The supervisory official will not be subject to suit if the objective circumstances warranted a belief that the alleged unconstitutional conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Doe*, 733 F. Supp. at 258 (quoting *Harlow* 102 S. Ct. at 2738).

The causation standard in 42 U.S.C. Section 1983 is generally a proximate cause standard. Proximate cause in the 42 U.S.C. Section 1983 actions includes components of cause in fact and foreseeability. *Nettles v. Griffith*, 883 F. Supp. 136 (E.D. Tex. 1995).

## III.
## SPECIFIC CONSTITUTIONAL VIOLATIONS
## THAT INMATES FREQUENTLY ASSERT

### A. Medical Claims

#### 1. Pretrial Detainees

For a pretrial detainee, his or her constitutional rights flow from due process guarantees, not the prohibition against cruel and unusual punishment. Hare v. City of Corinth, 74 F.3d 633, 639, 649 (5th Cir.1996) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976) and Bell v. Wolfish, 441 U.S. 520, 535 (1979)).

In the prison setting, however, the Eighth Amendment (which applies to convicted felons) and Fourteenth Amendments impose the same duty on prison officials to provide for the basic safety and well-being of all inmates. Hare, 74 F.3d at 644. As the Supreme Court explained:

[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney v. Winnebago County Dept. of Social Servs., 489 U . S. 189, 200 (1989) (citing Estelle, 429 U.S. at 103). With one exception (which does not apply in the context of a specific alleged act or omission involving inmate medical care), pretrial detainees and convicted prisoners must establish the same elements of liability to maintain constitutional claims for injuries they received in prison. DeShaney, 489 U.S. at 198 n. 5 (citing Whitley v. Albers, 475 U.S. 312, 326 (1986)); Hare, 74 F.3d at 647, 649-50.

*Page 4 of 29*

The exception arises because pretrial detainees may not be subjected to conditions of confinement that constitute punishment. Bell, 441 U.S. at 535. The Constitution mandates humane, not comfortable, conditions of confinement. If the Plaintiff in a case is alleging a specific act or omission, as opposed to an alleged unconstitutional condition of confinement, the detainee must show that the official possessed a sufficiently culpable state of mind. Farmer v. Brennan, 511 U.S. 825, 832 (1994).

In particular, the Constitution prohibits "deliberate indifference to inmate health or safety." Id. Unlike the first element addressing the seriousness of the injury or danger, this element involves a subjective test. Deliberate indifference requires that the official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. Subjective deliberate indifference cannot be inferred from a prison official's failure to act reasonably or failure to alleviate a risk that he did not perceive. Hare v. City of Corinth, 74 F.3d 633, 649 (5th Cir.1996). In cases involving medical treatment, the inmate must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. at 645. Unsuccessful treatment, ordinary acts of negligence, and disagreements with the level or type of treatment do not amount to deliberate indifference. Domino v. Tex. Dep't of Crim. Justice, 239 F.3d 752, 756 (5th Cir.2001); see, e.g., Hudson v. McHugh, 148 F.3d 859, 864 (7th Cir.1998) (jail officers and nurse knew plaintiff had epilepsy, knew he was not receiving any medication, and ignored his repeated requests for treatment); see Estelle v. Gamble, 429 U.S. 97, 105 (1976); Davidson v. Tex. Dep't of Crim. Justice, 91 F. App'x 963, 965 (5th Cir.2004); Hall v. Thomas, 190 F.3d 693, 697 (5th Cir.1999); Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir.1999); Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir.1997); Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir.1995).

## 2. Convicted Felons

To prevail on an Eighth Amendment claim for deprivation of medical care, a prisoner must also prove that care was denied and that such denial constituted a "deliberate indifference to serious medical needs, constituting unnecessary and wanton infliction of pain." Johnson v. Treen, 759 F.2d 1236, 1237 (5th Cir. 1985) (citing Estelle v. Gamble, 97 S. Ct., 285, 291 (1976)). In Estelle, Mr. Gamble complained repeatedly to prison authorities of severe pains in his back, chest, arms and legs. Estelle, 97 S. Ct. at 288-89. Additionally, he complained of "blank outs." Id. at 288-89. Despite his repeated complaints, Gamble was only given examinations in the prison infirmary, pain pills and muscle relaxants for months. Id. at 288-89. After continuing his complaints in the face of disciplinary action for shirking work, Gamble was placed in administrative segregation and given quinidine as treatment for irregular cardiac rhythm. Id. at 288-89. Although Gamble had repeatedly made known his subjective feelings of substantial pain to prison officials, the district court dismissed Gamble's complaint for failure to allege facts sufficient to support a conclusion of deliberate indifference. Id. at 288-89. The Fifth Circuit Court of Appeals reversed and remanded the case with instructions to reinstate the complaint. Id. at 293. The Supreme Court then reversed the Fifth Circuit and held that the district court's decision

054
Plaintiffs' Appendix 128

should have been affirmed as it related to the claim for deprivation of medical care. *Id.* at 293.

In the wake of *Estelle*, the Fifth Circuit has held that to state a claim alleging deliberate indifference to serious medical needs of a prisoner, a plaintiff must plead facts showing an unnecessary and wanton infliction of pain prescribed by the Eighth Amendment. See *Johnson*, 759 F.2d at 1238. The facts underlying a claim of deliberate indifference must clearly evidence the medical need in question and the alleged official dereliction. *Id.* at 1238 (citing *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981)). The legal conclusion of deliberate indifference, therefore, must rest on facts clearly evidencing wanton actions on the part of the defendants. *Id.* at 1238. As stated in *Johnson*, the Supreme Court defined the common law meaning of wanton in some detail:

> Wanton means reckless -- without regard to the rights of others . . .. Wantonly means causelessly without restraint, and in reckless disregard to the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as a conscious failure of one charged with the duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with the knowledge of such peril, and being conscience of the inevitable or probable results of such failure.

*Id.* at 1238; see also *Walker v. Butler*, 967 F.2d 176 (5th Cir. 1992). Finally, mere negligence, neglect, or medical malpractice is insufficient to state a claim. *Graves v. Hampton*, 1 F.3d 315 (5th Cir. 1993); *Mendoza v. Lynaugh*, 889 F.2d 191 (5th Cir. 1993); *Field v. Bosshard*, 590 F.2d 105 107 (5th Cir. 1979). As stated in *Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982), cert. denied, 103 S. Ct. 1438 (1983):

> The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare or Medicaid provide for the aged or needy. It prohibits only deliberate indifference to serious medical needs.

*Id.* at 1149.

Moreover, a delay in medical care can only constitute an eighth amendment violation if there has been deliberate indifference, which results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Plaintiff must establish both of these crucial elements to defeat a motion for summary judgment. *See id.*

In the context of medical claims, it has also been held that an individual entering jail on a probation or parole violations charge is a convicted felon and is protected by the Eighth Amendment's prohibition against cruel and unusual punishment rather than the Fourteenth Amendment. *See generally Van Cleave v. U.S.*, 854 F.2d 82 (5th Cir. 1989), citing *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1983). Consequently, in the Fifth Circuit, a convicted inmate, even if he is in jail on a probation or parole revocation charge, has to assert a claim

Plaintiffs' Appendix 129

that officials were deliberately indifferent to his or her serious medical needs, and a showing of nothing more than negligence cannot state a claim. *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).

Simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. *Johnson*, 759 F.2d at 1238; see also *Varnado v. Lynaugh*, 920 F. 2d 320 (5th Cir. 1991). Even if the jail medical staff committed malpractice in dealing with an inmate's medical needs, this would not suffice to state a constitutional claim. *Varnado*, 920 F.2d at 323. Likewise, differing medical opinions, and even negligent medical attention, without more, do not support a claim under 42 U.S.C. Section 1983. *Burrell*, 158 F.R.D. 104. Stated simply, a disagreement between an inmate and his or her physician concerning whether certain medical care was appropriate is not actionable under 42 U.S.C. Section 1983. *Vanuelos v. McFarland*, 41 F.3d 232 (5th Cir. 1995).

To cite some specific examples, a prisoner has no claim against prison officials under 42 U.S.C. Section 1983 for allegedly being given medicine that had been dropped on the floor and medicine not meant for him. *Freeze v. Griffith*, 849 F.2d 172 (5th Cir. 1988) (the inmate did not take any wrong medicine and never suffered an ill effects from taking medicine that had fallen on the floor). An inmate's allegation that medical treatment was administered without his consent and forced upon him after he previously tested positive for tuberculosis did not constitute deliberate indifference toward the medical needs of the prisoner nor did it constitute cruel and unusual punishment. *McCormick v. Stalder,* No. 96-30415 (Feb. 19, 1997) 1997 W.L. 40596. Finally, it has been held that an inmate failed to state an actionable claim for deliberate indifference to serious medical needs when he was denied an elevated bed, since the inmate saw doctors on numerous occasions, received physical therapy, heat applications, medication and other medical care designed to assist his recovery. *Burrell*, 158 F.R.D. 104.

From a purely evidentiary standpoint, medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. *Vanuelos*, 41 F.3d 232. As with most areas of law enforcement, documentation can be the key to avoiding liability.

### 3. HIV-positive Detainees

Courts have held that a prison may segregate inmates with HIV without violating the constitution, although no court has imposed a duty on prisons to segregate such prisoners. *Oladipupo v. Austin*, 104 F.Supp.2d 626, (W.D. La. 2000); *contrast Muhammad v. Carlson*, 845 F.2d 175 (8th Cir.1988) (upholding prison's segregation of HIV-infected inmates) *and Cordero v. Coughlin*, 607 F.Supp. 9 (S.D.N.Y.1984) (holding that segregation of inmates with AIDS did not amount to cruel and unusual punishment or violate inmates' equal protection or free association rights), *with Robbins v. Clarke,* 946 F.2d 1331 (8th Cir.1991) (failure to segregate HIV-positive prisoners from the general population held not to constitute cruel and unusual punishment) and *Glick v. Henderson,* 855 F.2d 536 (8th Cir.1988) (finding prison official's decision not to institute AIDS testing and segregation

*Page 7 of 29*

Plaintiffs' Appendix 130

program was not unreasonable); *see also Feigley v. Fulcomer*, 720 F.Supp. 475 (M.D.Pa.1989) (rejecting claim that failure to require segregation constituted cruel and unusual punishment); *Woods v. White*, 689 F.Supp. 874 (W.D.Wis.1988) (holding that prisoner had a right to privacy which was violated by disclosure of his HIV-positive status to non-medical prison personnel and other inmates), *aff'd*, 899 F.2d 17 (7th Cir.1990). In light of the precedent discussed above, jails are not under an affirmative duty under the constitution to segregate those detainees with HIV from the non-infected detainees.

In Sims v. Dretke, 212 Fed.Appx. 276 C.A.5 (Tex.),2006, the Fifth Circuit stated as follows:

As the district court noted, the United States Department of Health and Human Services has stated an HIV-positive individual need not necessarily undergo anti-HIV treatment; whether to undergo such treatment depends on an individual's medical assessments and particular circumstances. Sims admits being medically examined on numerous occasions, but disagrees with his diagnosis and course of treatment. Such disagreement, standing alone, is insufficient to state a claim under section 1983. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir.1991); *see also* Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir.1995).

B.    Excessive Use Of Force Claims

    **1.   Arrestees**

Currently, allegations of excessive use of force on arrestees implicate the Fourth Amendment's guarantee of freedom from "unreasonable seizures." See *Graham v. Conner*, 109 S. Ct. 1865, 1870-71 (1989); *Mouille*, 977 F.2d at 927. Under the broad definition in *Graham*, seizure was defined as a "means or show of force or show of authority, . . . in some way restraining the liberty of a citizen." *Graham*, 109 S. Ct. at 1871; *Mouille*, 977 F. 2d at 927. All claims that officers used excessive force in the course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than a substantive due process approach. *Graham*, 109 S. Ct. at 1871; *Mouille*, 977 F.2d at 927 n. 4. In *Graham*, the Court also stated that determining whether the force used to effect a particular seizure was "reasonable" under the Fourth Amendment required a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interest at stake. *Id*. The reasonableness of a particular use of force must be judged from the prospective of a reasonable officer on the scene, and the calculus of reasonableness must allow for the fact that police officers are often forced to make split second judgments, in circumstances that are tense, uncertain and rapidly evolving, about the amount of force that is necessary in a particular situation. *Id*. In determining whether the force used to effect a particular seizure as "reasonable" under the Fourth Amendment, the question is whether the officers actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regards to their underlying intent or motivation. *Id*.

The law in the Fifth Circuit prior to *Graham* was that the substantive due process clause of the Fourteenth Amendment governed such claims. *Mouille*, 977 F.2d at 927. Thus, when determining whether an officer was cloaked by qualified immunity for claims occurring prior to the Court's decision in *Graham*, the Court still applies the Fourteenth Amendment standard as set out in *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981) in making a determination of whether a reasonable officer would have known that he or she was violating clearly established statutory or constitutional rights of which a reasonable person would have known. *See Mouille*, 977 F.2d at 928.

The actual test applied by the Court's for pre-trial arrestees is the same as the test applied to convicted felons. To make out a claim for excessive use of force, there has to be: 1) an injury that is not deminimus; 2) that resulted directly and only from a use of force that was clearly excessive to the need, and the excessiveness of which was; 3) objectively unreasonable. *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989).

## 2.    Convicted Felons

Prior to 1992, the test as it related to convicted felons was that to make out a claim for excessive use of force, there had to be: 1) a significant injury; 2) that resulted directly and only from a use of force that was clearly excessive to the need; and the excessiveness of which was; 3) objectively unreasonable. *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989). The significant injury prong of the Johnson holding was, of course, called into doubt by *Hudson v. McMillian*, 112 S. Ct. 995, 997 (1992) (excessive force claim in eighth amendment context even without significant injury). *Mouille*, 977 F.2d at 929; *King v. Chide*, 974 F.2d 653, 657 (5th Cir. 1992). Indeed, the Fifth Circuit has held that the Supreme Court's decision in *Hudson* "makes clear that we can no longer require persons to prove significant injury as we had used that term for years, under section 1983." *Knight v. Caldwell*, 970 F.2d 1430, 1432 (5th Cir. 1992). As a result, the Plaintiff is only required to prove some injury that is not deminimous. *Harper v. Harris County*, 21 F.3d 597 (5th Cir.), rehearing denied, 29 F.3d 626 (5th Cir. 1994).

## 3.    Pre-trial Detainees in Jail

The ultimate question in the Fifth Circuit for suits brought by pre-trial detainees alleging excessive use of force in the context of a prison disturbance is whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm, and the focus of this standard is on the detention facility official's subjective intent to punish. *Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir.), cert denied, 113 S.Ct. 2998, (1993). In making a determination regarding the detention facility official's subjective intent to punish in a suit brought by a pre-trial detainee alleging excessive use of force during a prison disturbance, the trier of fact must consider such objective factors as extent of injuries suffered, apparent need for application of force, degree of force exerted, the threat reasonably perceived by the detention facility official and the need to act quickly and decisively. *Id.*

## 4.    Bystander Liability

Plaintiffs' Appendix 132

In the context of the use of excessive force, a police officer or jailer who is present at the scene and who does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable for civil rights violations depending on the nature and extent of the alleged excessive use of force. *Hale v. Townley*, 45 F.3d 914 (5th Cir.), rehearing denied, 51 F.3d 1047 (5th Cir. 1995). It is probable that this same rationale would apply in the context of any excessive use of force claim, regardless of whether it is asserted by an arrestee, pre-trial detainee or convicted felon.

### 5. Verbal Threats Do Not Arise To A Constitutional Violation

Verbal threats do not rise to the level of a constitutional violation. *See Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002). Mere allegations of verbal abuse do not present actionable claims under section 1983. *Oladipupo v. Austin*, 104 F.Supp.2d 626 (W.D. La. 2000); *see Bender v. Brumley*, 1 F.3d 271, 274 n. 4 (5th Cir.1993). "[A]s a rule, 'mere threatening language and gestures of a custodial officer do not, even if true, amount to a constitutional violation.'" *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir.1983) (quoting *Coyle v. Hughs*, 436 F.Supp. 591, 593 (W.D.Okla.1977)).

### C. Denial Of Access To The Courts And Access To Legal Materials

### 1. Inmates Are Entitled To An Adequate Law Library Or Adequate Assistance But There Is Room For Alternatives Other Than A Law Library. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977).

As stated by the Supreme Court in *Bounds*:

> We hold, therefore, that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. In a footnote (FN17), the Court went on to state, in pertinent part, "our main concern here is 'protecting the ability of an inmate to prepare a petition or complaint.'"

*Bounds*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72.

However, even the Bounds Court held that alternatives were acceptable.[1] It should be noted that while adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision here, as in Gilmore, does not foreclose alternative means to achieve that goal. Nearly half the States and the District of

---

[1] The Supreme Court stated that: "We reject the State's claim that inmates are "ill-equipped to use" "the tools of the trade of the legal profession," making libraries useless in assuring meaningful access.

Plaintiffs' Appendix 133

Columbia provide some degree of professional or quasi-professional legal assistance to prisoners. *Bryan v. Werner,* 516 F.2d 233 (CA3 1975); *Gaglie v. Ulibarri,* 507 F.2d 721 (CA9 1974); *Corpus v. Estelle,* 409 F.Supp. 1090 (SD Tex.1975).

Additionally, the Court held that this is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. *Bounds,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72. But the cost of protecting a constitutional right cannot justify its total denial. *Id.*

In *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (2002), the Supreme Court further clarified its holding in Bounds by holding as follows:

> The foregoing analysis would not be pertinent here if, as respondents seem to assume, the right at issue--the right to which the actual or threatened harm must pertain--were the right to a law library or to legal assistance. But *Bounds* established no such right, any more than *Estelle* established a right to a prison hospital. The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts.* *E.g., Bounds,* 430 U.S., at 817, 821, 828, 97 S.Ct., at 1492-1493, 1494, 1498. In the cases to which *Bounds* traced its roots, we had protected that right by prohibiting state prison officials from actively interfering with inmates' attempts to prepare legal documents, *e.g., Johnson v. Avery,* 393 U.S. 483, 484, 489-490, 89 S.Ct. 747, 748, 750-751, 21 L.Ed.2d 718 (1969), or file them, *e.g., Ex parte Hull,* 312 U.S. 546, 547-549, 61 S.Ct. 640, 640-642, 85 L.Ed. 1034 (1941), and by requiring state courts to waive filing fees, *e.g., Burns v. Ohio,* 360 U.S. 252, 258, 79 S.Ct. 1164, 1168-1169, 3 L.Ed.2d 1209 (1959), or transcript fees, *e.g., Griffin v. Illinois,* 351 U.S. 12, 19, 76 S.Ct. 585, 590-591, 100 L.Ed. 891 (1956), for indigent inmates. *Bounds* focused on the same entitlement of access to the courts. Although it affirmed a court order requiring North Carolina to make law library facilities available to inmates, it stressed that that was merely "one constitutionally acceptable method to assure meaningful access to the courts," and that "our decision here ... does not foreclose alternative means to achieve that goal." 430 U.S., at 830, 97 S.Ct., at 1499. In other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.,* at 825, 97 S.Ct., at 1496.

Prison officials have considerable discretion in choosing the mechanism and forms of assistance they will furnish to prisoners for the purpose of allowing prisoners to file non-frivolous legal claims. *Brinson v. McKeeman,* 992 F. Supp. 897, 909-12 (W.D. Tex. 1997).

While the precise contours of a prisoner's right of access to the courts remains somewhat obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court.

*Page 11 of 29*

Plaintiffs' Appendix 134

*Brinson,* 992 F. Supp. 897, 909-12 (W.D. Tex. 1997);*see Brewer v. Wilkinson,* 3 F.3d at 821. *See also Lewis v. Casey,* 518 U.S. at ----, 116 S.Ct. at 2179-81; *Norton v. Dimazana,* 122 F.3d at 290; and *Eason v. Thaler,* 73 F.3d 1322, 1329 (5th Cir.1996).

## 2. Actual Injury Required

An inmate must be Prejudiced by Denial of Access. *McDonald v. Steward,* 132 F.3d 225, 230-31 (5th Cir. 1998). Before a prisoner may prevail on a claim that his constitutional right of access to the courts was violated, he must demonstrate "that his position as a litigant was prejudiced by his denial of access to the courts." *McDonald,* 132 F.3d at 230-31, *Eason,* 73 F.3d at 1328 (citing *Walker v. Navarro County Jail,* 4 F.3d 410, 413 (5th Cir.1993)).

As the Supreme Court in Lewis stated:

Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," *id.,* at 823, 97 S.Ct., at 1495 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint. Although *Bounds* itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite. And actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which *Bounds* relied, see *id.,* at 821-825, 97 S.Ct., at 1494-1497. Moreover, the assumption of an actual-injury requirement seems to us implicit in the opinion's statement that "we encourage local experimentation" in various methods of assuring access to the courts. *Id.,* at 832, 97 S.Ct., at 1500. One such experiment, for example, might replace libraries with some minimal access to legal advice and a system of court-provided forms such as those that contained the original complaints in two of the more significant inmate-initiated cases in recent years, *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)--forms that asked the inmates to provide only the facts and not to attempt any legal analysis. We hardly think that what we meant by "experimenting" with such an alternative was simply

061
Plaintiffs' Appendix 135

announcing it, whereupon suit would immediately lie to declare it theoretically inadequate and bring the experiment to a close. We think we envisioned, instead, that the new program would remain in place at least until some inmate could demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded.

### 3.    Right to Law Library Access Or Legal Assistance Not Unlimited

Prisoners have a constitutional right of meaningful access to the courts through adequate law libraries or assistance from legally trained personnel. *McDonald*, 132 F.3d at 230-31; *Degrate v. Godwin*, 84 F.3d 768, 768-69 (5th Cir.1996) (quoting *Bounds*, 430 U.S. at 828).    Nevertheless, this constitutional guarantee does not afford prisoners unlimited access to prison law libraries.  Limitations may be placed on library access so long as the regulations are "reasonably related to legitimate penological interests." *McDonald, 132 F.3d at 230-31; Lewis,* 518 U.S. 343, (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261-62, 96 L.Ed.2d 64 (1987)); *see also Eason,* 14 F.3d at 9-10 (right of meaningful access to courts may be narrowed under certain circumstances).

Additionally, restrictions on direct access to legal materials may even be warranted when prison security is involved. *Brinson,* 992 F. Supp. at 909-12; *see Eason,* 73 F.3d at 1329; *Morrow v. Harwell,* 768 F.2d 619, 622 (5th Cir.1985).

### 4.    Inmates' Access Limited To Claims That Attack Their Sentences, Directly Or Collaterally, And Challenge The Conditions Of Their Confinement

In *Lewis*, 518 U.S. 343, the Court stated as follow:

In other words, *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. 343. In explaining the rationale for this holding, the Lewis Court stated:

Finally, we must observe that the injury requirement is not satisfied by just any type of frustrated legal claim. Nearly all of the access-to-courts cases in the *Bounds* line involved attempts by inmates to pursue direct appeals from the convictions for which they were incarcerated, see *Douglas v. California,* 372 U.S. 353, 354, 83 S.Ct. 814, 815, 9 L.Ed.2d 811 (1963); *Burns,* 360 U.S., at 253; *Griffin, supra,* at 13, 18, 76 S.Ct., at 588, 590; *Cochran v. Kansas,* 316 U.S. 255, 256, 62 S.Ct. 1068, 1069, 86 L.Ed. 1453 (1942), or habeas

*Page 13 of 29*

petitions, see *Johnson v. Avery, supra,* at 489, 89 S.Ct., at 750-751; *Smith v. Bennett,* 365 U.S. 708, 709-710, 81 S.Ct. 895, 896-897, 6 L.Ed.2d 39 (1961); *Ex parte Hull, supra,* at 547-548, 61 S.Ct., at 640- 641. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), we extended this universe of relevant claims only slightly, to "civil rights actions"--*i.e.,* actions under 42 U.S.C. § 1983 to vindicate "basic constitutional rights." 418 U.S., at 579, 94 S.Ct., at 2986. Significantly, we felt compelled to justify even this slight extension of the right of access to the courts, stressing that "the demarcation line between civil rights actions and habeas  petitions is not always clear," and that "[i]t is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ." *Ibid.*

### 5.  Some Additional Assistance May Be Required For The Illiterate Or Non-English Speaking Inmate

In *Lewis,* 518 U.S. 343, the Supreme Court addressed this problem as follows:

When any inmate, even an illiterate or non-English-speaking inmate, shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates that the State has failed to furnish "*adequate* law libraries or *adequate* assistance from persons trained in the law," *Bounds,* 430 U.S., at 828, 97 S.Ct., at 1498 (emphasis added). Of course, we leave it to prison officials to determine how best to ensure that inmates with language problems have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement. But it is that capability, rather than the capability of turning pages in a law library, that is the touchstone.

### 6.  Prisoner Who Waives Appointed Counsel And Other Arbitrary Denial

A prisoner who knowingly and voluntarily waives appointed representation by counsel in a criminal proceeding is not entitled to access to a law library for purposes of that proceeding. *Brinson,* 992 F. Supp. at 909-12; *see Degrate,* 84 F.3d at 769.

### 7.  Prisoners In Administrative Segregation

Arbitrary limitations and restrictions on access to legal materials, without the assistance of persons trained in the law, and without the ability of inmates in administrative segregation to examine legal digests, hornbooks, and other legal materials firsthand is unconstitutional. *Brinson,* 992 F. Supp. 897, 909-12 (W.D. Tex. 1997); *see Eason,* 14 F.3d at 8, 9-10, (holding that allegations of a total denial of all access to the prison law library for 25 days following a prison riot stated a constitutional violation); *Pembroke v. Wood County, Texas,* 981 F.2d at 229, (holding that the total denial of all access to the law library for

seven months violated the plaintiff's constitutional right of access to the courts), *citing Morrow*, 768 F.2d at 622, (holding that access to a weekly bookmobile coupled with circumscribed assistance from law students was insufficient to afford meaningful access to the courts); and *Green v. Ferrell*, 801 F.2d 765, 772 (5th Cir.1986), (holding that allowing inmates to select volumes twice each week from a list of books available in the County law library and limiting inmates to no more than two volumes at a time violated the inmates' rights to meaningful access to the courts).

### 8.  No Constitutional Right To File Frivolous Lawsuits

Prisoners possess no constitutionally-protected right to file frivolous lawsuits. *Brinson*, 992 F. Supp. 897, 909-12 (W.D. Tex. 1997); see *Johnson v. Rodriguez*, 110 F.3d 299, 310-13 & 316 (5th Cir.1997), *cert. denied*, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997).

### 9.  Inmates Are Allowed to Assist Each Other On Legal Matters

In *Johnson*, 393 U.S. 483,, the Supreme Court struck down a regulation prohibiting prisoners from assisting each other with habeas corpus applications and other legal matters.  Johnson was unanimously extended to cover assistance in civil rights actions in *Wolff*, 418 U.S. at 577-580,; see *Bounds*, 430 U.S. at 828.

However, prisoners possess no right to the assistance of any particular other prisoner or writ writer as long as the constitutional right of access to the courts by the putative recipient of such assistance is not infringed.  *Brinson*, 992 F. Supp. at 909-12 (W.D. Tex. 1997); *see Tighe v. Wall*, 100 F.3d 41, 43 (5th Cir.1996).

### 10.  Inmates Must Receive Paper, Pens, Notaries And Stamps

It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them. *See Bounds*, 430 U.S. 817.  States must forgo collection of docket fees otherwise payable to the treasury and expend funds for transcripts. *Id.*  It is well-established in this Circuit that access to typewriters and copy machines is *not* an essential part of the right of access to the courts. *Brinson*, 992 F. Supp. at 909-12; *see Beck v. Lynaugh*, 842 F.2d 759, 762 (5th Cir. 1988), (holding that denial of access to carbon paper and reproduction equipment and denial of face-to-face access to other inmates did not deprive an inmate of his right of access to the courts); and *Eisenhardt v. Britton*, 478 F.2d 855 (5th Cir.1973). There simply is no constitutional right of access to carbon paper, reproduction equipment, or to face-to-face meetings with other inmates possessed by pretrial detainees or prisoners. *Brinson*, 992 F. Supp. at 909-12; *See Beck v. Lynaugh*, 842 F.2d at 762.

### 11.  States Must Pay For Lawyers For Indigent Defendants

064
Plaintiffs' Appendix 138

State expenditures are necessary to pay lawyers for indigent defendants at trial, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), and in appeals as of right. *See Bounds*, 430 U.S. at 828 (citing prior authority).

### 12.    Appointment of Counsel in Civil Rights Cases

Generally, there is no right to the appointment of counsel for indigent prisoners bringing section 1983 cases. *See e.g., Jackson v. Dallas Police Dep't*, 811 F.2d 260, 261 (5th Cir.1986). This court is vested with discretion to appoint counsel when doing so would advance the proper administration of justice; however, this court is not required to do so unless the case presents exceptional circumstances. *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir.1982) (citing 28 U.S.C. § 1915(d)); *Branch v. Cole*, 686 F.2d 264, 266 (5th Cir.1982). A finding of exceptional circumstances depends on the following factors: (1) the type and complexity of the case; (2) whether the indigent is capable of adequately presenting his case; (3) whether the indigent is in a position to adequately investigate his case; and (4) whether the evidence will consist in large part of conflicting evidence that would require skill in the presentation of evidence and in cross examination. *Jackson*, 811 F.2d at 262 (citing *Ulmer*, 691 F.3d at 213). In addition, this court may consider whether appointing counsel will "aid in the efficient and equitable disposition of the case." *Id.*

Although section 1983 cases are often complex, this factor alone does not warrant a finding of exceptional circumstances. *See id.* (citing *Branch*, 686 F.2d at 266). Franklin has demonstrated an adequate ability to present his claims and to investigate the facts and evidence related to his claims. His ability to adequately present his case is demonstrated in his complaint and accompanying brief in which he provided this court with an understanding of his claims and the bases and law upon which he supports his claims. In addition, he articulated very clearly his claims and the facts attendant to his claims at his *Spears* hearing. Finally, the evidence in this case does not consist of conflicting testimony that would require skill in presentation or cross examination because the evidence which the court must consider consists entirely of authenticated records, which comport with his testimony at the *Spears* hearing.

*Page 16 of 29*

Plaintiffs' Appendix 139

## D.    Food

Inmates have a constitutional right to receive reasonably adequate food. *George v. King*, 837 F.2d 705 (5th Cir. 1987). To be actionable, a plaintiff must show that the jail diet had an adverse effect on his health. see *Newmam v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977) (Constitution does not require that prisoners be provided with any and every amenity which some person might think is necessary to avoid mental, physical, or emotional deterioration).

The Fifth Circuit has instructed that the fact that an inmate misses one meal does not necessarily implicate the inmates's constitutional rights. *See Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir.1999); *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir.1986); *see also Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir.1998) ("Missing a mere one out of every nine meals is hardly more than that missed by many working citizens over the same period.")

## E.    Visitation

### 1.    General Visitation

Convicted inmates have no constitutional right to visitation. *Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir. 1980). Instead, for convicted prisoners, visitation privileges are a matter subject to the discretion of the prison officials. *Morrow* , 768 F.2d at 172. Pre-trial detainees have a right to reasonable visitation, absent a legitimate governmental reason to the contrary. *Id.*

### 2.    Conjugal Visits

It is well settled that "(f)ailure to permit conjugal visits does not deny an inmate a federal constitutional right." *Montana v. Commissioners Court*, 659 F.2d 19, 20-23 (5th Cir. 1981) *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.), cert. denied, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *Tarlton v. Clark,* 441 F.2d 384, 385 (5th Cir.), cert. denied, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971) (federal prisoner). The State of Texas is not required to permit prisoners conjugal visits. *Montana*, 659 F.2d at 20-23; *Guajardo v. Estelle*, 580 F.2d 748, 762 (5th Cir. 1978). While penal authorities in foreign countries have allowed prisoners to continue conjugal relationships with their spouses, no precedent exists for such practices in United States institutions. *See, e.g., Tarlton,* 441 F.2d at 385.

### 3.    Contact Visits

Convicted felons have no right to visitation, and contact visits may be denied pretrial detainees for "legitimate security reasons." *Montana*, 659 F.2d at 20-23.

066
Plaintiffs' Appendix 140

**F.    Grievances**

Inmates "do not have a constitutionally protected right to a grievance procedure." *Oladipupo*, 104 F.Supp.2d 626; *Brown v. Dodson,* 863 F.Supp. 284, 285 (W.D.Va.1994) (citing *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir.1991)); *Spencer v. Moore,* 638 F.Supp. 315, 316 (E.D. Mo.1986) (holding that "an inmate grievance procedure is not constitutionally required").    "When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance." *Oladipupo*, 104 F.Supp.2d 626; *see Flick,* 932 F.2d at 729.  A number of courts have held that inmate grievance procedures are not constitutionally required, and so violations of such procedures do not deprive inmates of constitutionally protected rights. *Spencer*, 638 F. Supp. at 316, citing *O'Bryan v. County of Saginaw*, 437 F. Supp. 582 (E.D. Mich. 1977); see also *Azeez v. DeRobertis*, 568 F. Supp. 8 (N.D. Ill. 1982).  In *Mann v. Adams*, 855 F.2d 639 (9th Cir.), cert. denied 109 S. Ct. 242 (1988), the Ninth Circuit Court of Appeals noted that inmates have no legitimate claim of entitlement to a grievance procedure, and thus no protected liberty interest exists.  This position was also taken by the Eighth Circuit in *Flick*, 932 F.2d 728.

**G.    Jail Conditions**

**1.    Convicted Felons**

In the context of convicted inmates, the eighth amendment cruel and unusual punishment standard governs the conditions of confinement.  Indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. *Wilson v. Lynaugh*, 878 F.2d 846, 848 (5th Cir.), cert. denied 493 U.S. 969 (1989).  The Supreme Court has held, however, that to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. *Rhodes v. Chapman*, 452 U.S. 337, 346-7 (1981).

The *Rhodes* Court held that any Eighth Amendment analysis must look to the evolving standards of decency that mark the progress of a maturing society, but cautioned that the standards are derived from objective factors. *Rhodes*, 452 U.S. at 346.

In compliance with the Supreme Court's opinion, the Fifth Circuit has stated that the Eighth Amendment does not afford protection against mere discomfort or inconvenience. *Wilson*, 878 F.2d at 849.

A plaintiff cannot state a claim by alleging that the conditions were filthy, as in *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457 (5th Cir. 1983); by simply stating that he did not like the time that cleaning supplies were given out.  This does not amount to a claim of constitutional dimensions.

A prison warden's liability for damages for squalid prison conditions which violated a prisoner's right to be free of cruel and unusual punishment required a showing that the infliction of harsh conditions was "unnecessary and wanton," which depended upon a number of factors, including the extent to which the warden knew of the unsanitary conditions, the prisoner's exposure to conditions, the steps taken to correct conditions, or remove prisoners form unsanitary cells, and what the warden could have done to protect prisoners from those conditions. *McCord v. Maggio*, 927 F.2d 844 (5th Cir. 1991).

A prisoner is also required to show significant injury as a prerequisite to a recover in a civil rights claim based on squalid prison conditions, requiring proof that he endured pain, suffering or mental anguish sufficiently significant to justify monetary relief for deprivation of his right to be free from cruel and unusual punishment; however, a prisoner is not required to show "lasting harm." *Id.*

## 2. Pre-trial Detainees

In the context of pre-trial detainees, to determine whether a particular imposition or restriction on a pre-trial detainee amounts to punishment within the purview of the federal statute governing civil actions for deprivation of rights, the necessary inquiry is whether the disability is imposed for the purpose of punishment or is but incident to other, legitimate governmental purposes. *Simons v. Clemons*, 752 F. 2d 1053 (5th Cir. 1985). Unless there is express intent to punish, the imposition or restriction on a pre-trial detainee is not a violation of the 42 U.S.C. Section 1983 if there is an alternative purpose to which the imposition may rationally be connected, or unless it appears excessive in relation to the alternative purpose assigned. *Id.* Thus, denial of telephone and recreational privileges while a pre-trial detainee was in protective custody was not punishment, such as to support a 42 U.S.C. Section 1983 claim, where the placement was for detainee's own safety and availability of services was subject to personnel restraints. *Grabowski v. Jackson County Public Defender's Office*, 47 F.3d 1386 (5th Cir. 1995). Similarity, an inmate's claim that he was temporarily forced to sleep on the jail floor due to overcrowding did not give rise to a violation of his constitutional rights and was not cognizable under 42 U.S.C. Section 1983, especially where there existed a legitimate governmental objective to house violent inmates or recidivists for the protection of the general public, despite existing overcrowded

Plaintiffs' Appendix 142

conditions.[2] *Castillo v. Bowles*, 787 F. Supp. 277 (M.D. Tex. 1988) (affirmed by the Fifth Circuit in an unpublished opinion), cert. denied, 110 S.Ct. 92 (1989).

## H. Recreation

Convicted inmates do not have a constitutional right, *per se*, to recreation; however, a deprivation of exercise which impairs health may amount to a constitutional violation under the Eighth Amendment. *Miller v. Carson*, 563 F.2d 741, 750-51 at n.13 (5th Cir. 1977). The absence of outdoor exercise opportunities may also constitute a violation of the Eighth Amendment. *See Montana*, 659 F.2d at 22; *McGruder v. Phelps*, 608 F.2d 1023, 1025 (5th Cir.1979).

## I. Due Process

### 1. Deprivation of Property

It is necessary, in order to make out a procedural due process claim under Section 1983, for one to allege not only a deprivation of property by State action, but also that State procedures available for challenging the deprivation did not satisfy the requirements of due process. *Collins v. King*, 743 F. 2d 248 (5th Cir. 1984). Indeed, to state a claim under Section 1983 for the alleged violation of due process rights for confiscation or destruction of property, the Plaintiff must allege that he has a recognized liberty of property interest within the purview of the Fourteenth Amendment and that he was intentionally and recklessly deprived of that interest, even temporarily, under color of State law. *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995); *Does v. Taylor Indep. School District*, 15 F.3d 443 (5th Cir. 1994), cert. denied, *Lankford v. Does*, 115 S.Ct. 70 (1995).

---

[2] Some Courts however, have held that the deprivation of a mattress is a constitutional violation. "[T]he State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Hare*, 74 F.3d at 650; *Oladipupo*, 104 F.Supp.2d 626. A mattress is a basic human need, which must be provided to a detainee. *Id.* Several federal courts have found that forcing a pretrial detainee to sleep without a mattress, or on the floor on a mattress, for even a short period of time, constitutes a violation of the Fourteenth Amendment. *See, e.g., Thompson v. City of Los Angeles*, 885 F.2d 1439, 1449 (9th Cir.1989) (valid Fourteenth Amendment claim where pretrial detainee forced to sleep on the floor for two nights); *Lyons v. Powell*, 838 F.2d 28 (1st Cir.1988) (pretrial detainee's allegation that he was forced to sleep on floor mattress sufficient condition to show deprivation of due process); *Anela v. Wildwood*, 790 F.2d 1063, 1067 (3d Cir.1986) (allegation that City failed to provide bed or mattress to pretrial detainees states actionable constitutional claim); *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir.1981) (prison's use of floor mattresses for pretrial detainees unconstitutional "without regard to the number of days for which a prisoner is so confined"); *Martino v. Carey*, 563 F.Supp. 984, 1002 (D.Or.1983) (fact that jail overcrowding forced some pretrial detainees to sleep directly on floor contributed to finding that overcrowded conditions violated detainees' Fourteenth Amendment rights); *Vazquez v. Gray*, 523 F.Supp. 1359, 1365 (S.D.N.Y.1981) (use of floor mattresses for pretrial detainees unconstitutional).

In sum, a literal reading of *Wolfish* is the only reading which the holding permits. As pointed out by the Court in *Powell*, the Supreme Court's holding in *Wolfish* specifically contemplates that body cavity searches will be conducted on all detainees who have contact visits regardless of their charges. *See Powell*, 541 F.3d at 1308. The lack of a requirement for reasonable suspicion to conduct the body cavity searches in *Wolfish* is underscored by the dissenting opinions of Justice Powell and Justice Marshall. Clearly, these dissenters based their opinions on the fact that the majority opinion did not require reasonable suspicion to conduct body cavity searches. *See Wolfish*, 441 U.S. at 563, 99 S. Ct. at 1886 (Powell, J., concurring in part and dissenting in part); *Id*. at 578, 99 S. Ct. at 1894 (Marshall, J., dissenting). This Court should readily adopt this common-sense and literal approach to the interpretation of *Wolfish* which is explained by the 11th Circuit in *Powell*. Any other interpretation would be directly contrary to the literal meaning and clear intent of the Supreme Court.

### 2. Jail Disciplinary Proceedings

The role of federal courts in reviewing prison disciplinary proceedings, via civil rights actions, is a narrow one, and the court must uphold the administrative decision unless it was arbitrary and capricious. *Stewart v. Thigpen*, 739 F.2d 1002 (5th Cir. 1984). The court need not review a disciplinary board's fact findings de-novo, but need consider only whether the decision was supported by some facts or evidence at all. *Id*.

A prisoner has a claim under 42 U.S.C. Section 1983 for placement in segregation only if he possesses a liberty interest in remaining among the general prison population. *Dzanav v. Foti*, 829 F.2d 558 (5th Cir. 1987). Members of a disciplinary committee who hear cases in which inmates are charged with rule infractions, are entitled to qualified, but not absolute immunity, for personal damages for actions violative of United States Constitution. *Cleavenger v. Saxner*, 106 S. Ct. 496 (1985).

In reviewing a prison administrative action in a 42 U.S.C. Section 1983 civil rights cause of action, the court must uphold administrative decisions unless they arbitrary and capricious, and a decision is not arbitrary and capricious if it was made by specific exercise of professional judgment and on basis of factors clearly bearing on the appropriateness of the decision. *Gartrell v. Gaylor*, 866 F. Supp. 325 (S.D. Tex. 1994).

### 3. Violation of State's or County's Own Rules

Even though a governmental entity acts in a manor which violates its own rules, or those of the State, there is no due process violation actionable under Section 1983, as long as appropriate individuals ultimately receive adequate process. *Ramirez v. Ahn*, 843 F.2d 864 (5th Cir.), rehearing denied, 849 F.2d 1471 (5th Cir. 1988), cert. denied, 109 S.Ct. 1545 (1989). Action by a governmental entity that violates its own rules or those of the State does not constitute a constitutional deprivation. *Vaga v. Parsley*, 700 F. Supp. 879 (W.D. Tex. 1988).

*Page 21 of 29*

Failure to follow procedural guidelines, standing alone, does not implicate constitutional liability. *Evans*, 986 F.2d 104.

### 4. Failure To Follow State Laws Or Procedures Does Not Give Rise To A 1983 Claim

The failure of state officials to fulfill their duties under state law does not give rise to a federal constitutional claim. *Brinson*, 992 F. Supp. at 909-12; *See Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir.1996), (holding that a prison official's failure to follow the prison's own policies, procedures, and regulations does not constitute a violation of due process if constitutional minima are nevertheless met); *Giovanni v. Lynn,* 48 F.3d 908, 912 (5th Cir.1995), *cert. denied,* 516 U.S. 860, 116 S.Ct. 167, 133 L.Ed.2d 109 (1995), (holding that a mere failure to accord procedural protection called for by state law or regulation does not of itself amount to a denial of due process); *Murphy v. Collins,* 26 F.3d 541, 543 (5th Cir.1994), (holding that a state's failure to follow its own procedural regulations does not constitute a violation of due process if constitutional minima are met); *Murray v. Mississippi Department of Corrections,* 911 F.2d 1167, 1168 (5th Cir.1990), *cert. denied,* 498 U.S. 1050, 111 S.Ct. 760, 112 L.Ed.2d 779 (1991), (holding that alleged violations of a state statute did not give rise to federal constitutional claims); *Jackson v. Cain,* 864 F.2d 1235, 1251 (5th Cir.1989): ("A state's failure to follow its own procedural regulations does not establish a violation of due process, because 'constitutional minima may nevertheless have been met.'"); and *Brown v. Texas A & M University,* 804 F.2d 327, 335 (5th Cir.1986), (holding that a state agency's violations of its own internal regulations did not establish a Due Process violation or otherwise give rise to a constitutional claim).

### J. Jail Suicide

Prison and jail officials have a duty to protect prisoners prone to suicide from self destruction. *Lewis v. Terrebonne*, 894 F.2d 142, rehearing denied, 901 F.2d 1110 (5th Cir. 1990).

Failure to provide a pre-trial detainee with adequate protection from his or her known suicidal impulses is actionable under 42 U.S.C. Section 1983. *Evans*, 986 F.2d 104.

A county's failure to provide continuous observation of a known suicidal pre-trial detainee did not constitute a deliberately indifferent method of conducting suicide watches, as there was no evidence that periodic checks on suicidal inmates every ten minutes was obviously inadequate. *Rhyne v. Henderson County*, 973 F. 2d 386 (5th Cir. 1992).

Additionally, the county's failure to obtain a commitment order for a suicidal pre-trial detainee, and instead relying on the county mental health agency to deliver the necessary emergency warrant for a commitment, was not "deliberate indifference," so as to subject the county to Section 1983 liability. *Id.* No evidence was presented that the mental health agency had ever failed to deliver commitment orders when needed in the past or that any prisoner had ever committed suicide in jail because he could not properly be moved to the state hospital. *Id.* For a pre-trial detainee to establish a claim for denial of medical care by

*Page 22 of 29*

Plaintiffs' Appendix 145

a jailer, he must show denial of reasonable medical care not reasonably related to a legitimate governmental objective. *Thomas v. Kippermann*, 846 F.2d 1009 (5th Cir. 1988).

A police officer's violation of departmental policy in failing to remove the belt of a prisoner who later hung himself, did not rise to a level of "constitutional deprivation" that might support a Section 1983 claim, as there was nothing in the prisoner's behavior to alert the officer to the prisoner's suicidal tendency. *Gagne v. City of Galveston*, 671 F. Supp. 1130 (S.D. Tex. 1987), affirmed, 851 F.2d 359 (5th Cir. 1989).

In *Martin v. Harrison County Jail*, 975 F.2d 192 (5th Cir. 1992), a guard's assault on a prisoner who was cutting his wrist in a suicide attempt did not involve unconstitutionally excessive force, where the prisoner did not allege how many times he was struck, whether the blows were significant, or how many people hit him. Guards are obligated to prevent a prisoner from committing suicide, and some force was called for in that case. *Id.*

### K.   Freedom Of Religion

#### 1.   General Rule

It is axiomatic that inmates may not be deprived of their right to worship as they so choose, given reasonable and necessary governmental reasons to the contrary. Consequently, for any religion recognized as such, an inmate may worship as he sees fit. However, the Courts have drawn the line at smoking "gonja," dancing with snakes, and other unreasonable actions.

#### 2.   Designation of Affilitation

Consequently, it has been held that if prison or jail regulations require inmates to designate themselves members of a particular religious group, such as Muslim inmates, the prison or jail may seize and discard religious paraphernalia. *Caffey v. Johnson*, 883 F. Supp. 128 (E.D. Tex. 1995). Indeed, in *Caffey,* since the inmate did not designate himself as a Muslim in accordance with prison regulation stating that only those prisoners who designate themselves with particular religious groups may possess religious paraphernalia, the inmate's handkerchief with his Islamic prayer on it and Islamic papers were contraband and it was not unreasonable for a prison officer to seize and discard these items, and, therefore, the officer was entitled to qualified immunity for purposes of inmate's Section 1983 action. *Id.*

#### 3.   Grooming Policy

Inmates have challenged TDCJ's grooming policies on the ground that they violated their free expression of religion as guaranteed under the Free Exercise Clause of the First Amendment. Specifically, they have argued that jail policies are unconstitutional if they do not allow beards. Wearing beards is an accepted means of expressing religious devotion for Muslims, and the Fifth Circuit dealt with the issue of prisoners wearing beards on a number of occasions. Most notably, in *Powell v. Estelle,* 959 F.2d 22 (5th Cir.1992), we

*Page 23 of 29*

Plaintiffs' Appendix 146

rejected a challenge to a prison policy forbidding long hair and beards, finding the policy to fall within the discretion granted to prison officials for legitimate penological reasons. *Green v. Polunsky,* 229 F.3d 486, 489 (5th Cir. 2000). We have not yet addressed the specific issue of short beards, raised here by Khidar, but other Circuits have done so. *Id.* Every Circuit that has considered the issue of short beards under similar circumstances has upheld the prison grooming policies – and the Fifth Circuit joined them, convinced by the logic of their opinions. *Id., see, e.g., Hines v. South Carolina Dep't of Corrections,* 148 F.3d 353, 358 (4th Cir.1998); *Harris v. Chapman,* 97 F.3d 499, 504 (11th Cir.1996); *Friedman v. Arizona,* 912 F.2d 328, 332 (9th Cir.1990).

## L.    First Amendment - Publications and Mail

Subject to certain reasonable and necessary limitations, inmates may read what they wish to read. Along these lines, a county jail's "publisher only" rule, requiring that all magazines and books received by inmates must be sent directly from the publisher's authorized distributor, does not violate a prisoner's civil rights. *Wagner v. Thomas,* 608 F. Supp. 1095 (E.D. Tex. 1985). Allowing an inmate's family or friends to provide reading materials is a good way for the inmate to smuggle contraband and also takes up a tremendous amount of time for corrections officials to search. A microdot of L.S.D. ("acid") can easily be hidden in a magazine or other publication.

Additionally, it has been held that state prison officials do not act outside the scope of their qualified immunity from an inmate's federal civil rights action for allegedly violating free speech rights by suppressing distribution of a revolutionary publication within the prison system by failing to extricate the portions found threatening to prison security and allowing the remainder to be distributed. *Hernandez v. Estelle,* 788 F.2d 1154, rehearing denied, 793 F.2d 1287 (5th Cir. 1986).

The First Amendment rights afforded pretrial detainees are the same as those afforded convicted inmates. *Oladipupo,* 104 F.Supp.2d 626*; See Bell,* 441 U.S. at 545, 99 S.Ct. at 1877. Before a prison may infringe on the First Amendment rights of its inmates, it must show that any restriction on prisoners first amendment rights is reasonably related to a legitimate penological interest. *Oladipupo,* 104 F.Supp.2d 626; *see Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). To determine whether the jail's policy of excluding sexually explicit material "is reasonably related to legitimate penological interests," and therefore valid, the Courts must consider four factors: (1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an "exaggerated response" to the jail's concerns. *Oladipupo,* 104 F.Supp.2d 626; *see id.* at 89-90, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64.

Under the Fifth Circuit's law, enunciated in *Guajardo,* 580 F.2d at 762, before delivery of a publication may be refused, prison administrators must review the particular

*Page 24 of 29*

Plaintiffs' Appendix 147

issue of the publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage deviate, criminal sexual behavior. *Montana*, 659 F.2d at 20-23. Censorship may not proceed according to the whims of the prison administrators. *Id.*

## 1. Censorship of Mail

A pretrial detainee's first amendment rights may be violated when incoming or outgoing mail to licensed attorneys, courts, and court officials is searched or censored. *Montana*, 659 F.2d at 20-23; *Guajardo,* 580 F.2d at 758-59. Non-legal outgoing and incoming mail may be searched for contraband and censored for legitimate penological reasons. Incoming or outgoing legal mail may be opened and viewed in the presence of the inmate if the jail has specific articulate facts to believe that the legal mail is a "sham," is being used to smuggle contraband, or for other specified legitimate penological purposes.

## M. Cause Of Action For State Created Danger

A Plaintiff seeking to recover based on a theory of "state created danger" must show that the State actor's increased the danger to the Plaintiff and that the State actors acted with deliberate indifference. *Piotrowski v. City of Houston*, 51 F.3d 512 (5th Cir. 1995).

This is a theory that is in flux right now, in 2004, the Fifth Circuit clearly stated that this court had neither adopted nor rejected the state-created danger theory. *Priester v. Lowndes*, 354 F.3d 414, 422-23 (5th Cir. 2004); *McKinney v. Irving Ind. Sch. Dist.*, 309 F.3d 308 (5th Cir.2002); *McClendon v. City of Columbia*, 285 F.3d 1078 (5th Cir.2002). Under the state-created danger theory, a state actor who knowingly places a citizen in danger may be accountable for the foreseeable injuries that result, the Fifth Circuit assumed in 2004 that section 1983 liability may arise when: (1) the state actors created or increased the danger to the plaintiff; and (2) the state actors acted with deliberate indifference. *Priester*, 354 F.3d at 422-23; *McKinney*, 309 F.3d 308; *see also Piotrowski*, 51 F.3d 512.

In order for Section 1983 liability to be imposed on a theory of State created danger, the environment created by the State actor must be dangerous, he or she must know it is dangerous, and he or she must have used their authority to create an opportunity that would not otherwise have existed for a third party's crime to occur, ie, Defendants must have been at least deliberately indifferent to the plight of the Plaintiff. *Johnson v. Dallas Independent School District*, 38 F. 3d 198 (5th Cir. 1994).

## N. Claims for Sex in Jail

The Fifth Circuit's Opinion in *Scott v. Moore,* 114 F.3d 51, 54-55 (5th Cir. 1997), makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, including sex with an inmate, a pre-trial detainee must establish that an official acted with *subjective* deliberate indifference. *Id.* Once a detainee has met this burden, he or she has proved a violation of her rights under the Due Process Clause. *Id.* To succeed

*Page 25 of 29*

Plaintiffs' Appendix 148

in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights. *Id.*; see *Farmer v. Brennan*, 511 U.S. 825, 841, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994) ("It would be hard to describe the *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective."). In the case of a sexual assault or even admitted sex between a jailer and an inmate, there is never any doubt that the constitutional violation complained of was committed with *subjective* deliberate indifference to that detainee's constitutional rights. *Scott,* 114 F.3d at 54-55. The next determination is whether the governmental entity can be held accountable. *Scott,* 114 F.3d at 54-55. Under *Hare,* as the Fifth Circuit has stated, this latter burden may be met by putting forth facts sufficient to demonstrate that the predicate episodic act or omission resulted from a municipal custom, rule, or policy adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights. *Scott,* 114 F.3d at 54-55; *see Grabowski,* 79 F.3d at 479 (citing *Hare,* 74 F.3d at 649 n. 4). Most recently, the Supreme Court has reminded us that for purposes of liability under § 1983, " 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997).

## O.    Female Guards Supervising Male Inmates

In *Oliver v. Scott,* 276 F.3d 736, 746-47 (5th Cir. 2002), the Fifth Circuit noted that the Fifth Circuit, in an unpublished but precedential opinion,[3] and several other courts of appeals have reached the same conclusion regarding cross-sex surveillance,[4] i.e., that female guards can view male inmates in shower type situations.

---

[3] *Barnett v. Collins,* 940 F.2d 1530 (5th Cir.1991) (table) (unpublished) (upholding use of female guards in guard towers giving full view of male inmates taking showers).

[4] *Johnson,* 69 F.3d at 147 (Easterbrook, J.) ("If only men can monitor showers, then female guards are less useful to the prison; if female guards can't perform this task, the prison must have more guards on hand to cover for them."); *Timm v. Gunter,* 917 F.2d 1093, 1101-02 (8th Cir.1990) (explaining that constant visual surveillance by guards of both sexes is a reasonable and necessary measure to promote inmate security); *Michenfelder v. Sumner,* 860 F.2d 328, 334 (9th Cir.1988) (stating that espisodic and casual observation of male prisoners by female guards is justified by security concerns); *Grummett v. Rushen,* 779 F.2d 491, 496 (9th Cir.1985) (stating that "[t]o restrict female guards from ... occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities"). Many courts have identified protecting female prison guards' constitutional and statutory rights to equal employment opportunities as a legitimate penological objective. *E.g., Johnson,* 69 F.3d at 147-48; *Timm,* 917 F.2d at 1102; *Forts v. Ward,* 621 F.2d 1210, 1217 (2d Cir.1980). We do not need to reach the issue, because we conclude that the policy furthers the jail's interest in promoting security.

Plaintiffs' Appendix 149

In *Letcher v. Turner,* 968 F.2d 508 (5th Cir.1992), the Fifth Circuit held that the mere *presence* of female officers during a strip search of prisoners during *emergency circumstances* did not violate the Fourth Amendment. *See id.* at 510 (emphasis added); *Moore v. Carwell,* 168 F.3d 234, 236-37 (5th Cir. 1999). "A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs." *Elliott v. Lynn,* 38 F.3d 188, 190-91 (5th Cir.1994); *Moore,* 168 F.3d at 236-37. However, "searches and seizures conducted of prisoners must be reasonable under all the facts and circumstances in which they are performed." *United States v. Lilly,* 576 F.2d 1240, 1244 (5th Cir.1978); *Moore,* 168 F.3d at 236-37. We must balance the need for the particular search against the invasion of the prisoner's personal rights caused by the search. *See Elliott,* 38 F.3d at 191 (citing *Bell,* 441 U.S. at 558); *Moore,* 168 F.3d at 236-37. We must consider the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559; *Moore,* 168 F.3d at 236-37.

## P.   Retaliation

It is well established that prison officials may not retaliate against an inmate because that inmate exercised his right of access to the courts. *McDonald,* 132 F.3d at 230-31; *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir.1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996). To prevail on a claim of retaliation, a prisoner must establish: (1) a specific constitutional right; (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right; (3) a retaliatory adverse act; and (4) causation. Causation requires a showing that "but for the retaliatory motive the complained of incident ... would not have occurred." *McDonald,* 132 F.3d at 230-31; *Johnson,* 110 F.3d at 310 (quoting *Woods,* 60 F.3d at 1166), *cert. denied,* 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997).

## Q.   Trustee Status, Lack of Education/Work Opportunities

The Constitution does not mandate educational, rehabilitative, or vocational programs. *Oladipupo,* 104 F.Supp.2d 626; see *Beck v. Lynaugh,* 842 F.2d 759, 762 (5th Cir.1988) (citing *Newman v. State of Alabama,* 559 F.2d 283, 292 (5th Cir.1977), *rev'd in part on other grounds sub nom., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978)). Further, a plaintiff has no right to a job in the prison or to any particular job assignment. *Oladipupo,* 104 F.Supp.2d 626; *see Ingram v. Papalia,* 804 F.2d 595, 596 (10th Cir.1986); *Garza v. Miller,* 688 F.2d 480, 485 (7th Cir.1982); *Fuller v. Rich,* 925 F.Supp. 459, 462 (E.D.Tex.1995).

## R.   Arbitrary Punishments Of A Complete Cellblock

If the punishment of everyone for the violation of one is "arbitrary or purposeless" or "not reasonably related to a legitimate goal," it may be unconstitutional. *Montana,* 659 F.2d at 20-23.

076
Plaintiffs' Appendix 150

## S.     Radio and Television Access

Claims relating to the usage of radio and television have all been properly dismissed as frivolous. These claims do not pertain to federal constitutional rights. *Montana*, 659 F.2d at 20-23; See *Lovern v. Cox,* 374 F.Supp. 32, 34 (W.D.Va.1974).

## T.     Telephone Access

The Fifth Circuit and district courts in the Fifth Circuit have guarded against unreasonable restrictions on telephone use. *Montana*, 659 F.2d at 20-23; see *Feeley v. Sampson,* 570 F.2d at 374, and cases cited therein.

## IV.
## THERE IS NO STATE LAW COUNTERPART TO 42 U.S.C. § 1983

There is no Texas counterpart to § 1983, and there is no cognizable state law action for damages for the alleged violation of rights guaranteed under the Texas Constitution. *Bagg v. University of Texas Medical Branch at Galveston*, 726 S.W.2d 582, 584 n.1 (Tex. App. -- Houston [1st Dist] 1987, writ ref'd n.r.e.); *Gillum v. City of Kerrville*, 3 F.3d 117 (5th Cir. 1993), cert. denied, 114 S. Ct. 881 (1994). Consequently, while some Plaintiffs may attempt to assert claims that sound under the Texas Constitution in Texas Courts, claims for damages are not actionable under the Texas Constitution, because there is no enabling statute under Texas law equivalent to Section 1983.

## V.
## THE PRISON LITIGATION REFORM ACT

The Congress of the United States adopted the Prison Litigation Reform Act specifically to address the overwhelming number of frivolous inmate lawsuits which are inundating the Federal Court. The primary portion of the Act requires that inmates show that they are truly in forma pauperis before they will be allowed to file their pleadings at either the District or Appellate Court level. Under the Prison Litigation Reform Act, inmates filing a civil appeal informa pauperis must file an affidavit listing all assets, as well as submit a certified copy of his or her prison trust fund account statement for the preceding six month period. *Jackson v. Stinett*, No. 96-20720 (December 11, 1996), 1996 W.L. 714352. Further, the inmate must pay a filing fee upon the filing of his appeal. *Id.* The Prison Litigation Reform Acts amended requirements for informa pauperis certification applies to each case as it was pending on the effective date of the PLRA. *Auo v. Bathey*, No. 96-30020 (Feb. 10, 1997) 1997 W.L. 52200. If the inmate fails to comply with this requirement, his suit will not be accepted for filing or will be dismissed. If the inmate is not truly a pauper, the inmate is now required to file filing fees.

Plaintiffs' Appendix 151

Absent in the definition of "physical injury" in the Prison Litigation Reform Act, which requires a prisoner to make a prior showing of physical injury before bringing any federal civil action, the Fifth Circuit will be guided by Eighth Amendment standards in determining whether a prisoner has sustained a necessary physical injury to support a claim for mental or emotional suffering. Thus, an injury must be more than diminimous, but need not be significant. *Siglar v. Hightower*, No. 96-11096 (May 8, 1997), 1997 W.L. 197320.

3/10/2017



**In-Custody Death**

Recognition & Response to:

Excited Delirium Syndrome;
Drug & Alcohol Withdrawal;
and
Suicide Prevention

---

## Learning Objectives

Participants should be able to identify:

- Requirements for reporting custodial deaths
- Types and frequencies of custodial deaths
- Certain High Risk Physical and Behavioral Characteristics commonly associated with custodial deaths, including:

"Excited Delirium" (ED) *Agitated Chaotic Events,* Drug and Alcohol Withdrawal and Suicide.

---

## In-Custody Death

### The effect on law enforcement:

Civil Liability
Issues

---

3/10/2017



**In-Custody Death**

**The effect on law enforcement:**

Reputation
Issues

Texas Association of Counties
Risk Management Pool

---

**Statutory Requirements
for In-Custody Death**

Texas Association of Counties
Risk Management Pool

---

**Penal Code Section 39.05**

**Failure to Report Death of Prisoner:**

(a) A person commits an offense if the person is required to conduct an investigation and file a report by Article 49.18, Code of Criminal Procedure, and the person fails to investigate the death, fails to file the report as required, or fails to include in a filed report facts known or discovered in the investigation.

(b) A person commits an offense if the person is required by Section 501.055, Government Code, to:

1) give notice of the death of an inmate and the person fails to give the notice; or

2) conduct an investigation and file a report and the person:
   A.fails to conduct the investigation or file the report, or
   B.fails to include in the report facts known to the person or discovered by the person in the investigation;

(c) An offense under this section is a Class B misdemeanor

Texas Association of Counties
Risk Management Pool

3/10/2017

## Code of Criminal Procedure Article 49.18

**Death In Custody:**

If a person dies,

while in the custody of a peace officer

or

as a result of a peace officer's use of force

or

while incarcerated in a jail, or correctional facility, the director agency/facility shall investigate the death and file a written report of the cause of death with the attorney general no later than the 30th day after the date on which the person in custody or the incarcerated person died.

"in the custody of a peace officer" means:

under arrest by a peace officer;

or

under the physical control or restraint of a peace officer.

## Jail Commission Requirements

All in-custody deaths must be reported to the Texas Commission on Jail Standards within 24 hours.

## TCJS Reporting Deaths in Custody

· email: **death@tcjs.state.tx.us**

· or by calling **(512) 463-5505.**

http://www.tcjs.state.tx.us/index.php?linkID=236
10/31/13

## Statistics for
## In-Custody Deaths

### 729 Arrest-Related Deaths 2009

- Officer Involved Homicides (68.2%)
- Drug/Alcohol Intoxication (6.9%)
- Suicides (12.9%)
- Accidental Injuries (4%)
- Illness or Natural Causes (4.3%)
- Others/Non-specified (3.3%)



### Causes of In-Custody Jail Deaths

- Natural Causes (49.8%)
- Suicide (33.8%)
- Drug and Alcohol Intoxication (7.2%)
- Accident (3.2%)
- Homicide (2.9%)
- Other Causes (1.9%)

3/10/2017

**Natural Causes**

## Natural Causes

**Sudden In-Custody Death**

## Excited Delirium

**SUDDEN IN-CUSTODY DEATH**

**Excited Delirium**

## What is "Excited Delirium"?

AKA
Agitated Chaotic Events

3/10/2017

## Excited Delirium

Usually related to:

- Chronic or prolonged drug use, or

- Mental health issues.

  **Cardio-respiratory collapse** usually occurs within 24 hours of the onset of symptoms. *(World Health Organization)*

## FOCUS OF TRAINING

You are **NOT** being trained to make a clinical diagnosis!

You are being trained to recognize clues that permit you to identify high-risk candidates for sudden death syndrome (ED).

## Four Phases Of "Excited Delirium"

| Phase I: | • Hyperthermia<br>• (strips off clothing; naked) |
| Phase II: | • Delirium<br>• (incredible strength) |
| Phase III: | • Respiratory Arrest<br>• (shallow or non-breathing) |
| Phase IV: | • Cardiac Arrest<br>(death) |

Plaintiffs' Appendix 158

3/10/2017

## Excited Delirium

Characterized by :

- Extreme agitation
- Incoherence
- Bizarre behavior
- Superhuman strength
- High body temperature.

## How it works (we think)



Dopamine buildup → Adrenaline flood → Body temp soars

↓

Organs shut down ← "Panic Period" following restraint ← Violent behavior with restraint

↓

Cardiac arrest

## Public Perception Problems

These deaths usually follow physical confrontations with law enforcement.

o  Pain-compliance techniques don't usually work.

o  Multiple officers are usually present.

o  Media, Family, Society wants someone to blame.

o  It is easily assumed the death resulted from LE use-of-force.

3/10/2017

## Excited Delirium

**What to do (Generally):**

- Identify ED symptoms
- Quickly summon medical personnel
- Have adequate LE Officers respond
- Attempt to de-escalate the situation, when possible
- Don't rush in unless absolutely necessary



## Excited Delirium

**What to do (Generally):**

- After restraint, get the individual out of a prone position (side, seated upright) ASAP.
- Immediately transport the individual to a hospital.
- Continue to monitor the individual while at the scene and during transport.



3/10/2017

## Sudden In-Custody Death Scenario

- Family members, neighbor, or citizen calls 911 to report bizarre behavior by an individual.
- Police arrive (correctional officers in a jail setting) and are confident the individual will resist their efforts for a safe apprehension.
- When confronted, the subject struggles forcing the officers to use defensive tools, which will include: OC spray, batons, electronic control device, neck hold, etc., or tactics such as the SWARM
- The person is taken to the ground for handcuffing.



## Sudden In-Custody Death Scenario

- Officers kneel/sit on the person for control, until restraints are applied to the person's wrists and in some cases the ankles.
- He is placed into the rear of a patrol car or onto a gurney in the prone position, and taken to the station or jail.
- During transport or at the jail, the person becomes calm or becomes unconscious, with labored or shallow breathing, goes into cardiac arrest, and dies even though medical intervention was attempted.





3/10/2017

## Paradigm Shift

Struggling and resistance can indicate a

### medical emergency

not a criminal act.

## Excited Delirium Profile

- 91-99% male.
- Generally, between the ages of 35-44.
- Person usually involved in a struggle.
- Death generally follows bizarre behavior episode, and/or the use of illegal drugs.
- Geographic residence not a factor.

## Excited Delirium

### Physical Characteristics

| Dilated pupils | High body temperature – Hyperthermia |
| --- | --- |
| Sweating profusely | Skin discoloration |

10

3/10/2017



3/10/2017

## Excited Delirium

**Who should be trained in recognition?**

- Patrol Deputies
- Constables
- Police Officers
- Dispatchers

- Jail Staff
- EMT Staff
- Hospital Staff
- Medical Examiners

## Excited Delirium

**What to do (Generally):**

- If restraint must be used, use overwhelming force
  - ➤ Recommended officers on the scene: 6

- After individuals are restrained, monitor them at the scene and during transport.

- Immediately transport the individual to a hospital for treatment and/or observation

## Drug and Alcohol Withdrawal

12

Plaintiffs' Appendix 164

3/10/2017

## Withdrawal from Drugs or Alcohol

Withdrawal happens when the body is deprived of alcohol or drugs it is accustomed to getting.

The symptoms may include:
- o nausea or vomiting
- o diarrhea
- o sweating
- o shakiness
- o anxiety

## 85% of Inmates have some Substance Involvement...

What does this mean for those in corrections?



Adequate screening is crucial to anticipate problems and respond immediately

Staff training is crucial to prevent problems from DTs, as well as providing litigation mitigation

## Consequences of Drug and Alcohol Abuse

- Throughout the years, alcohol and drug withdrawal have been seen frequently in the corrections setting.

- Due to many offenders being addicted to alcohol or drugs, and a sudden interruption of alcohol or drug use occurs when offenders are taken into custody.

- Correctional health care providers and custodial staff should be properly trained to recognize the symptoms and respond promptly.

13

091



## Drug and Alcohol Use

**Prescription Drugs**

- From 1990-1998, number of new users of prescription pain relievers increased by 181%
- Of the 5.7 million users of illicit drugs other than marijuana, 3.8 million were using pain relievers, tranquilizers, stimulants, and sedatives non-medically in 2000

**Non-Prescription Drugs**

- Include such types as marijuana, cocaine, hallucinogens, heroin, methamphetamine, and ecstasy

**Alcohol**

- 12.6 million Americans aged 12 and up are heavy drinkers

Texas Association of Counties
Risk Management Pool

## Alcohol Abuse Statistics

- 1 in 13 Americans abuses alcohol
- Economic losses from alcoholism exceed $185 Billion per year
- It was estimated that in 2001, approximately 75,766 deaths were attributed to the harmful effects of excessive alcohol use.
- In 2008, a more recent study was done, that determined that in 2001-2005, approximately 79,000 deaths occurred annually that were attributed to excessive alcohol use.

Texas Association of Counties
Risk Management Pool

14

092

3/10/2017

## Drug and Alcohol Statistics

- Prescription Drugs
  - The Centers for Disease Control and Prevention has declared that prescription drug abuse in the U.S. is an epidemic
  - Prescription opiod overdose deaths have increased to almost 17,000(2012)
  - An estimated 493,000 persons aged 12 or older used a prescription pain reliever non-medically for the first time within the past 12 months, or 1350 persons a day.

  Source: http://www.drugabuse.gov/





3/10/2017







16

Plaintiffs' Appendix 168

3/10/2017

## Alcohol Statistics

- 16.6 Million adults have an Alcohol use disorder
- Nearly 88,000 people die from Alcohol related causes annually-makes it the 3rd leading preventable cause of death in the U.S.
- Alcohol misuse problems cost the U.S. $ 223.5 billion annually

Source: http://www.niaaa.nih.gov/alcohol-health/overview-alcohol-consumption/alcohol-facts-and-statistics

| 2014 Total Emergency Room visits for Drug Misuse or Abuse | |
|---|---|
| All races, both genders | 2011 |
| Illicit Drugs only | 656,025 |
| Alcohol Only (under 21) | 117,653 |
| Pharmaceuticals Only | 835,275 |
| Illicit Drugs with Alcohol | 261,125 |
| Illicit drugs with Pharmaceuticals | 247,342 |
| Alcohol with Pharmaceuticals | 257,520 |
| All three | 88,008 |
| Total Emergency Room Visits related to Drugs and Alcohol Misuse or abuse | 2,462,948 |

Source: http://www.samhsa.gov/data/sites/default/files/DAWN2k11ED/DAWN2k11ED/DAWN2k11ED.pdf

## The Cost of Addiction

When you look at the dollars and cents cost of addiction, the figures are mind boggling.

- Twice as many people die from alcoholism every year as die from motor vehicle accidents
- Alcohol intoxication is associated with 40-50% of traffic fatalities, 25-35% of nonfatal motor vehicle injuries, and 64% of fires.
- Alcohol is present in nearly 50% of homicides, either in the victim or the perpetrator
- Alcohol intoxication is involved in 31% of fatal injuries, and 23% of completed suicides.



Texas Association of Licensed Bail Management Firms

3/10/2017

## General Withdrawal Symptoms from Drugs and Alcohol



### Withdrawal from Drugs or Alcohol

•Withdrawal is a physical or mental change that happens when the body is deprived of alcohol or drugs that it is accustomed to getting.

•The symptoms can last a few days and may include:
    o nausea or vomiting
    o sweating
    o shakiness
    o anxiety

### Withdrawal

There are two lists of withdrawal symptoms.

– The first list is the emotional withdrawal symptoms produced by all drugs.

  • Inmates can experience them whether they have physical withdrawal symptoms or not.

  • These symptoms frequently result in suicide attempts.

– The second list is the physical withdrawal symptoms that usually occur with alcohol, opiates, and tranquilizers.

3/10/2017



**Emotional Symptoms of Withdrawal**

anxiety    restlessness    irritability

insomnia    poor concentration    headaches

depression    social isolation

**Physical Symptoms of Withdrawal**

sweating    tremors    palpitations

racing heart    difficulty breathing    tightness in the chest

muscle tension

nausea, vomiting or diarrhea

**Dangerous Withdrawal Symptoms**

Alcohol and tranquilizers produce the most dangerous physical withdrawal:

grand mal seizures    hallucinations

heart attacks    strokes

delirium tremens (DTs)

19

3/10/2017

## Consequences of Alcohol Abuse

- The four most common medical consequences of alcohol abuse are:
  - High blood pressure
  - Liver damage
  - Red blood cell damage
  - Depression
- One study found that 88 % of homicide offenders, 37 % of assault offenders, 57 % of men and 27 % of women involved in marital violence were drinking at the time of their offense.

## Alcohol Withdrawal

•Symptoms of alcohol withdrawal begin from 4 to 12 hours after a person cuts down on or stops drinking

•As the disease of alcohol dependence progresses, severe symptomsof withdrawal (called delirium tremens, or DTs) can occur.

## Common Withdrawal

Alcoholic Tremulousness ("The shakes")
- Occurs 6-12 hours after cessation of alcohol intake
- Characterized by anxiety, tremors, hypertension, increased heart rate, nausea, vomiting or diarrhea

Alcohol withdrawal seizures ("rum fits")
- Occur at 6-48 hours after last drink (most commonly within 24 hours)

Alcoholic Hallucinosis
- Occurs 10-72 hours after last drink

Delirium Tremens
- Usually occurs 3-7 days after last drink

## What are Delirium Tremens (DTs)?

- Delirium Tremens (commonly referred to as "The Horrors", "Jazz Hands", or "The Shakes") is a psychological and physiological reaction to the sudden disruption of habitual/prolonged daily alcohol or narcotic consumption.

- Delirium Tremens (aka "DTs") is also referred to as "Alcoholic Psychosis".

- Previously used only to describe alcohol withdrawal symptoms

- Currently being used as term to describe some types of drug withdrawal as well



## Who Gets DT's



## Symptoms of Delirium Tremens

Symptoms may occur as little as 72 hours after the last drink, or sometimes not until 7-10 days after the last drink.

Symptoms Include:

- Body tremors
- Psychological changes include (but not limited to):
  - Confusion
  - Delirium
  - Hallucinations

3/10/2017

## Symptoms con't

Other symptoms include:

- •Palpitations
- •Loss of appetite
- •Pale skin
- •Sweating
- •Chest or Stomach Pain
- •Fever

## Treatment for DTs

Delirium Tremens is a medical emergency that can ultimately lead to death without proper treatment. Delirium Tremens usually requires hospital treatment.

## Protocols for DTs

The following is a protocol implemented by Salt Lake City, as well as other departments:

- Patients identified at booking
- Serial CIWA (Clinical Institute Withdrawal Assessment) exams performed twice daily
- Exams quantified to show variations between assessments and to show trends
- Very aggressive medical treatment tied to CIWA score suppression

22

100

3/10/2017



23

Plaintiffs' Appendix 175

3/10/2017





## What does this mean for those in corrections?

•It is our job to make sure nothing happens to offenders while in custody.

•If an offender has a history of heavy drinking of alcohol and then becomes incarcerated, their body will begin to withdraw from the lack of alcohol.

24

3/10/2017



3/10/2017

## National Statistics

- **It is the <u>NUMBER ONE</u> cause of death in jails after natural causes**

- **Rate in county jails is <u>9 TIMES</u> greater than general population**

---

## A Pro Active Stance

**Written Policies & Procedures containing**



| Training | Screening |
| Classification | Monitoring |

---

## Why officers need suicide training…

Plaintiffs' Appendix 178

3/10/2017



3/10/2017



## Factors that have an IMPACT

- Authoritarian
- No control
- Isolation
- Shame
- Dehumanizing
- Fears

- Insensitivity
- Trauma of arrest
- High-risk
- Knowledge insufficient
- Training needs



## Pre Disposing Factors

- Recent drinking/drugs
- Recent loss
- Guilt or shame

- Same sex rape
- Mental illness
- Poor health
- Breaking point

28

106

3/10/2017

## Periods of High Risk

| | |
|---|---|
| First 24 hours | Impending Release |
| Intoxication | Holidays |
| Withdrawal | Darkness |
| Waiting trial | Decreased Staff |
| Sentencing | Bad News |

## Signs & Symptoms of Suicide

- Key times
- Depression/Paranoia
- Guilt/Shame
- Threatens
- Alcohol
- Previous attempts

## Signs & Symptoms of Suicide

- Agitated/aggressive
- Hopelessness
- Concern what will happen
- Behavior changes
- Sudden calmness
- Unrealistic

29

107

3/10/2017

## Signs & Symptoms of Suicide

- Can't relate
- Preoccupied with past
- Packs up
- Gives away stuff
- Hurts self
- Delusions

## Signs & Symptoms of Depression

- Hopelessness/ helplessness
- Sadness and crying
- Withdrawal/silence
- Loss of appetite
- Pessimistic attitude
- Insomnia or excessive sleep
- Moody

## The Most Important Factor in Suicide Prevention:

# A well-trained

# corrections officer

30

Plaintiffs' Appendix 182

3/10/2017

## The Basic Role of the Officer

- Be aware of symptoms
- Be tuned into obvious & sometimes subtle signals
- Daily contact
- Be empathetic
- Don't give up
- Non-rejecting staff saves lives
- One person cares



## Communication Techniques

- Show compassion
- Redirect inmate thoughts
- Offer alternatives
- Let the person talk
- Convey that suicidal thoughts are a normal part of severe depression
- Help person to identify pain





31

109

3/10/2017



32

Plaintiffs' Appendix 184

3/10/2017



3/12/2017



**Employment Issues:**
Avoiding Landmines When Managing Line Staff

Including Hiring, Firing and Employee Discipline

By: Thomas Kerss
Law Enforcement Consultant

---

## Disclaimer
*This training is designed to provide general information about the subject matter covered. Neither TAC nor the trainers are engaged in rendering legal advice. If you need legal advice, TAC recommends that you seek the services of a competent attorney who is familiar with your specific situation.*

---

## Objectives

Discuss the top employment-related claim trends

Review common myths and employer mistakes

Discuss the employee disciplinary process

Review employee overtime designations

---

1

112

3/12/2017

## What Generates Employment Liability?

**Wrongful termination**          **Discrimination**

**Liability =**

**Retaliation**          **Other employment related claims**

## MYTHS AND MISTAKES

## I can ask applicants anything I want to know.

3/12/2017

**Wait..**
Interview questions must be job related. Stay clear of questions that reveal:





**Wait..**
You cannot fire employees for an Illegal reason:

| Protected status under federal, state, or local laws or statutes | Exercising legal rights |
| Constitutional rights – political affiliation, etc. | Whistleblower |

*...don't forget unemployment!*

114

Plaintiffs' Appendix 188

3/12/2017

## TEXAS Common Law Protections

- Witness for another employee
- Filing valid worker's comp claim
- Filing a wage and hour claim
- Filing a claim with the EEOC



## Discharge Documentation

- Texas Workforce Commission requires facts.

- Claim may be filed a year after separation.



**I love that my employees are so comfortable with each other, have laid back behaviors, and tell the best "jokes".**



3/12/2017



## But Wait..

Employees have protection from "hostile environments" in the workplace. The EEOC will be happy to come and investigate.

| | |
|---|---|
| Don't allow inappropriate behavior. | Be wary of off-color jokes, a pattern of put-downs or threats based on any protected status. |
| Have a policy in place. | Tell employees how and where to immediately report harassment. |



116

5

3/12/2017



**Keeping a Lid on Liability**

✓ Comply with federal and state laws

✓ Treat employees consistently (fairly)

**Liability**

✓ Develop *compliant* employment policies and procedures

✓ Have specific and valid <u>documented</u> <u>reasons</u> for actions and decisions

**Questions**

"Policy, Custom or Practice"

**POLICY VS. LIABILITY**

117

6

3/12/2017

I like our county policy manual to be vague-- it helps me with flexibility.

**But Wait..**

Remember: with no written, consistently applied policies, you're only as good as your worst supervisor or worst employee.

A well written employee policy manual is an important defense in employment litigation.

Practice is policy – your written policy needs to reflect your practice.

## Liability Concerns

### Where do most 1983 suits occur?

**Jail Claims**
- Sexual Misconduct
- Use of Force
- Custodial Death/Suicide
- Denial or Lack of Adequate Medical Care

7

118

3/12/2017



**CRITICAL TASK
MODEL POLICIES**

*Available at no cost to all 254 Texas Sheriffs*

Provided by:

Texas Association of Counties – Risk Management Services

Partnered with: Legal & Liability Risk Management Institute

Endorsed by SAT & JPCA

---

**Instructions to Access *Model Policies & Procedures***

Go to: **www.llrmipolicies.com/texas/**

Click on *"Policies & Procedures Login"*

Enter password: **TXPolicies**

---



www.llrmipolicies.com/texas/

**Click here**

---

8

119

3/12/2017







Plaintiffs' Appendix 194

## DISCIPLINE AND THE DOCUMENTATION PROCESS

## Why is Discipline Important...

**The primary goal of discipline is to correct wrong behavior, not punish the employee.**

## Common Employee Problems...

- Attitude
- Attendance
- Anger
- Performance Problems – expectations, skills, conflict
- Performance Problems – health, family, child care

3/12/2017

## Determining Appropriate Discipline

Sufficiency of discipline should be based on:

•Harm caused or seriousness of the misconduct?
- ✓ Accident or mistake vs intentional bad behavior?
- ✓ Inappropriate joke, slur, email?
- ✓ Hostile, angry or violent?

•Employee's work history and disciplinary record

•TIMING – retaliation, discrimination…

•CONSISTENCY OF DISCIPLINARY ACTION



I don't keep too many records on employees. I am concerned about their privacy.

3/12/2017

**But Wait..**

There is often confusion among employers concerning the legal requirements for recordkeeping and retention of employee files and other employment-related records based on federal and state requirements.

Types: Selection, Hiring, employment, I-9, Workers' Compensation, Tax Records, Payroll, FMLA, Employees Benefit Records

I don't like to write anything down about my employees.

**Wait..**

Documentation of issues is important to win unemployment and employment lawsuits.

For documentation to stand you need it to be:

Written in a timely manner

Factual

Signatures

Consequences of failure to comply

12

123

Plaintiffs' Appendix 197

3/12/2017

## Liability Control

- Treat all employees consistently and fairly
- Investigate the allegation of wrongdoing.
- Have **specific and valid** work-related reasons for actions and decisions
- Document those reasons

  **Document, Document, Document!**



## Types of Discipline ...

| Preventative Discipline | Done without employees' knowledge |
| Corrective Discipline | After behavior or poor performance has occurred |
| Punitive Discipline | After wrong behavior Job in jeopardy |



## Compelled Employee Statements

- Most agencies have policies that require employees cooperate fully with internal investigations. Do you?
- Threat of disciplinary action is commonly given for an employee's failure to fully cooperate.
- Lack of full cooperation may include refusal to provide answers or known information, intentional errors, omissions or falsifications.

3/12/2017

## Garrity Warning to Employee

- *Garrity v. New Jersey* **does not** prevent compelling cooperation or taking disciplinary action when the information is compelled.

- Garrity protects employees from having compelled information used against them in criminal proceeding.

- Nothing in Garrity precludes an employee from giving a **true voluntary statement** *(Miranda Warning)*.

## Follow Proper Disciplinary Process

**Government Code, Ch. 614.023 (a)** applies to deputies & jailers that have complaints filed against them. It contains a specific process.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

3/12/2017



FLSA, OVERTIME AND THE 207(K) PROVISION

The FLSA establishes:
•minimum wage
•overtime and
•recordkeeping standards
affecting employees in the
private sector and Federal,
State, and local
governments.

3/12/2017





## Compensable Work Hours?

| | |
|---|---|
| Integral pre- and post-duty activities | Driving county car to and from work |
| Meal or rest periods | "On call" time |

Attending trainings, lectures and meetings

3/12/2017

## 207(k) Maximum LE Work Periods
### 29 C.F.R. 553.230

| Work Period (days) | Maximum Hours | Work Period (days) | Maximum Hours |
|---|---|---|---|
| 28 | 171 | 17 | 104 |
| 27 | 165 | 16 | 98 |
| 26 | 159 | 15 | 92 |
| 25 | 153 | 14 | 86 |
| 24 | 147 | 13 | 79 |
| 23 | 141 | 12 | 72 |
| 22 | 134 | 11 | 67 |
| 21 | 128 | 10 | 61 |
| 20 | 122 | 9 | 55 |
| 19 | 116 | 8 | 49 |
| 18 | 110 | 7 | 43 |

## Overtime for Non-Law Enforcement



- Dispatchers
- Clerks/Secretaries
- Janitors and Maintenance Workers
- Civilian Food or Commissary Service Workers

These positions are not eligible for 207(k) exemption and fall under the 40 hour work week.

*An agency employing less than 5 employees in law enforcement may be exempt from overtime.*

Texas Municipal League
Risk Management Pool

## Work Schedule Example

| | Sun. | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Hours |
|---|---|---|---|---|---|---|---|---|
| | 12 | off | off | 12 | 12 | off | off | 40 u. 48 36 |
| | Sun. | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Hours |
| | off | 12 | 12 | off | off | 12 | 12 | 80 u. 84 48 |
| | Sun. | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. | Hours |
| | 12 | off | off | 12 | 12 | off | off | 36 84 160 v 168 |

17

Plaintiffs' Appendix 202

3/12/2017



**Compensatory Time Accruals**

Requires a written policy and employee's agreement in advance.

- Awarded in lieu of pay @ 1 ½ times the overtime hours worked.
- Maximum Accrual = 240 hrs civilian (480 hrs for Law Enforcement staff)
- Must allow use in a reasonable period unless a hardship exists



**Retiring Compensatory Time**

- Forced use of Comp time is OK
- County cannot "erase" from the records but can buy back in part or full at current rate of earning.
- County must pay off at separation. Paid at current rate of earning or an avg. for past 3 years, whichever is greater.

**Time Keeping**

Employers may use any timekeeping method they choose, but it MUST be accurate and complete for each non-exempt employee.

Records must be kept at the place of employment or central records office.

Records must be kept for at least 3 years and are open for DOL inspection.

Recording Keeping Requirements
29 C.F.R. 516

18

129

Plaintiffs' Appendix 203

3/12/2017



3/12/2017

**But Wait..**
If your County has over 50 employees and the employee worked at least 1,250 hours during the 12 months prior to starting FMLA;

Gather enough detailed information to determine if absence qualifies and provide employee with proper paper work.

Don't ignore employee statements about medical conditions. May require reasonable accommodations.

FMLA does not guarantee 12 paid weeks of leave. Reinstate qualifying employees to their jobs.

---

**TWCA Applies to All Public Agencies**

**Counties must provide Workers' Compensation Coverage to all eligible employees.**

**Elected Officials and volunteers may be added to your coverage.**

---

**"Course and Scope"**

Activity of any kind or character that has to do with and originates in the work, business, trade or profession of the employer and that is performed by an employee while engaged in or about the business of the employer.

20

131

3/12/2017

## Salary Continuation

**Texas Constitution, Article 3, Section 52e**

Applies to county law enforcement officials who are injured in the course of their official duties. Each county is authorized to pay all medical expenses, all doctor bills and all hospital bills.

**While hospitalized or incapacitated** the county shall continue to pay his or her maximum salary until the expiration of the term of office to which such official was elected or appointed.



## Questions?






21

132

3/12/2017



## TAC RISK MANAGEMENT POOL
### Law Enforcement Consultants

**Northeast**
**Thomas Keras**
thomask@county.org
(512) 589-3922

**Southeast**
**Terry Pickering**
terryp@county.org
(512) 517-7197

**Southwest**
**David Whitis**
davidw@county.org
(512) 517-2547

**Northwest**
**Gary Henderson***
garyh@county.org
(512) 968-8407

# NEWLY ELECTED SHERIFF'S SESSION JAIL ADMINISTRATION MANAGEMENT & OPERATIONS TRAINING
## March 20 - 24, 2017      Instructor Biographies



### Deborah Overton Bonner
*Claims Attorney, Texas Association of Counties*

Debbie joined TAC in 2012 and manages claims and litigation relating to the public officials and law enforcement liability lines. She previously managed TAC claims with a third-party provider and has worked in litigation management specializing in governmental claims since 1997 as well as handling professional liability claims across the state. Debbie is licensed to practice with the State Bar of Texas, the 5th Circuit, and the Supreme Court of the United States and is also a certified mediator. Debbie received her JD from Texas Wesleyan University now Texas A & M University School of Law in 1995. She received her BA from Baylor University in 1991 with a dual major in English and History. Debbie resides in Flower Mound and can be reached at debbieb@county.org or at 972-567-9075.

### Maxey Cerliano
*Sheriff, Gregg County*

Maxey Cerliano has served as sheriff of Gregg County since 2001. He started, as a Patrol Officer with Kilgore Police Department in 1978 and rose to the rank of Assistant Chief at his departure in 2000 to become sheriff. Maxey attended Kilgore College. Sheriff Cerliano is the recipient of numerous awards and recognition; Outstanding Leadership Award, Supervisor of the Year, Investigator of the Year, Outstanding Peace Officer, and Making a Difference Award for outstanding safety leadership by Texas Association of Counties. Sheriff Cerliano is a past president of the Sheriff's Association of Texas. He is active in local advisory boards also serving as director on many of them. He is a lifetime Longview, Texas resident.

### Robert Davis
*Partner, Flowers Davis Law Firm*

Mr. Davis received his preparatory education at Trinity University in San Antonio, Texas, where he received a Bachelor of Science Degree in History in 1985. Mr. Davis' legal education was at Southern Methodist University, where he graduated with a Juris Doctor Degree in 1988. Mr. Davis served as Briefing Attorney to the Honorable Justice Sue LaGarde, 5th Judicial District Court of Appeals in Dallas, Texas from 1988 to 1989. Thereafter, Mr. Davis was appointed as Law Clerk to United States District Judge William M. Steger from 1989 to 1991. Mr. Davis has extensive experience in representing governmental entities and government officials in all types of litigation. Since 1994, Mr. Davis has tried more than 100 jury trials in state and federal court to verdict and has handled 159 appellate cases at the United States Court of Appeals for the Fifth Circuit. Mr. Davis has spoken extensively at educational seminars and conferences regarding issues such as liability in Texas jails and liability in law enforcement.

# NEWLY ELECTED SHERIFF'S SESSION JAIL ADMINISTRATION MANAGEMENT & OPERATIONS TRAINING

**March 20 - 24, 2017**   Instructor Biographies



### Randy Garner
*Professor, Sam Houston State University*

Dr. Randy Garner is a Professor of Behavioral Sciences and former Associate Dean in the College of Criminal Justice at Sam Houston State University. He holds a B.S., M.A., and Ph.D. in Psychology from the University of Houston, with specialization in the area of Social Psychology, and a doctoral minor in Organizational Behavior and Management. Additionally, Dr. Garner has a (second) Ph.D. in Theology and Religious Studies.

Prior to moving into academia, Dr. Garner began his more than 30 years of law enforcement service in 1976 and has worked in all divisions and levels of command. He was appointed as the Chief of Police for a Houston-area agency in the mid 1980's where he was active in a variety of national, state, and local law enforcement organizations. Dr. Garner has taught with or is a graduate of all of the major police command colleges in the country, including the F.B.I. National Academy (139th), the Graduate Management Institute, the Leadership and Command College (LEMIT), the Institute for Law Enforcement Administration, and the Southern Police Institute (66th AOC; University of Louisville). During his police career, Dr. Garner was licensed as a Texas Polygraph Examiner, a Forensic Hypnotist, a Police Firearms Master Instructor, a Police Defensive Tactics Instructor, and was an FBI-trained Hostage Negotiator.

Dr. Garner has been with Sam Houston State University for more than 18 years and was the founding Director of the Texas Regional Community Policing Institute (TRCPI) and served as the Executive Director of the Law Enforcement Management Institute of Texas (LEMIT) before his appointment as Associate Dean. Currently he serves as the Director of the Texas Police Chaplains Association.

Dr. Garner has received numerous academic awards and honors including the Excellence in Educational Instruction award in 2006, the University of Houston's 2005-2006 Distinguished Alumni Award—the highest honor the association and the University can bestow upon an alumnus and the Social Psychologist in Texas award in 2004.

Dr. Garner has authored numerous books and professional publications with particular emphasis in the areas of social influence, persuasion, and leadership. His books, *Criticism Management* and *Constructing Effective Criticism: How to Give, Receive, and Seek Productive and Constructive Criticism in Our Lives* have been adopted by command colleges, leadership courses, and communication programs across the country. Additionally, Dr. Garner is the Editor-in-Chief of *Applied Psychology in Criminal Justice*, an interdisciplinary, peer-reviewed, academic journal that examines the social and psychological aspects of human behavior as related to applied societal and criminal justice settings.

# NEWLY ELECTED SHERIFF'S SESSION JAIL ADMINISTRATION MANAGEMENT & OPERATIONS TRAINING
## March 20 - 24, 2017      Instructor Biographies



### Shannon Herklotz
*Assistant Director, Texas Commission on Jail Standards*

Shannon Herklotz came to the Commission in January 1998 as Inspector for the South Texas region from his position as Administrative Captain with Corrections Corporation of America's Hutto Unit in Taylor. Prior to joining CCA, he worked at the Texas Department of Criminal Justice – Institutional Division for six and one-half years. Mr. Herklotz began his career as a Correctional Officer at the Byrd Unit in Huntsville, Texas, in July 1990. He rose to the rank of Lieutenant at the Stevenson Unit in Cuero, Texas. Mr. Herklotz attended Sam Houston State University while employed with TDCJ – ID and received a bachelor's degree in 1993. Mr. Herklotz was promoted to Assistant Director of the Texas Commission on Jail Standards over Inspections and Jail Management on September 1, 2007. Mr. Herklotz now has over 20 years of experience in the Criminal Justice Field.

### Gary Henderson
*Law Enforcement Consultant, Texas Association of Counties*

Gary joined TAC in January 2017 as a law enforcement consultant. Prior to joining TAC, Gary was a security professional for Devon Energy. Previously, he was the Hemphill County Sheriff, serving from 2005-2011. Gary began his career in law enforcement with the Texas Department of Public Safety and served 31 years as a Texas Ranger and Texas Ranger Sergeant. He also served as an Investigator for the 31st and 223rd District Attorney's Office. Gary travelled extensively throughout the United States on Protective Detail to then Governor, George W. Bush. Gary is Master Peace Officer, Instructors and Firearms certified. He attended Southwest Texas State University in San Marcos, Texas. Gary can be reached at garyh@county.org or (800) 456-5974.

### Carmella Jones
*Program Specialist, Correctional Management Institute of Texas*

Carmella Jones joined the staff at Sam Houston State University in August 2014. Employed as a Law Enforcement Consultant with Texas Association of Counties for 11 years, Carmella developed numerous training programs for law enforcement and corrections personnel for a variety of topics, focusing on liability, jail issues and wellness. Prior to joining TAC, she became the elected Sheriff of Armstrong County and served for two terms. During her tenure as Sheriff she was appointed as a Commissioner and acted as Vice Chair on the Texas Commission on Jail Standards. She is a lifetime member of the Sheriff's Association and also served on the Board of Directors. Carmella has been a member of the Texas Jail Association Board of Directors as Historian since 2005. In 2008, she was honored as a recipient of the Texas Jail Association's Hall of Fame Award and in 2009 selected to receive the TJA President's Award. Carmella has achieved Master Peace Officer, Master Jailer certification and is certified by the Cooper Institute as a Law Enforcement Fitness Specialist.

136

# NEWLY ELECTED SHERIFF'S SESSION JAIL ADMINISTRATION MANAGEMENT & OPERATIONS TRAINING

**March 20 - 24, 2017**      Instructor Biographies



### Thomas Kerss
*Law Enforcement Consultant, Texas Association of Counties*

Thomas joined TAC in January 2013 as a law enforcement consultant. He began his law enforcement career with the Tyler Police Department in 1981 and served multiple terms as the sheriff in Nacogdoches County. Thomas is a past president of the Sheriffs' Association of Texas and holds a Master Peace Officer's License, a Master Jailer's License and an Instructor's Certificate through the Texas Commission on Law Enforcement (TCOLE). Thomas graduated from the FBI National Academy (Session 181) in Quantico, VA. and the Texas Certified Public Managers Course. He holds a B.A.A.S. in Criminal Justice from Stephen F. Austin State University and can be reached at thomask@county.org or (512) 589-3922 or (800) 456-5974 ext. 3743.

### Chris Kirk
*Sheriff, Brazos County*

Chris Kirk of Bryan, Texas, has worked for the Brazos County Sheriff's Office since 1980. Kirk began his career as a Jail Officer serving for one year, then served two years as a Patrol Deputy, 14 years as a Criminal Investigator, and elected to the Office of Sheriff in 1996. He is currently serving in his sixth four-year term as the Brazos County Sheriff. Kirk received a bachelor's degree and a master's degree from Stephen F. Austin State University. He is a graduate of National Sheriff's Institute, Class of 2000. Kirk has also earned a Texas Master Peace Officer Certification.

Sheriff Kirk has served as the Coordinator for Brazos County Crime Stoppers since November 1988. He actively participates with the Sheriff's Association of Texas; having served as their President in 2007-2008 and is currently serving the SAT Legislative Committee. Sheriff Kirk has also served as the President for the Western States Sheriffs' Association and is currently a member of the Board of Directors for the Nation Sheriffs' Association. Governor Rick Perry appointed him to a 2nd six-year term on the Texas Criminal Justice Advisory Committee on Offender with Medical or Mental Impairment (TCOOMMI).

In the community, Kirk has served as the President for the Sexual Assault Resource Center; the former District Chairman of the Arrowmoon  District of the Sam Houston Area Council of the Boy Scouts of America; and currently serves as the President of Board of Directors for Scotty's House Children's Advocacy Center.

Member of Bryan Noon Lions Club and was awarded the Lions Club 2007 Citizen of the Year. 2007 Public Elected Official of the Year / awarded by Texas Chapter of National Assoc. of Social Workers. 2008 "Community Builder" Award / awarded by the Masonic Sul Ross Lodge No. 1300. 2011 "Sheriff of the Year" awarded by the Western States Sheriffs' Association. 2013, 2015 & 2016 "Elected Official of the Year" The Bryan /College Station Eagle Newspaper,  Readers' Choice Award.

Chris Kirk has been married to Sheryl for 23 years; they have 5 children & 17 grandchildren.

# NEWLY ELECTED SHERIFF'S SESSION JAIL ADMINISTRATION MANAGEMENT & OPERATIONS TRAINING

**March 20 - 24, 2017**     **Instructor Biographies**



### Stan Lewiecki
*Claims Attorney, Texas Association of Counties*

Stan joined TAC in 2014 and manages claims and litigation relating to the public officials and law enforcement liability lines. Before joining TAC, Stan managed claims for a third-party administrator beginning in 2002, and was a trial lawyer for Allstate Insurance Company from 1997 – 2001. Stan has worked in litigation management since 2002, specializing in governmental claims, professional liability claims, and claims against privately operated prisons. Stan is licensed to practice law with the State Bar of Texas and the U.S. District Court for the Northern District of Texas. In addition, he is licensed as a property-casualty adjuster by the Texas Department of Insurance. Stan received his JD from the University of Texas School of Law in 1993, and his BA from the University of Texas in 1989, majoring in Psychology with a minor in Government. Stan resides in Arlington and can be reached at stanl@county.org, or at 512-743-4426.

### Terry Pickering
*Law Enforcement Consultant, Texas Association of Counties*

Terry joined TAC in June 2016 as a law enforcement consultant. Prior to joining TAC, Terry was the Bastrop County Sheriff, elected in 2008 and re-elected to a second term in 2012. Prior to becoming Bastrop County Sheriff, Terry retired from the Travis County Sheriff's Office after 28 years of services. He is the recipient of several service awards, including a Commendation for his response to an emergency plea from Federal ATF agents at the Mount Carmel siege in Waco, Texas in 1993. Terry is a graduate of the Leadership & Command College of the Law Enforcement Management Institute of Texas, the FBI National Academy, the Drug Enforcement Administration's, Drug Unit Commanders Academy, and the National Sheriff's Institute. He holds a Master Peace Officer and Law Enforcement Instructor's license. He can be reached at terryp@county.org or (800) 456-5974, ext. 3481

### Dennis Wilson
*Sheriff, Limestone County*

Limestone County Sheriff Dennis D. Wilson began his 40th year in Law Enforcement in July 2015. His career in Law Enforcement began 1975 as a Deputy Sheriff with the Limestone County Sheriff's Office. In November 1999, Sheriff Wilson served as a District Attorney Criminal Investigator for the Limestone County District Attorney Office. On January 1, 2001, he began his 1st elected term as Sheriff of Limestone County, Texas. On January 1, 2017, Sheriff Wilson began serving his 5th term as Sheriff.

Sheriff Wilson graduated from the Heart of Texas Council of Government Police Academy in 1976. He is a 1973 graduate of Groesbeck High School and attended Cisco Junior College and Navarro College where he earned an associate degree in education. He obtained his Master Peace Officer certificate in 1994. He has over 4402 hours of continued education with the Texas Commission on Law Enforcement. Sheriff Wilson also holds an Instructors Certificate from TCOLE.

138

# NEWLY ELECTED SHERIFF'S SESSION JAIL ADMINISTRATION MANAGEMENT & OPERATIONS TRAINING

**March 20 - 24, 2017**      Instructor Biographies



Dennis Wilson continued

As of July 2016, Sheriff Wilson serves as the President of the Sheriff's Association of Texas. Sheriff Wilson serves on the Legislative Committee and Jail Advisory Committee for the S.A.T. In 2013 Sheriff Wilson was appointed by Governor Rick Perry to serve as a Commissioner on the Board for the Texas Commission on Jail Standards representing the rural Sheriffs in our state. Sheriff Wilson currently serves as Chairman of the Board for the Texas Council of Community Centers Board. Sheriff Wilson also serves on the H.O.T.R.M.H.M.R. Board of Directors. Sheriff Wilson has a great passion in helping improve mental health services all across Texas. He also proudly works with the staff at Sam Houston State University Correctional Management Institute of Texas, working on educational training for all Texas Law Enforcement and Correctional Officers.

### Brandon Wood
*Executive Director, Texas Commission on Jail Standards*

Brandon began working with the Texas Commission on Jail Standards in 1999 as a Planner, assisting counties in identifying jail population trends, preparing needs analyses and developing/reviewing construction plans. Brandon served as the agency's Assistant Director from August 2007 to October 2012 at which time he became Executive Director. Throughout his tenure with the agency, he has assisted with administrative oversight and operations, facilitated communications with local officials to find solutions for minimum jail standards, interacted with the Governor's office, Legislative Budget Board, and numerous state officials regarding the functional aspects, goals and responsibilities of the Commission and the impact on counties. Brandon is a Texas A&M University graduate, class of 1995. Recognitions and honors include outstanding company commander for the Navy/Marine ROTC unit and the LBJ Congressional Internship working for Representative Bill Sarpaulis in 1993.

Plaintiffs' Appendix 213

# TAB D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
## San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as     :
Dependent Administrator of, and on Behalf of, the     :
Estate of Derrek Quinton Gene Monroe     :
vs.     :     CIVIL ACTION NO. 6:18-CV-00015-C
    :
Coleman County, Texas; Leslie W. Cogdill;     :
Mary Jo Brixey; and Jessie W. Laws     :

### NOTICE

TO:  ALL PARTIES BY AND THROUGH THEIR ATTORNEY(S) OF RECORD AS PROVIDED IN THE ATTACHED SERVICE LIST.

PLEASE TAKE NOTICE THAT ON THE  21st  DAY OF September  2018  , AT THE HOUR OF 10:00 A.M., THE PRODUCTION OF DOCUMENTS AND/OR TANGIBLE THINGS BY THE CUSTODIAN OF RECORDS FOR:

**Texas Association of Counties (Any & All Records)**
**1210 San Antonio St.**
**Austin, TX 78701**

will be conducted before a Notary Public, or other officer authorized to administer oaths employed by Records Deposition Service of Texas, Inc., 2201 Main St., Ste. 1250, Dallas, TX 75201, at the deponent's address, pursuant to provisions of Federal Rules of Civil Procedure. A subpoena duces tecum will be issued to require the witness to produce records, books, papers, documents, and tangible things pertaining to:  see attached Exhibit "A."

This notice is given on behalf of the Plaintiff, at the instance and authorization of (his)(her)(its) counsel of record T. Dean Malone, Esq., whose address is 900 Jackson St., Ste. 730, Dallas, TX 75202 and whose phone number is 214-670-9989. Counsel does not propose to interrogate the Deponent, the proceeding being solely for the purpose of authenticating and copying the records, books, and documents in the possession or control of the Deponent. You, of course, are welcome to appear if you so desire. If you have any objection to the copying of the records and documents please call (214) 760-7600.

If the Deponent designated in this Notice is an organization such as a corporation, partnership, association or government entity, deponent-organization shall designate one or more officers, agents or other persons who can testify on behalf of the Deponent with respect to all of the matters thereto.

Order No. **15694**

Plaintiffs' Appendix 215

THERE WILL BE NO INTERROGATION OF THE DEPONENT BY THE UNDERSIGNED COUNSEL.

STATE OF TEXAS    )
COUNTY OF DALLAS )

            Law Offices of Dean Malone
            T. Dean Malone, Esq.
            900 Jackson St., Ste. 730
            Dallas, TX 75202

            NOTICED BY: T. Dean Malone, Esq.
            24003265

                                      Stacy Ochoa

### CERTIFICATE OF SERVICE

    BEFORE ME, the undersigned authority, on this day personally appeared Stacy Ochoa being first duly sworn, on oath states that a copy of the above Notice was personally served this _____09/10/2018_____ on the above-named attorneys to whom this Notice is addressed, at the address set out in such Notice, the same being the last known address of such attorney, (by depositing a copy thereof, postage paid, in a wrapper addressed to such attorneys at such address) or (by facsimile) or (by personal delivery of such Notice to the addressee above set forth).

SUBSCRIBED AND SWORN before me this _____09/10/2018_.



HOWARD R. FALLON
Notary Public of Texas
My Commission Expires 07/02/22

HOWARD RICHARD FALLON
Notary Public
STATE OF TEXAS
ID#9477935
My Comm. Exp. July 2, 2022

Order No. 15694

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
## San Angelo DIVISION

| | | |
|---|---|---|
| Patsy K. Cope, Individually, and Alex Isbell, as | : | |
| Dependent Administrator of, and on Behalf of, the | : | |
| Estate of Derrek Quinton Gene Monroe | : | |
| vs. | : | CIVIL ACTION NO.  6:18-CV-00015-C |
| | : | |
| Coleman County, Texas; Leslie W. Cogdill; | : | |
| Mary Jo Brixey; and Jessie W. Laws | : | |

### LIST OF ATTORNEYS:

Jon M. Hogg, Esq.
Jackson Walker, LLP
135 W. Twohig Ave., Ste. C
San Angelo, TX  76903
325-481-2550   Fax: 325-481-2552

Order No. **15694**

Plaintiffs' Appendix 217

IN THE UNITED STATES DISTRICT COURT
FOR THE Northern DISTRICT OF TEXAS
San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as    :
Dependent Administrator of, and on Behalf of, the    :
Estate of Derrek Quinton Gene Monroe    :
vs.    :    CIVIL ACTION NO. **6:18-CV-00015-C**
    :
Coleman County, Texas; Leslie W. Cogdill;    :
Mary Jo Brixey; and Jessie W. Laws    :

## EXHIBIT A

### I. DEFINITIONS

The term "records, books, papers and documents" as used herein shall include any printed, typewritten or handwritten matter or reproduction thereof whatever character, including without limitation, correspondence, memoranda, agreements, letters, hand or typewritten notes, tape recordings, computer runs and any codes necessary to comprehend such runs, checks, check stubs, bank statements, and writings of every kind and character, whether originals or reproductions.

### II. DOCUMENTS TO BE PRODUCED

Copies of the following for Course No. 3517, entitled "Suicide Prevention (not 3501)," taken by Mary J. Brixey on April 25, 2017 and Jessie W. Laws on April 26, 2017 through the Texas Association of Counties; syllabus, books, all course materials, audio and video recordings, all display slides (including projector slides and PowerPoint slides), and documents and tests completed by Mary J. Brixey and/or Jessie W. Laws.

Order No. **15694.001**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
## San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as      :
Dependent Administrator of, and on Behalf of, the   :
**Estate of Derrek Quinton Gene Monroe**       :
vs.                                :     CIVIL ACTION NO. **6:18-CV-00015-C**
                                       :
**Coleman County, Texas; Leslie W. Cogdill;**    :
**Mary Jo Brixey; and Jessie W. Laws**         :

**AFFIDAVIT**

STATE OF_____

COUNTY OF_____

    BEFORE     ME,     the     undersigned     authority,     personally     appeared
(Custodian)_____ who being by me duly sworn, deposed as
follows:    (Please print your name)

    1. I, the undersigned, am over twenty-one (21) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

    2. I am the Custodian of Records for **Texas Association of Counties** and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.

    3. Attached hereto are _____ pages of records concerning **Mary J. Brixey and/or Jessie W. Laws**. These are the original records or exact duplicates of the original records.

    4. It is the regular practice of **Texas Association of Counties** to make this type of record at or near the time of each act, event, condition, opinion or diagnosis set forth in the record.

    5. It is the regular practice of **Texas Association of Counties** for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.

    6. It is the regular practice of **Texas Association of Counties** to keep this type of record in the course of regularly conducted business activity.

    7. It is the regular practice of the business activity to make the records.

Further Affiant sayeth not.

_____
SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the _____ day of
_____ , _____.

_____
NOTARY PUBLIC
In and for the State of_____
My Commission Expires:_____

Order No. **15694.001**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

San Angelo Division

Patsy K. Cope, Individually, and Alex Isbell, as
dependent administrator of, and on behalf of,
the Estate of Derrek Quinton Gene Monroe and
his heirs-at-law,

*Plaintiff*

v.

Coleman County, Texas; Leslie W. Cogdill;
Mary Jo Brixey; and Jessie W. Laws,

*Defendant*

)
)
)
)
)
)
)

Civil Action No. **6:18-cv-00015-C**

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: **Texas Association of Counties**
   **1210 San Antonio Street, Austin, Texas 78701, (512) 478-8753**

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the materials: **Copies of the following for Course No. 3517, entitled "Suicide Prevention (not 3501)," taken by Mary J. Brixey on April 25, 2017 and Jessie W. Laws on April 26, 2017 through the Texas Association of Counties: syllabus, books, all course materials, audio and video recordings, all display slides (including projector slides and PowerPoint slides), and documents and tests completed by Mary J. Brixey and/or Jessie W. Laws.**

| Place: | Records Deposition Service of Texas, Inc. | Date and Time: |
|---|---|---|
| | 1701 N. Collins Blvd., Ste. 334, Richardson, TX 75080 | **September 21, 2018 at 3:00 p.m.** |
| | Phone: (214)760-7600; Fax: (214)760-0222 | |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 8/31/2018

CLERK OF COURT

OR

_____
Signature of Clerk or Deputy Clerk

_____
Attorney's signature

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* **Patsy K. Cope and Alex Isbell** , who issues or requests this subpoena, are:
**T. Dean Malone, Law Offices of Dean Malone, P.C., 900 Jackson St., Suite 730, Dallas, Texas 75202
dean@deanmalone.com / (214) 670-9989**

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Plaintiffs' Appendix 220

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. **6:18-cv-00015-C**

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                           *Server's signature*

                                           _____
                                           *Printed name and title*

                                           _____
                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Plaintiffs' Appendix 222

## IN THE UNITED STATES DISTRICT COURT
## FOR THE Northern DISTRICT OF TEXAS
### San Angelo DIVISION

Patsy K. Cope, Individually, and Alex Isbell, as      :
Dependent Administrator of, and on Behalf of, the  :
**Estate of Derrek Quinton Gene Monroe**         :
vs.                                    :      CIVIL ACTION NO.  **6:18-CV-00015-C**
                                       :
**Coleman County, Texas; Leslie W. Cogdill;**    :
**Mary Jo Brixey; and Jessie W. Laws**        :

**AFFIDAVIT**

STATE OF _Texas_

COUNTY OF _Travis_

    BEFORE    ME,    the    undersigned    authority,    personally    appeared
(Custodian) _Gene Terry_ who being by me duly sworn, deposed as
follows:    (Please print your name)

    1. I, the undersigned, am over twenty-one (21) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

    2. I am the Custodian of Records for **Texas Association of Counties** and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.

    3. Attached hereto are _152_ pages of records concerning **Mary J. Brixey and/or Jessie W. Laws**. These are the original records or exact duplicates of the original records.

    4. It is the regular practice of **Texas Association of Counties** to make this type of record at or near the time of each act, event, condition, opinion or diagnosis set forth in the record.

    5. It is the regular practice of **Texas Association of Counties** for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.

    6. It is the regular practice of **Texas Association of Counties** to keep this type of record in the course of regularly conducted business activity.

    7. It is the regular practice of the business activity to make the records.

Further Affiant sayeth not.

_____
SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the _____ 21st _____ day of
_September_ , _2018_ .

KRISTI SHEPPERSON
My Notary ID # 3685943
Expires July 18, 2022

_____
NOTARY PUBLIC
In and for the State of _Texas_
My Commission Expires: _July 18, 2022_

Order No. **15694.001**



# Jail Suicide Prevention

Presented by the Texas Association of Counties

# Disclaimer

**This training is designed to provide general information about the subject matter covered. Neither TAC nor the trainers are engaged in rendering legal advice. If you need legal advice, TAC recommends that you seek the services of a competent attorney who is familiar with your specific situation.**

Plaintiffs' Appendix 225

# Learning Objectives
## Students will be able to:

- Define Deliberate Indifference

- List four actions that demonstrate a proactive stance

- List the three major aspects of intake screening

- List the most important factor in suicide prevention

Plaintiffs' Appendix 226

# Deliberate Indifference

- Knew or Suspected and Failed to Act or Report

- Conscious or Reckless Disregard of the Consequences of one's Acts or Omissions

4

# Deliberate Indifference

- No screening for suicidal behavior

- No Monitoring of suicidal inmates

- No training in signs/symptoms of suicide

Plaintiffs' Appendix 228

# Deliberate Indifference

## Three things cannot be defended:

### Abuse

- physical, sexual, verbal

### Lies

- false representation, half truth

### Stupid Remarks

- uncaring, cold

# National Statistics

- **It is the <u>NUMBER ONE</u>** cause of death in jails after natural causes

- Rate in county jails is <u>**9 TIMES**</u> greater than general population

# A Pro Active Stance

## Written Policies & Procedures containing

Training

Screening

Classification

Monitoring

Plaintiffs' Appendix 231











# Suicidal Behavior

TEXAS ASSOCIATION *of* COUNTIES
RISK MANAGEMENT POOL

14

# Pre Disposing Factors

- Recent drinking/drugs

- Recent loss

- Guilt or shame

- Sexual Assault

- Mental illness

- Poor health

- Breaking point

Plaintiffs' Appendix 238

# Periods of High Risk

First 24 hours

Intoxication

Withdrawal

Waiting trial

Sentencing

Impending Release

Holidays

Darkness

Decreased Staff

Bad News

Plaintiffs' Appendix 239

# Signs & Symptoms of Suicide

- Key times

- Depression/Paranoia

- Guilt/Shame

- Threatens

- Alcohol

- Previous attempts



Plaintiffs' Appendix 240

# Signs & Symptoms of Suicide

- Can't relate

- Preoccupied with past

- Packs up

- Gives away stuff

- Hurts self



- Delusions

Plaintiffs' Appendix 241

# Signs & Symptoms of Suicide

- Agitated/aggressive

- Hopelessness

- Concern what will happen

- Behavior changes

- Sudden calmness

- Unrealistic

Plaintiffs' Appendix 242

# Situational Factors

- First time offender

- Young

- Status

- Family history

- New charges

- Copycat

- Harsh officers

- Suffering experience



Plaintiffs' Appendix 243

# Assessing Mental
# Health Conditions & Suicidal Risk

TEXAS ASSOCIATION *of* COUNTIES
RISK MANAGEMENT POOL

21

# Aspects of Intake Screening

## Three Major Aspects

What to observe:

| Observation of signs & symptoms |  | Appropriate forms |  | Disposition & referral |
|---|---|---|---|---|

Plaintiffs' Appendix 245

## Aspects of Intake Screening

When is the intake:

# Immediately upon arrival

23

# Aspects of Intake Screening

Who conducts intake screening:

- Trained booking or corrections officers

- Nurses or paramedical personnel

Plaintiffs' Appendix 247

# Benefits on Intake Screening

- Suicidal persons identified

- Illnesses & diseases detected

- Drug/alcohol abuse & withdrawal assessed

- Acute medical illnesses effected

- Medication use determined

- Legal liability protection

Plaintiffs' Appendix 248

# Conditions to Observe

- Behavior, speech actions, attitude & mind set

- Scars from previous suicide attempts

- Traumas or bruises, color and condition of skin

- Visible signs of drug or alcohol use/withdrawal

Plaintiffs' Appendix 249

# ELEMENTS OF A SUCCESSFUL

# INTAKE SCREENING INTERVIEW

Plaintiffs' Appendix 250

# Successful Intake

- Continually assess

- Report assessments

- NOTE:
  - Behavior, speech, actions, attitudes & state of mind
  - Scars
  - Traumas
  - Visible signs on drugs/alcohol use 
  - Medication

Plaintiffs' Appendix 251

# Successful Intake

- Follow-up questions

- Effective interviewing

- Explain rationale

- Ask questions in common-sense manner



Plaintiffs' Appendix 252

# Successful Intake

- Speak in normal, quiet, matter-of-fact tone

- Using language that can be understood

- DO NOT be pushy, abrupt or sarcastic

- Repeat question slowly & clearly

Plaintiffs' Appendix 253

# ASSESSING SUICIDAL BEHAVIOR

31

# Assessing Suicidal Behavior

- Prior suicide risk

- Gauge intensity of stress & depression

- Determine impulsiveness

- Ask direct questions

- Explore plan for degree of risk

- Assess resources available

Plaintiffs' Appendix 255

# INTERACTING WITH POTENTIALLY SUICIDAL INMATES

33

# The Most Important Factor in Suicide Prevention:

# A well-trained

# corrections officer

Plaintiffs' Appendix 257



# The Basic Role of the Officer

- Be aware of symptoms

- Be tuned into obvious & sometimes subtle signals

- Daily contact

- Be empathetic

- Don't give up

- Non-rejecting staff saves lives

- One person cares

36

## Steps for Approaching a Suicidal Person

- May attempt to have others kill them

- Remain calm

- Make a plan and follow it

- Be alert

- Ask intent

- Check out the situation

37

# Barriers

## The officer should <u>NOT</u>:

- Offer solutions or give advice

- Become angry, judgmental or threatening

- Act sarcastic or make jokes about the situation

- Lie about promises that you can't keep

- Challenge the inmate to follow through with threat

- Ignore the suicidal risk or threat

Plaintiffs' Appendix 261

# PROPER HANDLING OF AN INMATE WHO IS FOUND HANGING

Plaintiffs' Appendix 262

# Hanging May Affect Any or All Neck Structures

Airway

Spinal cord

Blood vessels



Plaintiffs' Appendix 263

# Cut Victim Down Immediately

- One person holds body up

- Other cuts noose

- Deaths occur due to no cutting tool

Plaintiffs' Appendix 264

# Immediate Steps

- Have someone call ambulance

- Give basic first aid

Plaintiffs' Appendix 265

# Aspects of FIRST AID

- Rescue breathing and CPR

- Slowly roll victim onto back

- Open airway by tilting head or modified jaw thrust

- Check for breathing

- If no pulse, begin CPR

43

Plaintiffs' Appendix 266

# NOTE:

Only physician or other qualified professional designated by state law can pronounce individual dead. Until such time, start and continue first aid and CPR.

44

# Jail Suicide Prevention Plan

TEXAS ASSOCIATION *of* COUNTIES
RISK MANAGEMENT POOL.

Plaintiffs' Appendix 268

## Components

# TEXAS COMMISSION ON JAIL STANDARDS

Plaintiffs' Appendix 269

# Components

## Training

- Training in procedures, supervision, documentation and handling

- Supplemental training for staff responsible for intake



47

# Components

# Identification/Screening

- Procedures to identify inmates

- Procedures for referrals to TXMHMR



48

# Components

- Communication between staff members

- Housing

- Supervision

- Intervention

- Reporting

- Follow-up/Review

Plaintiffs' Appendix 272

# But; it's not always in the jail



Plaintiffs' Appendix 273

# CONTROVERSIAL ISSUES

51

Plaintiffs' Appendix 274

# Controversial Issues

- Contracts not to commit suicide

- Stripping potential suicides naked

- Using closed circuit television

- Rating scales

- Suicide profiles

- Policy of not allowing single officers in cells



Plaintiffs' Appendix 275

# Controversial Issues

- Protecting the crime scene

- No vital signs equal death

- Don't talk with inmates

- Using citizen volunteers for suicide watch

- Using inmate watchers

Plaintiffs' Appendix 276

# PROS AND CONS

## Policy:

- *Never enter without backup*

- *Don't cut down*

- *Protect crime scene*

- *Don't talk to inmates*

- *Citizen volunteers*

54



Plaintiffs' Appendix 278



TEXAS ASSOCIATION *of* COUNTIES
## Law Enforcement Consultants



**NORTHWEST**
Darren Jackson

**NORTHEAST**
Thomas Kerss

**SOUTHWEST**
Vacant

**SOUTHEAST**
Terry Pickering

(800) 456-5974
county.org



## Gary Henderson
garyh@county.org
cell 512-986-8407



## David Whitis
davidw@county.org
cell 512-517-2547



## Thomas Kerss
thomask@county.org
cell 512-589-3922



## Terry Pickering
terryp@county.org
cell 512-517-7197



TEXAS ASSOCIATION *of* COUNTIES
RISK MANAGEMENT POOL

56

**ROSTER ID: 10328402**
**Suicide Prevention (not 3501)**

| Course Date | Hours | Course ID | Course Description |
|---|---|---|---|
| 4/26/2017 | 4 | 3517 | Jail Suicide Prevention |

| P_ID | Name | Department |
|---|---|---|



| 355840 | JESSIE W LAWS | COLEMAN CO. SHERIFF'S OFFICE |



**ROSTER ID: 10328445**
**Suicide Prevention (not 3501)**

| Course Date | Hours | Course ID | Course Description |
|---|---|---|---|
| 4/25/2017 | 4 | 3517 | Jail Suicide Prevention |

**P_ID**      **Name**                                                    **Department**



240399      MARY J BRIXEY                            COLEMAN CO. SHERIFF'S OFFICE



**PENDING ROSTER ID: 9901759**
**Suicide Prevention (not 3501)**
**Jail Suicide Prevention**

| Date | Hours | Course ID | Instructor |
|---|---|---|---|
| 4/25/2017 | 4 | 3517 | Gary Henderson Brown County |

| P_ID | Name | DOB | Gender | Race | Citizen |
|---|---|---|---|---|---|
| 240399 | MARY J BRIXEY | | F | | Yes |

# TAB E

To:  Judge Mike McAuliffe

FROM:  Nizam Peerwani, M.D.

RE:  1715358 Derrek G. MONROE Autopsy Report 10-03-2017

Thank you.



Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
Tarrant County, Texas
200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919
(817) 920-5700  FAX (817) 920-5713

# AUTOPSY REPORT

**CASE NO:** 1715358

**Name:** Derrek Gene MONROE          **Age:** 28 years
**Sex:** Male          **Race:** White
**Date and Time of Death:** October 2, 2017 at 9:40PM
**Place of Death:** ICU, Hendrick Medical Center, Abilene, Texas
**Autopsy Authorized By:** Judge Mike McAuliffe, Pct # 1-1, Taylor Co, Texas

I, Nizam Peerwani, M.D., hereby certify that I performed a complete autopsy on the body of DERREK GENE MONROE at the Tarrant County Medical Examiner's District Morgue in Fort Worth, Texas on the 3rd day of October 2017, beginning at 0815 AM, and upon investigation of the essential facts concerning the circumstances of the death and history of the case as known to me at this time, I am of the opinion that the findings, cause and manner of death are as follows:

## FINDINGS:

I.   **Investigative findings:**

A. Decedent discovered suspended in Coleman County Jail on 10-01-2017 at 08:20 AM:

   1. Ligature composed of telephone cord.

   2. Transported by EMS and admitted to Coleman County Medical Center on 10-01-2017 at 09:30 AM:

     a) Admit vital: Obtunded with blood pressure = 109/51 mmHg and pulse = 122/minute.

     b) CT-scan of neck: No cervical fractures.

     c) Serum chemistry: marked abnormalities.

     d) Serum pH = 7.29 (Normal: 7.35 – 7.45) with severe lactic acidosis (Lactic acid = 7.2 mol/L) (normal = 0.4 – 2.0)

   3. Transferred to Hedrick Medical Center in Abilene where he was subsequently pronounced dead.

B. History of drug and or alcohol abuse: Unknown.

C. Drugs and alcohol found at the scene: None.

D. Medical history: Seizure disorder (per Coleman County Medical Center records).

Plaintiffs' Appendix 285

Page 2 of 9

1715358
Darrek Gene MONROE

FINDINGS (Continued):

    E. Suicide Profile:
        1. History of depression: Unknown.
        2. History of threatened or past attempted suicide: Not provided.
        3. Suicide Note at the scene: None.

II. **Postmortem findings:**
    A. Hanging with:
        1. A slanted "V"-shaped ligature impression of the anterior neck above the thyroid prominence.
        2. Healing patchy subcutaneous, strap muscle and deep para-spinal muscle hemorrhage.
        3. Absence of facial plethora or cutaneous petechiae.
        4. Minimal faint bulbar and palpebral conjunctival petechiae.
        5. Absence of fracture of hyoid bone or thyroid cartilage.
        6. Pulmonary vascular congestion, bilateral, severe, with edema.
        7. Leptomeningeal congestion, global, severe, with prominent edema.

III. No evidence of defensive wound or foul play.

---

CAUSE OF DEATH:   HANGING

MANNER OF DEATH:   SUICIDE

_____
Signature

Nizam Peerwani, M.D.
Chief Medical Examiner

Plaintiffs' Appendix 286

1715355
Derrek Gene MONROE

## GROSS ANATOMIC DESCRIPTION

I.    **CLOTHING AND PERSONAL EFFECTS:**  The body is presented to the Morgue nude except for a hospital gown, wrapped in a white sheet and secured in a white body bag.

II.   **THERAPEUTIC INTERVENTION:**
1.    Indwelling Foley with 30 mL of urine.
2.    IV along right antecubital fossa and dorsal right hand.
3.    Pulse oximeter around left index finger.
4.    Five EKG pads.

III.  **EXTERNAL BODY DESCRIPTION**

Body length: 64-1/2 inches.
Body weight: 161.5 pounds.

The decedent is a normally developed, adult white male with the stated age of 28 years.  The unembalmed body is identified by an ankle bracelet. Body presents medium build with average nutrition, normal hydration and good preservation. There is moderate rigor with developed posterior fixed lividity of normal color. Body is cold to touch post refrigeration.

The decedent is normocephalic without apparent trauma about the face or scalp. The bones of the forehead, nose, cheeks, and jaw are intact to palpation. Head is covered by very short, black hair with non-receding anterior hairline and without balding. Face is cyanotic and presents mild plethora and without petechiae. Face is unshaven with black mustache and goatee. Average body hair of male pattern distribution is noted. Eyes are closed with clear bulbar and palpebral conjunctivae. There are sparse petechiae without tache noire. Scattered petechiae of the bulbar and palpebral conjunctivae are present. Cataracts are not identified. Arcus senilis are absent. Bulbar conjunctival edema is absent.  Irides are brown with white sclerae. Pupils are equal at 4 mm. Orbits appear normal. The ears are well-formed and symmetrical and the external auditory canals are without discharge. The nose is well-formed and symmetrical. The external nares are patent and without hemorrhage or discharge. The lips are intact. The mouth contains a small amount of seromucous secretion without obstructing materials or lesions. Oral cavity presents natural teeth with good oral hygiene characterized by absence

of caries. Tongue is not protuberant. The buccal mucosa is pink and shows no signs of trauma.

The neck is symmetrical. There is no palpable crepitus or hypermobility. The trachea is palpably straight and in the midline. A partial slanted ligature impression of the anterior neck is present. The chest is symmetrical and without palpable crepitus or bony deformity. The male breasts are small and soft without palpable masses, skin retraction, or nipple discharge. The abdomen appears flat and soft without organomegaly or external trauma. Upper and lower extremities are equal and symmetrical presenting cyanotic nailbeds without clubbing. Edema is absent. There are no fractures, injuries, deformities or amputations present. The soles of the feet are soft and without calluses. There is no lymphadenopathy including cervical, axillary, or inguinal. The posterior trunk presents a symmetrical external contour and the spine appears straight. The anus is closed and atraumatic. The skin shows no irregularity. External genitalia present descended testicles with unremarkable penis.

SCARS:    None

TATTOOS: Multiple including:
1.    A large confluent tattoo of left upper extremity extending to the shoulder and left upper chest with design, skulls, skeleton, swastika   and spider web.
2.    A large confluent tattoo of right upper extremity and hand with designs.
3.    Skull with design along left and right medial and dorsal feet.
4.    Marijuana leaf along right knee.
5.    A symbol along left anterior distal thigh.
6.    "White Pride" along right posterior shoulder.
7.    "MONROE" along lower back.

DESCRIPTION OF NECK FINDINGS

A slanted ligature impression of the neck is present, above the thyroid prominence, extending from right anterior neck to left lateral neck and measuring 4 inches in length with a width of approximately 3/8 inch. The point of suspension is along the posterior neck.

Layered dissection of the neck reveals an intact hyoid bone as well as thyroid and cricoid cartilages.  Larynx is comprised of unremarkable vocal cords and folds, appearing widely patent without foreign material, and is lined by hyperemic, congested membrane. Epiglottis is a characteristic plate-like structure without edema, trauma or pathological lesions. Patchy areas of hemorrhage of the

1715358
Derrek Gene MONROE

subcutaneous area, the strap muscles as well as the deep paraspinal muscles are noted. The vasculature of the anterior neck is unremarkable with absence of endothelial trauma. The anterior cervical spine is in the midline and palpably unremarkable. No obstructive material or lesions are present in the glottis or larynx.

## IV.  INTERNAL EXAMINATION

### 1.  INTEGUMENTS AND NECK

A standard Y-shaped thoracoabdominal incision reveals a subcutaneous fat thickness of 1-2 cms at the midabdominal level. Neck is described above.

### 2.  SEROUS CAVITIES

The chest wall is intact without rib, sternal or clavicular fractures. The mediastinum is in the midline. The pericardial sac contains normal amount of serous fluid and presents glistening, smooth surfaces. The parietal pleural surfaces are glistening and smooth without adhesions. There is no pleural fluid. There are no pneumothoraces. The domes of the diaphragm are at the fifth rib bilaterally. Omental and mesenteric fat is normal. The peritoneal surfaces are glistening and smooth and there are no unusual fluid collections in the abdominal space. The organs occupy their usual positions. There is no scoliosis, kyphosis or lordosis present.

### 3.  CARDIOVASCULAR SYSTEM

Heart weight: 338 gms.
Left ventricular wall thickness: 1.5 cms.
Right ventricular wall thickness: 0.5 cms.
Circumference of aortic, mitral, pulmonary and tricuspid valves: 7, 9, 7 and 12 cms.

The heart is of normal size and shape and located in its usual position in the left chest, with its apex pointing to the left (normal). There is a normal amount of epicardial fat. The epicardial surface is glistening and smooth. The atrial chambers are not dilated. Both the interatrial septum and interventricular septum are intact. The atrioventricular connections are present, and the leaflets of the atrioventricular valves are thin and delicate. The chordae tendineae are thin and pearly gray. The papillary muscles are normal and reveal no tears or scars. There is no evidence of ventricular hypertrophy or dilatation. The myocardium is beefy, firm and red-brown, and on sectioning reveals absence of acute or healed infacts. The endocardial surface is smooth without thrombi or inflammation. The outflow tracts are widely

1716358
Derrek Gene MONROE

patent, and the semilunar valves each contain three thin and delicate cusps. The pulmonary artery is of appropriate caliber and configuration; its intimal surface is glistening and intact without atheromas.  The coronary ostia are in their normal anatomic location and lead into widely patent coronary arteries without significant atheromas. The coronary arteries course over the surface of the heart in the usual fashion. Right dominant coronary artery circulation is noted. The ascending aorta is of the usual caliber and arches normally before descending along the left side of the vertebral column. The major arteries arise from the aortic arch and descending aorta in the usual configuration and are patent. The intimal surface of the aorta is smooth. The venae cavae and other major veins are patent and thin walled. There are no congenital anomalies identified.

4.    PULMONARY SYSTEM

Left and right lungs:       1171 gms.

The lungs hyperinflated and reveal the usual number of lobes and fissures. Both the lungs appear severely congested and moderately edematous and on sectioning frothy edema fluid can be easily expressed. The visceral pleural surfaces are slightly opaque with a small amount of anthracotic pigment. There are no emphysematous changes observed. The parenchyma is soft and pale red. Air spaces are not enlarged. There are no gross pneumonic lesions or abnormal masses present. The tracheobronchial tree contains large amounts inspissated frothy edema fluid without aspirated gastric contents. The pulmonary vessels are patent revealing no evidence of thromboemboli.

5.    GASTROINTESTINAL SYSTEM

The esophagus courses in the usual fashion to enter the stomach and is lined by normal mucosa. The squamocolumnar junction is well demarcated without erosions or varices. The stomach is devoid of food particles. Gastric mucosa is intact with tall rugal folds with pliable wall. The pylorus is normally contracted. There is no evidence of gastritis or gastric ulcers. The small intestine is of the usual caliber, and its walls are pliable. The cecum is freely mobile in the right lower quadrant. The appendix is retrocecal and not inflamed. The colon contains formed brown stool and is of generous caliber. No focal mass lesions are identified throughout the gastrointestinal tract.

6.    HEPATOBILIARY SYSTEM AND PANCREAS

Liver:     1820 gms.
Pancreas:  159 gms.

1715358
Derrek Gene MONROE

The liver presents a sharp anterior margin with smooth glistening surface. The parenchyma is red-brown and soft with the usual lobular pattern and mild fatty changes. Intrahepatic bile ducts and vessels are patent. The gallbladder is present and contains approximately 35 mL of viscid green bile. The wall is thin and pliable with reticulated intact mucosa. The common bile duct is patent and drains into the duodenum. There are no calculi present.

The pancreas is located in its usual position within the duodenal sweep. The parenchyma has a firm, pink-gray with minimal fat in the tail. The pancreatic ducts are of the usual caliber. There is no evidence of acute or chronic pancreatitis.

7. GENITOURINARY SYSTEM

Left Kidney:  150.3 gms
Right kidney: 144 gms.

The kidneys are located in their usual retroperitoneal position and have capsules that strip with the usual ease to reveal smooth surfaces. The parenchyma is red-brown with clearly demarcated corticomedullary junctions. The cortex has a thickness of 8-9 mm. A minimal amount of peripelvic fat is present. The collecting systems are not dilated. The renal columns of Bertin extend between the well demarcated pyramids and appear unremarkable. The medulla presents normal renal pyramids with unremarkable papillae. The pelvis and ureters are patent and not dilated. Their mucosa is smooth. The urinary bladder is lined by intact mucosa and contains 75 mL of clear urine.

External genitalia present an unremarkable penis without hypospadia, epispadias or phimosis. There are no infectious lesions or tumors noted. The descended testicles are of normal size encased within an intact and unremarkable scrotal sac and on palpation abnormal masses or hernias are not present. The prostate is of normal size and shape and sectioning presents normal two lateral lobes with thin median lobe forming the floor of the unremarkable urethra. There are no gross pathological lesions.

8.    LYMPHORETICULAR SYSTEM:

Spleen:    221.5 gms.

The thymic tissue is ill defined with its parenchyma largely replaced by fat. The spleen presents a smooth, intact capsule and the splenic parenchyma is dark red.

Page 8 of 9

1716358
Derrek Gene MONROE

The follicles are small, and trabeculae are delicate. There is no lymphadenopathy. The mediastinal lymph nodes which are soft and black. Other lymph nodes are small and gray. Rib and vertebral marrow is red, moist, and ample.

9. ENDOCRINE SYSTEM

Thyroid gland is of symmetric, red-brown and firm presenting two well-defined lobes with connecting isthmus. There are no goitrous changes or adenomas present. Adrenal glands are of normal size and shape and sectioning present no gross pathological lesions. Pituitary gland is encased within an intact sella turcica and presents no gross pathological lesions.

10. CENTRAL NERVOUS SYSTEM

Brain:       1386 gms (unfixed).

Reflection of the scalp reveals no evidence of contusions of lacerations. There are no subgaleal hemorrhage or hematomas identified. The underlying calvarium is intact and normal in thickness. The dura is intact other and its inner surface smooth and glistening. The dural sinuses are patent. Serial cross-sectioning through the superior sagittal sinus reveal no antemortem thrombus.

Both the left and right cerebral hemispheres are essentially equal in size and the pattern of gyri and sulci is within normal limits. There is no shift of the interhemispheric fissure. Moderate cerebral edema is noted. The piarachnoid is regularly transparent. On the undersurface of the brain, the unci or cerebellar tonsils reveal absence of pressure markings. The olfactory bulbs are present and the optic nerves are well myelinated and of equal size. Both the mamillary bodies and brainstem appear normal and the cerebellar hemispheres are of normal size. The Circle of Willis is patent without atherosclerotic narrowing or thrombosis. Berry aneurysms are not identified.

Multiple coronal sections of the cerebrum show an intact cortical ribbon of appropriate thickness. The internal architecture shows the usual pattern without focal lesions or hemorrhage. The ventricular system is of appropriate configuration and size containing clear cerebrospinal fluid with delicate and unremarkable choroid plexus. The fourth ventricle is unremarkable. Transverse sections of the brainstem show unremarkable basal ganglia, midbrain, pons, medulla, and cerebellar hemispheres. Well-pigmented substantia nigra and locus caeruleus are noted. Sections of the cerebellum show prominent inferior olivary nuclei and the hemispheres present the usual foliar pattern and normal appearing dentate nuclei.

Plaintiffs' Appendix 292

Page 9 of 9

1715358
Derrek Gene MONROE

Spinal cord is noted examined.

## SPECIMENS AND EVIDENCE COLLECTED

1. 14 mL of aortic blood, 14 mL of femoral blood and 7 mL of vitreous and 14 mL of urine for toxicology.
2. Representative tissue sections in formalin.
3. 30 digital photos.
4. Blood card.
5. Fingerprints and palmprints.
6. Criminalistic Evidence:
   a. Blood card.
   b. Pulled scalp, facial and pubic hair.

Exam Date:                         October 3, 2017
Expected Date Completion:   December 3, 2017
Dictated/Typed:                  October 3, 2017
Completed:                        October 28, 22017
NSP:np

ME-31  REV. 7/08

# Office of Chief Medical Examiner
## Tarrant, Denton and Parker Counties, Texas

200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919  ◆  (817) 920-5700

Case No: 1716358

Examiner: Scene Caw



4 x 3/8"

Ligature
Impression