IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | |
|---|---|
| PATSY K. COPE and ALEX ISBEL, ,<br>*as Dependent Administrator of, and on behalf*<br>*of, the Estate of Derrek Quinton Gene*<br>*Monroe and his heirs at law*,<br><br>Plaintiffs,<br><br>v.<br><br>COLEMAN COUNTY, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 6:18-CV-015-C |

## ORDER

On this date, the Court considered:

(1) Individual Defendants' Motion for Summary Judgment, filed November 9, 2018; and

(2) Plaintiffs' Response, filed December 4, 2018.

## I.
## BACKGROUND

Following the suicide death of Derrek Monroe ("Mr. Monroe"), Plaintiffs filed suit against Defendants Coleman County, Coleman County Sheriff Leslie Cogdill, Coleman County Jailer Jessie Laws, and Coleman County Jail Administrator Mary Jo Brixey for violations of the Fourteenth Amendment under 42 U.S.C. § 1983, for the alleged wrongful death of Mr. Monroe. Plaintiff Patsy Cope brings claims in her individual capacity as the mother of Mr. Monroe. Plaintiff Alex Isabell brings claims as the Dependent Administrator of Mr. Monroe's Estate and on behalf of Mr. Monroe's minor children.

Plaintiffs claim deliberate indifference by the Defendants in that Defendants allegedly acted intentionally and with a conscious indifference to Mr. Monroe's rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.[1] The parties do not dispute the general facts and circumstances preceding Mr. Monroe's suicide. Moreover, here, unlike in many jail suicide cases, there is a clear video capturing the entire incident.

To provide insight, Mr. Monroe was brought to the Coleman County Jail following an arrest and was determined to be a suicide risk after being booked. He was transported to medical care following an attempted suicide using a sheet/blanket while housed in a cell with several other inmates. Monroe also made multiple verbal threats of suicide. A mental health evaluation was ordered and completed by MHMR and, as a result, Mr. Monroe was then classified as "high risk." Upon return to Coleman County Jail, he was placed in a cell as the solitary detainee within that cell and monitored by video surveillance, along with personal jailer observations completed at fifteen-minute intervals.

On the morning of October 1, 2017, Jailer Laws was on duty as the sole jailer at the facility during that particular shift because it was a Sunday. The Coleman County Jail did not maintain more than one jailer on duty during the night shifts or on weekends due to staffing shortage/budget issues. Although the prior Sheriff requested funding for additional staffing, Sheriff Cogdill was informed that no additional funding was available for more staff to be hired. For the shifts in which only one jailer was staffed, the County's policy was that the jailer on duty

---

[1] It appears that Plaintiffs did not allege claims against the individual Defendants in their official capacities because suit was also brought against Defendant Coleman County. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (suit against official in his official capacity is, in reality, asserted against the governmental entity itself).

could not enter a cell until another jailer or deputy was available to enter the cell or stand by as back up. In instances such as occurred here, this required the sole jailer on duty to call and wait for backup to arrive before entering the cell—with a time delay for such a wait.

The basic facts, as supported by the video surveillance footage, shows that Mr. Monroe required a shower on the morning of October 1, 2017, and Defendant Laws called his supervisors to verify that it was permissible to allow Monroe to exit the cell and go shower. Laws was given permission to remove Monroe from the cell and take him for a shower.[2] Upon return from the shower, the toilet in Monroe's cell was clogged and overflowing. In the video footage, Monroe appears to become agitated and began swinging a toilet plunger at the cell bars hitting them.[3] Laws then began mopping up the overflowing water and can be seen in the video footage reaching up and turning off the water valve to the cell in order to stop the overflowing toilet. Laws continued to clean up the overflow with a mop and Monroe can be seen banging the receiver of a telephone located in the cell against the wall—still agitated.[4] Monroe then wrapped the phone receiver cord around his neck in an effort to commit suicide. The video footage indicates that Laws took note of the situation and at first it appears that Laws did not take Monroe's actions seriously because Laws continued mopping for a few seconds. Laws then

---

[2] It is unclear why a single jailer could permissibly be alone with Monroe outside the cell to take him to the shower, but could not enter the cell to assist Monroe when he hanged himself.

[3] It is not clear if the plunger is generally left in the cell or if it was placed in there sometime that morning and not retrieved.

[4] As to why it was determined that phones (along with phone cords) should be placed within the inmate cells is puzzling. Moreover, in light of well-known suicide risks involving such items as cords entailed, it is not at all clear why a cell used to house a "high risk" suicidal detainee would have such an item in the cell or not have a policy that required removal of such items.

3

placed the mop in the bucket and leaves the screen to call Defendants Brixey and Cogdill to apprise them of the situation and request assistance.[5] Laws apparently did not call emergency medical care at this point. The video shows Laws looking into Monroe's cell several times over the next few minutes and checking his watch (obviously concerned at the amount of time that was passing while Monroe continued to have the phone cord around his neck).[6] Laws did not enter the cell until Brixey arrived at the jail and can be seen on the camera footage. At this point, Monroe was removed from the cell and they waited on EMT to arrive. The video footage files show the EMT personnel attempting CPR on Monroe for several minutes and then removing him for transport to the hospital.[7] Although Monroe was noted as having a pulse at the time EMT arrived, he failed to survive.

In the video footage, other detainees and inmates can be seen in the multi-person cell next to Monroe's cell, yet none (at least one of which was a trustee) were enlisted to help Laws assist Monroe while Laws waited on backup from Brixey or the Sheriff. The Sheriff's Department did not, or at least no evidence has been provided to the contrary, provide tasers or other similarly

---

[5]The evidence indicates that Laws also attempted to call another deputy who was on call for that period, but he failed to reach the other deputy.

[6]The video shows what appears to be obvious and clear appreciation of the risk of harm/death likely to result to Monroe because Laws repeatedly looks at his watch (indicating the importance that time was of the essence) and keeps checking on Monroe through the bars of the cell. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

[7]The video footage of the EMT was submitted to the Court in a separate video file, but on the same disc as the video file containing the footage from earlier in the morning. The video appears to be from the same camera.

appropriate tools/weapons for jailers to utilize to enter cells when a jailer was the only person on duty during a particular shift.

## II. STANDARDS

### A. *Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); that is, "[a]n issue is material if its resolution could affect the outcome of the action." *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002). To demonstrate the existence of a material fact issue, non-movants are required "to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (if an adverse party completely fails to make a showing sufficient to establish an essential element of that party's case on which it will bear the burden of proof at trial, then all other facts are rendered immaterial and the moving party is entitled to summary judgment). A district court is under no duty to sift through the record in search of evidence to support a party's opposition to summary judgment. *Forsyth*, 19 F.3d at 1537.

Typically, the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). However, "[a] qualified immunity defense to § 1983 liability alters the usual summary

judgment burden of proof; once an official pleads the defense of qualified immunity in a § 1983 action, the burden then shifts to the plaintiff." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *see also Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) ("Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised."). Nonetheless, all of the evidence and reasonable inferences deducted therefrom are to be construed in a light most favorable to the nonmoving party. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009); *see also Brown*, 623 F.3d at 253 ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." (citation omitted)).

### B. Qualified Immunity

The qualified immunity defense has two prongs, and a court may rely on either prong of the defense in its analysis. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). The court first decides whether an official's conduct violated a constitutional right of the plaintiff that was clearly established at the time of the violation. *Id.* To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). The unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact act have been illegal. *Id.* at 236-37.

If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were "objectively reasonable" in light of "law which was clearly established at the time of the disputed

action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004) (citations omitted). Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

As the Fifth Circuit has noted, "the analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits). Otherwise, a successful claim of qualified immunity . . . would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine." *Hare v. City of Corinth*, 135 F.3d 320, 328 (5th Cir. 1998). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Thompson v. Upshur County*, 245 F.3d 447, 460 n.9 (5th Cir. 2001) (quotation marks and citation omitted). Again, the plaintiff bears the burden to demonstrate objective unreasonableness. *Id.* at 460.

### III.
### DISCUSSION

The precedent in this circuit is that qualified immunity must be analyzed as to each individual Defendant and the Defendants may not be lumped together in analysis. *See Meadours*

*v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007) ("we should consider the conduct of each officer independently" and "the district court erred in considering the officers' actions collectively").

Here, a video surveillance camera captured the relevant acts and omissions at the time of Mr. Monroe's suicide and that footage is not disputed. The video speaks for itself and clearly allows the viewer to see what occurred. Defendant Laws' conduct of watching Monroe wrap the phone cord around his neck and then failing to assist Monroe to free him from the cord will have to be analyzed by a jury to determine whether his conduct was reasonable under the circumstances and whether there were other reasonable actions that Laws could have taken to prevent Monroe's death—including entering the cell with a weapon, cutting Monroe loose immediately after he lost consciousness, enlisting aid from other inmates, etc.

Likewise, because the Court finds that evidence clearly demonstrates a high and obvious risk of suicide by maintaining a policy of housing suicidal inmates in a cell with a phone (and attached cord), Defendants Brixey and Cogdill are not entitled to summary judgment on the basis of qualified immunity.[8] A jury will have to make the determination, after considering the facts and circumstances presented, whether certain policies at Coleman County Jail were obviously likely to lead to serious harm or death—including the policy of having one jailer on duty at a time with instructions not to enter a cell until backup later arrived. Deliberate indifference implies an official's actual knowledge of facts showing that a risk of serious harm exists as well

---

[8]Keeping in mind that Plaintiffs do not allege that Defendant Cogdill was present at the time of the suicide, "[s]upervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivations; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *Mouille v. City of Live Oak,* 977 F.2d 924, 929 (5th Cir. 1992); *Tompkins v. Belt,* 828 F.2d 298 (5th Cir. 1987). As to a sheriff in particular, the standard is the same. *Bigford v. Taylor,* 834 F.2d 1213, 1220 (5th Cir. 1988).

as the official's having actually drawn that inference. *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998). The jury will likewise make the determination as to whether Sheriff Cogdill and Administrator Brixey subjectively appreciated that Monroe's prior stated suicide intent and actual attempts while housed at Coleman County Jail should have caused them to draw the inference that a phone cord might be an obvious risk of death by strangulation or hanging.[9] It is undisputed that all named Defendants were aware of Mr. Monroe's attempts at suicide the days immediately preceding the incident on the morning of October 1, 2017. "[T]he law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk. . . ." *Hare v. City of Corinth,* 135 F.3d 320, 328-29 (5th Cir. 1998). "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Yet, it is not an impossible standard and the suicide of an inmate/detainee is almost never watched by a jail official as it occurs. While, negligence cannot form the basis for a § 1983 claim, s*ee, e.g., Farmer v. Brennan*, 511 U.S. 825, 835 (1994), a jury may determine that the facts, circumstances, and obvious inferences at issue here amount to more than mere negligent (or even grossly negligent) conduct. In order to demonstrate deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Domino,* 239 F.3d at 755 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

---

[9]After all, Monroe had attempted to first strangle himself with a sheet/blanket and then used a sheet/blanket to attempt to hang himself in the day or two prior to his actual successful suicide.

9

"[A]n official's failure to alleviate a significant risk that he should have perceived but did not" cannot amount to deliberate indifference. *Farmer*, 511 U.S. at 838. However, in *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395-97 (5th Cir. 2000), the sheriff was not only aware of facts indicating a serious risk—the detainee had tried to kill herself previously and a prior inmate had in fact killed himself on tie-off points in the same cell—but the sheriff also essentially ratified the decision to keep the detainee in that particular cell and *personally ordered* his deputies to give the detainee a blanket that they had previously withheld and that she then used to hang herself. Id. at 395. Here, the facts are very similar, except that the cell maintained a phone with a receiver cord that could easily be (and was) used by the inmate to hang himself.

Accordingly, a reasonable juror could determine that it was obvious that the likely consequence of each Defendant's actions and/or inactions were deliberately indifferent and amounted to a deprivation of civil rights. As stated by United States Court of Appeal for the Fifth Circuit, "[w]e express no opinion about the ultimate reasonableness of the officers' actions. It is for a jury to decide the factual disputes, and at this stage we cannot say the officers are entitled to qualified immunity." *Meadours*, 483 F.3d at 424. A reasonable jury could find that due to constitutionally deficient policies and actions/inactions of the Defendants, Mr. Monroe's death occurred and that Defendants' conduct was not reasonable in failing to implement more adequate and specific policies or take actions relating to suicide prevention.

## V.
## CONCLUSION

The Individual Defendants' Motion for Summary Judgment on the Issue of Qualified Immunity is **DENIED** for the reasons stated above, as well as those argued by the Plaintiffs in their Response. The stay of discovery not related to the issue of qualified immunity, imposed in the Court's prior Order, is **LIFTED**.

SO ORDERED this 25th day of April, 2019.

_____
SAM R. CUMMINGS
SENIOR UNITED STATE DISTRICT JUDGE