# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 2, 2021

Lyle W. Cayce
Clerk

No. 19-10798

PATSY K. COPE; ALEX ISBELL, *as Dependent Administrator of and, on behalf of* ESTATE OF DERREK QUINTON GENE MONROE, AND HIS HEIRS AT LAW,

*Plaintiffs—Appellees,*

*versus*

LESLIE W. COGDILL; MARY JO BRIXEY; JESSIE W. LAWS,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 6:18-CV-15

---

Before STEWART, DENNIS, and HAYNES, *Circuit Judges.*

HAYNES, *Circuit Judge*:

This appeal concerns whether three officers employed by the Coleman County Jail are entitled to qualified immunity for claims regarding Derrek Monroe's death by suicide that occurred at the jail.[1] The district court determined that the officers were not entitled to qualified immunity.

---

[1] The suit was filed by Monroe's estate and his mother, Patsy Cope.

No. 19-10798

For the following reasons, we REVERSE its holding and RENDER judgment in the officers' favor.

## I.   Background

Monroe was arrested on September 29, 2017, and booked at the Coleman County Jail.  A screening form completed during intake indicated that Monroe said he "wished [he] had a way to" kill himself that day and that Monroe had attempted suicide two weeks prior.  The form also indicated that Monroe had previously received psychiatric services, had been diagnosed with "some sort of schizophrenia," and displayed other signs of mental illness and emotional disturbance.  Jail Administrator Mary Jo Brixey put Monroe on a temporary "suicide watch."  That afternoon, Monroe had a medical emergency, and he was taken to the Coleman County Medical Center for treatment.

Monroe returned to the jail the next day.  Cope alleges that "only about 17 minutes after returning to the Coleman County Jail[,] . . . [Monroe] attempted to commit suicide by hanging."  This attempt was unsuccessful. Cope alleges that Sheriff Leslie Cogdill spoke with Monroe and sought the intake form reflecting Monroe's mental health issues.  Instead of seeking emergency admission at a facility providing mental health treatment, Cogdill and Jailer Jessie Laws continued to hold Monroe in his cell.

On October 1, Laws began his shift at 7:00 a.m., as the only jailer on duty.  The jail typically has two jailers on duty during weekdays but only one during nights and weekends due to budgetary considerations.  The following incidents occurred[2] between 8:20 and 9:00 a.m.:

_____

[2] These events were captured on jail surveillance video.

2

No. 19-10798

Laws had a discussion with Monroe. A few minutes later, Monroe went to the phone in his cell and appeared to do something with it, and Laws then spoke to Monroe through the cell bars. After Laws unlocked Monroe's cell, Monroe exited the cell and walked toward a shower area, and Laws followed. A few minutes later, Monroe returned to his cell, and Laws locked the cell door and pocketed the key. Then, Monroe started to overflow his toilet, prompting Laws to turn off a water valve near the ceiling, which shut off water to Monroe's cell. Monroe became visibly angry and appeared to beat the toilet in his cell with a toilet plunger. Laws then began mopping the area outside of Monroe's cell. While Laws mopped, Monroe remained visibly upset, slamming the phone receiver against the wall several times.

Monroe wrapped the phone cord around his neck around 8:37 a.m., while Laws continued mopping. As Monroe strangled himself with the cord, Laws made a phone call to Brixey. Laws did not call Emergency Medical Services. About a minute or two after the strangulation began, Monroe's body stopped moving. Throughout the next five minutes, Laws looked into the cell several times, but he never unlocked or entered it.

After Brixey arrived at the jail around 8:47 a.m., Laws took the cell key out of his pocket, unlocked and entered the cell, and unwrapped the cord from Monroe's body. Neither Laws nor Brixey attempted to resuscitate Monroe, but they called paramedics, who began performing chest compressions around 8:54 a.m. Monroe was taken to the hospital, where he died the following day.

Cope sued Cogdill, Brixey, and Laws, alleging that they violated the Fourteenth Amendment's Due Process Clause because they were objectively

No. 19-10798

unreasonable in their treatment of a pretrial detainee and denied Monroe appropriate medical care.[3]

Cogdill, Brixey, and Laws moved for summary judgment on the basis of qualified immunity. The district court denied the motion. As to Laws, the district court determined that "watching Monroe wrap the phone cord around his neck and then failing to assist Monroe to free him from the cord will have to be analyzed by a jury to determine whether his conduct was reasonable under the circumstances." As to Cogdill and Brixey, the district court determined that they were not entitled to qualified immunity because "evidence clearly demonstrates a high and obvious risk of suicide by maintaining a policy of housing suicidal inmates in a cell with a phone (and attached cord)." Cogdill, Brixey, and Laws timely filed an interlocutory appeal.

## II.    Jurisdiction & Standard of Review

"Although a denial of a defendant's motion for summary judgment is ordinarily not immediately appealable, the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc).

We review the district court's denial of summary judgment de novo and apply the same legal standard as the district court. *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 461 (5th Cir. 2015). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute about a material fact is 'genuine' if the evidence is such that a

---

[3] Cope also sued Coleman County, alleging unconstitutional patterns or practices. The allegations against the county are not at issue here.

No. 19-10798

reasonable jury could return a verdict for the non-moving party." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 (5th Cir. 1999). Since this is an interlocutory appeal, we lack jurisdiction to determine whether any factual disputes are genuine, and we only consider, as a matter of law, if they are material. *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015).

### III.    Discussion

### A.    Legal Standards

### 1.    *Qualified Immunity*

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). There are two aspects to qualified immunity: whether the plaintiff has alleged a violation of a constitutional right and whether the right at issue was "clearly established" at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). Courts retain flexibility as to which step of the two-step process they consider first. *Id.* at 236. Still, often "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). This is especially true "with respect to questions that do not frequently arise." *Pearson*, 555 U.S. at 236.

We are bound by the restrictive analysis of "clearly established" set forth in numerous Supreme Court precedents. A right is "clearly established" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks and citation omitted). Courts must not "define clearly established law at a high

No. 19-10798

level of generality"; instead, their "inquiry must be undertaken in light of the specific context of the case." *Id.* at 12 (internal quotation marks and citations omitted). Therefore, unless existing precedent "squarely governs" the conduct at issue, an official will be entitled to qualified immunity. *See Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam); *Mullenix*, 577 U.S. at 12 (emphasizing that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" (internal quotation marks and citation omitted)).

Generally, to satisfy this standard, the plaintiff must "identify[] a case in which an officer acting under similar circumstances was held to have violated the [Constitution], and . . . explain[] why the case clearly proscribed the conduct of that individual officer." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020) (concluding the defendants were entitled to qualified immunity because the plaintiffs failed to identify an analogous case). While an exact case on point is not required, the confines of the officers' violation must be "beyond debate." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (internal quotation marks and citation omitted), *cert. denied*, 141 S. Ct. 1379 (2021) (mem.). Broad general propositions are not enough to overcome qualified immunity.[4] *Id.*

---

[4] The crux of the dissenting opinion is its rejection of this well-established rule. According to the dissenting opinion, "in the context of a deliberate indifference claim, clearly established rights may be defined generally." Dissenting Op. at 13 n.6. The dissenting opinion reaches this conclusion almost entirely based on its reading of *Jacobs v. West Feliciana Sheriff's Department*, 228 F.3d 338 (5th Cir. 2000), which supposedly denied qualified immunity on two deliberate indifference claims without identifying any factually analogous cases, Dissenting Op. at 12–13, 13 n.6. But nowhere in *Jacobs* did we purport to decide the question of the degree of specificity at which a clearly established right must be defined, and we certainly did not make any statements suggesting that deliberate indifference claims are subject to a different analysis than other claims. Perhaps more importantly, *Jacobs* preceded a series of Supreme Court decisions demanding a high degree of specificity and the identification of an analogous case to overcome qualified immunity.

No. 19-10798

Supreme Court cases have been repeated and consistent on this high standard at the second prong. For example, in *Mullenix*, despite indications that the officer was told to stand down and he nonetheless shot from a bridge at a moving car on the street, the Court concluded qualified immunity was appropriate. 577 U.S. at 9–10, 19. Similarly, in *Kisela v. Hughes*, the Court determined that a police officer was entitled to qualified immunity after he repeatedly shot a woman who, although holding a kitchen knife, was apparently calm and was separated from the officer by a chain-link fence with a locked gate. 138 S. Ct. 1148, 1151–52, 1154–55 (2018) (per curiam); *see also Brosseau*, 543 U.S. at 196–97, 201 (ruling that a police officer did not violate a clearly established right when she shot a fleeing suspect in the back).

It might seem that things changed with the recent opinion in *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam). But, instead, that decision emphasizes the high standard. In *Taylor*, the Supreme Court vacated our grant of qualified immunity to a group of corrections officers for an alleged Eighth Amendment violation. 141 S. Ct. at 53. But that was based upon the

---

*E.g. White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Mullenix*, 577 U.S. at 12. Regardless of what *Jacobs* may have done twenty-one years ago, we must enforce the heightened requirements that the Supreme Court has set forth in its recent qualified immunity decisions.

 Given the clear and unequivocal language used by the Supreme Court in imposing these requirements, we see no basis for recognizing a special exception for deliberate indifference claims. Moreover, as the dissenting opinion recognizes, we have applied the high-specificity rule to deliberate indifference claims before. *See* Dissenting Op. at 13 n.6 (citing *Cleveland v. Bell*, 938 F.3d 672, 677 (5th Cir. 2019)). Even if these precedents are "misguided," as the dissenting opinion claims, Dissenting Op. at 13 n.6, they are nonetheless binding. *See, e.g.*, *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (per curiam) ("Under our rule of orderliness, one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." (quotation omitted)). Rather than follow the dissenting opinion's foreclosed approach, we proceed in accordance with the detailed directives of the Supreme Court.

No. 19-10798

Supreme Court's conclusion of how "particularly egregious" and over the top the misconduct at issue was: the officers had allegedly placed the plaintiff, an inmate, in a cell covered in "massive amounts of feces" for four days, only to transfer him to a "frigidly cold cell" where he was "left to sleep naked in sewage." *Id.* (internal quotation marks and citation omitted).  Further, the officers acted with a marked callousness; for example, when placing the plaintiff in the second cell, one officer allegedly said that he hoped the plaintiff "would f***ing freeze." *Id.* at 54 (internal quotation marks and citation omitted).  Accordingly, under *Taylor*, plaintiffs are only excused of their obligation to identify an analogous case in "extreme circumstances" where the constitutional violation is "obvious." *Id.* at 53–54 (internal quotation marks and citation omitted); *see also Joseph*, 981 F.3d at 330 (explaining that the Supreme Court's qualified immunity precedents allow for the "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear" (cleaned up)).

## 2.     *Pretrial Detainees' Right to Medical Care*

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment." *Estate of Henson*, 795 F.3d at 462.  A state may detain defendants for trial; its "exercise of its power to hold detainees and prisoners, however, brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being." *Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc).

"Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care." *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019).  We have articulated "proper legal measures of a State's duty to tend to a pretrial detainee posing a risk of suicide," which depend on whether

No. 19-10798

the plaintiff challenges the conditions of confinement or if he alleges episodic acts or omissions. *Hare*, 74 F.3d at 643.

When, as in this case, "a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the proper inquiry is whether the official had a culpable state of mind in acting or failing to act."[5] *Id.* An official "violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference." *Estate of Henson*, 795 F.3d at 464 (internal quotation marks and citation omitted). Although deliberate indifference is a high bar and requires egregious conduct, plaintiffs need not prove that the official acted with the intent to cause harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (stating that deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). "Deliberate indifference is an extremely high standard to meet" but can be satisfied by a "wanton disregard for [an inmate's] serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). In the context of inmate suicide, "to defeat qualified immunity, the plaintiffs must establish that the officers . . . were aware of a substantial and significant risk that [the detainee] might kill [him]self, but

---

[5] In contrast, if a pretrial detainee challenges "general conditions, practices, rules, or restrictions of pretrial confinement," we evaluate whether the condition was "reasonably related to a legitimate governmental objective." *Hare*, 74 F.3d at 644–47; *see also Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Conditions of confinement may be explicit (for example, rules about disciplinary segregation) or they may be de facto (that is, acts that are proven to be a pervasive practice). *Estate of Henson*, 795 F.3d at 463. Conditions are not "reasonably related to a legitimate governmental objective" if they are "arbitrary or purposeless"; in that case, "a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." *Bell*, 441 U.S. at 539. "[T]here is no rule barring a plaintiff from pleading both alternative theories." *Estate of Henson*, 795 F.3d at 464.

No. 19-10798

effectively disregarded it." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000).

When multiple officials are named as defendants, we "evaluate each officer's actions separately, to the extent possible." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012). Accordingly, each officer's actions are discussed separately, to the extent possible, below.[6]

## B.    Laws's Actions

Laws's actions fall under a "deliberate indifference" standard "[b]ecause the focus of the claim is one individual's misconduct." *Shepherd v. Dall. Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009). If this case went to trial, then, the questions would be whether Laws (1) "had subjective knowledge of a substantial risk of serious harm"[7] and (2) "responded to that risk with

---

[6] In her brief, Cope addresses her claims against Cogdill and Brixey together. The claims center on supervisory decisions made at the jail, and it is unclear exactly who was responsible for each decision. During oral argument, Defendants' counsel conceded that Brixey "was not involved in placing [Monroe] in the cell." As Cope's claim against Brixey is predicated on Brixey's involvement in this placement decision, then counsel's concession demonstrates that Brixey should prevail. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (explaining that "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must [show] that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). However, since we conclude that she is entitled to qualified immunity either way, we need not analyze this issue further.

[7] Cope argues that the Supreme Court announced an objective standard for pretrial detainees and that the standard of reasonableness employed here should be objective, not subjective. She relies on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). But *Kingsley* did not address claims regarding medical treatment. Rather, the Supreme Court held that plaintiffs alleging excessive force must show that the force was objectively excessive. *Id.* at 396–97. Since *Kingsley* discussed a different type of constitutional claim, it did not abrogate our deliberate-indifference precedent. Thus, Cope must prove subjective knowledge. *See Hare*, 74 F.3d at 643. We recently clarified, however, that subjective intent of harm does not have to be proven. *Dyer*, 964 F.3d at 380.

No. 19-10798

deliberate indifference." *Estate of Henson*, 795 F.3d at 464 (internal quotation marks and citation omitted). At the very least, Cope has presented sufficient evidence to create a genuine dispute of material fact as to whether Laws had subjective knowledge of the risk of serious harm. Brixey testified that Laws called her saying that Monroe was trying to hang himself. Just one day prior, Laws had witnessed Monroe attempt suicide by hanging. Notably, Laws appears to concede the point, stating "[t]here is no dispute that Laws knew Monroe was potentially suicidal the morning of the suicide." In the context of deliberate indifference, the question is "whether the unlawfulness of the Officers' conduct was clearly established at the time." *Dyer v. Houston*, 964 F.3d 374, 383 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) (alteration and internal quotation marks omitted). Therefore, our analysis turns to this second prong: whether the unlawfulness was clearly established.

1.    ***Waiting to Enter Monroe's Cell Until Back-Up Arrived***

The first issue we address is whether Laws's failure to immediately intervene after Monroe strangled himself and decision to instead wait until another jailer arrived was constitutionally unlawful under clearly established law. Laws's decision not to enter Monroe's cell was in line with his training and the jail's policy that jailers not enter the cell until back up arrives. Cope argues that, notwithstanding the policy, Laws should have requested permission to enter the cell when he called Brixey and that even if Brixey denied permission, Laws should have entered the cell to render aid because failing to do so unconstitutionally deprived Monroe of medical assistance.

To violate the constitution in this context, Laws must have "effectively disregarded" the risk to Monroe's health. *Jacobs*, 228 F.3d at 395. After Monroe began strangling himself, Laws called Brixey. Once Brixey arrived, Laws entered the cell to unwrap Monroe's body from the

No. 19-10798

cord.[8]  Waiting for Brixey to arrive was in line with the jail's policy, and we have held that a jailer supervising a suicidal inmate acted reasonably when he "essentially follow[ed] orders" and "the orders he received . . . were not facially outrageous." *Id.* at 398.  Moreover, in affirming a grant of qualified immunity in an inmate-suicide case in which the prison official waited for help to arrive, we recently stated that requiring a jailer to enter a cell without back-up "would create an unenviable Catch-22: Either enter the cell alone and risk potential attack, or take appropriate precautions and incur liability under § 1983." *Arenas*, 922 F.3d at 621.

We conclude that Laws's decision to wait for Brixey before entering the cell did not violate any clearly established constitutional right. Specifically, it would not be "sufficiently clear that every reasonable official would have understood that" waiting for a backup officer to arrive in accordance with prison policy "violates [a pretrial detainee's] right." *See Mullenix*, 577 U.S. at 11 (internal quotation marks and citation omitted) (addressing excessive force).  Since our case law supports that jailers who follow policies aimed at protecting the jailer should not be considered deliberately indifferent to an inmate's medical need, *see Arenas*, 922 F.3d at 621, Laws is entitled to qualified immunity on this claim.

---

[8] In addition to waiting to enter the cell until Brixey arrived, Laws also did not try to revive Monroe while waiting for emergency personnel. But "a due process claim [can] never be based on a jail official's negligent failure to provide either medical care or protection from harm." *Hare*, 74 F.3d at 642; *see also Dyer*, 964 F.3d 381 (distinguishing between negligence and deliberate indifference).  Because negligence does not support a deliberate indifference claim, Laws's failure to resuscitate Monroe did not rise to the level of deliberate indifference and therefore cannot be a violation of clearly established law.

No. 19-10798

### 2.     *Failure to Call Emergency Medical Services*

Cope further argues that Laws should have immediately called 911, which Laws failed to do, after calling Brixey.  A jailer has a "duty to not act with subjective deliberate indifference to a known substantial risk of suicide" and accordingly cannot "disregard . . . precautions he kn[ows] should be taken." *Jacobs*, 228 F.3d at 397–98.  In general, a prison official who knew of a serious threat to inmate safety and responded *reasonably* cannot be held liable for his actions.  *Farmer*, 511 U.S. at 844.  But watching an inmate attempt suicide and failing to call for emergency medical assistance is not a reasonable response.  This was especially true in the situation at hand, where jail policy did not permit Laws to personally enter the jail cell to assist Monroe until a second staff member arrived.  Calling for emergency assistance was a precaution that Laws knew he should have taken, and failing to do so was both unreasonable and an effective disregard for the risk to Monroe's life.  *See Jacobs*, 228 F.3d at 395.  For these reasons, we now make clear that promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency—e.g., suffering from a suicide attempt—constitutes unconstitutional conduct.

As explained above, in determining whether the law was clearly established at the time the conduct occurred, constitutional rights must not be defined at a high level of generality.  *Mullenix*, 577 U.S. at 12.  Until today, we have not spoken directly on whether failing to call for emergency assistance in response to a serious threat to an inmate's life constitutes deliberate indifference.  *See Shepard v. Hansford Cnty.*, 110 F. Supp. 3d 696, 711, 713 (N.D. Tex. 2015) (noting a lack of Fifth Circuit precedent on, among other things, an official's failure to call 911).  Recently, in *Dyer*, we engaged in a similar discussion but did not specifically address the 911 issue.  964 F.3d at 381–85.  In that case, officers were aware that the detainee was "in the grip

No. 19-10798

of a drug-induced psychosis" and had repeatedly "struck his head violently against the interior of [the] patrol car"; nonetheless, the officers neither sought any medical care nor informed the jail officials that the detainee had suffered a head injury. *Id.* at 381–82. Indeed, they did nothing at all to address his additional injuries; it was another official who finally reacted two hours later.[9] We concluded that existing precedent showed that officers who, "despite being aware of the detainee's dire condition[,] . . . did nothing to secure medical help" at all were on "fair warning" that their behavior was deliberately indifferent. *Id.* 384–85 (internal quotation marks and citation omitted). Here, in contrast, Laws did *something*: he called Brixey for assistance and she called 911, albeit not as promptly as should have been done. Existing case law, therefore, was not so clearly on point as to "place[] the statutory or constitutional question beyond debate[,]" and we conclude that the right was not clearly established. *Morgan*, 659 F.3d at 372. Unlike the officers in *Taylor*, Laws did nothing so extreme or even close as forcing an inmate to sleep naked in raw sewage. 141 S. Ct. at 53. The failings of Laws are in a time of minutes and lack of complete action, not days and affirmative misconduct.[10] *Cf. id.* Accordingly, even though Laws fails on the first prong, he is nonetheless entitled to qualified immunity.

---

[9] Unlike this case, in *Dyer* the person in question (Graham) had originally come to the officers' attention due to a 911 call. *Id.* at 378. Paramedics had examined Graham and released him to the police. *Id.* However, during the trip to the police department, Graham continued to injure himself with at least forty head bashes. *Id.* at 378–79. It was not until two hours later, when a sergeant noted Graham's labored breathing, that paramedics were summoned. *Id.* at 379. In this case, by contrast, the delay was minutes, not hours, and Laws was at least attempting to obtain help, unlike the officers in *Dyer*, who never did anything to help.

[10] *Converse v. City of Kemah*, 961 F.3d 771 (5th Cir. 2020), also demonstrates the need for and importance of similar cases. Like this case, *Converse* concerned Fourteenth Amendment claims against a group of officers arising from a detainee's suicide. 961 F.3d at 774. Based on the facts of that case, we held that the officers were not entitled to qualified

No. 19-10798

### C.    Cogdill's & Brixey's Actions

Because Cope's briefing focuses on deliberate indifference, she appears to be arguing an episodic-acts theory of liability.  To be liable, therefore, Brixey and Cogdill must have (1) "had subjective knowledge of a substantial risk of serious harm" and (2) "responded to that risk with deliberate indifference." *Estate of Henson*, 795 F.3d at 464 (internal quotation marks and citation omitted).  Even if their actions were constitutionally unlawful, they are entitled to qualified immunity if the constitutional right at issue was not "clearly established." *Pearson*, 555 U.S. at 232.

#### 1.    *Placement of Monroe in a Cell Containing a Phone Cord*

Cope contends that Brixey and Cogdill were deliberately indifferent by housing Monroe in a cell "with the means of committing suicide readily available to him in the form of a lengthy telephone cord."

We have held that a sheriff was deliberately indifferent when he was "fully aware that [the detainee] had actually attempted suicide once before, regarded her as a suicide risk at all times during her detention, and yet still . . . ordered loose bedding to be given to her" and placed her in a cell with "several 'tie-off' points (bars and light fixtures from which a makeshift rope could be suspended)" after "another inmate . . . had previously committed suicide in the very same cell by hanging himself with a sheet from one of these tie-off points." *Jacobs*, 228 F.3d at 390, 396.  Similarly, in *Converse v. City of Kemah*, we recently determined that officers who gave a suicidal inmate a

---

immunity at the motion-to-dismiss stage.  *Id.* at 773.  While making some general statements, the actual course of our reasoning in *Converse* demonstrates that we did not rely merely on an abstract legal proposition when denying the defendants qualified immunity; rather, we denied qualified immunity because we identified a prior precedent, *Jacobs*, with "closely analogous" facts.  *Converse*, 961 F.3d at 777–80.  Thus, we adhered to the analogous-case requirement in *Converse*, and consequently, we do so here as well.

No. 19-10798

blanket were not entitled to qualified immunity. 961 F.3d 771, 773–74 (5th Cir. 2020). We noted that the plaintiffs' allegations supported, among other things, that the officers were aware that "bedding hanging was the most frequent method of suicide" in Texas jails. *Id.* at 777.

Here, Brixey had placed Monroe on a temporary suicide watch, and Cogdill was aware that Monroe had attempted suicide by hanging the day before. However, the record does not suggest that any inmate had previously attempted suicide by strangulation with a phone cord; nor is there non-speculative evidence that Brixey and Cogdill were aware of this danger.[11] The

---

[11] In light of multiple suicides in Texas jails involving phone cords, in 2015, the Texas Commission on Jail Standards issued a memorandum recommending that phone cords in jails "be no more than twelve (12) inches in length." The phone cord in Monroe's cell is longer than the recommended length. In certain circumstances, the Supreme Court has indicated that subjective knowledge may be inferred based on circumstantial evidence, *Farmer*, 511 U.S. at 842–43. Here, however, the Commission memorandum is insufficient to support the inference that Brixey and Cogdill had subjective knowledge of the risk posed by the lengthy phone cord. Specifically, the Supreme Court has approved reliance on circumstantial evidence if the relevant risk "was longstanding, pervasive, well-documented, or expressly noted by [jail] officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (internal quotation marks omitted). There is nothing like that here and certainly no evidence that either Brixey or Cogdill ever received or reviewed the Commission's memorandum prior to Monroe's suicide.

Further, even at the summary judgment stage, it would go too far to infer that Brixey and Cogdill were aware of the Commission's recommendations simply due to their employment in the Texas jail system at the time the memorandum was written—just because information is *available* to a defendant does not mean she has been *exposed* to it. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988) (rejecting the plaintiff's theory that the Governor of Pennsylvania could be inferred to have personal knowledge of state employees' acts of retaliatory harassment "because of numerous articles that appeared in newspapers throughout the state and through the introduction of a legislative resolution seeking an investigation into [the harassment], the filing of grievances with the Governor's office of administration, and telephone calls and correspondence with the office of the Lieutenant Governor"). Consequently, there is insufficient evidence that Brixey and Cogdill were exposed to the Commission's memorandum to create a genuine dispute of

No. 19-10798

danger posed by the phone cord was not as obvious as the dangers posed by bedding, which is a well-documented risk that has been frequently used in suicide attempts. *Id.* at 777. We therefore conclude, under these facts and circumstances, that Brixey's and Cogdill's holding of Monroe in a cell containing a phone cord did not violate a clearly established constitutional right.[12]

### 2.  *Staffing the Jail with Only One Weekend Jailer*

Cope also alleges that Brixey and Cogdill acted with deliberate indifference when they staffed the jail with just one jailer even though they knew both that Monroe was on suicide watch and that the jail's policy did not allow for the jailer to intervene until backup arrived.

Coleman County employs only one weekend jailer due to budgetary constraints. Our precedent suggests that municipalities, not individuals, should generally be held liable for city policies.[13] *See Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997). Thus, at the time of the suicide, no clearly established

---

material fact as to their subjective knowledge of the risk posed by the phone cord in Monroe's cell.

[12] Recently, in *Sanchez v. Oliver*, we determined that summary judgment on the plaintiff's deliberate indifference claim was inappropriate where the defendant had placed a suicidal inmate "in general population, with ready access to blankets, other potential ligatures, and tie-off points." 995 F.3d 461, 473 (5th Cir. 2021). *Sanchez* did not involve the possible dangers of phone cords; hence, whatever its import, *Sanchez* did not hold that, at the time relevant for this case, it was clearly established that a defendant violates the Constitution by placing a suicidal inmate in a cell containing a phone cord. In short, *Sanchez* is not contrary to our conclusion here.

[13] Indeed, Cope brought such § 1983 claims against Coleman County, along with claims under the Americans with Disabilities Act and the Rehabilitation Act. These claims have been stayed since July 2019 to permit the completion of this interlocutory appeal. Although we express no view as to the viability of these claims, we note that our decision therefore does not end Cope's lawsuit entirely.

No. 19-10798

precedent suggested that Brixey and Cogdill could be liable under an
episodic-acts theory for staffing the jail in line with Coleman County's budget
and policies. Cope has cited no case law providing that jailers must deviate
from the typical staffing procedures if they believe that a detainee is a suicide
risk. We, therefore, hold that Brixey's and Cogdill's decision to staff only
one weekend jailer did not violate any clearly established constitutional right.

## IV.   Conclusion

Based upon the above analysis, all three defendants are entitled to
qualified immunity. We REVERSE the district court's decision and
RENDER judgment in the officers' favor.

No. 19-10798

James L. Dennis, *Circuit Judge*, dissenting:

Small county jails are no strangers to in-custody suicides. Indeed, the suicide rate for local jails of 100 beds or fewer is nearly ten times that of the nation as a whole. *The Role of Corrections Professionals in Preventing Suicide*, National Institute of Corrections, https://nicic.gov/role-corrections-professionals-preventing-suicide (last visited June 17, 2021). Located in a pocket of rural Central Texas, Coleman County Jail is one such small local jail. It comprises four cells and has a staff of seven—five jailers, a jail administrator, and a sheriff—for an inmate population of up to nine persons. And, like so many other similarly sized jails, it has been the scene of an in-custody suicide—the self-strangulation of detainee Derrek Monroe via a lengthy telephone cord that was, inexplicably, contained inside the cell in which jail staff isolated him.

Monroe's tragic death resulted not just from egregious acts and omissions by Coleman County Jail staff after he was taken into custody on September 29, 2017. The jail leadership's decision to implement policies that they knew to be inadequate also contributed to Monroe's avoidable suicide. In particular, the jail maintains only one jailer on duty during nights and weekends. But jail policy forbids a jailer from entering a cell without backup support. Thus, on nights and weekends, jail policy effectively prevents the lone jailer from rescuing a known suicidal detainee who is actively committing suicide inside a cell. In light of the manifest danger this situation presents to suicidal detainees, Sheriff Leslie Cogdill and Jail Administrator Mary Jo Brixey, the jail's second-in-command, agree that the policy of staffing the jail with only one jailer on nights and weekends—a policy they administer—is "just not safe" because it creates the conditions that can lead to tragedies like the suicide in this case of Derrek Monroe.

No. 19-10798

A few months before Monroe's suicide, Coleman County Jail staff attended a training where they learned that the suicide rate for all county jails is nine times greater than in the general population. But trainings and academic presentations were not the only source of jail officials' knowledge of the risks of in-custody suicides. Prior to their tenures with the County Jail, both Sheriff Cogdill and Jail Administrator Brixey had worked at the Coleman City Jail when inmates had committed suicide, including, as in this case, suicide by strangulation. One suicide involved a detainee who used a ligature—his shoestrings—to choke himself to death in manner similar to the way Monroe strangled himself with the phone cord. In short, Defendants here were acutely aware of the danger of suicide at small county jails like the very one they were charged with overseeing.

On Friday, September 29, 2017, Derrek Monroe was delivered into the custody of the Coleman County Jail in Texas. During booking, Monroe informed jailhouse authorities that he had attempted suicide by ingesting pills just two weeks before and that he was presently having suicidal thoughts. This information was immediately relayed to Sheriff Cogdill and Jail Administrator Brixey. On Monroe's first night in the jail, Cogdill chose to house him in Cell 2 in the company of several other detainees. Cogdill's decision was in keeping with the training he had received, which advised against "isolat[ing]" suicidal inmates.

The following day, Saturday, September 30, Monroe had a seizure requiring treatment at a local hospital. After being successfully treated, Monroe was transported back to the County Jail. Jailer Jessie Laws, who, per jail policy, was the only jailer on duty, placed Monroe back in Cell 2 and in the company of other inmates. Laws watched as Monroe proceeded to attempt suicide twice in rapid succession. Monroe sat against the wall, wrapped a blanket around his neck, and, according to one of his cellmates, tried to "choke himself out." After that didn't work, Monroe stood up,

No. 19-10798

climbed atop the cell's latrine, and tried to hang himself by tying the cloth to a fixture before "bomb div[ing]" off.  The knot gave way, and Monroe crashed to the floor of the cell.  Undeterred, Monroe wrapped the sheet around his neck again.  Only at this point did Laws call Sheriff Cogdill for backup.  After arriving at the scene, Cogdill decided to remove Monroe from Cell 2 and, with the assistance of Laws, to isolate Monroe in Cell 3, the jail's only single-occupancy cell.  Cogdill's decision to relocate Monroe to an isolation cell was directly contrary to his training, which had instructed him that isolating a suicidal detainee is a dangerous and disfavored policy.  Jail Administrator Brixey, was aware of and effectively ratified Cogdill's decision.

In addition to the risks created by isolating Monroe in Cell 3, the cell contained an obvious potential ligature for suicide: a phone mounted to the wall with a thirty-inch telephone cord.[1]  Two years earlier, in 2015, the Executive Director of the Texas Commission on Jail Standards ("the Texas Jail Commission") circulated a memorandum addressed to "All Sheriffs and Jail Administrators" warning jail officials that four suicides involving phone cords had occurred in Texas jails in the span of eleven months.  Based on these multiple suicides, the Texas Jail Commission notified Sheriffs and Jail Administrators that "**ALL** phone cords be no more than twelve (12) inches in length."

Cogdill was also aware that Coleman County Jail's own policy required that a suicidal detainee—like Monroe—"be transferred to a facility better equipped to manage an inmate with mental disabilities" if doing so was necessary in order to protect the inmate, and, in fact, had previously

---

[1] The phones are operated by a private company, City Telecoin, that charges inmates for outgoing calls.  Coleman County receives a portion of the revenue from these calls.

No. 19-10798

authorized transfers of inmates to other facilities when his inmate population reached 9, the maximum number of inmates the Texas Jail Commission permitted to be supervised by a single jailer. Despite this guidance and Cogdill's awareness that Monroe could be transferred to a more suitable facility, Cogdill chose to keep Monroe at the Coleman County jail and to house him in isolation in a cell with a thirty-inch phone cord. Late Saturday afternoon, after Monroe was relocated to Cell 3, a mental health evaluator from Central Texas Mental Health and Mental Retardation Services, an outside agency, interviewed Monroe, who told her, "The first chance I get[,] it's over." Following the interview, the mental health evaluator met with Cogdill and Brixey and debriefed them on her conversation with Monroe. The MHMR staffer advised that jail staff observe Monroe at least every 15 minutes instead of every 30 minutes as the jail had been doing. Cogdill and Brixey agreed that staff would monitor Monroe in 15-minute intervals. But based on Monroe's suicidal history, the jail's suicide prevention plan mandated that he be classified as a "high risk" of suicide and, accordingly, that staff observe him not less than every five minutes.

Throughout Saturday night and into the morning of Sunday, October 1, the jailer on duty, per the instructions of Cogdill and Brixey, monitored Monroe in 15-minute intervals. At 7 a.m., Jailer Jessie Laws started his shift. Laws was the only jailer on duty, and he continued the practice of monitoring Monroe every 15 minutes. Laws knew from Monroe's suicide attempts the day before that Monroe was definitely suicidal.

Though jailers are prohibited from entering a jail cell unless back-up personnel are present, Brixey, via phone, authorized Laws to escort Monroe, who was unrestrained, from Cell 3 to the shower and then back to the cell,

No. 19-10798

even though Laws was unarmed.[2]  Minutes later, Monroe became agitated and, at 8:37 a.m., began strangling himself by wrapping the thirty-inch telephone cord phone cord several times tightly around his neck.  Within a minute or two, Monroe's body became motionless.  Maj. Op. at 3.  Laws stood on the other side of the bars from Monroe's cell, mere steps away and watched.

The simple, obvious, and safe response —indeed, the one that Laws was specifically trained to undertake and that was required of him by jail policy—was to immediately contact and summon by phone emergency medical services (EMS).  Laws knew that Monroe needed immediate help because Laws was aware that a person who is being strangled can suffer brain damage in less than 10 minutes.  He also knew that EMS was available 24/7 and would come immediately in response to his call.  Yet Laws failed to call EMS.  When asked later why he didn't call, Laws said, "Honestly, I don't know."  Instead of contacting EMS, Laws called his superiors, Cogdill and Brixey,[3] even though he knew they were off-duty.  Laws requested that Cogdill and return to the jail because of Monroe's suicidal actions with the thirty-inch telephone cord.  In speaking with his superiors, Laws failed to ascertain their precise locations and thus did not know if they could arrive within the critical period before Monroe would suffer serious brain damage.

---

[2] None of the jail officials explain the seemingly incongruous policy of forbidding a jailer from entering a detainee's cell without another jail officer present—regardless of whether the detainee is restrained—but permitting a lone officer to remove an unrestrained detainee from his cell and then to escort that detainee through the jail's hallways and into its shower area before escorting the detainee back to his cell.

[3] Laws also called Deputy Tucker, an off-duty deputy.  The summary-judgment evidence does not reveal Deputy Tucker's first name nor the contents of Laws's conversation with Tucker.

No. 19-10798

After Laws made these calls—and with no assurance of when his supervisors would arrive at the jail—he continued merely to stand outside Monroe's cell, watching and waiting. Monroe, according to Laws, was motionless and silent as the cord remained wrapped around his neck. Significantly, Laws did not retrieve the beathing mask he would need in order to perform rescue breathing on Monroe once Brixey or Cogdill arrived. At nearly 8:48 a.m., almost ten minutes after Monroe wrapped the phone cord around his neck, Brixey made it to the jail. She and Laws entered Cell 3, and Laws unwound and unwrapped the thirty-inch cord from Monroe's neck. He said he did not apply chest compressions because Monroe still had a pulse. Brixey quickly left the cell to call emergency services. Meanwhile, Monroe could not perform rescue breathing because he had failed to get the breathing mask. Two minutes after completing her call, Brixey went to locate the breathing mask. Ultimately, Laws did not commence rescue breathing until more than 5 minutes after Brixey arrived. EMS arrived at 8:54 a.m., approximately five minutes after Brixey called. By this point, sixteen minutes had elapsed since Monroe cinched the cord fast around his neck. Although the first responders tried to save Monroe, their resuscitative efforts came too late, and Monroe died in the hospital the next day. Following Monroe's death, Coleman County jail officials had the phone cord in Cell 3 shortened in response to Texas Jail Commission's recommendation.

Detainee Monroe's death by his own hand with a thirty-inch cord in plain sight of a jailer while emergency medical services were on duty only five minutes away is especially tragic. In this interlocutory appeal from the district court's denial of qualified immunity, the legal questions for this court are (1) whether the acts and omissions of each of the defendants individually amounted to deliberate indifference and therefore violated Monroe's constitutional rights and (2) if so, whether Monroe's constitutional right to be free from each Defendants' deliberate indifference was clearly established

No. 19-10798

at the time of the violation.  An officer's conscious disregard of an inmate's known risk of suicide constitutes deliberate indifference in violation of a detainee's constitutional due process rights.  *See Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020).  And that incontestable principle has been established for decades in this circuit.  *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000) ("[T]o defeat qualified immunity, the plaintiffs must establish that the officers . . . were aware of a substantial and significant risk that [the detainee] might kill [him]self, but effectively disregarded it."); *accord Converse*, 961 F.3d at 775 ("We have repeatedly held that pretrial detainees have a . . . right to be protected from a known risk of suicide.  And it is well-settled law that jail officials violate this right if 'they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference.'" (internal citations omitted) (quoting *Hare v. City of Corinth* (*Hare II*), 74 F.3d 633, 650 (5th Cir. 1996) (en banc)).

In this case, Defendants were all aware of Laws's risk of suicide.  Their responses to this known risk convince me that a reasonable jury could find that they each effectively disregarded the risk by acting in a manner that they knew or believed was likely inadequate in light of the circumstances.  First, based on Laws having watched Monroe wrap the thirty-inch phone cord around his neck and yet failing to promptly contact emergency services—in direct contravention of his training—a reasonable jury could find that Laws recognized that Monroe was at risk of committing suicide but deliberately disregarded it by not taking the one action he knew would be the most likely to save Monroe's life.  Second, Cogdill had been trained to avoid isolating suicidal inmates, yet he chose to remove Monroe from Cell 2 where there were other inmates and to relocate Monroe to Cell 3 by himself, a decision Brixey ratified.  Compounding the dangers of isolation, Cell 3 had a thirty-inch telephone cord—an obvious potential suicidal ligature for a known suicidal inmate, like Monroe, who had just attempted to strangltehimself to

No. 19-10798

death the previous day.  In addition to the obviousness of the danger posed by the lengthy cord, a jury could infer that Cogdill and Brixey had received guidance from the Texas Jail Commission recommending jails limit the length of phone cords to no more than 12 inches and yet ignored this recommendation.

Moreover, the risks of isolating Monroe and of the lengthy cord in Cell 3 could have been eliminated by transferring Monroe to a better equipped facility, an option Cogdill knew he could employ.  Cogdill and Brixey also could have reduced the risk of harm to Monroe by maintaining a second jailer on duty during when the jail had custody of a suicidal inmate.  This simple and low-cost change to staffing policy would provide readily available backup support and thus enable a jailer to immediately enter a cell in the event of a suicide attempt, avoiding the delays inherent in a lone jailer having to await the arrival of off-duty personnel before being able to save a known suicidal detainee.  In short, Monroe's suicide in Cell 3 was highly predictable and easily preventable, and the failure by Cogdill and Brixey to take any of these obvious precautions permits the reasonable inference that they were deliberately indifferent to Monroe's substantial risk of suicide.

Thus, viewing the evidence in the light most favorable to Plaintiffs and making all reasonable inferences in their favor—as we must in this appeal—the officers violated clearly established law.  It should be for a jury to decide the factual question of whether Defendants "responded reasonably" to the grave and urgent situation and thus were deliberately indifferent to the risk of suicide. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).[4]

---

[4] To be sure, the inquiry into whether an officer responded "reasonably" is not an objective test but instead requires that the officer actually was subjectively aware that her response was inadequate. *See Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) ("What

No. 19-10798

Departing from longstanding and binding precedent, the majority erroneously grants the officers' qualified immunity defense by embracing an excessively narrow definition of the clearly established rights at issue and the risk of harm Monroe faced. Because I would follow our court's deliberate-indifference caselaw and affirm the district court's denial of qualified immunity on several of Plaintiffs' claims, I respectfully dissent.

I.

Since the majority's articulation of the qualified-immunity analysis is inconsistent with this court's cases and unduly restricts plaintiffs' ability to recover for violations of constitutional rights, it is necessary to set forth the established framework for evaluating claims of deliberate indifference in the context of a known risk of prisoner suicide. "To overcome qualified immunity," a plaintiff "must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right [was] clearly established at the time of the challenged conduct.'" *Converse*, 961 F.3d at 775 (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)).

As to the first prong of the qualified-immunity analysis, "pretrial detainees," like Monroe, "have a Fourteenth Amendment right to be protected from a known risk of suicide." *Id.* This right is violated when a jail officer responds with deliberate indifference to a known risk of suicide. *Id.* And a jail officer is deliberately indifferent in violation of the Fourteenth Amendment when he "knows of and disregards" a detainee's risk of suicide. *Farmer*, 511 U.S. at 837 (analyzing a convicted prisoner's deliberate indifference claim under the Eighth Amendment); *see also Hare II*, 74 F.3d at 639 (observing that, "[s]ince the State *does* punish convicted prisoners, but

---

is clear is that, even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability.").

No. 19-10798

*cannot* punish pretrial detainees, a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" (quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983))).  But a jailer who knew of the risk of harm "may be free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844.

Under the second prong of the qualified-immunity analysis, a court must determine "'whether the [D]efendants' conduct was objectively unreasonable in light of clearly established law at the time of [Monroe's] suicide.'"  *Converse*, 961 F.3d at 775 (first set of alterations in original) (quoting *Jacobs*, 228 F.3d at 393).  "It has been clearly established in this Circuit since at least 1989 that 'pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide,' and it is well-settled law that jail officials violate this right if 'they have actual knowledge of the substantial risk of suicide and respond with deliberate indifference.'" *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021) (cleaned up) (quoting *Converse*, 961 F.3d at 775).  Thus, as the majority opinion recognizes, "[i]n the context of inmate suicide, 'to defeat qualified immunity, the plaintiffs must establish that the officers . . . were aware of a substantial and significant risk that [the detainee] might kill [him]self, but effectively disregarded it.'" Maj. Op. at 9 (second and third sets of alterations in original) (quoting *Jacobs*, 228 F.3d at 395).

Given that the focus of a deliberate-indifference claim is on the jailer's subjective knowledge and intent, it is apparent that, in the uniquely extreme and consequential circumstance where a jail official is aware of a prisoner's risk of suicide but "effectively disregards" that risk, the jailer has violated clearly established law.  *Jacobs*, 228 F.3d at 395.  Put another way, it is always clearly, objectively unreasonable for a jail official to intentionally disregard a known suicide risk.  Therefore, in this context—deliberate indifference by a

No. 19-10798

jailer who knows that a detainee in his custody and care is at risk of suicide—
establishing prong one of the qualified-immunity test necessarily satisfies the
demands of prong two.  A showing that a jailer violated the Fourteenth
Amendment by being deliberately indifferent to a known suicide risk is
necessarily also a showing that the official's conduct was "objectively
unreasonable in light of clearly established law."  *Converse*, 961 F.3d at 775.
Put simply, the two prongs of the qualified-immunity test merge in this
specific situation.

This conclusion makes sense because the constitutional violation at
issue in a deliberate indifference claim is not a negligent failure to learn of a
suicide risk that *should have* been apparent, nor is it responding to a known
suicide risk in a manner that the official *should have* known to be
unreasonable.  *See Farmer*, 511 U.S. at 835 (observing "that deliberate
indifference entails something more than mere negligence"); *see also Hare II*,
74 F.3d at 649 n.5 (explaining that, "where there is recognition of substantial
danger and a response thereto" by the officer, that officer must possess a
"state of mind more blameworthy than lack of due care" in order to be
deliberately indifferent).  Rather, deliberate indifference to a risk of suicide
requires that an official *actually*, subjectively perceive the risk of suicide risk
and respond unreasonably, meaning that the officer actually believes his
response to a known risk is likely insufficient but still does not care.  *See
Farmer*, 511 U.S. at 847 (explaining than an officer is deliberately indifferent
"only if he knows that inmates face a substantial risk of serious harm and
disregards that risk by failing to take reasonable measures to abate it"); *Hyatt
v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) ("What is clear is that, even if
an officer responds without the due care a reasonable person would use—
such that the officer is only negligent—there will be no liability.").  There is
no need for a prior case to put an officer on notice that a situation presents a
risk of inmate suicide or that a particular sort of response is unreasonable

No. 19-10798

because, by the very nature of a deliberate-indifference claim, the officer must actually know both of these things in order for a constitutional violation to occur. *Jacobs*, 228 F.3d at 395. In sum, if an officer faced with the greatest possible risk—the loss of a human life that an officer is charged with protecting—intentionally disregards that known risk by either failing to act or acting in a manner that is so clearly inadequate as to permit the inference that the officer knew or believed that his "response" was substantially likely to be ineffectual but did not care, the officer's conduct contravenes clearly established law.

The majority asserts, however, that the determination that a jailer effectively disregarded a prisoner's known risk of suicide is not sufficient to satisfy the strictures of the qualified-immunity analysis. Their conclusion rests on two errors in the qualified-immunity analysis. First, the majority takes an incredibly narrow approach to defining the clearly established right at issue, claiming that the right must be defined much more specifically than simply the right of a suicidal detainee to be free from a deliberately indifferent response by officers charged with his supervision. Second, having defined the clearly established right in an overly narrow manner, the majority requires in effect that Plaintiffs point to a case with virtually identical facts to prove that this excessively narrow description of the right has been clearly established. *See* Maj. Op. at 12-14. Both of these propositions are contrary to what our precedent in the detainee-suicide context demands.

In *Jacobs v. W. Feliciana Sheriff's Dep't*, for instance, we stated that "[t]he case law from our own and from our sister circuits offers little guidance for determining whether the defendants' particular actions toward Jacobs were unreasonable in light of their duty not to act with deliberate indifference toward a known risk of suicide." 228 F.3d at 393-94. Nevertheless, and unlike today's majority, we asked only whether the prison officers "conducted [themselves] in an objectively reasonable manner with

30

No. 19-10798

respect to [their] duty to not act with subjective deliberate indifference to the known risk that Jacobs might have attempted suicide." *Id.* at 397. Applying this standard, we had no trouble concluding that two of the officers were not entitled to qualified immunity because their allegedly deliberately indifferent conduct was objectively unreasonable, even if no particular inmate-suicide case was factually analogous. *Id.* at 397-98. Our court has continued to approvingly cite *Jacobs* and apply it in inmate-suicide cases, *see, e.g.*, *Converse*, 961 F.3d at 775, and, indeed, the majority itself purports to rely on *Jacobs*.[5] Thus, under the law of this circuit, an officer who responds with deliberate indifference to a known risk of suicide violates clearly established law even if the "particular actions" of the officer have not been addressed in a previous case. *Jacobs*, 228 F.3d at 394.[6]

_____

[5] The majority does not contend that *Jacobs* was abrogated by any intervening Supreme Court decision, and *Jacobs* therefore remains "good law" and binding on this and subsequent panels.

[6] The majority erroneously relies on *Mullenix v. Luna*, a Fourth Amendment excessive force case, where the Court stated that clearly established rights should not be defined at a "high level of generality." 577 U.S. 7, 16 (2015). Of course, for many § 1983 claims, the Court has insisted that clearly established rights be defined at a particularized level in order to ensure that "[t]he contours of the right" are "sufficiently clear [such]that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Put differently, defining the clearly established right at issue at a granular level makes sure that an officer has "fair warning" that her actions are unconstitutional before she may be held individually liable for damages. *Hope*, 536 U.S. at 741; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (explaining that in a qualified immunity case "the focus is on whether the officer had fair notice that her conduct was unlawful"). And of course, fair warning is the ultimate touchstone of qualified immunity. *Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018). Crucially, whenever an officer is found liable for deliberate indifference, that conclusion necessarily means that the officer had fair warning that his conduct violates the Constitution—regardless of his particular acts or omissions constituting deliberate indifference. Thus, the requirement that clearly established rights be defined with a high degree of specificity does not apply to a deliberate indifference claim.

No. 19-10798

───────────────────

To understand why an officer always has fair notice that conduct that is deliberately indifferent violates the Constitution requires an appreciation of the particular nature of a meritorious deliberate indifferent claim, which is fundamentally different in kind from an excessive force claim—or other § 1983 claims for that matter.  Deliberate indifference specifically requires that an officer have subjective awareness not only of the risk of harm but also that his response to that risk is inadequate—that is, the officer must consciously disregard the risk by responding to it in a way that the officer knows to be unreasonable. *See Farmer*, 511 U.S. at 847.  In short, the officer must possess a "state of mind more blameworthy than lack of due care" in order to be deliberately indifferent. *Hare II*, 74 F.3d at 649 n.5; *see also Lawson v. Dallas Cnty.*, 286 F.3d 257, 262-63 (5th Cir. 2002) ("The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it. . . . Deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone.").  By sharp contrast, excessive force claims apply an "objective not subjective" inquiry in determining whether an officer's use of force was excessive and therefore the officer's "state of mind is not a matter that a plaintiff is required to prove." *Kinglsey v. Hendrickson*, 576 U.S. 389, 395 (5th Cir. 2015).

With this distinction in mind, it cannot be doubted that it would be "sufficiently clear" to "a reasonable officer" that it violates the Constitution to be deliberately indifferent to a risk of harm to a detainee. *Anderson*, 438 U.S. at 640.  All reasonable officers would know that it is unlawful to respond to a risk of harm to a detainee in a manner that the officer consciously believes to be unreasonable.  Therefore, officers do not need clearly established rights to be defined so narrowly to the point that the illegality of their particular acts or omissions constituting deliberate indifference have been established in a prior case in order to have "fair warning" that it is unconstitutional to deliberately ignore a risk of harm to a detainee.

Unsurprisingly, then, the Supreme Court has never applied *Mullenix*'s admonition against defining clearly established rights at a "high level of generality" in reviewing a deliberate indifference claim.  And even following *Mullenix*, our sister circuits have recognized that, in the context of a deliberate indifference claim, clearly established rights may be defined generally. *See, e.g.*, *Lewis v. McLean*, 864 F.3d 556, 566 (7th Cir. 2017) ("[W]e ask whether the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  It has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." (cleaned up)); *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1097 (6th Cir. 2019) (holding that "it was clearly established in 2014 that ignoring known risks of harm to an inmate due to inadequate medical care, inhumane conditions of confinement, or abuse by another inmate could constitute deliberate indifference" (citing, *inter alia*, *Farmer*, 511 U.S. at 834)); *Cox v. Quinn*, 828 F.3d 227, 239 (4th Cir. 2016) ("It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm,

No. 19-10798

The majority does note (before promptly foreclosing) an additional path by which Plaintiffs might satisfy the clearly established prong, even without a directly on-point case. Under Supreme Court precedent, an officer violates clearly established law when his conduct so obviously transgresses the Constitution such that the unlawfulness would have been apparent to any reasonable officer. *E.g.*, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The majority even cites the Supreme Court's recent rebuke of this court in *Taylor v. Riojas*, 141 S. Ct. 52 (2020) for failing to apply properly this principle. In *Taylor*, a panel of this court had determined that officers who left an inmate in a squalid, excrement-filled jail cell for "only six days" were entitled to qualified immunity because this court "hadn't previously held that a time period so short violated the Constitution." *Taylor v. Stevens*, 946 F.3d 211, 222 (5th Cir. 2019), *vacated sub nom. Taylor v. Riojas*, 141 S. Ct. at 54. The Supreme Court summarily vacated, reaffirming the longstanding rule that a plaintiff need not provide a precisely analogous case to overcome qualified immunity when the circumstances are such that "no reasonable correctional

---

including harm inflicted by other prisoners." (citing *Farmer*, 511 U.S. at 833)). Respectfully, this court's cases that have relied on *Mullenix* to narrowly define the right at issue in a deliberate indifference case, *see e.g.*, *Cleveland v. Bell*, 938 F.3d 672, 677 (5th Cir. 2019), are misguided, failing to grapple with the distinguishing feature of a *deliberate* indifference claim, which requires that an officer have subjective awareness of the inadequacy of his acts or omissions in responding to a risk of harm.

In any event, our court held over twenty years ago in *Jacobs* that an officer who responds with deliberate indifference *to a known risk of a detainee's suicide* violates clearly established law, even though the officer's particular conduct constituting deliberate indifference had not been addressed in a previous case. *See* 228 F.3d at 394. Thus, even putting aside the logical conclusion that an officer who acts with deliberate indifference necessarily violates clearly established law, we are bound by *Jacob*'s clear holding. *Jacobs*'s conclusion makes eminent sense because the risk of harm in a case involving a claim of deliberate indifference to a known risk of suicide is uniquely high—indeed, there can be no greater risk. In this circumstance, it would be "sufficiently clear [to] every reasonable official" that it violates constitutional rights to disregard that risk of harm. *Mullenix*, 577 U.S. at 11.

No. 19-10798

officer could have concluded" that the conduct at issue was constitutional. *Taylor*, 141 S. Ct. at 53 (citing *Hope*, 536 U.S. at 741 (explaining that "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question'" (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). In short, the Court made clear that the shield of qualified immunity vanishes when there is no "doubt about the obviousness" of an officer's violation of an inmate's constitutional rights. *Id.* at 54 n.2.

Though the majority cites *Taylor*, it fails to absorb and apply the case's lesson. In the majority's view, because the conduct of Defendants here was not as extreme as that of the guards in *Taylor*, the Supreme Court's decision is inapplicable. Maj. Op. at 7, 12-13. But this essentially repeats the very same analytical error this court made in *Taylor* and which the Supreme Court found necessary to correct. Rather than asking only whether the facts here are closely analogous to *Taylor* and thus if there exists an on-point precedent—which is essentially the majority's analysis—*Taylor* teaches that the proper qualified-immunity inquiry must also ask whether the violation was so obvious that "any reasonable officer should have realized that" their conduct "offended the Constitution." *Taylor*, 141 S. Ct. at 54; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law.").[7] And because, as discussed above, deliberate

---

[7] To be sure, it should infrequently be the case that an officer's conduct so obviously violates constitutional rights such that any reasonable officer would have known of the unlawfulness of his conduct. But this is not to say, as the majority appears to believe, that a constitutional violation is only obvious when the facts of a particular case are as "deplorabl[e]" as those in *Taylor*, 141 S. Ct. at 53. The question, as noted above, is more straightforward: whether "any reasonable officer should have realized that" their conduct "offended the Constitution." *Id.* at 54.

No. 19-10798

indifference by an officer in the face of an inmate's known risk of suicide is always objectively unreasonable in light of clearly established law, such a violation will necessarily be "obvious" in that "any reasonable officer should have realized that" their conduct "offended the Constitution." *Taylor*, 141 S. Ct. at 54. Where the violation at issue is *intentionally* disregarding a known suicide risk, this standard is clearly met.

In sum, in the deeply alarming circumstance where a detainee is known by jail officials to be at risk of suicide, a response by those officials that deliberately "effectively disregards" that risk violates clearly established law in a manner that should be clear to all reasonable officers. *Jacobs*, 228 F.3d at 395. Such facts would thus defeat qualified immunity if proven. *Id.* For the reasons outlined below, a reasonable jury could infer that Laws was deliberately indifferent by failing promptly to contact emergency services once Monroe had begun actively choking himself and Cogdill and Brixey were likewise deliberately indifferent for housing Monroe by himself in a cell with a lengthy phone cord.

II.

In this appeal from Defendants' motion for summary judgment, we must view the evidence in the light most favorable to Plaintiffs and making all reasonable inferences in their favor. *See Jacobs*, 228 F.3d at 393. Under this standard, Jailer Laws's alleged response to Monroe's ongoing suicide was so inadequate as to permit a reasonable juror to infer that Laws was deliberately indifferent to Monroe's plight. Indeed, the majority agrees that Laws may have been deliberately indifferent, but it asserts that he is entitled to qualified immunity because he "did something," *i.e.*, contacting his supervisors. Maj. Op. at 13. But, as discussed above, the issue is not whether a prior case put Laws on notice that calling his supervisors was an inadequate response because the constitutional violation at issue is not based solely on

No. 19-10798

the objective unreasonableness of his response. Instead, the violation is Laws's alleged *deliberate* indifference. If Laws knew calling his off-duty supervisors was likely going to fail to save Monroe's life but did not care—that is, if he thought "this is not my problem and someone else can deal with it"—the constitutional violation was obvious to any reasonable officer, regardless of the specifics details of his inadequate response.

The majority's holding is inconsistent with common sense and our precedent. Even setting aside the specific and acutely urgent context of an ongoing suicide attempt, no one would suggest that an officer who responds to an inmate in need of medical care but does so in a manner that he knows or believes to be plainly inadequate is immunized from liability. *See, e.g.*, *Farmer*, 511 U.S. at 847 (holding that a prison official is deliberately indifferent "if he knows that inmates face a substantial risk of serious harm and disregards that risk *by failing to take reasonable measures to abate it*" (emphasis added)); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (denying qualified immunity where, although a prison guard rendered first aid, the minor-aged prisoner remained unconscious and vomiting due to heat stroke and the guard waited nearly two hours to call for emergency services); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999) (prisoner stated deliberate indifference claim when he alleged that he had complained to prison medical staff that his jaw had "fallen out of place" and that he was in excruciating pain and required immediate medical attention yet prison medical officials performed only a "cursory inspection" of his mouth and otherwise ignored his repeated requests for treatment for eight days after his jaw re-broke). Rather, "this court ha[s] previously held that taking some reasonable precautions does not mean the officer, on the whole, behaved reasonably." *Converse*, 961 F.3d at 779.

*Jacobs* well-illustrates this principle. In that detainee-suicide case, the jail's sheriff "did not completely ignore [the detainee's] suicidal condition,

No. 19-10798

and in fact instituted some preventative measures," such as prohibiting the detainee from having loose bedding during her initial period in detention and ordering more frequent checks on her.  228 F.3d at 395.  Nevertheless, we held these precautions were "not enough to mitigate [the sheriff's] errors," including ratifying the decision to place the detainee in a cell that had a "significant blind spot and tie-off points" that the detainee later used to hang herself.  *Id.*  Similarly, in *Converse*, we held that, although an officer removed a suicidal detainee's shoelaces before placing him in a cell, the officer was not entitled to qualified immunity when he failed both to regularly check on the detainee and to remove bedding that the detainee later used to hang himself.  961 F.3d at 779 (reviewing assertion of qualified immunity at motion-to-dismiss stage).  When an officer "disregard[s] . . . precautions he knew should be taken" or responds to a crisis in a manner that is so deficient as to permit the inference that the officer consciously disregarded the risk, then that officer acts with deliberate indifference.  *Jacobs*, 228 F.3d at 397; *see also Hare II*, 74 F.3d at 649 n.5.

Applying this standard, a reasonable juror could infer that Laws responded to Monroe's self-strangulation with deliberate indifference.  The risk of death posed by a suicidal inmate actively choking himself with a telephone cord is obvious and clearly urgent.  In fact, Laws knew that less than ten minutes of strangulation can result in serious brain damage.  He also knew that EMS was available 24/7 and would come.  Nonetheless, Laws's only affirmative response was to call Cogdill, Brixey, and Deputy Tucker for help.  Thereafter, despite Laws's alleged awareness that none of the superiors he called were in the jailhouse or even on duty, he "basically just waited for somebody to get there."  This violated the commonsense training Laws had received, which demanded that he promptly call emergency services.  *See Arenas v. Calhoun*, 922 F.3d 616, 624 (5th Cir. 2019) ("[A]

No. 19-10798

knowing failure to execute policies necessary to an inmate's safety may be evidence of an officer's deliberate indifference.").

And such a response would have required minimal effort while posing no risk to Laws. *Cf. Converse*, 961 F.3d at 778 ("Plaintiffs have plausibly alleged that, by failing to take simple and reasonable precautions, Officer Melton displayed deliberate indifference to the risk of harm to Silvis."). Instead, with a crisis unfolding right in front of him, Laws allegedly just waited for ten minutes for Brixey to get to the jail, even though he was "sure" from his education and training as a jailer that someone being strangled by a ligature could suffer serious brain damage in "less than ten minutes." Once Brixey arrived, she took it upon herself to call for emergency medical assistance. From Laws's glaring record of inaction, a reasonable juror could infer that, although he "did not completely" ignore Monroe's risk of suicide, he "effectively disregarded" that risk and therefore is not absolved of liability.[8]  *Jacobs*, 228 F.3d at 395-96.  Because a reasonable juror could

---

[8] The majority cites a district court opinion in *Shepard v. Hansford County*, 110 F. Supp. 3d 696, 711, 713 (N.D. Tex. 2015), for the proposition that our caselaw has yet to clearly establish (prior to this case, at least) that the failure to promptly call for emergency services in response to an inmate attempting suicide is a constitutional violation. Maj. Op. at 13. Reliance on *Shepard* is misplaced as that decision fundamentally misreads this court's precedents on deliberate indifference in the face of a suicidal inmate.  First, *Shepard* thought that our determination that officers were deliberately indifferent in *Jacobs* turned on the fact that the officers in that case failed to implement sufficient suicide prevention measures even though there had been a previous jailhouse suicide.  On that basis, *Shepard* sought to distinguish *Jacobs* from the detainee suicide at issue in that case, which was the first in that jail's history.  *See id.* at 713.  However, in *Converse*, we expressly rejected this very distinction as immaterial, explaining that the fact of a past suicide in *Jacobs* "speaks only to the *degree*, not the *occurrence*, of unreasonable behavior." 961 F.3d at 777 (emphasis in original).  Hence, we determined that officers responded with deliberate indifference to a suicidal detainee by failing to take reasonable preventative measures, despite the fact that no previous inmate had committed suicide in the cell in which the detainee killed himself. *See id.*  Second and more fundamentally, *Shepard* misconstrues *Jacobs*'s statement, mentioned above, that "we cannot say that the law is established with any clarity as to what

No. 19-10798

conclude that Laws was deliberately indifferent to the risk that Monroe
would die from his suicide attempt, Laws's actions, viewed in the light most
favorable to Plaintiffs, violated clearly established law. *See Converse*, 961 F.3d
at 775. Accordingly, I would affirm the district court's conclusion that this
claim against Laws should proceed to trial.

### III.

Turning to the claims against Sheriff Cogdill and Administrator
Brixey, I consider first whether each subjectively perceived the substantial
risk of harm Monroe faced before addressing each of their responses to that
risk.[9]  Cogdill concedes that he believed Monroe to pose a real risk of suicide.
So, too, was Brixey aware of this risk as she, along with Cogdill, knew that
Monroe had attempted suicide on his second day in the jail and made the
initial decision to place Monroe on suicide watch. Accordingly, I would
address the second part of the deliberate indifference inquiry, *i.e.*, whether

---

[measures jailers must take to prevent inmate suicide]." *Shepard*, 110 F. Supp. 3d at 713
(alterations in original) (quoting *Jacobs*, 228 F.3d at 394-95). Notwithstanding this
statement, *Jacobs* continued on to explain what is required, as a matter of law, to overcome
qualified immunity when an inmate presents an ongoing risk of suicide: to defeat qualified
immunity, the plaintiffs must establish that the officers in this case were aware of a
substantial and significant risk that Jacobs might kill herself, but effectively disregarded it."
228 F.3d at 395. *Jacobs* then applied that standard, ultimately finding a violation of clearly
established law by multiple officers. *See id.* at 397. In other words, *Jacobs* makes clear what
*Shepard* does not recognize: even if the law has not spelled out each precise measure a jailer
must take in response to a known suicide risk, a jailer's response that is deliberately
indifferent to such a risk violates clearly established law. *See id.* at 393-94.

[9] Of course, each officers' subjective deliberate indifference—and therefore
liability—must be analyzed separately. *See, e.g.*, *Jacobs*, 228 F.3d at 395. While adhering
to this requirement, the evidence pertaining to Cogdill's and Brixey's individual deliberate
indifference is mentioned together for the sake of concision. But again, the legal analysis is
individualized because each officer must personally act with deliberate indifference in order
for liability to attach.

No. 19-10798

the officers "effectively disregarded" Monroe's risk of suicide by housing him in a cell alone with a thirty-inch phone cord. *Jacobs*, 228 F.3d at 395.

The majority, however, determines that Cogdill and Brixey escape liability because they lacked knowledge of the specific risk of suicide by strangulation posed by placing Monroe in a cell with a lengthy phone cord. *See* Maj. Op. at 15-17.[10]   Under Supreme Court and circuit precedent, however, the risk of harm in the first step of the deliberate-indifference test should not be defined so narrowly.  Rather, as the Supreme Court made clear in *Farmer v. Brennan*, 511 U.S. 825, 843 (1994), all that must be established is that the jail official had actual knowledge that the inmate faced a risk of harm. *Id.* (holding that the deliberate-indifference standard requires that the official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

---

[10] Curiously, the majority suggests that *Plaintiffs* cannot prevail on their claim against Brixey because "*Defendant's* counsel conceded that Brixey 'was not involved in placing [Monroe] in the cell'" and because a § 1983 claim cannot be based on vicarious liability.  Maj. Op. at 9 n.5 (emphasis added).  First, it transgresses fundamental rules of fairness to assert that an argument put forward by a defendant that is intended to avoid liability—here, the contention by Brixey's counsel that she was not involved in the decision to place Monroe in the cell with the phone cord—(1) constitutes a "concession" by that party and (2) somehow binds a plaintiff who might point to facts leading to a different conclusion.  And to simply take the defendant's characterization of the facts as gospel violates the long-established rule that we are to view the facts in the light most favorable to the non-moving party.  But even assuming that Brixey was not involved in the initial decision to place Monroe in the cell in which he ultimately committed suicide, our court has held that a supervisor can be deliberately indifferent in response to a known risk of suicide when they "effectively ratified th[e] decision" to place a detainee in a particular cell "by keeping [the detainee] in the cell while he considered her to be a significant suicide risk." *Jacobs*, 228 F.3d at 395; *cf. Hunt v. Davis*, 749 F. App'x 522, 524 (9th Cir. 2018) (explaining that "a supervisor's acquiescence in a subordinate's constitutional violation may result in his individual liability" if the supervisor "'knowingly refuse[s] to terminate' acts by others which he knows or has reason to know inflict constitutional injury.'" (quoting *Starr v. Baca*, 656 F.3d 1202, 1205-06 (9th Cir. 2011)).

No. 19-10798

The Court did not impose an additional burden on plaintiffs to show that the official possessed knowledge of the specific manner or source of harm. To the contrary, it squarely rejected engrafting such a requirement, explaining that the official's knowledge as to "whether the risk comes from a single source or multiple sources" is irrelevant to the inquiry into the officer's awareness of the risk of harm. *Id.* (internal quotation marks omitted).

In a case involving a detainee with a known risk of suicide, the risk of harm *is* the risk of the detainee's suicide, not the risk of suicide by a particular means. *See Converse*, 961 F.3d at 779 ("Plaintiffs have alleged sufficient facts to demonstrate that Officer Kimball was subjectively aware of *the risk of suicide* Silvis faced." (emphasis added)); *Hyatt v. Thomas*, 843 F.3d 172, 179 (5th Cir. 2016) (explaining that plaintiffs were "not required to demonstrate that [the officer] was aware of the particular means that [the detainee] would ultimately use to hurt himself, only of the substantial risk that he might try to hurt himself"); *Sanchez*, 995 F.3d at 473 ("Thus, the question is whether Sanchez has presented evidence from which a reasonable jury could infer that Oliver knew Gauna was at risk of suicide and ignored the risk."); *cf. Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 881-82 (5th Cir. 2004) (State-employed social workers "contend that the plaintiffs cannot show that by placing [a foster child] with the [foster family] the social workers had actual knowledge of a specific danger of the particular injury of suffocation. . . . [T]his court has never required state officials to be warned of a specific danger. . . . [T]o require state officials to have knowledge of the exact risk of harm, i.e. suffocation, would be inapposite with the Supreme Court's decision in *Farmer*. . . . We need not address the form that such a risk might eventually manifest").[11]  Thus,

---

[11] Relying on *Farmer*, other circuits have applied similar reasoning. *See, e.g., Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (McConnell, J.) ("The official's knowledge

No. 19-10798

Cogdill's and Brixey's knowledge of the specific risk of strangulation by the phone cord should be considered only at the second stage of the deliberate indifference test—which asks whether Cogdill and Brixey "effectively disregarded" the risk of harm, *Jacobs*, 228 F.3d at 395—where this awareness may demonstrate that the officers knew or believed that their response to Monroe's suicidal ideation and attempts could be inadequate.

With regard to the second part of the deliberate-indifference test, I would hold that a reasonable juror could conclude that Cogdill's and Brixey's responses to Monroe's known risk of suicide were deliberately indifferent, *viz.*, that the officials "effectively disregarded" Monroe's risk of suicide. *Id.*. Cogdill decided to transfer Monroe, who just attempted to strangle and hang himself, to Cell 3, an isolation cell with a thirty-inch phone cord, and Brixey ratifed that decision, even though they both knew that other, safer options for housing Monroe were available.

"A supervisory official may be held liable" if he "implements unconstitutional policies that causally result in the constitutional injury." In this case, Cogdill and Brixey chose to have only one jailer on duty when the jail houses a suicidial detainee in its custody. However, the jail's policy requires a jailer to wait for backup support to arrive before entering a cell,

---

of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." (citing *Farmer*, 511 U.S. at 843)); *Haley v. Gross,* 86 F.3d 630, 643 n.33 (7th Cir. 1996) ("Likewise Sergeant Ellis and Superintendent Gross are no less liable for deliberate indifference because, while they knew that [prisoner] Wilborn presented a substantial risk of serious harm to [his cellmate] Haley, they may not have envisioned that Wilborn would light the cell on fire. While there must be some link between the risk of which the official was aware and the harm that actually occurred—as it would be unfair to hold officials liable for risks they could not have anticipated simply because they ignored other unrelated risks—prison officials need not be specifically aware of the precise risk that unfolds. It is sufficient that Ellis and Gross knew that Haley was in danger of some kind of attack from Wilborn and made no attempt to prevent it." (citing *Farmer*, 511 U.S. at 843)).

No. 19-10798

even when, as here, a detainee is actively attempting suicide inside his cell. Maintaining only one jailer on duty thus increases the response time before a jailer can physically intervene to prevent a detainee from committing suicide. The obvious consequence of a policy of keeping only a single jailer on duty even when a suicidal detainee is in the jail's custody is that a suicidal detainee may commit serious self-harm before a jailer can effectively intercede. And critically, Cogdill and Brixey knew that this staffing policy—which they were responsible for administering—was "just not safe" precisely because of the delays it creates in responding to a crisis situation. Had an additional jailer been on duty the morning that Monroe wrapped the phone cord around his neck, either Laws or that additional jailer could have immediately intervened and prevented the suicide. On this record, a reasonable jury could infer that Cogdill and Brixey's policy of keep only a single jailer on duty when the jail houses a suicidal detainee "causally result[ed]" in Monroe's death. *Porter*, 659 F.3d at 446.

Cogdill and Brixey's liability as supervisors can also be framed as their conscious choice not to implement policies even though they knew that the likely result of failing to implement these policies would eventually be a detainee's suicide; in other words, Cogdill and Brixey can be liable for opting not to put into effect policies that they knew would decrease substantially the risk of harm to suicidal detainees and instead to continue to adhere to a more dangerous policy that was apt to lead to an in-custody suicide. *See Porter*, 659 F.3d at 446 ("A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." (internal quotation marks omitted)). Cogdill and Brixey both knew that they had multiple options available for housing Monroe that would have been safer than keeping him in the jail's custody with only a single jailer on duty. For example, Cogdill was aware that jail policy mandated that Monroe "be transferred to a facility better equipped

43

No. 19-10798

to manage an inmate with mental disabilities" if a transfer was required in order to protect Monroe. And in the past, Cogdill had specifically ordered transfers of inmates to other jails. *See Jacobs*, 228 F.3d at 397 (holding that a jail official's "disregard for precautions he knew should be taken" can evidence subjective deliberate indifference). Besides this alternative to housing Monroe at the Coleman County Jail, Cogdill and Brixey could have taken the simple and obvious step of employing a second jailer to be on-duty at all times when a suicidal inmate, like Monroe, was in the jail's custody. This latter course of action would have averted the delays in responding to a suicide attempt when a single jailer is on duty. And even though Cogdill and Brixey averred that budgetary restrictions prevent hiring more than six total staff, this does not indicate that financial limitaitons would prevent maintaining (and paying for) one additional jailer on duty in the limited circumstance where a suicidal detainee is custody.

In sum, Cogdill and Brixey adhered to a policy of maintaining just one jailer on duty even when a suicidal detainee was in the jail's custody, despite knowing that this policy was unsafe, and instead of transferring suicidal detainees to better equipped facilities or keeping a second jailer on duty— policies that they knew were available to them. A jury could determine that the supervisors' were deliberately indifferent based on their "failure to adopt [] polic[ies]" when they knew—as any reasonable jailer would know—that the consequence of not implementing these policies was likely to be an in-custody suicide. *Porter*, 659 F.3d at 446.

There are further grounds upon which a jury could conclude that Cogdill and Brixey were deliberately indifferent. Both officials were aware of the risk and prevalence of suicide in local jails and had previously worked in a local jail where multiple inmates had committed suicide by strangulation. Moreover, Cogdill had been trained to house suicidal inmates in cells with other inmates and not in insolation. In other words, based on Cogdill's

No. 19-10798

training, it would have been safer to simply leave Monroe in Cell 2 after Monroe attempted suicide than to move him to Cell 3. Further, the fact that the jail contained only four cells supports an inference that both Cogdill and Brixey were aware that Cell 3 was outfitted with a lengthy phone cord. And the very length of the cord constitutes circumstantial evidence from which a factfinder could infer that Defendants were aware of the obvious risk it posed to an individual who had just attempted to hang himself. *See Farmer*, 511 U.S. at 842 (explaining that a prison official's "knowledge of a substantial risk" can be demonstrated based on "inference from circumstantial evidence, and [that] a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" (internal citation omitted)). Indeed, Cogdill spent time with Monroe in Cell 3 just the day before Monroe strangled himself with the phone cord, attempting to dissuade Monroe from committing self-harm. It strains credulity to accept that Cogdill would not have noticed the lengthy cord and considered it a potential ligature, and at the very least, it is rational to infer that Cogdill was aware of the risk posed by the cord.

Furthermore, the absence in the record of past suicides by strangulation with telephone cords specifically in the Coleman County Jail does not foreclose a finding that Cogdill and Brixey were aware of the risk posed by the lengthy phone cord. As mentioned above, in 2015 the head of the Texas Jail Commission circulated a memorandum notifying "All Sheriffs and Jail Administrators" in the state that multiple suicides had occurred in Texas jails in less than a years' time through the use of lengthy phone cords. Accordingly, the Commission advised that phone cords in jails "be no more than twelve (12) inches in length." Although Cogdill and Brixey testified that they had not received or read the memorandum, a reasonable factfinder could find their denials incredible. *See Deville v. Marcantel*, 567 F.3d 156, 165–166 (5th Cir. 2009) (summary judgment inappropriate "where the credibility of

No. 19-10798

key witnesses loom large" (cleaned up)).  Cogdill was Deputy Sheriff of the
Coleman County Jail at the time the memorandum was circulated, and one
could reasonably infer that Cogdill's predecessor as sheriff would have
informed him of the memo's contents when it was circulated.  And Cogdill
had been Sheriff for two years at the time of Monroe's suicide.  A juror could
infer that Cogdill—like any responsible senior jail official, particularly one
starting a role as the head of a jail—would have familiarized himself with
reports issued by the Texas Jail Commission, the state's regulator of county
jails,[12] and thus that he reviewed the Jail Commission's 2015 memorandum
warning officials about the risk to suicidal inmates posed by lengthy phone
cord.  Likewise, a juror could reasonably conclude that Brixey reviewed the
memorandum after she became Jail Administrator in 2017 given that it was
addressed to Jail Administrators and given the fact that Cogdill tasked her
with handling communications with the Jail Commission.

Even assuming that neither Cogdill nor Brixey received the memo or
heard reports of its contents—which would be contrary to our duty to make
reasonable inferences in favor of Plaintiffs as the non-movants—the
existence of the document suggests that the clear and obvious nature of the
risk posed by housing a suicidal prisoner in a cell with a phone cord in excess
of twelve inches was generally known within the Texas jail system.  *See*
*Farmer*, 511 U.S. at 842.  What is more, Cogdill and Brixey's extensive
experience in jails lends support to the inference that they would have been
generally aware of the risk posed by lengthy phone cords as potential ligatures

---

[12] "The Texas Commission on Jail Standards is the regulatory agency for all county
jails and privately operated municipal jails in the state." Texas Commission on Jail
Standards, Compact with Texas, https://www.tcjs.state.tx.us/compact-with-
texas/ (last visited June 23, 2021).  Among other oversight duties, the Jail Commission
establishes "reasonable minimum standards for the . . . operation of jails" and "monitor[s]
and enforce[s]" compliance with jail standards.  *Id.*

No. 19-10798

to suicidal detainees.  Thus, although Cogdill and Brixey did not admit that they were aware of the risk the phone cord presented, a factfinder could disbelieve their denials in light of the substantial circumstantial evidence pointing the other way.  *See Deville*, 567 F.3d at 165–166.[13]  And it is not our

---

[13] In determining that Cogdill and Brixey were not aware of the risk of the phone cord, the majority purports to rely on *Farmer*'s statement that risks that are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" can serve as circumstantial evidence that an official "has been exposed to information concerning the risk and thus 'must have known' about it."  Maj. Op. at 15 n.10 (quoting 511 U.S. at 842).  First, as explained above, *Farmer* itself and this court's caselaw make clear that the relevant risk of harm in this case is the risk of suicide, not the risk of suicide by a thirty-inch telephone cord.  *See Farmer*, 511 U.S. at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.  The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." (cleaned up)); *Hyatt*, 843 F.3d at 179 (explaining that plaintiffs were "not required to demonstrate that [the officer] was aware of the particular means that [the detainee] would ultimately use to hurt himself, only of the substantial risk that he might try to hurt himself"); *Hernandez*, 380 F.3d at 881-82 (5th Cir. 2004) (State-employed social workers "contend that the plaintiffs cannot show that by placing [a foster child] with the [foster family] the social workers had actual knowledge of a specific danger of the particular injury of suffocation. . . . [T]his court has never required state officials to be warned of a specific danger. . . . [T]o require state officials to have knowledge of the exact risk of harm, i.e. suffocation, would be inapposite with the Supreme Court's decision in *Farmer*. . . . We need not address the form that such a risk might eventually manifest").  And it is undisputed here that Cogdill and Brixey were aware that Monroe was suicidal, and thus subjectively appreciated that Monroe faced a risk of harm.

Although Cogdill and Brixey's awareness of the danger posed by the phone cord does not bear on whether they knew Monroe was at a risk of harm, their awareness is relevant to the second prong of the deliberate indifference test—whether they effectively disregarded that risk by failing to act or acting in a manner they believed to be unreasonable. In this case, Cogdill and Brixey's decision to house Monroe in Cell 3, despite their awareness that the lengthy phone cord in that cell could be used as a suicidal ligature, evidences the inadequacy of their individual responses to Monroe's risk of suicide.  And

No. 19-10798

province to weigh this competing evidence in reviewing a summary judgment order. *See Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1026 (5th Cir. 2011).

To summarize, Cogdill and Brixey chose to house Monroe, who they knew was a suicide risk, alone in a cell with a thirty-inch long phone cord despite (1) their training, which generally advised against housing suicidal prisoners by themselves; (2) their knowledge that there were other, safer facilities to house Monroe and that they had a duty to relocate him if their jail could not adequately protect Monroe; (3) the risk posed by the lengthy cord, which was both obvious and a specific risk that a jury could infer that the officials were made aware of by the Texas Jail Commission. Considering this evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, a juror could conclude that Cogdill and Brixey knew or believed that their response to Monroe's risk of suicide was deficient and therefore possessed a "state of mind more blameworthy than lack of due care." *Hare II*, 74 F.3d at 649 n.5. Put differently, one could conclude that the officers "effectively disregarded" the risk of harm to Monroe. *Jacobs*, 228 F.3d at 395. Plaintiffs have thus raised material questions as to whether

---

contrary to the majority's contention, the dangers to suicidal inmates from phone cords more than twelve-inches in length—like the cord in Cell 3—were "longstanding" and "well-documented" because two years before Monroe's suicide the Texas Jail Commission expressly warned senior jail officials like Cogdill and Brixey of the risk created by phone cords of over twelve inches in length. Moreover, *Farmer* expressly states that whether a risk was "longstanding, pervasive, or expressly noted" by past officials are merely examples of the types of circumstantial evidence that could support the inference that an official had subjective knowledge of a risk of harm; they are not the exclusive forms of such evidence. 511 U.S. at 842. Rather, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* There is no doubt that a lengthy phone cord contained inside a jail cell poses an obvious risk of harm to a suicidal inmate housed in that cell where the inmate had attempted to strangle himself to death just the previous day. Thus, a jury could reasonably find that Cogdill and Brixey were aware of the risk to Monroe created by the thirty-inch phone cord in Cell 3.

No. 19-10798

each officer independently was deliberately indifferent and, as explained above, have therefore also established a violation of clearly established law. *See id.*; *see also Converse*, 961 F.3d at 775.

\* \* \*

Qualified immunity is not the judicial equivalent of the Armor of Achilles, an impenetrable shield that governmental actors can wield to insulate themselves from liability no matter how flagrant their conduct. As the Supreme Court has recently reminded this court, qualified immunity vanishes where an official's action or inaction so obviously violates the Constitution that "any reasonable officer should have realized" the unlawfulness of the conduct. *Taylor*, 141 S. Ct. at 54. And "any reasonable officer" would know that it offends the Constitution to be deliberately indifferent to a detainee's known risk of suicide. Taking the facts and inferences in the light most favorable to Plaintiffs, a reasonable juror could conclude that the officers here responded with deliberate indifference to the risk that pretrial detainee Derrek Monroe would commit suicide, and therefore the officers are not entitled to qualified immunity. It should be left to a jury to weigh the competing evidence and resolve the factual disputes, most particularly Defendants' subjective states of mind. Instead, today's majority ends all claims against all officers by erroneously granting them qualified immunity. Because the majority misapprehends decades of clearly established law and denies Plaintiffs the jury trial to which they are entitled, I respectfully dissent.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

August 23, 2021

Ms. Karen S. Mitchell
Northern District of Texas, San Angelo
United States District Court
33 E. Twohig Street
Room 202
San Angelo, TX 76903

     No. 19-10798   Cope v. Cogdill
              USDC No. 6:18-CV-15

Dear Ms. Mitchell,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                     Sincerely,

                     LYLE W. CAYCE, Clerk

                     *Lisa E. Ferrara*

                     By:
                     Lisa E. Ferrara, Deputy Clerk
                     504-310-7675

cc:
     Mr. Jon Mark Hogg
     Mr. Thomas Dean Malone
     Mr. Bruce K. Thomas